## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| Reddy Vijay Annappareddy, | C/A No. 1:18-cv-03012-JFA |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| Maura Lating, *et al*., | |
| Defendants. | |

This matter is currently before the court on defendant Pamela Arnold's motion for summary judgment. (ECF No. 239). Within her motion, Arnold seeks summary judgment as to all remaining claims asserted against her in the Amended Complaint.[1] This motion has been extensively briefed, (ECF Nos. 255 & 270), and the court heard oral argument on February 27, 2023. Thus, this matter is ripe for review.[2]

---

[1] Those remaining claims include Counts 2, 4, 6, 8, 12, 15, 16, 17, 18, and 20. Counts 10 and 14 were previously dismissed at the motion to dismiss stage. (ECF No. 106, p. 45 & 59).

[2] This order is being entered contemporaneously with orders adjudicating Plaintiff's motion for summary judgment (ECF No. 244) and the Government's motion for summary judgment (ECF No. 240). Given the substantial overlap in factual and legal issues between each of these motions, those orders are hereby incorporated by reference.

I.      **FACTUAL[3] AND PROCEDURAL HISTORY**

A.  <u>**Investigation and Prosecution Generally**</u>

Around 2006, Plaintiff, a pharmacist, founded a pharmacy company known as Pharmacare which expanded into a chain of nine pharmacy locations in several states. In mid-2012, the State of Maryland's Medicaid Fraud Control Unit ("MFCU") began an investigation into Pharmacare after a former employee accused Plaintiff of billing for prescriptions that were refilled but never delivered to patients. Arnold was an MFCU agent assigned to work on this investigation.

The investigation began when the chief investigator of MFCU, Peggy Gayhardt, received a telephone call from Dennis Tokofsky, the former Chief Operating Officer for Pharmacare. Tokofsky alleged that Pharmacare was billing Medicaid for prescriptions and then not reversing the claims when the prescriptions were not picked up or delivered to patients. In June 2012, Tokofsky filed a *qui tam* action. MFCU investigator Laurie Gutberlet began investigating Tokofsky's claims by conducting background research of Pharmacare and identifying individuals to interview. She conducted the initial interview with Tokofsky.

By July 27, 2012, MFCU was coordinating efforts investigating Pharmacare with the U.S. Attorney's Office in Baltimore Maryland. During the late summer and fall 2012, Gutberlet continued her interviews of former and current Pharmacare employees. She also completed her preliminary background investigation on Pharmacare and key personnel and

---

[3] For purposes of this motion, all contested facts and inferences derived therefrom are construed in a light most favorable to the Plaintiff to the extent evidentiary support is provided.

performed an analysis of paid claims. Investigative efforts continued through the end of 2012, including additional interviews and planning for undercover and surveillance operations.

In late 2012 or early 2013, Assistant U.S. Attorney Sandra Wilkinson and FBI Agent Maura Lating joined the team investigating Pharmacare. Wilkinson led the prosecutorial team and Lating was designated to draft the affidavit in support of the search and seizure warrants. After Gutberlet resigned from MFCU and left the team, Lating became the leader of the non-attorney team members. Lating circulated drafts of the affidavit for review by the prosecutors as well as the non-attorney members of the team. The prosecutors provided comments about the substance of the affidavit.

On July 23, 2013, the "Lating Affidavit" was presented to a federal magistrate judge who issued search and seizure warrants for multiple Pharmacare facilities. Concurrently, the grand jury returned an indictment against Plaintiff. The search and seizures occurred on July 25, 2013. Pharmacare closed shortly thereafter.

Preparation for the criminal trial against the plaintiff Annappareddy, including additional investigative efforts, continued through 2013. In 2014, a superseding indictment was issued against Annappareddy. In 2014, the federal prosecutors decided not to continue working with MEDIC[4], and instead used Mary Hammond and Steven Capobianco—analysts with the U.S. Attorney's Office—as their expert witnesses regarding the analysis of the financial losses to Medicaid and Medicare.

---

[4] MEDIC was the Government's contractor used in analyzing Pharmacare's prescription billing records.

Trial went forward in November and December 2014. The jury convicted Annappareddy of criminal health care fraud and identity theft. After the verdict, Annappareddy's counsel filed a motion for a new trial asserting that the verdict was against the weight of the evidence. On March 11, 2015, while the new trial motion was pending, most of the team investigating Pharmacare met at the U.S. Attorney's Office. At that meeting, Wilkinson decided to destroy some documents that had not been used as evidence in the trial as part of an alleged cleanup. Wilkinson took responsibility for that decision.

