# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| Reddy Vijay Annappareddy, | C/A No. 1:18-cv-03012-JFA |
| Plaintiff, | |
| vs. | |
| | **MEMORANDUM OPINION AND ORDER** |
| Maura Lating, *et al.*, | |
| Defendants. | |

This matter is currently before the court on Plaintiff's motion for partial summary judgment. (ECF No. 244). Within his motion, Plaintiff seeks a pretrial determination that the "loss" and "shortage" numbers within the Lating Affidavit are false. This issue is relevant in determining whether defendants had probable cause to search Plaintiff's pharmacies and charge him with health care fraud. This motion has been extensively briefed, (ECF Nos. 250, 251, & 265), and the court heard oral argument on February 27, 2023. Thus, this matter is ripe for review.[1]

## I.    FACTUAL[2]  AND PROCEDURAL HISTORY

Around 2006, Plaintiff, a pharmacist, founded a pharmacy company known as Pharmacare which expanded into a chain of nine pharmacy locations in several states. In

---

[1] This order is being entered contemporaneously with orders adjudicating the Government's motion for summary judgment (ECF No. 240) and Defendant Pam Arnold's motion for summary judgment (ECF No. 239). Given the substantial overlap in factual and legal issues between each of these motions, those orders are hereby incorporated by reference.

[2] For purposes of this motion, all contested facts and inferences derived therefrom are construed in a light most favorable to the defendants to the extent evidentiary support is provided.

mid-2012, the State of Maryland's Medicaid Fraud Control Unit ("MFCU") began an investigation into Pharmacare after a former employee accused Plaintiff of billing for prescriptions that were refilled but never delivered to patients. At some point, federal law enforcement officials joined the investigation.

On July 23, 2013, FBI Special Agent Maura J. Lating obtained warrants to search several Pharmacare locations by submitting an application supported by an affidavit from her that purported to establish probable cause to search each of those locations (the "Lating Affidavit"). The veracity of certain information within the Lating Affidavit is central to a bulk of Plaintiff's claims.

The Lating Affidavit alleges that Plaintiff, through Pharmacare, engaged in a scheme to defraud that targeted low-income patients who were Medicaid recipients and were often prescribed more expensive medications — referred to internally as "Med 4's." (Lating Aff. ¶ 11)("Pharmacare internally refers to these more expensive (e.g. high dollar cancer and HIV related prescription medications) as 'Med 4's.'"). The Lating Affidavit further alleges that Pharmacare "collectively" and nine of its stores had "losses" and "shortages" for many such medications, meaning that Pharmacare submitted claims for — and was paid for — more units of these medications than it acquired. (*Id*. at ¶¶ 14-17; ¶ 50(b)). These statements are based on an invoice review by MEDIC – the Government's Medicare drug integrity contractor for the Southeast region. The specific invoice review used to determine the "loss" and "shortage" calculations in the Lating Affidavit is referred

to as "MEDIC 1495." After obtaining the search warrant and during trial, several other calculations and invoice reviews were created.[3]

Although Plaintiff does not identify the specific "loss" or "shortage" numbers he challenges, it appears that he asserts falsity as to the "loss" of $2,672,067 to the Government alleged in Paragraph 15 of the Affidavit. (Lating Aff. ¶ 15) ( " . . . with a total potential fraud loss as of October 31, 2012 of approximately $2,672,067 for the nine locations examined.").

As for the "shortage" numbers, it appears that Plaintiff is challenging every specific calculation of drug shortages mentioned in the Lating Affidavit. Specifically, the Lating Affidavit states:

> 15.    Each of the nine Pharmacare locations examined reflected a shortage of some form of drugs reviewed that is, the number of dosage units purportedly dispensed from a particular location and billed to Prescription Insurance Programs exceeded the number of dosage units ordered by Pharmacare locations from its wholesale suppliers and delivered to that location. For instance, for all of the Pharmacare locations reviewed, Pharmacare was collectively short 27,818 units of the drug Kaletra, TAB 200-50MG; 9,600 units short of the drug Abilify SOL 1MG/ML; 12,939 units short of the drug Lidoderm DIS 5%; and 12,033 units short of the drug Norvir, CAP100MG. For these four medications alone, the potential fraud loss as a result of the fraudulent billings to Prescription Insurance Programs is approximately $401,000. In total, 59 of the 76 prescription medications reviewed have thus far shown a shortage at one or more Pharmacare locations, with a total potential fraud loss as of October 31, 2012 of approximately $2,672,067 for the nine locations examined. For purposes of

