## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
### BALTIMORE DIVISION

| | |
|---|---|
| Reddy Vijay Annappareddy, | C/A No. 1:18-cv-03012-JFA |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| Maura Lating, *et al.*, | |
| Defendants. | |

This matter is currently before the court on defendant the United States' (the "Government") motion to dismiss and/or for summary judgment. (ECF No. 240). Within its motion, the Government seeks summary judgment as to each claim asserted against it. Specifically, the Amended Complaint contains five claims against the Government pursuant to the Federal Torts Claims Act ("FTCA"). Four of the claims are for malicious prosecution and the fifth is for intentional infliction of emotional distress ("IIED"). The Government's motion has been extensively briefed, (ECF Nos. 254, 262, & 271), and the court heard lengthy oral argument on February 27, 2023. Thus, this matter is ripe for review.[1]

---

[1] This order is being entered contemporaneously with orders adjudicating Plaintiff's motion for summary judgment (ECF No. 244) and Defendant Pam Arnold's motion for summary judgment (ECF No. 239). Given the substantial overlap in factual and legal issues between each of these motions, those orders are hereby incorporated by reference.

I.     **FACTUAL[2] AND PROCEDURAL HISTORY**

A.  <u>**Investigation and Prosecution Generally**</u>

Around 2006, Plaintiff, a pharmacist, founded a pharmacy company known as Pharmacare which expanded into a chain of nine pharmacy locations in several states. In mid-2012, the State of Maryland's Medicaid Fraud Control Unit ("MFCU") began an investigation into Pharmacare after a former employee accused Plaintiff of billing for prescriptions that were refilled, but never picked up or delivered to patients.

The investigation began when the chief investigator of MFCU, Peggy Gayhardt, received a telephone call from Dennis Tokofsky, the former Chief Operating Officer for Pharmacare. Tokofsky alleged that Pharmacare was billing Medicaid for prescriptions and then not reversing the claims when the prescriptions were not picked up or delivered to patients. In June 2012, Tokofsky filed a *qui tam* action in the United Stated District Court for the District of Maryland. MFCU investigator Laurie Gutberlet began investigating Tokofsky's claims by conducting background research of Pharmacare and identifying individuals to interview. She conducted the initial interview with Tokofsky.

By July 27, 2012, MFCU was coordinating efforts investigating Pharmacare with the U.S. Attorney's Office in Maryland. During the late summer and fall of 2012, Gutberlet continued her interviews of former and current Pharmacare employees. She also completed her preliminary background investigation on Pharmacare and key personnel and performed

---

[2] For purposes of this motion, all contested facts and inferences derived therefrom are construed in a light most favorable to the Plaintiff to the extent evidentiary support is provided.

an analysis of paid claims. Investigative efforts continued through the end of 2012 which included additional interviews and planning for undercover and surveillance operations.

The Government asserts the investigation revealed that the Plaintiff, Annappareddy, directed a shadow pharmacy as to certain expensive prescription drugs, referred to internally as "Med-4s." Med-4s were expensive prescriptions used to treat cancer, psychiatric conditions, and HIV, among other things. The employees who were responsible for billing and reversing the billing for most medications were not responsible for the Med-4s. Instead, the Med-4s were handled by a close set of co-conspirators. One of those co-conspirators described the fraud scheme in an email to Plaintiff, stating "in some situation patient dont want to pick up medication as they have meds with them. so if they dont pick up we have to reverse the claim but as to increase our volume in respect to grow our business we were not reversing the high dollar amount volume rxs in some case we did reverse the lower dollar amount rxs."

According to the Government, if one of Pharmacare's employees reversed a Med-4 billing because the prescription was never dispensed, then one of Annappareddy's co-conspirators would re-bill the prescription. Finally, to cover for the fact that the patient never received their medication, Annappareddy's co-conspirators would forge the patient's signature on a delivery log. Annappareddy also maintained an "L" list, which was a list of friends, family, and other patients who Annappareddy knew he could bill for every month without delivering the prescription. Four of these co-conspirators pleaded guilty: Jigar Patel ("Jigar"), Vipin Patel ("Vipin"), Venkata Srinivas Mannava ("Mannava"), and Ram Guruvareddy ("Ram"). Plaintiff denies any such illicit activity ever occurred.

3

In late 2012 or early 2013, Assistant U.S. Attorney Sandra Wilkinson and FBI Agent Maura Lating joined the Pharmacare investigation team. Wilkinson led the prosecutorial team and Lating was designated to draft the affidavit in support of the search and seizure warrants (the "Lating Affidavit"). After Gutberlet resigned from MFCU and left the team, Lating became the leader of the non-attorney team members. Lating prepared the Affidavit based on numerous witness interviews, including accounts from Pharmacare employees and patients. Additionally, Lating provided prescription "shortage" and "loss" calculations gleaned from an "in-and-out analysis"[3] known as "MEDIC 1495." MEDIC was the Government's contractor used in analyzing Pharmacare's prescriptions records. Lating circulated drafts of the Affidavit for review by the prosecutors as well as the non-attorney members of the team. The prosecutors provided comments about the substance of the Affidavit.

On July 23, 2013, the Lating Affidavit was presented to a federal magistrate judge in Baltimore who issued search and seizure warrants for multiple Pharmacare facilities. Concurrently, the grand jury returned an indictment against Annappareddy. The search and seizures occurred on July 25, 2013. Pharmacare closed shortly thereafter.

Preparation for the criminal trial against Annappareddy, including additional investigative efforts, continued through 2013. In 2014, a superseding indictment was issued. In 2014, the prosecutors decided not to continue working with MEDIC. Instead, Mary Hammond and Steven Capobianco—analysts with the U.S. Attorney's Office—were

---

[3] This type of analysis compares the number of units (i.e., pills, capsules, tables, etc.) of certain medications submitted for reimbursement claims with the number of units acquired.

used as the prosecutor's expert witnesses regarding the analysis of the financial losses to Medicaid and Medicare.

Trial went forward in November and December 2014. The jury convicted Annappareddy of criminal health care fraud and identity theft. After the verdict, Annappareddy's counsel filed a motion for a new trial asserting that the verdict was against the weight of the evidence. On March 11, 2015, while the new trial motion was pending, most of the Pharmacare investigative team met at the U.S. Attorney's Office. At that meeting, Wilkinson decided to destroy several boxes of documents that had not been used as evidence in the trial.[4] Wilkinson took responsibility for that decision.

On September 1, 2016, the Honorable George L. Russell III dismissed the conviction against Annappareddy. The Court based its ruling on the failure of the prosecutors to provide defense counsel with details of MEDIC's analysis (*Brady* violation); false testimony relating to a July 25, 2013 email; and the destruction of documents without having consent of defense counsel. The Court did not consider any issues related to the Lating Affidavit.

### B.  Participation of Lating, Mosley, Ryan, Wilkinson, and Pascale

The Plaintiff's Amended Complaint contains the following FTCA claims against the Government:

---

[4] At oral argument on February 27, 2023, Plaintiff clarified that he was no longer pursuing any claims based upon the post-trial destruction of evidence given this court's prior holding that Plaintiff had shown no damages attributable to this destruction. Accordingly, the Government's motion is moot to the extent it seeks summary judgment as to any claims based up the destruction of evidence after trial.