On September 1, 2016, the Honorable George L. Russell III dismissed the conviction against Annappareddy. The Court based its ruling on the failure of the prosecutors to provide defense counsel with details of MEDIC's analysis (*Brady* violation); false testimony relating to a July 25, 2013 email; and the destruction of documents without having consent of defense counsel. The Court did not consider any issues related to the Lating Affidavit.

### B. Arnold's Role

Prior to the finalization of the Lating Affidavit, numerous instigative steps—including witness interviews and undercover operations—were performed by both the MFCU and the U.S. Attorney's office. Arnold was involved in several aspects of the investigation. Specifically, Arnold was present while Gutberlet interviewed former Pharmacare employees Candice Covahey and Nikkia Brown Dansbury, along with several Pharmacare patients. Gutberlet also conducted several interviews with Pharmacare employee Lisa Ridolfi. After Gutberlet resigned from MFCU, Arnold became Ridolfi's contact on the team. Arnold claims that she found Ridolfi to be credible given that the

information Ridolfi provided had been generally corroborated by other witnesses, photographic evidence, and paid claims data. However, Plaintiff heavily contests Ridolfi's trustworthiness. Arnold also participated in an undercover operation where she posed as a Pharmacare patient.

Arnold avers that throughout the Pharmacare investigation she played a supportive role. Initially, she took directions from Gutberlet. By summer 2012, the investigation was a joint effort between the federal and state governments. By the time Gutberlet resigned from MFCU, the federal employees were in charge of the matter. Arnold took directions from Wilkinson, Pascale, and Lating. She contends that she did not act without authorization from one of them.

Additionally, Arnold claims she had little to do with the financial analysis by MEDIC, known as MEDIC 1495. She neither retained MEDIC nor had direct contact with its personnel. She claims that she lacked the technical expertise to evaluate MEDIC's reports. Although she would provide team members with raw data from Maryland Medicaid, she herself performed no analysis or calculations.

Although Arnold participated in meetings where the Lating Affidavit was discussed, she did not draft any portion of the Lating Affidavit. She did, however, proofread the Lating Affidavit for typographic errors. Arnold also reviewed portions that related to her undercover activity and interviews conducted by MFCU investigators. On one occasion in July 2013, Arnold questioned the accuracy of one statement regarding Ridolfi. Her recollection of Ridolfi's statement differed from the one in the draft Lating Affidavit. Lating contacted Gutberlet and verified that the statement in the draft was accurate.

Arnold contends that all of the information she provided, whether verbal or memorialized in writing, was accurate to the best of her knowledge and belief and she was not aware of any errors or inaccuracies in the Lating Affidavit. Plaintiff contests this assertion by averring that Arnold was well aware of material inaccuracies within the Lating Affidavit, but that she affirmatively chose not to rectify them.

On March 11, 2015, Arnold was present at the U.S. Attorney's Office when Wilkinson decided to dispose of Pharmacare documents that were not used at the trial. When Arnold realized that Wilkinson was planning to destroy documents, she arranged for all documents belonging to MFCU to be returned to MFCU's offices. As a State of Maryland employee, Arnold did not know the federal procedure for shredding documents; she did not know that documents placed in shredding bins could be removed.

## II.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden

and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III. DISCUSSION

The claims remaining against Arnold focus on her role in the drafting of the Lating Affidavit and her role in the alleged destruction of evidence on March 11, 2015. Plaintiff contends that Arnold: (1) fabricated evidence or knew that evidence used in the Lating Affidavit was fabricated by others; (2) failed to include evidence that would discredit witnesses referenced in the Lating Affidavit; and (3) otherwise misled the Court so that it would issue search and seizure warrants. Specifically, Plaintiff contends that all references to material evidence provided by Ridolfi and all references to the financial analysis performed by MEDIC must be stricken from the Lating Affidavit. Finally, Plaintiff asserts that Arnold affirmatively acted to destroy evidence in March 2015, subsequent to the trial and while post-trial motions were pending.

### A. Destruction of Evidence

At oral argument, Plaintiff clarified that he is no longer pursuing any claims based upon the post-trial destruction of evidence given this court's prior holding that Plaintiff had shown no damages attributable to this destruction. Accordingly, Arnold's motion is moot

7

to the extent it seeks summary judgment as to any claims based up the destruction of evidence after trial.

## B. **The Lating Affidavit**

Arnold next avers, for a host of reasons, that the remaining claims against her should be dismissed because there is no dispute that the Lating Affidavit was properly supported by probable cause.[5] Plaintiff vehemently opposes such a contention.