---

[3] The parties spend much time discussing the accuracy and methodology underlying these later reports and calculations, especially those utilized at Plaintiff's criminal trial. However, MEDIC 1495 was the only invoice review in existence prior to the Lating Affidavit and, therefore, any other calculations or invoice reviews created after the Lating Affidavit are irrelevant for purposes of this motion. The analysis used in Plaintiff's criminal trial included several additional data sources that caused additional double counting errors not present in MEDIC 1495.

this affidavit, the Target Locations #2 and #3 reflected shortages not limited to but to include the following:

 a. **Target Location #2:** For the time period March 8, 2011 through October 31, 2012, Target Location #2 (Plumtree) was short <u>18,960 pills for the drug Kaletra</u> resulting in an estimated overpayment by the Prescription Insurance Programs of approximately $116,000 for that medication alone. Target Location #2 did not have adequate purchases to support payments for <u>56 of the 69 drugs</u> reviewed that were sold out of that location.

 b. **Target Location #3**: For the time period January 3, 2007 through October 31, 2012, Target Location #3 was <u>short 8,468 pills for the drug Kaletra</u> resulting in an estimated overpayment by Prescription Insurance Programs of approximately $52,000 for that medication alone. Target Location #3 did not have adequate purchases to support payments for <u>19 of the 71 drugs</u> reviewed. Thus far, the overall approximate dollar loss to the Prescription Insurance Programs for prescription medications for which Target Locations # 2 and #3 did not have sufficient inventory thus far is $1,637,526.6

 c. **Target Location #6**: For the time period March 12, 2012 through October 31, 2012, Target Location 46, Pharmacare at Park Heights did not have adequate purchases to support payments for <u>7 of 21 prescription</u> medications reviewed. The overall approximate dollar loss to the Prescription Insurance Programs for the 7 drugs for which Target Location #6 did not have sufficient inventory is approximately $30,982.53.

**16.    Pharmacare at Mt. Claire.** For the time period October 10, 2011 through October 31, 2012, Pharmacare at Mt. Claire did not have adequate purchases to support <u>30 of the 37 prescription</u> medications reviewed. The overall approximate dollar loss to the Prescription Insurance Program for the 30 drugs for which Pharmacare at Mt. Claire did not have sufficient inventory is $535,260.17.

(Lating Aff. ¶¶ 15–16)(emphasis added via underlined text, bold in original).

Each of the calculations in MEDIC 1495 compares the number of units (i.e., pills, capsules, tablets, etc.) of certain medications for which a Pharmacare store submitted reimbursement claims with the numbers of units of those medications that the store acquired. This comparison is commonly referred to as an "in-and-out analysis." Stated

differently, MEDIC 1495 shortage calculations were created by obtaining the number of pills Pharmacare purchased from its suppliers and subtracting the number of pills Pharmacare billed for.  Billing for more pills than the amount purchased resulted in a "shortage" number which indicated fraudulent billing practices. MEDIC 1495 performed this in-and-out analysis for 76 different prescription drugs. However, only four drugs were specifically identified in the Lating Affidavit.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."

*Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.    DISCUSSION

The crux of Plaintiff's argument is that several issues become evident when examining the methodology of how MEDIC 1495 calculated the number of units Pharmacare billed for. On the purchasing side, MEDIC 1495 used purchasing data from all of the suppliers and distributors from whom Pharmacare purchased prescription drugs. On the dispensing side, MEDIC 1495 used claims from five governmental insurers. MEDIC 1495 then added in insurance claims for medication billed to the Maryland AIDS Drug Assistance Program ("MADAP"). The review did not include claims data from every insurer, public or private, who paid for prescription drugs dispensed by Pharmacare.

Plaintiff avers that the inclusion of MADAP claims resulted in a double counting of some of the AIDS/HIV drugs initially included in the original claims data. Thus, inclusion of MADAP claims artificially inflated the shortage calculations for certain HIV medications. The parties do not appear to dispute the fact that inclusion of MADAP data caused some level of inaccuracy in certain HIV medications. However, the parties do dispute just how great that discrepancy is and whether such a discrepancy is materially false. Moreover, if MEDIC 1495 had included private insurance claims, then the shortage number would become larger. Additionally, Plaintiff avers that MEDIC 1495 reviewed each of the Pharmacare pharmacies separately by looking at each store independently. Accordingly, Plaintiff contends that MEDIC 1495 fails to account for store transfers and that it incorrectly found shortages at stores that would be offset by surpluses at other stores. However, it appears that no one can determine just how flawed the numbers in the Lating

Affidavit are because the underlying data originally used to complete MEDIC 1495 is no longer available.