- Claim 21–Malicious Prosecution by Instituting the Search Warrants that Destroyed Pharmacare (Based on the Wrongful Acts and Omissions of Defendants Lating and Mosley);

- Claim 22–Malicious Prosecution by Instituting the Original Criminal Proceedings and Criminal Processes (Based on the Wrongful Acts and Omissions of Defendants Lating and Mosley);

- Claim 23–Malicious Prosecution by Instituting the Superseding Indictment and Continuing the Criminal Proceedings and Criminal Processes (Based on the Wrongful Acts and Omissions of Defendants Lating, Mosley, and Ryan);

- Claim 24–Malicious Prosecution by Instituting and Continuing All of The Criminal Proceedings and Criminal Processes (Based on the Wrongful Acts and Omissions of Defendants Lating, Mosley, and Ryan); and

- Claim 25–Intentional Infliction of Emotional Distress (Based on the Wrongful Acts and Omissions of Defendants Lating, Mosley, Ryan, Wilkinson, and Pascale).

(ECF No. 46, p. 100-106).

Therefore, in reviewing the Government's motion for summary judgment, it is important to focus on the specific actions undertaken by Federal agents Lating, Mosley, Ryan, Wilkinson, and Pascale,[5] in the pre-indictment phase of Annappareddy's criminal prosecution as well as their continued roles through trial. Although Plaintiff's malicious prosecution claims cover "all of the criminal proceedings and criminal processes," the crux

---

[5] Lating, Mosley, Ryan, Wilkinson, and Pascale were each previously named defendants in this action. However, all claims against them in their individual capacities (the "*Bivens* Claims") were dismissed at the motion to dismiss stage. (ECF No. 106). That decision was affirmed by the Fourth Circuit Court of Appeals after the parties took an interlocutory appeal. However, each of their actions remain relevant to Plaintiff's FTCA claims. Under the FTCA, 28 U.S.C. §§ 1346(b), 2401(b), and 2671- 2680, the United States is liable for personal injury caused by the negligent or wrongful act or omission of a federal employee under circumstances where the United States, if a private person, would be liable to the claimant according to the law of the place where the act or omission occurred.

of Plaintiff's claims is that probable cause did not exist to arrest Annappareddy or search his pharmacies once exculpatory information is accounted for and erroneous inculpatory information is excised from the Lating Affidavit.[6]

## C. Pre-Indictment

In January 2013, the Criminal Division of the U.S. Attorney's office and its federal investigators joined the case. Specifically, Assistant U.S. Attorney Sandra Wilkinson, Defense Criminal Investigative Service Special Agent James Ryan, and FBI Special Agent Maura Lating joined the investigation. Assistant Attorney General Pascale, who had been investigating the case for the State of Maryland, was eventually appointed as a Special Assistant U.S. Attorney ("SAUSA"). Department of Health and Human Services Special Agent Robert Mosley and Civil AUSA Michael DiPietro had already been a part of the investigation as a result of Tokofsky's *qui tam* complaint. Relevant aspects of these individuals' specific involvement in the criminal action against Annappareddy are outlined below.

Mosley was present during a second interview with Tokofsky in which he reported bins of old undelivered prescriptions and Pharmacare's failure to reverse 90% of these undelivered prescriptions. More importantly, Mosley served as the "point person" who provided prescription information to MEDIC to facilitate the in-and-out analysis used in

---

[6] Although disputed by the Government, Plaintiff avers that the pharmacy searches effectively shut down his entire business causing tens of millions in damages. In its Reply, the Government argues for the first time that the criminal indictment and subsequent prosecution would have inevitably shut down Plaintiff's business regardless of the searches. The court declines to consider this causation theory as it was not initially raised in its opening brief. Moreover, this causation argument is heavily disputed and is more appropriately left to the fact finder.

the Lating Affidavit and at the criminal trial. Mosley's level of involvement with this data and MEDIC is disputed. The Government avers Mosley simply transferred raw data and provided no analytical services. Plaintiff, however, contends Mosley performed, or claimed to have performed, a review of the data to account for potential duplication.

On June 12, 2013, Lating and Mosley interviewed Pharmacare employee Dan Walker for a second time. Walker stated that Annappareddy "is a 'one man operation', he know and directs everything. Walker stated that Reddy is smart and has his hand in everything. He makes all the decisions. There is a management team but on paper only." (ECF No. 242; USAO-000671).

On July 18, 2013, Mosley, Pam Arnold,[7] and Lating interviewed Lisa Ridolfi, a Pharmacare pharmacist, to gain clarification about her recollection of certain of Annappareddy's statements. According to an interview report prepared by Gutberlet in 2012, Ridolfi told Gutberlet that Annappareddy instructed her to never reverse prescriptions. Ridolfi told investigators during the July 2013 meeting that she had no personal recollection of making such a statement to Gutberlet, but that she recalled being "constantly" told by Jigar and Vipin that nothing is ever to be reversed "per Annappareddy."

Although numerous other interviews and investigative actions were taken prior to the indictment, most of those actions were conducted by state agents without the aid or presence of federal agents. Federal agents, particularly Lating, learned of these other

---

[7] Arnold was an MFCU investigator whose conduct is fully addressed in the contemporaneously filed order adjudicating her related motion for summary judgment.

investigative efforts through various reports, memoranda, and in-person "round table" discussions with other state and federal agents.

### D. <u>The Indictment, Search Warrants, and Additional Investigation</u>

A grand jury indicted Annappareddy, Vipin, and Jigar on July 23, 2013, for health care fraud and aggravated identity theft. Also on July 23, 2013, a federal magistrate judge authorized search warrants for six locations associated with Pharmacare. Plaintiff avers these searches effectively shuttered his business.

Thereafter, several investigators conducted numerous other witness interviews and additional searches including a search of 1803 Eloise Lane, Edgewood, Maryland 21040. Pharmacare employee Sindura "Sindhu" Motaparthi told investigators that Pharmacare learned of the investigation before the search warrants were executed on July 25, 2013, and Pharmacare began to "clean up" their pharmacies. Motaparthi stated that undelivered medications that had been stored in the basement of the Park Heights Pharmacare location were moved to 1803 Eloise Lane, which was, at the time, an unoccupied residence owned by Annappareddy's wife. The Government obtained a search warrant the next day for 1803 Eloise Lane. There, agents, specifically Ryan, found and photographed trash bags containing prescription drugs, along with binders of delivery logs that were blank except for patients' names and signatures.

Plaintiff avers Ryan's efforts during this search resulted in the fabrication of evidence when he repackaged medication to catalog the materials seized during the search. Specifically, Plaintiff alleges Ryan erroneously repackaged loose pills into open bubble packs. Plaintiff avers the repackaging efforts fabricated evidence that created the false

impression that the medication-related trash—all of which had been previously delivered to clinics—contained undelivered prescriptions for which the claims were not reversed. Plaintiff contends that Ryan included this fabricated evidence on a "Pharmacare Master Spreadsheet," which became a 106-page spreadsheet named the "Ryan Analysis," and was pervaded by false evidence that the Government used at trial to help convict Annappareddy.