In *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978), the Supreme Court established a two-prong test as to what a criminal defendant must demonstrate when challenging the truthfulness of assertions in an affidavit supporting a search warrant. The defendant must establish both prongs of the test by a preponderance of the evidence. *Id.* A detailed offer of proof must establish that the affidavit included a false statement that was made knowingly or with reckless disregard for the truth. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 2014). Further, the false information must be essential to the probable cause determination. *Id.*[6]

---

[5]Although Plaintiff has asserted a litany of claims against Arnold under various theories of liability, including § 1983, Intentional Infliction of Emotional Distress, Civil Conspiracy, and violation of the Maryland Constitution, Arnold has forgone an individualized attack as to each type of claim and instead focused wholesale on the defense of probable cause.

[6] Although Arnold also contends that the court should afford a magistrate judge's probable cause determination "great deference," that standard does not appear to be applicable here given the challenges to the information included and omitted from the Lating Affidavit. *United States v. McLamb*, 220 F. Supp. 3d 663, 668–69 (E.D. Va. 2016), *aff'd,* 880 F.3d 685 (4th Cir. 2018)("When reviewing a magistrate's determination of probable cause, district courts should award it 'great deference,' declining to defer only when the finding was not supported by substantial evidence in the record or when the basis of the determination was a knowingly or recklessly false affidavit.").

Accordingly, if the remaining, unchallenged content in the affidavit is sufficient to support a finding of probable cause, then the affidavit is valid. *Id.* Likewise, the *Franks* test applies when material facts are omitted intentionally or in reckless disregard of whether they are included, such that the affidavit is misleading. *Id.* (citing *United States v. Reivich*, 793 F. 2d 957, 961 (8th Cir. 1986)). "Thus, unless the tainted information is so important that 'probable cause did not exist without it,' the warrant will be deemed valid." *Simmons v. Poe,* 47 F.3d 1370, 1378 (4th Cir. 1995)(quoting *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984)).

Thus, Arnold contends that to prevail against her, Plaintiff must prove that:

(1) (a) the portions of the affidavit which were based on Arnold's contributions were materially false or that Arnold acted with deliberate indifference or reckless disregard for the truth; or (b) she withheld information that was necessary to include in the affidavit; and (c) that the remaining portions of the affidavit did not give rise to probable cause; or

(2) (a) Arnold knew or should have known that other portions of the affidavit were materially false; or (b) she knew others withheld information that was necessary to include in the affidavit; and (c) without those portions of the Affidavit, that the remaining portions of the Affidavit did not give rise to probable cause.

1. Ridolfi's Reliability

To that end, Plaintiff's claims against Arnold focus heavily on his contention that information provided by Ridolfi, a former Pharmacare pharmacy manager, was known to

be fabricated. Thus, Plaintiff contends that all information in the Lating Affidavit attributable to Ridolfi must be stricken. [7]

Arnold's argument in favor of summary judgment is essentially that certain evidence corroborates Ridolfi's attestations and, therefore, Ridolfi's information is properly included in the Lating Affidavit. Specifically, Arnold avers that other witnesses, including patients and Pharmacare employees, provided similar accounts of Plaintiff's bad acts. Arnold further avers that Ridolfi's accounts were supported by photographic and video evidence. Moreover, Arnold asserts that no other member of the investigation team ever questioned Ridolfi's credibility.

However, Plaintiff claims that Ridolfi fabricated evidence of which Arnold should have been aware. One example is that Arnold coordinated with Ridolfi to dispose of a bag of prescription labels in the trash which Lating later retrieved and used as evidence. Although Ridolfi indicated the trash would contain labels peeled from prescription bottles —indicating fraudulent billing—the trash also contained labels that were not torn or peeled off, but still on the original backing.[8] Another example includes Arnold being aware of an audiotaped conversation in which Ridolfi told a technician at Plumtree pharmacy to "hide" undelivered prescriptions. Plaintiff avers this inclusion of unpeeled labels and attempts to

---

[7] Plaintiff also avers that all information gleaned from former Pharmacare employee Tokofsky must likewise be removed from the Affidavit. The arguments related to Tokofsky are explored more fully in the order adjudicating the Government's motion for summary judgment. Again, that order is being filed contemporaneously with this order and is incorporated herein by reference.