This allegedly flawed methodology is expounded on by Plaintiff's expert, Jed Smith, who is a CPA that heads his firm's pharmacy sector. Smith opines that "the shortage calculations contained in the Lating Affidavit have significant data and methodological flaws that make those calculations unreliable for purposes of evaluating the existence of any shortages or quantifying the impact of any purported shortages." (ECF No. 244-3 at 1 ¶ 1; *id*. at 5 ¶ 15). The two errors Smith identifies in MEDIC 1495 are: (1) double-counting errors involving claims submitted to MADAP; and (2) the fact that each of the Pharmacare locations were reviewed separately which fails to account for store transfers. None of the defendants have identified a rebuttal expert on this issue.[4]

To demonstrate the falsity of the shortage and loss numbers in the Lating Affidavit, Smith reviewed MEDIC 1495's results for the top seven HIV medications "to determine the impact on any shortages if MADAP were excluded . . . and if Pharmacare were analyzed on a whole rather than as individual stores to account for transfers." (*Id*. at 7 ¶ 18). When correcting for these errors, Smith avers there were no shortages for any of these seven HIV medications. (*Id*.). Moreover, Smith testified that if MADAP claims were removed in their entirety, and the pill counts were aggregated across all stores, then there would have been a surplus of these seven HIV drugs.

---

[4] The Government asserts that Smith's opinions are simple addition and subtraction and therefore no rebuttal expert is necessary.

The problem with Smith's methodology, the Government argues, is that Smith assumes that all MADAP claims were duplicative and therefore he incorrectly removed the entirety of that data set in coming to his conclusions. However, there is no indication that all of MADAP claims were duplicative. Thus, removal of all MADAP data is an overcorrection that works in Plaintiff's favor. This dispute alone creates a genuine issue of material fact as to whether Smith's corrective methodology reflects accurately revised shortage calculations. A jury may well believe Smith's decision to remove all MADAP data was the correct way to calculate the shortage numbers, or they may believe it resulted in an overcorrection. Thus, summary judgment is inappropriate.

The Government further avers that Smith hand-selected seven HIV drugs that, when re-calculated without MADAP duplication and aggregated across all stores, reveals a surplus instead of a previously determined shortage. The Government takes issue with these "cherry-picked" medications as they are not representative of the remaining medications. Specifically, because MEDIC 1495 contained overlap with the Maryland *AIDS* Drug Assistance Program (again "MADAP"), Smith was able to maximize the appearance of an error by only selecting HIV drugs. The Government asserts that because Abilify and Lidoderm, two medications specifically referenced in the Lating Affidavit, are not HIV drugs, there is no overlap with MADAP. In other words, the shortage figures for Abilify and Lidoderm in the Lating Affidavit are correct.

Furthermore, the Government avers that if each of the medications in MEDIC 1495 were analyzed under Smith's proposed methodology, shortages would still be found in 11 drugs, including 10 drugs classified as Med-4s. Specifically, the Government contends that

three of the medications referenced by name in the Affidavit — Abilify, Norvir and Liboderm — still have shortages even when applying Smith's new methodology.

For the first time in his reply brief, Plaintiff asserts that the Norvir drug calculations are false for reasons other than double counting and failure to aggregate. Specifically, the Lating Affidavit states that Pharmacare "collectively" was "12,033 units short" of the capsule form of Norvir 100 mg. (Lating Aff. ¶ 15). The Government asserts that a shortage of 1,263 pills exists for that form of Norvir after applying Smith's methodology. Plaintiff counters that, even if accurate, this purported shortage could not cure the Affidavit's false statement about Norvir capsules (also called caplets) because the Government disregards the fact that "Norvir tablets and Norvir caplets were interchangeable from a treatment or therapeutic perspective, meaning tablets can be substituted for caplets and vice versa." (ECF No. 255-4, Annappareddy Decl. at 4 ¶ 12). Plaintiff suggests that the tablet form is not "a different type of Norvir" from the capsule form of the same drug, as the Government posits. Plaintiff's suggestion, however, would have the court construe the facts in a light most favorable to Plaintiff. Here, the Lating Affidavit references Norvir CAP 100MG — i.e., the 100mg caplet form of this medication. There is no indication that the Affidavit contemplated Norvir tablets or the alleged interchangeability of tablets and caplets. Therefore, the Government contends the Lating Affidavit is based on an in-and-out analysis as to only Norvir caplets and the presence or absence of tablets does not render the shortage of caplets false. Thus, a genuine issue of material fact as to this specific medication still exists.