On September 16, 2013, Pascale, AUSA DiPietro, Lating, and Arnold interviewed Venkata Srinavas Mannava, a Pharmacare pharmacist. Mannava also said that Annappareddy directed him to visit other Pharmacare locations in Maryland at the end of the month "to handle the billing of refills not yet billed." Mannava told the pharmacy technicians at these locations that Annappareddy sent him there "because their store numbers were down." Mannava stated that "Med-4s" were HIV and cancer-related drugs. Mannava also acknowledged the existence of an "L" list, which was a list of customers whose medications were billed, but not filled or delivered, each month. As stated above, the "L" list consisted mostly of Annappareddy's close acquaintances or family.

On October 25, 2013, Wilkinson, Pascale, Lating, Ryan, and Mosley interviewed Jigar Patel. The five-page interview report contains the following passage:

> When asked about an E-mail he received in 2012, specifically about Pharmacare billing for meds that were never received by patients, he would not answer. He folded his arms and became very tensed. Patel never gave a direct answer, but wanted to discuss how [Plaintiff] was responsible. He refused to answer and kept looking at the attorneys and agents for awhile without saying anything. Patel and [his attorney] took a break and walked out of the room. Upon Patel return, he still would not answer the question stating that if he answers, "he would be in trouble." The proffer concluded.

(ECF No. 242; USAO-0001367).

On December 13, 2013, Wilkinson, Pascale, Ryan, Mosley, Lating, and an Assistant U.S. Attorney for the District of Columbia again interviewed Mannava. Mannava told the investigators that "Annappareddy said not to do too many reversals. . . . [Mannava] confirmed that some of the medication bottles undelivered were not reversed but were used to fill someone else's prescription." Mannava further reported that Annappareddy told employees not to do too many reversals because it would cost Annappareddy money and "kill my business." (ECF No. 242; FBI009548).

On January 22, 2014, Pascale, Wilkinson, Mosley, Lating, and Ryan interviewed Wayne Dyke, the former CEO of Pharmacare. Dyke explained that undelivered prescriptions were not reversed with regularity and that this was the general practice of Pharmacare. He recalled that "Lisa Ridolfi was a good pharmacist" and shared his suspicion "that Annappareddy will make Ridolfi a scapegoat. Annappareddy will claim that all of these problems that led to the investigation were Ridolfi's failure to reverse." (ECF No. 242; FBI009589).

Plaintiff denies that any illegal conduct or scheme to defraud Medicare and Medicaid by billing for undelivered prescriptions ever took place.

Plaintiff also asserts that in the winter of 2014, Agents Mosley and Lating manipulated MEDIC to fabricate false "loss" calculations in a second invoice review known as "MEDIC 1884." Plaintiff contends that Mosley and Lating again chose to leave the prosecutors under the misimpression that MEDIC's invoice reviews counted all of Pharmacare's inventory, which caused MEDIC 1884 to find false "losses" and "shortages."

The Government also references an investigation conducted by the Department of Justice's Office of Professional Responsibility (OPR).[8] The OPR essentially found no evidence of intentional wrongdoing on behalf of the Government agents. The OPR investigation, which was performed years after the relevant actions discussed above, is not binding on this court and, therefore, is of very little, if any, evidentiary value for purposes of this summary judgement motion.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine

---

[8] Specifically, OPR investigated claims that: "(1) Wilkinson allegedly destroyed documents after the trial in violation of the government's due process obligations and the Department's and statutory document retention policies; (2) Lating allegedly testified falsely during the trial in violation of her obligation of candor; (3) Wilkinson and Pascale allegedly changed auditors and purposefully used unreliable data to increase the amount of loss purportedly resulting from the charged fraud scheme; and (4) Wilkinson and Pascale failed to disclose various documents to [Annappareddy] before trial in violation of the government's discovery obligations." OPR found that Government actors' errors "were generally the result of mistakes, misunderstandings, and poor communication by and among the members of the prosecution team." Feb. 28, 2019 OPR Report.

dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.   ANALYSIS

In its effort to have each of the FTCA claims dismissed, the Government advances a multitude of arguments and defenses. Each is addressed in turn below.

### A. <u>Absolute Prosecutorial Immunity and Qualified Immunity</u>

Claims 21 through 24 of the Amended Complaint allege malicious prosecution on account of the actions of agents Lating, Mosley, and Ryan.[9] Claims 21 and 22 implicate the institution of the search warrants and the original criminal indictment. Claims 23 and 24 cover those actions occurring after the original indictment, including the superseding indictment, and the remainder of Annappareddy's criminal prosecution.

Plaintiff initially claimed that all of the state and federal investigators, along with the prosecutors, were engaged in a conspiracy to violate his Constitutional rights by

---

[9] Malicious prosecution claims are generally prohibited under the FTCA. *See* 28 U.S.C. § 2680(h). The FTCA provides a limited exception to this prohibition as it relates to "investigative or law enforcement officers . . . who [are] empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Plaintiff, therefore, has limited his malicious prosecution allegations to only those claims arising out of the conduct of agents Lating, Mosley, and Ryan.

fabricating or suborning evidence. On the interlocutory appeal that followed this Court's order on the various motions to dismiss (ECF No. 106), the Fourth Circuit affirmed the dismissal of all claims but those relating to Pam Arnold. In its decision, the Fourth Circuit held that absolute prosecutorial immunity bars Plaintiff's claims of evidence fabrication and evidence destruction against SAUSA Pascale. *Annappareddy v. Pascale*, 996 F.3d 120, 139–40 (4th Cir. 2021).

Consequently, the Government now argues that this absolute prosecutorial immunity similarly extends to AUSA Wilkinson and to the actions of the federal investigators in this case (Lating, Mosley, and Ryan), because they were working with and under the direction of the prosecutors at all times. Further, both the FTCA and the law in the Fourth Circuit allow the United States to rely upon the immunities of its employees. *See* 28 U.S.C. § 2674 (related to "judicial immunity"); *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) (referring to prosecutorial immunity as "quasi-judicial immunity"); *Norton v. United States*, 581 F.2d 390, 397 (4th Cir. 1978) (stating, "the remedy against the government under the FTCA is inextricably tied to the remedy against the individual officer under *Bivens*.").

Maryland law follows the federal doctrine for prosecutorial immunity, whereby "absolute immunity safeguards the process, not the person, and so extends only to actions intimately associated with the judicial phase of the criminal process." *Annappareddy*, 996 F.3d at 138 (internal quotations and citations omitted). All other actions are entitled only to qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). To determine whether an act is so "intimately" associated with the judicial phase that it warrants absolute

14

immunity, courts take a "functional approach," looking to the "nature of the function performed" and not the "identity of the actor who performed it." *Nero v. Mosby*, 890 F.3d 106, 118 (4th Cir. 2018) (quoting *Buckley*, 509 U.S. at 269). Even a prosecutor, that is, will be entitled only to qualified immunity, rather than absolute immunity, if he or she is performing a function that is not tied to the judicial phase of the process. *Buckley*, 509 U.S. at 273.

Under this functional approach, advocative functions—which include evaluating evidence and preparing for its presentation at trial—are protected by absolute immunity. *Buckley*, 509 U.S. at 273. In contrast, investigative or administrative functions enjoy qualified immunity. *Id.* While not dispositive, the timing of the conduct in question "is a key factor." *Annappareddy* at 139; *Buckley*, 509 U.S. at 274 (holding that prosecutors are not advocates before they have probable cause to arrest); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (finding that prosecutors receive only qualified immunity for conduct before any formal legal proceeding has begun and before probable cause to arrest exists).