[8] For the first time at oral argument, the Government argued that these unpeeled labels were not "pristine" as claimed by Plaintiff, but rather removed from prescription bags to which they had been stapled. This evidence creates a genuine issue of material fact that must be construed in Plaintiff's favor.

hide prescriptions are indicators that Ridolfi was artificially creating evidence of fraudulent billing. Although Arnold offers a competing interpretation as to what Ridolfi meant when she told a coworker to "hide" prescriptions, this only shows a genuine issue of material fact exists. Plaintiff avers Arnold was aware Ridolfi fabricated evidence, and thus, the entirety of information sourced from Ridolfi must be removed from the Lating Affidavit.

As further suggestion that Arnold should not have included information in the Lating Affidavit from Ridolfi, Plaintiff cites evidence, specifically emails, suggesting that Ridolfi lied to investigators. Plaintiff asserts that certain Pharmacare emails show Arnold knew before the Lating Affidavit was finalized that Ridolfi was lying when Ridolfi reported that Pharmacare's Med-4 calendars were concealed from her and that Med-4s were refilled without her knowledge.

Moreover, Plaintiff points to Ridolfi's alleged motive to fabricate evidence including her desire to become a *qui tam* whistleblower. Plaintiff also notes Ridolfi had been reprimanded by Annappareddy in the past. Arnold was aware of these facts before the Lating Affidavit was finalized and Plaintiff avers this bias should have been revealed in the Affidavit.

Plaintiff also highlights discrepancies from Ridolfi's interviews with other sources of information. Specifically, on November 20, 2012, after interviewing an HIV patient with Mosley and Dykes, Arnold wrote that the facts were "the opposite of what [they] expected" based on the information and documents Ridolfi provided in September 2012.

In summation, both parties submit varying degrees of evidence supporting their position on Ridolfi's credibility. Thus, the record indicates there is a genuine issue of

material fact as to whether Ridolfi's claims were properly included within the Lating Affidavit.

    2. <u>14-day Reversal Window</u>

Plaintiff also takes issue with the fact that several Pharmacare employees reported that Pharmacare was legally required to reverse claims within 14 days for prescriptions not yet received by customers. In reality, there was no such 14-day requirement when the Lating Affidavit was prepared. Plaintiff alleges Arnold was deliberately indifferent for failing to determine the actual legal requirement for prescription reversals prior to the Affidavit. Evidence shows that Arnold sought to determine if there was a law requiring 14-day reversals, but not until several months after the Lating Affidavit was presented. Thus, Plaintiff avers that all references to failures to reverse prescriptions within 14 days as evidence of fraudulent activity must be excised from the Lating Affidavit.

Arnold counters that the 14-day reversal period was an "industry standard" and, therefore, failure to follow such a standard was reasonably included in the Lating Affidavit. Whether the 14-day reversal window is actually an industry standard supportive of fraudulent activity is contested. Thus, there is a genuine issue of material fact that must be construed in Plaintiff's favor. Consequently, the court must assume Arnold was aware that the 14-day reversal period was not a legal requirement and, therefore, summary judgment is inappropriate.

3. <u>Loss and Shortage Calculations</u>

Separately, Plaintiff avers that Arnold was aware of falsities in MEDIC 1495,[9] yet affirmatively chose not to correct them when reviewing the draft Lating Affidavit. Arnold counters that her responsibilities on the investigative team did not include analyzing financial data or working with MEDIC. Before and after the date of the Lating Affidavit, Arnold had no direct contact with anyone from MEDIC. While she may have provided raw data from Maryland Medicaid to be used in MEDIC's analysis, she argues that she did not have the technical expertise to analyze financial data provided in the Lating Affidavit. Arnold avers that she did not review any paragraph in the Lating Affidavit which referred to financial analysis for accuracy. She further contends that she was unaware of any errors or inaccuracies in the final Lating Affidavit.

In response to this assertion, Plaintiff points to an email Arnold sent in May 2013, immediately after reviewing loss and shortage data. The initial email, sent by MFCU AAG Jeremy Dykes, contained a summary of the data in MEDIC 1495 and stated that the attached Excel spreadsheet "shows the total drugs purchased versus the total drugs sold." (ECF No. 254–24). This spreadsheet shows that, when transfers are counted, Pharmacare had surpluses for most of the drugs that MEDIC 1495 analyzed. At the end of the attachment, it appears that the loss to the payers was approximately 1.3 million dollars. These figures differ greatly from those included in the Lating Affidavit. Ten minutes after

---

[9] MEDIC 1495's alleged inaccuracies are discussed in greater detail in the order addressing Plaintiff's motion for partial summary judgment. Again, that discussion is incorporated herein by reference.

receiving this email, Arnold forwarded it to other investigative members and wrote, "This is not what we hoped for." (*Id.*). Plaintiff avers that this solitary sentence indicates Arnold knew that counting transfers eliminated numerous purported "losses" and "shortages" and that excluding transfers created false losses and shortages. For this reason, Plaintiff avers Arnold was aware that the loss and shortage calculations in the Lating Affidavit were incorrect, yet she chose to remain silent.