9

The parties' arguments as to the drug Abilify similarly presents a genuine issue of material fact which precludes summary judgment. Specifically, the Lating Affidavit states that, when aggregated, the Pharmacare locations were "9,600 units short of the drug Abilify SOL 1MG/ML." Plaintiff asserts that this statement disregards the fact that Pharmacare collectively had surpluses for all six of the tablet forms of Abilify: specifically, surpluses of 17,523 pills, 13,383 pills, 9,889 pills, 5,705 pills, 6,008 pills, and 13,784 pills for the 10 mg, 15 mg, 20 mg, 2 mg, 30 mg, and 5 mg sizes, respectively. Plaintiff avers that Abilify tablets could generally be substituted for Abilify SOL 1 mg/ml from a therapeutic perspective and large surpluses of Abilify tablets were more than sufficient to fill the prescriptions for Abilify SOL 1mg/ml. However, such a conclusion would have this court construe the facts in a light most favorable to Plaintiff. When construed in a light most favorable to the Government, the Lating Affidavit was concerned only with Abilify 1mg and treated different tablet forms as separate medications. Therefore, there is a genuine issue of fact as to whether the Affidavit, which referenced only Abilify 1mg, was correct in its accounting of that specific tablet.

Plaintiff separately avers that Abilify and Liboderm are not "Med-4's" and therefore cannot be used to support allegations of a scheme to defraud which entails billing for Med-4s. Again, Plaintiff would have this court construe the contested facts in his favor by assuming that the label Med-4 was applied only to high value HIV medications. In reality, the Lating Affidavit appears to label any of the "more expensive" medications as Med-4s. The affidavit states that "Pharmacare internally refers to these more expensive (e.g. high dollar cancer and HIV related prescription medications) as 'Med 4's.'" (Lating Aff. ¶ 11).

The use of "e.g." indicates that HIV medications are but one example of "high dollar" medications used in an alleged fraud scheme along with cancer and other medications. Moreover, whether the Med-4 label is appropriately applied to any given medication is essentially irrelevant for purposes of this motion because the focus is on the shortage calculation assigned to each specific medication regardless of cost or category. Here, the Lating Affidavit mentions Abilify and Lidoderm by name. Thus, whether they are classified as Med-4's is irrelevant. Accordingly, Plaintiff's argument misses the mark.

Additionally, there is a genuine issue as to whether the shortage calculations in the Lating Affidavit were flawed for failure to aggregate unit counts across each of the stores. Plaintiff's expert, Smith, opines that MEDIC 1495's analysis is flawed for failure to combine data from each Pharmacare location which would allow one store's surplus to offset another location's shortage. However, the Government avers that, like Smith, the figures in the Affidavit aggregated the pill counts for the same prescription drugs across all nine pharmacies. The Lating Affidavit itself states that "for all of the Pharmacare locations reviewed, Pharmacare was collectively short . . ." (Lating Aff. ¶ 15). Moreover, grand jury testimony indicates that Agent Mosley offered the same aggregate totals to the grand jury when seeking the indictment against Plaintiff. (ECF No. 250-3). Thus, both parties have presented conflicting evidence on this point making summary judgment inappropriate at this time.

The Government also asks the court to deny Plaintiff's motion for partial summary judgment because it does not seek to fully resolve any claim in the Amended Complaint. This argument can be easily disposed of by looking at the plain text of the applicable rule.

11

The Federal Rules specifically state that a party may move for summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Moreover, the Rule states a court "may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). Thus, Plaintiff need not seek summary judgment as to an entire claim to be granted the relief sought.

Next, the Government avers that Plaintiff's motion should be denied because there is no evidence that the investigating agents were aware of any alleged falsity at the time that Lating swore out her Affidavit. Plaintiff responds by clarifying that the instant motion seeks only a determination of falsity as to the loss and shortage calculations. Plaintiff is not seeking judgment on any issue of culpability such as whether any agent acted intentionally or reckless with regard to those numbers. Thus, this argument likewise misses the mark.

## IV.   CONCLUSION

In summation, Plaintiff has presented evidence which could allow a factfinder to conclude that some of the pill shortage calculations, especially HIV medications, and resulting dollar loss figures in the Lating Affidavit are incorrect to varying degrees. However, because the degree of any potential inaccuracy cannot be shown, a genuine issue of material fact exists as to whether the loss and shortage calculations are materially false. Thus, Plaintiff's motion for partial summary judgment (ECF No. 244) must be denied.

[Signature page to follow]

IT IS SO ORDERED.

March 16, 2023                              Joseph F. Anderson, Jr.
Columbia, South Carolina                   United States District Judge