Specifically, "actions taken by a prosecutor *after* a probable-cause determination has been made generally are classified as 'advocative' functions —relating to an advocate's preparation for the initiation of a prosecution or for judicial proceedings—that trigger absolute immunity." *Annappareddy*, 996 F.3d at 139 (cleaned up) (emphasis in original). "By contrast, actions taken *before* probable cause is established are more likely to be 'investigative' in nature—the same kind of function normally performed by detectives or police officers—and therefore protected only by qualified immunity." *Id.*

15

Law enforcement officers are entitled to the same immunity available to prosecutors for execution of identical functions. *See, e.g.*, *Jean v. Collins*, 155 F.3d 701, 706 (4th Cir. 1998), *cert. granted, vacated on other grounds*, 526 U.S. 1142 (1999); *Clair v. St. Mary's Cnty. State's Attorney Off.*, No. CIV.A PWG-14-713, 2015 WL 302860 (D. Md. Jan. 22, 2015) (explaining that an investigator or administrator's act of evaluating and excluding evidence may be protected by absolute immunity).

Applying the functional approach established by the Supreme Court, the Fourth Circuit determined that SAUSA Pascale was entitled to absolute prosecutorial immunity against the charges of fabricating inculpatory evidence and destroying exculpatory evidence. *Annappareddy*, 996 F.3d 138.  Because the prosecution team had already identified Annappareddy as a suspect and established probable cause when the alleged evidence fabrication took place, Pascale's conduct fell within her advocative role, warranting absolute prosecutorial immunity.  *Id*. at 140–41. Similarly, Pascale's actions regarding evidence destruction were taken in an advocative capacity because the alleged withholding of exculpatory information occurred while a criminal proceeding was still pending. *Id*. at 141–42. The Fourth Circuit emphasized that the complaint "alleges wrongdoing on Pascale's part that occurred only after [Annappareddy] had been identified as a suspect, after probable cause had been established, and after he had been twice indicted." *Id.* at 140. The Court concluded that the fact that all of Pascale's alleged wrongdoing occurred post-indictment was dispositive. *See id.* ("In the context of this case, that is enough to establish that Pascale's alleged evidence fabrication was undertaken in

her 'advocative' capacity, in preparation for the trial that was about to begin, and not as an 'investigator' seeking probable cause for an arrest or indictment.").

Following that logic, the Government asserts that absolute immunity should similarly apply to Agents Ryan and Mosley, who also participated in the evaluation of loss calculations by outside experts for trial, and the post-trial destruction of certain evidence at the direction of the prosecutors. *Hill,* 45 F.3d at 660; *see also Gill v. Ripley*, 724 A.2d 88, 97–98 (Md. 1999) (extending absolute immunity to clerical employees in prosecutor's office for claims arising from their role in the judicial process); *Buari v. City of New York,* 530 F. Supp. 3d 356, 382–83 (S.D.N.Y. 2021) (granting absolute prosecutorial immunity to investigators for protecting guilty verdict from post-conviction collateral attack under assistant district attorney's direction).

This court agrees with the Government's invocation of prosecutorial immunity to the extent it relates to allegations of wrongdoing occurring <u>after</u> the indictment was returned and the search warrants were authorized. In this very case, the Fourth Circuit emphasized the distinction between actions occurring pre-indictment and post-indictment. Although "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," the Fourth Circuit did not hesitate in drawing a definitive line between the pre- and post-indictment actions alleged here. *Annappareddy* at 140. In doing so, the Court held that actions taken after the indictment were not done in an effort to identify a suspect or establish probable cause. Instead, these actions were done with an eye towards trial and therefore were intimately associated with the prosecutorial phase. Thus, actions occurring prior to the indictment were found to be

17

investigative and those occurring after the criminal prosecution had begun were prosecutorial in nature. Essentially, the evaluation, and even fabrication of evidence occurring after the decision has been made to prosecute are presumptively prosecutorial and subject to absolute immunity.

Plaintiff attempts to dissuade the court from employing prosecutorial immunity despite the Fourth Circuit's specific ruling in this case by pointing out that the previous determination was made as to Pascale, a prosecutor, and the instant claims are against Ryan, Lating, and Mosley, who are federal investigative agents from various organizations. However, as stated above, prosecutorial immunity protects the process and not the person. *Jean v. Collins*, 155 F.3d 701, 707 (4th Cir. 1998), *cert. granted, judgment vacated,* 526 U.S. 1142 (1999) ("The fact that the defendants in the present suit are police officers, rather than prosecutors, is irrelevant to the immunity analysis.").

Additionally, Plaintiff attempts to point to certain actions undertaken by Ryan, Lating, and Mosley in an effort to label them as purely investigative in nature. Specifically, Plaintiff avers Ryan's efforts to repackage pills during a search of 1803 Eloise Lane fabricated evidence which created the false impression that the medication-related trash— all of which had been delivered to clinics—contained undelivered prescriptions for which the claims were not reversed. Plaintiff contends that Ryan included this fabricated evidence on a "Pharmacare Master Spreadsheet," which became a 106-page spreadsheet named the "Ryan Analysis," and was pervaded by false evidence that the Government used at trial to help wrongfully convict Annappareddy.

However, as Plaintiff clearly acknowledges, this alleged evidentiary analysis was prepared and used to present evidence at trial. Because these actions were taken not in the pursuit of probable cause, but to advance the prosecution's case at trial, they are prosecutorial in nature.

Likewise, Plaintiff avers that in the winter of 2014, Agents Mosley and Lating manipulated MEDIC to fabricate false "loss" calculations in an invoice review known as "MEDIC 1884." Thus, Plaintiff avers Mosley and Lating again chose to leave the prosecutors under the misimpression that MEDIC's invoice reviews counted all of Pharmacare's inventory—which, standing alone, caused MEDIC 1884 to find false "losses" and "shortages." As with the allegations against Pascale, these allegations claim Mosley and Lating "participated in the fabrication of a new inventory analysis, which produced the same false 'shortage' and 'loss' figures as the old one [MEDIC 1495], and was used at trial to convict Annappareddy." *Annappareddy* at 140. The Fourth Circuit clearly stated such fabrication occurring after the indictment was done in preparation for trial and is protected by absolute immunity. Thus, Plaintiff's attempt to distinguish Lating and Mosley's entitlement to absolute immunity from that provided to Pascale for identical actions is unavailing.

In summation, the post-indictment allegations against Ryan, Lating, and Mosley are that they conspired together and with prosecutors to fabricate evidence to be used at trial and later destroy exculpatory information. These allegations mirror those actions alleged against Pascale and Wilkinson. Thus, the timing of their actions (post-indictment) is more critical than their respective job titles. In other words, after the original indictment was

returned against Annappareddy, each of these agents participated in the prosecutorial team performing tasks alongside and under direction of federal prosecutors. Moreover, each of the alleged wrongdoings was performed to advance the Government's position at trial. Thus, to hold that only attorney members of the prosecutorial effort are entitled to absolute prosecutorial immunity when non-attorney members performed nearly identical tasks would run afoul of the letter and purpose of the law. The law surrounding prosecutorial immunity protects actions, not people, associated with prosecutorial efforts. Here, those actions occurring post-indictment are advocative in nature, regardless of the actor and are therefore subject to absolute prosecutorial immunity.