Conversely, Arnold contends that the reasonable interpretation of her email statement that "this is not what we hoped for" is that the shortage total was less than anticipated. What Arnold meant by this statement is ultimately an issue of fact to be determined by the jury. At this point however, all evidence and inferences derived therefrom must be viewed in a light most favorable to the Plaintiff. Because this statement could be interpreted to mean that Arnold was acknowledging errors within the report, summary judgment is inappropriate at this time.

### 4. Probable Cause

Arnold avers that even if the financial analysis and the statements of Tokovsky and Ridofi were removed, the Lating Affidavit would still support a finding of probable cause. In support, she points out that there is evidence from other former Pharmacare employees and patients, a competing pharmacist, and photographic evidence of health care fraud.

However, Plaintiff ultimately argues that once the Lating Affidavit is "corrected" to account for Arnold's, Lating's and Mosley's[10] reckless or intentional false statements, probable cause did not exist to search any Pharmacare location.

As is the case with the Government's argument on this point, the court is constrained to deny Arnold's motion. For Plaintiff to succeed on his probable cause argument, the court is required to conclude all inculpatory information related to the 14-day reversal window, MEDIC 1495, and flowing exclusively from Tokofsky or Ridolfi was materially incorrect. The court must then go further and conclude that Arnold, along with federal agents, knew of or recklessly disregarded such falsities and, therefore, improperly included inculpatory information and omitted exculpatory information. Given the vast amount of evidence obtained from various sources prior to his indictment, Plaintiff's burden on this point is no easy feat. A feat which may prove unachievable at trial. However, at this stage, when construing all issues of fact in Plaintiff's favor, it appears that large swaths of vital inculpatory information could be excluded from the Lating Affidavit. Given the importance of the 14-day reversal window, MEDIC's loss and shortage calculations, and accounts from Tokofsky and Ridolfi, probable cause is doubtful if each is fully removed. Moreover, the addition of Plaintiff's alleged exculpatory information renders a probable cause determination even more doubtful. Thus, at least at this point, a genuine issue of material fact exists as to whether probable cause exists if the Lating Affidavit is "corrected" as Plaintiff suggests. Therefore, summary judgment is not inappropriate at this time.

---

[10] Affidavit statements originating from Lating and Mosley are challenged in the Government's motion for summary judgment.

### C. **Prosecutorial Immunity**

By incorporating the Government's motion for summary judgment (ECF No. 240) by reference, Arnold has also asserted the defense of absolute prosecutorial immunity.[11] For the reasons discussed in the order adjudicating the Government's motion for summary judgment, Arnold is entitled to absolute prosecutorial immunity for those actions taken after the original indictment against Annappareddy issued. Thus, to the extent the remainder of Plaintiff's claims are based on Arnold's post-indictment efforts, Arnold is awarded summary judgment as to those claims.[12] This would include any allegations of evidence fabrication performed after the original indictment. However, prosecutorial immunity does not shield Arnold from liability for any of her investigative actions performed prior to the indictment and Pharmacare searches. This would include her role in gathering and approving evidence used to support the Lating Affidavit.

## IV.   CONCLUSION

For the reasons stated above, Arnold is not entitled to summary judgment for claims based on the Lating Affidavit given the various genuine issues of fact. This would include those claims alleging that she fabricated evidence used to obtain the original indictment and depriving Annappareddy of his liberty before trial. However, Arnold is entitled to

---

[11] Plaintiff likewise incorporated his opposition to the Government's motion within his response. (ECF No. 254). Moreover, Arnold also asserted this immunity specifically in her reply brief. (ECF No. 270).

[12] Plaintiff's Claim 12 avers Arnold should be held liable for suppressing materials and fabricating evidence related to the superseding indictment and continuation of the criminal trial in violations of the Fourteenth Amendment. Thus, Arnold is entitled to summary judgment for the entirety of Claim 12.

summary judgment for claims relating to post-indictment actions, including that she fabricated evidence leading to the superseding indictment and depriving Plaintiff of his liberty after trial. Thus, Arnold's motion (ECF No. 239) is granted in part and denied in part.

IT IS SO ORDERED.

March 16, 2023                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                         United States District Judge