Because Claims 23 and 24 concern the actions occurring after the original indictment and search warrants, these claims are subject to dismissal based upon absolute immunity.

However, the Government's argument is unpersuasive to the extent it contends pre-indictment actions, such as Agent Lating's drafting of the search warrant affidavit, are similarly protected by absolute prosecutorial immunity. The Government cites to *Kalina v. Fletcher*, 522 U.S. 118 (1997) in support of its argument that Lating's drafting of the search warrant is protected by absolute immunity.

In *Kalina*, the Supreme Court held that a prosecutor's actions taken "in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are protected by absolute immunity." *Kalina v. Fletcher*, 522 U.S. 118, 129. Namely, prosecutorial immunity would be "appropriate for her drafting of the certification, her determination that the evidence was sufficiently strong

to justify a probable-cause finding, her decision to file charges, and her presentation of the information and the motion to the court." *Id.* at 130. "Each of those matters involved the exercise of professional judgment; indeed, even the selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of the advocate." *Id.* However, that immunity ceased upon the prosecutor's certification of facts under penalty of perjury. Thus, the Court went on to hold that not all actions taken in connection with preparation of a probable cause determination were protected by absolute immunity. *Id.* at 130–31("Testifying about facts is the function of the witness, not of the lawyer. No matter how brief or succinct it may be, the evidentiary component of an application for an arrest warrant is a distinct and essential predicate for a finding of probable cause.").

Here, when construing the facts in a light most favorable to Plaintiff, Lating's compilation of facts and evidence for use in the Affidavit was part of an investigative function. Moreover, her attestation to the Affidavit's truth was a function akin to that of a witness and not performed in an advocative role. *See Kalina,* at 131 ("Even when the person who makes the constitutionally required 'Oath or affirmation' is a lawyer, the only function that she performs in giving sworn testimony is that of a witness.").

Thus, those actions occurring prior to the indictment—namely Lating's evidential compilation and drafting of the Affidavit necessary for a probable cause determination— are not entitled to absolute immunity. These actions all occurred prior to the indictment and more closely resemble actions best described as investigative in nature. Additionally,

those allegations against other agents, such as Mosley, which predate the indictment are not shielded by absolute immunity, because they too, are investigative.

This court acknowledges, as did the Fourth Circuit, that although the application of absolute prosecutorial immunity may lead to unfair results, the Supreme Court has concluded that important public policy justifications outweigh those harms. *Annappareddy*, 996 F.3d at 139 (citing *Savage v. Maryland*, 896 F.3d 260, 268 (4th Cir. 2018)). Moreover, when assessing the application of immunity, the court cannot consider "the harm that the conduct may have caused," or even "the question whether it was lawful." *Nero v. Mosby*, 890 F.3d 106, 118 (4th Cir. 2018) (quoting *Buckley*, 509 U.S. at 269, 271).

The Government also provides a cursory reference to qualified immunity. However, as Plaintiff points out, this argument is two sentences devoid of authority or specific citation to undisputed facts. Thus, the Government has failed to show that it is entitled to qualified immunity.

## B. The Discretionary Function Exception

The Government next argues that Plaintiff's claims are barred by the discretionary function exception of the FTCA.[10] The FTCA bars any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the government, whether or not the discretion involved be

---

[10] When a claim is covered by the discretionary function exception, it must be dismissed for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); 28 U.S.C. § 1346(b).

abused." 28 U.S.C. § 2680(a). To determine whether the discretionary function exception bars a claim, courts use a two-part test. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). First, the conduct that forms the basis of the suit must involve an element of judgment or choice by the government employee. *Berkovitz*, 486 U.S. at 536. "The inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action." *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993). If such a mandatory statute, regulation, or policy applies, then the conduct involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary. *Id.* The second tier of the analysis is whether the choice or judgment is "based on considerations of public policy." *Gaubert*, 499 U.S. at 323.

To that end, the Government again argues[11] that investigatory decisions regarding which informants to use, what evidence to gather or analyze, which investigatory techniques to utilize, or the general quality of an investigation satisfy the first element of the *Berkovitz* test because these decisions are guided by judgment and choices and not by any federal rule or policy. *McElroy v. United States*, 861 F. Supp. 585, 591–92 (W.D. Tex.

---

[11] This argument, repeated nearly verbatim, was previously rejected by the court at the motion to dismiss stage. The Government reasserts it here based on its contention that the factual allegations assumed to be true then, have been disproven to an extent sufficient to warrant this court altering its previous decision. Although Plaintiff takes issue with this rehashing and advances the law-of-the-case doctrine to foreclose assessment of this argument, the court acknowledges that a renewed look at this argument may be proper given the advanced procedural posture of this action. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (holding that the law-of-the-case doctrine "poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims.").

1994) (finding that officer's failure to obtain additional evidence, failure to conduct further investigation of the plaintiff, and decision to execute a search based on an incomplete but subjectively adequate investigation fell within the discretionary function exception). Additionally, the decision to obtain a search warrant "upon the information which [investigators] had at the time" is a "judgment based upon their discretion." *Doherty v. United States*, 905 F. Supp. 54, 56 (D. Mass. 1995).

However, Plaintiff counters that evidence shows not just a flawed investigation, but deliberate, or at least reckless, attempts to fabricate evidence or include knowingly false information in the hunt for probable cause. The Government characterizes Plaintiff's claims as mere grievances that revolve around the use of cooperating witnesses to procure evidence and the allocation of resources spent revising and analyzing the massive amount of data gathered in this case. Yet, Plaintiff has alleged, and offered some evidence to support the proposition that Government agents knowingly included evidence from unreliable sources and false data for use in the Lating Affidavit. Specifically, the crux of Annappareddy's claim is that the Affidavit, when excised of its materially false statements, fails to establish probable cause to execute the searches of Pharmacare. Such a claim "is properly understood as a Fourth Amendment claim for unreasonable seizure." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *as amended* (Aug. 22, 2017). As this court previously stated, federal officials do not possess

discretion to violate constitutional rights or federal statutes. *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001)(quotations omitted).[12]

Plaintiff's malicious prosecution claims against the Government are the functional equivalent of Fourth Amendment claims. *Rich v. United States*, 158 F. Supp. 2d 619, 629 (D. Md. 2001) ("However, Plaintiffs' claims here are based on the entry and search of their home, not the prior investigation. These acts are the subject of Fourth Amendment limitations, and thus can hardly be said to be discretionary.") (internal citation omitted).

Because the Government did not possess the discretion to violate Plaintiff's Fourth Amendment rights, there is no discretion to engage in malicious prosecution as alleged here. Indeed, the probable cause standard for a malicious prosecution claim under Maryland law is the same as for a Fourth Amendment claim. *See DiPino v. Davis,* 729 A.2d 354, 358, 361, 366-68 (Md. 1999) (applying the Supreme Court's standard for "probable cause" under the Fourth Amendment to the plaintiff's Fourth Amendment claim and his malicious prosecution claim.)

Moreover, the prior dismissal of all of Plaintiff's constitutional claims (i.e., the *Bivens* claims) does not render allegations of constitutional violations nonexistent, it only indicates that *Bivens* is not an avenue of relief available to Plaintiff. *See Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016) ("A plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim—whether or not she advances

---

[12] Although the Government argues that it did not violate the text of the Fourth Amendment because it obtained a search warrant, the court finds this argument unpersuasive given the Plaintiff's challenge to the probable cause underlying the warrant.

a *Bivens* claim against the individual official involved—may affect the availability of the discretionary-function defense, but she does not thereby convert an FTCA claim into a constitutional damages claim against the government."). Here, the Government's assertion that the only claims against it are "state law-based torts" is also unavailing. Annappareddy's FTCA claims necessarily sound in state law because the Government has not waived sovereign immunity for constitutional violations. 28 U.S.C. § 2679(b)(1)-(2).

In summation, if the Government is not entitled to summary judgment on the merits as to Plaintiff's malicious prosecution claims—which employ a standard overlapping with Fourth Amendment requirements—then the Government is likewise unable to invoke the discretionary function exception. As discussed in detail below, Plaintiff has asserted a viable malicious prosecution claim and therefore the discretionary function exception is unavailable to the Government.

## C. <u>Probable Cause and Malice</u>

The Government next argues that it is entitled to summary judgment for Plaintiff's malicious prosecution claims as Plaintiff has failed to establish the essential elements of lack of probable cause or malice.

These FTCA claims are governed by the law of Maryland, where the alleged tortious acts occurred. *Tinch v. United States*, 189 F. Supp. 2d 313, 317 (D. Md. 2002) (citing 28 U.S.C. §§ 1346(b); 2647). The elements of malicious prosecution under Maryland law are (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) without probable cause; (3) with malice, or with a motive other than to bring the offender

to justice; and (4) termination of the proceedings in favor of the plaintiff. *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000).

At the outset, it is important to note that the parties dispute which specific legal standard governs the malicious prosecution claims. The Government avers that Maryland black letter law applies to the exclusion of *Franks v. Delaware*, 438 U.S. 154 (1978).[13] The Plaintiff, however, avers that the *Franks* standard is applicable here. These two standards can be harmonized with the understanding that the *Franks* standard is used in the probable cause determination, which is just one element of the Maryland tort of malicious prosecution. Indeed, the Government cites to *Franks* in its briefs. (ECF No. 240-1, p. 39).

Moreover, the definition of probable cause for a malicious prosecution claim under Maryland law is the same as for a Fourth Amendment claim. *See DiPino v. Davis,* 729 A.2d 354, 358, 361, 366-68 (Md. 1999) (applying the Supreme Court's standard for "probable cause" under the Fourth Amendment to the plaintiff's Fourth Amendment claim and his malicious prosecution claim.). Accordingly, Maryland state law applies to Plaintiff's malicious prosecution claims and *Franks* serves a supplemental role in the probable cause analysis. All other elements of this tort, namely malice, remain essential to Plaintiff's claim.

The first prong of the *Franks* test requires showing that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the

---

[13] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court developed a two-prong test clarifying what a criminal defendant must show when challenging the veracity of statements made in an affidavit supporting a search warrant. If both prongs are met, the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 155–56.

warrant affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016). "Reckless disregard" means "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017).

The second prong requires showing that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Lull*, 824 F.3d at 114. "To determine materiality, the Court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Humbert*, 866 F.3d at 556.

The *Franks* test "applies not only to cases in which an agent includes affirmatively false statements in a warrant affidavit, but also when an agent omits relevant facts from the affidavit." *Lull*, 824 F.3d at 114 (citing *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)). A claim based on an omission requires showing that the agent "intentionally and/or recklessly omitted information that was material to the determination of probable cause." *Id.*

The term "probable cause" refers to "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. Defilippo,* 443 U.S. 31, 37 (1979). Probable cause is determined by considering "the totality of the circumstances." *Wadkins v. Arnold,* 214 F.3d 535, 539 (4th Cir. 2000). However, in determining whether probable cause exists, a court should only consider the information actually presented to the magistrate judge

during the warrant application process. *United States v. Lull*, 824 F.3d 109, 119 n.3 (4th Cir. 2016) (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004)).

Accordingly, several arguments presented by the Government are not relevant as they pertain to evidence and facts gleaned after the Lating Affidavit was presented to the magistrate judge.[14] For instance, the Government references Ryan's evidence collection and analysis resulting from the search at 1803 Eloise Lane. Additionally, the Government mentions Ryan's trial testimony based on his post-warrant searches. However, this search occurred after the Lating Affidavit was presented to the magistrate judge and after the initial indictment was returned. Likewise, the resulting trial testimony cannot be used to verify pre-indictment probable cause. Similarly, Mosley's post-indictment collaboration with MEDIC to produce data for trial cannot retroactively establish probable cause. Those facts discovered only after the indictment and search warrant are thus irrelevant for the remainder of this motion.

To challenge probable cause, a plaintiff must create a genuine dispute of material fact regarding "deliberate falsehood or of reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Annappareddy must show more than "negligence or innocent mistake." *Id.*

---

[14] The Government counters that evidence developed after the return of the original indictment relates to the continuation of the criminal process after both the initial indictment and the superseding indictment—conduct underlying Claims 23 and 24. Because these claims against continuation of the criminal process are dismissed on absolute prosecutorial immunity grounds, this post-indictment evidence is no longer relevant to Plaintiff's remaining claims for purposes of this motion.

Similar to the arguments against Arnold, Plaintiff avers that genuine issues of material fact exist as to whether any of the Government agents recklessly relied upon: (1) a 14-day reversal window; (2) MEDIC 1495; or (3) testimony from Tokofsky and Ridolfi. Plaintiff concludes that when the Lating Affidavit is "corrected" to account for these erroneous or omitted facts and witness accounts, probable cause is nonexistent.

1. 14-day Reversal Window

Initially, Plaintiff avers that any reference to a 14-day prescription reversal window should be removed from the Affidavit. It is uncontested that there was no legal requirement that a pharmacy reverse undelivered prescriptions within 14 days at the time the Lating Affidavit was submitted. Although several witnesses, including Tokofsky, stated that prescriptions were required to be reversed within 14 days, no such legal requirement existed.[15] Instead, the Government now avers that its inclusion was proper because the 14-day reversal period was an industry standard and failure to abide by it is evidence of fraud—even if not legally required. Inclusion of a 14-day reversal window is relevant because potentially incriminating declarations such as an informant stating she "observed bins full of filled prescription packages, some dating back months previous" are potentially undermined when corrected statements of law outlining a 60-day return window replace allegedly incorrect statements referencing a 14-day return window.

Whether the 14-day reversal window is actually an industry standard supportive of fraudulent activity is contested. Moreover, Plaintiff avers that this 14-day reversal window

_____

[15] In reality, the legally required return window was 60 days. 42 U.S.C. § 1320a-7k(d)(1), (2)(A).

30

was recklessly included in the Lating Affidavit. To support this, Plaintiff notes that in April 2013, Lating sent an email stating that "Robert [Mosley] is looking into Medicare REGS because I think there is a CMS regulation concerning when claims should be reversed for unclaimed billed drugs." This email provides evidence that Lating and Mosley recklessly disregarded or knew about the absence of any such 14-day reversal law or regulation. Therefore, Plaintiff has created a genuine issue of material fact as to whether inclusion of a non-existent 14-day regulation was at least reckless when attempting to persuade a magistrate judge that probable cause of fraud existed.

### 2. Loss and Shortage Calculations

Next, Plaintiff avers that each of the loss and shortage calculations derived from MEDIC 1495 are incorrect and must be removed from the Affidavit. Specifically, Plaintiff avers MEDIC 1495 has double-counting errors involving claims submitted to the Maryland Aids Drug Assistance Program ("MADAP"). Second, by treating the nine Pharmacare stores as if each operated independently, MEDIC 1495 failed to account for transfers of inventory and found shortages at certain stores that are offset by surpluses at other stores. MEDIC 1495's alleged inaccuracies are discussed in greater detail in the order addressing Plaintiff's motion for partial summary judgment. Again, that discussion is incorporated herein by reference. In essence, there is a genuine issue of fact as to the level of falsity in the loss and shortage calculations derived from MEDIC 1495. When construing those issues in a light most favorable to the Plaintiff, the court is constrained to assume these calculations are materially inaccurate for purposes of this motion.

Plaintiff further avers that Lating and Mosley knew by May 2013 that it would be false to state that MEDIC 1495 represents any "loss" or "losses" to government programs. When MEDIC emailed the final version of those invoice reviews on May 9, 2013, its cover letter warned that MEDIC 1495 "does not represent the impact to the government." Plaintiff also claims Lating and Mosley knew long before July 23, 2013, that Pharmacare transferred inventory acquired by one store to fill prescriptions at another store. Moreover, Plaintiff alleges they knew by May 2013 or earlier that MEDIC 1495 failed to account for transfers and that this failure rendered the Lating Affidavit's statements about "losses" and "shortages" false. Yet despite reviewing many drafts of the Lating Affidavit over several months before July 23, 2013, Lating and Mosley decided not to correct those false statements and instead to leave the prosecutors under the misimpression that those statements were accurate.

Plaintiff supports these claims by pointing out that memos that Gutberlet wrote in 2012 recount multiple persons who worked at Pharmacare telling her about such transfers. Also, Ridolfi reported that frequently drugs are moved from pharmacy to pharmacy—a statement that was corroborated by Pharmacare business records.

Plaintiff also points to numerous emails from Mosley indicating that he erroneously advised prosecutors that he had removed overlapping MADAP data and that MEDIC also prevented double-counting errors by removing duplicate claims. Specifically, Mosley sent an email in early August 2013 that allegedly misled Pascale into believing MEDIC "compared the Medicare/Medicaid data making sure there was no double

counting/duplication of drugs." Plaintiff avers this is evidence Mosley intentionally caused MEDIC 1495 to include double-counting errors.

The Government strongly contests this assertion by averring that Mosley is not an accountant or a person with training to forensically analyze claims data. The Government instead contends that Mosley's only role was to provide MEDIC with claims data and that he did not manipulate the data before passing it to MEDIC. Thus, Mosley could not have been aware of duplication or perform any de-duplication analysis. At this point, the evidence Plaintiff presents creates a genuine issue of material fact as to Mosley's role in providing information to MEDIC and knowledge of falsities in MEDIC 1495.

Plaintiff concludes that Lating and Mosley knew well before the Affidavit was finalized that Pharmacare often transferred inventory of medications between its stores and that failing to account for these transfers would obviously skew the loss and shortage numbers. Additionally, they were aware of double-counting errors. Nevertheless, Lating and Mosley decided not to tell the prosecutors that excluding transfers created artificial "shortages"; Lating never suggested Mosley make MEDIC aware of that fact; and he never did so. As a result, MEDIC produced incorrect loss and shortage totals which were then included in the Lating Affidavit.

Thus, the court agrees that Plaintiff has at least created a genuine issue of material fact as to whether the loss and shortage calculations were recklessly included in the Lating Affidavit.

3.  Tokofsky and Ridolfi

The Government next relies heavily on information provided by Tokofsky and Ridolfi in asserting that the Lating Affidavit supports a finding of probable cause. In contrast, Plaintiff argues that the Lating Affidavit misrepresents Tokofsky and Ridolfi as reliable informants and erroneously includes many statements based solely on their uncorroborated reports. Plaintiff thus concludes any uncorroborated statements must be removed from the Lating Affidavit as a matter of law. *See United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) (excluding "the information provided exclusively by the informant" who had been deemed unreliable).

As to Tokofsky, Plaintiff takes issue with his repeated reference to the non-existent 14-day return window discussed above. Additionally, Plaintiff notes that Tokofsky had a financial motive to fabricate evidence—namely his *qui tam* lawsuit based on Annappareddy's Medicaid fraud. Plaintiff also points to other contradicting accounts Tokofsky provided such as telling investigators that "Venkata Srinivas Mannava would visit Plumtree and other stores at the end of each month and 'bill' for all available refills 'without actually filling the prescriptions.'" Gutberlet's memos recount Tokofsky reporting the opposite—twice—telling an MFCU investigator that "Mannava fills the prescriptions for which he bills."

Plaintiff's evidence at least creates a genuine issue of material fact as to Tokofsky's reliability. Consequently, the court must construe this fact in Plaintiff's favor which requires inferring that Tokofsky was knowingly unreliable, and his uncorroborated assertions must be removed from the Lating Affidavit.

34

Similarly, Plaintiff avers that Ridolfi fabricated evidence of which federal agents should have been aware. One example is that Arnold coordinated with Ridolfi to dispose of a bag of prescription labels in the trash which Lating later retrieved and used as evidence. Although Ridolfi indicated the trash would contain labels peeled from prescription bottles—indicating fraudulent billing—the trash also contained labels that were not torn off but still on the original backing.[16] Another example includes Lating being aware of an audiotaped conversation in which Ridolfi told a technician at Plumtree to "hide" undelivered prescriptions. Plaintiff avers this inclusion of unpeeled labels and attempts to hide prescriptions are indicators that Ridolfi was artificially creating evidence of fraudulent billing. Although the Government offers a competing interpretation as to what Ridolfi meant when she told a coworker to "hide" prescriptions, this only shows a genuine issue of material fact exists. At this point, that issue must be construed in the Plaintiff's favor. Accordingly, Plaintiff avers Lating was aware that Ridolfi fabricated evidence and thus, the entirety of information sourced from Ridolfi must be removed from the Affidavit.

As further suggestion that agents should not have included information from Ridolfi, Plaintiff cites evidence, specifically emails, that Ridolfi lied to investigators. Plaintiff asserts certain Pharmacare emails show Lating knew before the Affidavit was finalized that Ridolfi was lying when she reported that Pharmacare's Med-4 calendars were concealed from her and that Med-4s were refilled without her knowledge.

---

[16] For the first time at oral argument on February 27, 2023, the Government argued that these unpeeled labels were not "pristine" as claimed by Plaintiff, but rather removed from prescription bags to which they had been stapled. Here again, this evidence creates a genuine issue of material fact that must be construed in Plaintiff's favor.

Moreover, Plaintiff points to Ridolfi's alleged motive to fabricate evidence including her desire to become a *qui tam* whistleblower and that she had been reprimanded by Annappareddy in the past. Agents were aware of these facts before the Affidavit was finalized and Plaintiff avers that this bias should have been revealed in the Affidavit.

Plaintiff also highlights discrepancies from Ridolfi's interviews with other sources of information. Specifically, on November 20, 2012, after interviewing an HIV patient with Mosley and Dykes, Arnold wrote that the facts were "the opposite of what [they] expected" based on the information and documents Ridolfi provided in September 2012.

In summation, both parties submit varying degrees of evidence supporting their position on Ridolfi's credibility. Thus, the record indicates there is a genuine issue of material fact as to whether Ridolfi's claims were properly included within the Lating Affidavit.

Despite Plaintiff's presentation of genuine issues of fact above, the Government avers that "Plaintiff's challenges to witness veracity rings hollow against the probable cause standard when stacks of interview reports, boxes of undelivered prescriptions, sworn eye-witness testimony, and forged signatures all point to the same conclusion." The Government's argument seeks to have this court weigh competing evidence. However, at this point, all issues of fact and inferences derived therefrom must be construed in Plaintiff's favor. The Government's arguments may be persuasive in a trial on the merits before a factfinder, but the request to comparatively evaluate evidence is premature at this point. Thus, summary judgment is inappropriate.

Based on the above, Plaintiff concludes that the Lating Affidavit fails to support probable cause to search any of the six Pharmacare locations after correcting its numerous false statements. Likewise, because Annappareddy's criminal indictment was based on much of the same evidence, probable cause to indict was also lacking. For example, Plaintiff avers that the false beliefs of informants like Mary Sue Cramer and Caitlin Biemer that Pharmacare was legally required to "complete reversals within 14 days" undermines their reports of seeing "bins full of filled prescription packages, some dating back months previous."

For Plaintiff to succeed on his probable cause argument, the court is required to conclude all inculpatory information related to the 14-day reversals, MEDIC 1495, and flowing exclusively from Tokofsky or Ridolfi was materially incorrect. The court must then go further and conclude the federal agents knew of or recklessly disregarded such falsities and therefore improperly included inculpatory information and omitted exculpatory information. Given the vast amount of evidence obtained from various sources prior to the indictment, Plaintiff's burden on this point is no easy feat. A feat which may prove unachievable at trial. However, at this stage, when construing all issues of fact in Plaintiff's favor, it appears that large swaths of vital inculpatory information could be excluded from the Affidavit. Given the importance of the 14-day reversal window, MEDIC's loss and shortage calculations, and accounts from Tokofsky and Ridolfi, probable cause is doubtful if each is fully removed. Moreover, the addition of Plaintiff's alleged exculpatory information renders a probable cause determination even more doubtful. Thus, at least at this point, a genuine issue of material fact exists as to whether

such a corrected affidavit contains probable cause. Therefore, summary judgment in inappropriate at this time.

   4. <u>Malice</u>

The Government next argues that Plaintiff fails to show agents Lating, Mosley, or Ryan acted with the requisite malice. Maryland's Court of Appeals defines the element of malice required for malicious prosecution as "a wrongful or improper motive in initiating legal proceedings against the plaintiff." *Montgomery Ward v. Wilson*, 664 A.2d 916, 924 (Md. 1995). However, Maryland courts have also held that "the 'malice' element of malicious prosecution may be inferred from a lack of probable cause." *Okwa v. Harper*, 360 Md. 161, 188, 757 A.2d 118, 133 (2000) (internal citations and quotations omitted). Because these federal agents may not have had probable cause as discussed above, malice can also be inferred under a Maryland state law claim for malicious prosecution. *See Montgomery Ward v. Wilson*, 339 Md. 701, 717, 664 A.2d 916, 924 (1995) ("Accordingly, a plaintiff who has generated sufficient evidence of lack of probable cause to send the case to the jury is also entitled to have the jury consider the issue of malice.").

As stated above, the probable cause determination is fraught with uncertainty at this stage given the numerous arguments for and against the veracity of several witnesses and MEDIC 1495. However, when considering that malice can be inferred from lack of probable cause, summary judgment is not appropriate here.

### D.  **Intention Infliction of Emotional Distress**

Finally, the Government argues that the court should enter summary judgment in its favor as to the Intentional Infliction of Emotional Distress ("IIED") claim because Lating,

Mosley, Ryan, Wilkinson, and Pascale did not act in reckless disregard for Annappareddy's emotional distress.

The elements of an IIED claim are: "(1) [defendant's] conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the intentional conduct caused emotional distress; and (4) the emotional distress was severe." *Chin v. Wilhelm*, No. 02-1551- CCB, 2006 WL 827343, at *9 (D. Md. Mar. 24, 2006) (citing *Harris v. Jones,* 380 A.2d 611 (Md. 1977)). Regarding the first element, a plaintiff must show that the defendant "desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from [her] conduct, or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow." *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011). The desire to cause distress must be "far more precise, for it is the achievement of that consequence, from which the distress is expected to arise, that lies at the heart of the tort." *Foor v. Juvenile Servs. Admin.*, 552 A.2d 947, 959 (Md. 1989).

Plaintiff's brief does not address the Government's arguments as to IIED, but rather incorporates arguments related to Arnold's motion by reference. This incorporated argument merely states that the Government does not dispute that genuine issues of fact exist "insofar as that IIED claim arises from the facts underlying the malicious prosecution claims." (ECF No. 255, p. 19–20). This argument is incorrect as the Government avers that the "record in the criminal case is similarly devoid of evidence of hurtful animus or reckless disregard for Annappareddy's emotional distress." Thus, Plaintiff's attempt to defend his IIED claim based solely on a reference to facts underlying his malicious prosecution claim

is unavailing. Proof of a constitutional violation is not enough to establish extreme and outrageous conduct. *See e.g. Sherrill v. Cunningham*, No. CV JKB-18-476, 2018 WL 3533550, at \*11 (D. Md. July 23, 2018) ("Plaintiff's allegations present a picture of bad behavior, unconstitutional policing and poor judgment, not extreme and outrageous conduct."); *Disney v. City of Frederick*, No. CIV. CCB-14-2860, 2015 WL 737579, at \*6 (D. Md. Feb. 19, 2015).

Plaintiff's cursory argument fails to make any meaningful rebuttal to the Government's assertion that Plaintiff has failed to meet the various elements of IIED. Namely, that any of defendants' actions were extreme, outrageous, or performed with a desire to inflict distress. Thus, Plaintiff has failed to show why the Government is not entitled to summary judgment. Accordingly, the Government's motion is granted as to the IIED claim.

Given this determination, there is no need to address the Government's additional argument that there is no wavier of sovereign immunity under the FTCA arising out of the conduct of federal prosecutors.

## IV.   CONCLUSION

For the reasons stated above, the Government's motion for summary judgment (ECF No. 240) is granted in part and denied in part. Specifically, absolute prosecutorial immunity works to foreclose all allegations of wrongdoing occurring post-indictment. Thus, Claims 23 and 24 of the Amended Complaint are dismissed. Moreover, Plaintiff fails to meaningfully combat any challenge to the IIED claim and, therefore, Claim 25 is dismissed as well.

However, Plaintiff has presented evidence of pre-indictment wrongdoing sufficient for Claims 21 and 22 to withstand summary judgment. At base, there are simply too many genuine issues of material fact within the probable cause analysis to make a determination on those malicious prosecution claims at this stage.

IT IS SO ORDERED.

March 16, 2023
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge