```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   REDDY VIJAY ANNAPPAREDDY        )
                                     )Trial Day 7
 4        Plaintiff,                 )
                                     )Civil No.
 5        vs.                        )18-cv-3012-JFA
                                     )
 6   PAM ARNOLD, et al.              )Baltimore, Maryland
                                     )June 12, 2023
 7        Defendants.                )9:01 a.m.
     _____  )

 8

 9            THE ABOVE-ENTITLED MATTER CONTINUED FOR
                          BENCH TRIAL
10         BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.

11                    A P P E A R A N C E S

12
     On Behalf of the Plaintiff:
13        JOSHUA D. GREENBERG, ESQUIRE
          KOBIE FLOWERS, ESQUIRE
14
     On Behalf of the Defendant United States of America:
15        MATTHEW P. PHELPS, ESQUIRE
          MOLISSA H. FARBER, ESQUIRE
16        LAWRENCE EISER, ESQUIRE

17   Also Present:
          Reddy Vijay Annappareddy
18

19

20

21

22        (Computer-aided transcription of stenotype notes)

23                        Reported by:
                    Ronda J. Thomas, RMR, CRR
24                   Federal Official Reporter
               101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland 21201
```

1                        <u>**INDEX**</u>

2                      <u>**June 12, 2023**</u>

3
<u>**PLAINTIFF'S WITNESSES:**</u>                    <u>**PAGE:**</u>
4
William Fassett
5    Direct by Mr. Greenberg                      3
     Cross by Mr. Eiser                          25
6    Redirect by Mr. Greenberg                   35

7  Sandra Wilkinson
     Direct by Mr. Greenberg                     37
8    Cross by Ms. Farber                         50

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1  (9:01 a.m.)

 2        **THE COURT:**  Good morning.  Please be seated.

 3      All right.  We've got a few developments since last week.

 4  I understand that Ms. Wilkinson is now available today, and we

 5  also have the Plaintiff's pharmacy expert today.

 6      Late last night, we received the Plaintiff's brief on

 7  rebuttal issues.  The Government has not had a chance to

 8  respond, so I'd rather not address that first thing.  Let's

 9  move ahead with these witnesses and get them up, and then

10  today, if we can, and then we'll discuss these others matters.

11      All right.  Please call your next witness.

12        **MR. GREENBERG:**  Judge Anderson, Plaintiff Vijay

13  Annappareddy calls Professor William Fassett.

14        **THE CLERK:**  Sir.  Please remain standing and raise

15  your right hand.

16      (Witness sworn.)

17        **THE CLERK:**  You may be seated, sir.

18      For the record, could you please state and spell your

19  first and last name.

20        **THE WITNESS:**  It's William Fassett.  F-A-S-S-E-T-T.

21  First name W-I-L-L-I-A-M.

22                    -    -    -

23                **DIRECT EXAMINATION**

24                    -    -    -

25  **BY MR. GREENBERG:**

```
 1   Q.   Good morning, Professor Fassett.  How are you today?
 2   A.   Fine.  Thank you.
 3   Q.   You came in here just last night, correct?
 4   A.   That's correct.
 5   Q.   Where did you come from?
 6   A.   I came from Spokane, Washington.
 7   Q.   What, if anything, do you do for your occupation in
 8   Spokane, Washington?
 9   A.   Well, I am professor emeritus of pharmacy at Washington
10   State University where I served as dean and professor until
11   2014, when I became professor emeritus.
12   Q.   And Professor Fassett, can you please give Judge Anderson
13   an overview of your career at the pharmacy industry, including
14   your teaching experience and professor work.
15   A.   Yes, sir.  I have been licensed to practice in the state
16   of Washington since 1969, continuously.  Up until 1980, I
17   practiced primarily community pharmacy in several settings.  I
18   managed a community pharmacy during that period of time.  And
19   in 1980, I joined the faculty at University of Washington and
20   stayed in academia until I retired.
21        From -- during my academic career, I taught pharmacy
22   practice, prescription processing, pharmacy information systems
23   management, and later in my career, pharmacy law and ethics.
24        From 1980 to 1999, at both University of Washington and at
25   Drake University, on weekends or sometimes in the summer, I
```

1  continued to practice part-time pharmacy primarily in community

2  settings.

3       From '99 to 2005, I was dean of pharmacy at Washington

4  State University, and during that time, I did not practice in

5  community pharmacies, just didn't have the time.

6       But in 2006 and '07, during the summers, I did practice,

7  again, primarily in community pharmacies.

8       And then up until 2015, I was also the consulting

9  pharmacist for Hollister-Stier Laboratories where I reviewed

10 prescriptions that were being dispensed to patients for allergy

11 treatment and approved them before they were shipped by the

12 manufacturer.

13 Q.   Professor Fassett, for about how many years have you

14 worked in the pharmacy industry in one way or the other or

15 multiple ways?

16 A.   Well, actually, I started in high school cleaning up a

17 pharmacy.  So I started in pharmacy in high school, 1962.  So

18 it's been 61 years, I guess.

19 Q.   And at what point in time, if any, Professor Fassett, did

20 you get your pharmacist degree?

21 A.   1969.  And, subsequently, degrees in business

22 administration and leadership and policy studies.

23 Q.   And at what point in time, if any, Professor Fassett, did

24 you obtain your pharmacist license?

25 A.   1969.

1  Q.   And to what extent, if any, have you maintained that

2  license through the present?

3  A.   I'm still licensed as a pharmacist.

4  Q.   Professor Fassett, in addition to the experience and the

5  types of work that you've described, to what extent, if any,

6  have you held any position or done any work with the American

7  Society for Pharmacy Law?

8  A.   Well, I served as the organization's treasurer for about

9  10 years, and I had -- currently am the editorial director for

10 that organization.  I edit their two publications, which

11 includes a monthly newsletter and a six-times-a-year journal.

12 Q.   And to what extent, if any, Professor Fassett, you have

13 authored publications related to pharmacy issues?

14 A.   I've got a hundred or so publications on issues ranging

15 from pharmaceutical returns to compliance to computer

16 applications in pharmacy.  I wrote a book on that.  And those

17 were -- and the effect of pharmacist interventions to save drug

18 misadventures.

19      Then I have, for the last 15 years or so, written the next

20 major textbook on Washington pharmacy law.

21 Q.   Professor Fassett, in your experience over the past

22 50-plus years, to what extent, if any, are standards of care in

23 the pharmacy industry applicable nationwide?

24 A.   There's a national standard of care.  It was formally,

25 really, enunciated in the early 1970s by the American

1   Pharmacist Association.  The expected duties that a pharmacist

2   owes to a patient and the responsibilities involved in assuring

3   safe and effective drug therapy are truly nationwide and are

4   taught uniformly throughout the pharmacy programs because

5   there's a uniformed national accredited curriculum.

6   **Q.**   Now, Professor Fassett, your opinions have been the

7   subject of some pretrial motions practice, so we're just going

8   to focus on maybe one or two categories, all right?

9   **A.**   That's fine.

10  **Q.**   Now, in this case, your assignment has been limited to

11  offering an opinion for a certain period of time; is that

12  right?

13  **A.**   That's correct.

14  **Q.**   Or opinions, I should say, for a certain period of time.

15      And what is that period of time?

16  **A.**   Well, if I recall, it's roughly 2006 to 2013, if I

17  remember correctly.

18  **Q.**   Is it all right with you if I mirror your report and at

19  least sometimes refer to that period as "the relevant period"?

20  **A.**   That would be fine.

21  **Q.**   Okay.  I want to focus on -- turn to, at least -- your

22  opinions on -- relating to prescription software systems.  And,

23  in particular, the generation of extra prescription labels.

24      Based on your experience and expertise, Professor Fassett,

25  during the relevant period, 2006 to 2013, to what extent, if

1  any, were prescription processing software systems used by

2  pharmacies designed to allow multiple labels to be printed?

3  A.   Well, during that period, virtually all pharmacies used

4  prescription processing software.  And all of the major systems

5  that were designed typically printed multiple -- printed a

6  single -- they were designed to print a single sheet of paper.

7  And on that paper would be preprinted with stickers, if you

8  will, with various labels.  And there would be multiple items

9  on that one sheet, including at least two copies of the

10 prescription label information.

11      There would be receipts.  There would be a record of the

12 insurance adjudication.  There would typically be a sticker

13 that would be placed in a signature log for when the

14 prescription is received.  And then it would also print off to

15 be given to the patient.  If that information was longer than

16 one page, then the printer would print a second page using a

17 paper from a different drawer in the printer.

18      But that was characteristic of virtually every system that

19 was out there.

20 Q.   So if I heard you correctly, Professor Fassett, there

21 would be at least two copies of a prescription label printed

22 among the various items you described, right?

23 A.   Typically, there would be two copies containing the

24 information on the label; that's correct.

25 Q.   To what extent, if any -- let me back up, Professor

1  Fassett.

2      Can you please name some of the more common prescription

3  processing software systems that were used during the relevant

4  period?

5  **A.**   Well, during that period, I think some -- the three major

6  wholesalers all had their own system.  And, as I sit here, I

7  don't recall the names of what they called them.  But McKesson

8  and Amerisource Bergen had their own systems, and then there

9  were other companies that developed them.  Three major players

10 during that period of time were Cerner, Prime, and a company

11 called RX30.

12 **Q.**   So three of the major ones, if I heard you correctly,

13 Professor Fassett, were Cerner, PrimeRX and RX30?

14 **A.**   As I recall, yes.

15      **MR. GREENBERG:**  Judge Anderson, I think this may have

16 been covered at the pretrial conference, but just in case it

17 wasn't, as a formality, I'll move to admit Professor Fassett as

18 an expert in the pharmacy issues in which he's testifying.

19      **THE COURT:**  Any objection as to qualifications?

20      **MR. EISER:**  No, Your Honor.  Our motion was focused on

21 the fact that he hasn't connected any of his opinions to the

22 facts in this case.

23      **THE COURT:**  All right.

24      Well, you may proceed under Rule 702 of the Rules of

25 Evidence.

1            **MR. GREENBERG:**  Thank you, Your Honor.

2  **BY MR. GREENBERG:**

3  **Q.**   Professor Fassett, to what extent, if any, does the

4  printing of a label tell you whether or not a claim was

5  submitted on or about the date that the label is printed?  If

6  you don't understand the question, I can rephrase it.

7  **A.**   Yes, please.

8  **Q.**   Let's sort of back up.  Can you explain for Judge Anderson

9  the connection, if any, between printing a label and submitting

10  a claim for a prescription?

11  **A.**   They -- the process of submitting a claim to a third-party

12  payor during the relevant period very often involved a

13  pre-submission to determine whether the patient or beneficiary

14  was eligible, and that would often occur at the same time that

15  the technician was processing the prescription and printing out

16  the label.

17         If the claim was rejected and had to be resubmitted, then

18  that label that was printed out wouldn't reflect the completion

19  of a claim or even necessarily the delivery of a prescription.

20         Does that answer your question?

21  **Q.**   I think at least in part, but let me sort of try to

22  clarify something.

23         Professor Fassett, can you please explain to

24  Judge Anderson to what extent, if any, from the period 2006 to

25  2013, if a claim was reversed, would or would not a label be

1  printed for that reason?

2  **A.**   Well, it might.  It might if the claim was reversed

3  because a particular -- for example, if a brand name drug was

4  not covered, they would reverse the claim, and then they would

5  submit a new claim for a generic version of the drug.  And if

6  that were approved, they would then generate a new label, and

7  the original label that was printed would be discarded.

8  **Q.**   Is it accurate or not, Professor Fassett, in your opinion,

9  that the mere fact that a label was printed does not tell you

10  whether or not a claim was submitted?

11          **MR. EISER:**  Objection, leading.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  Could you repeat the question.

14          **MR. GREENBERG:**  Could the court reporter please read

15  back the question.

16      (Reporter read back as requested.)

17          **THE WITNESS:**  That's correct.

18  **BY MR. GREENBERG:**

19  **Q.**   Professor Fassett, I want to circle back briefly to what

20  you said a few minutes ago about the different items that are

21  printed by the types of prescription software, processing

22  software systems you mentioned.  Okay?

23      To what extent, if any, would there be an extra copy of a

24  label, in your experience, from the very start, meaning there

25  could be one extra for the prescription bottle or one for other

1  reasons, from the very start?

2  **A.**    There would be several situations.  One of the more common

3  ones would be if the prescription required more than one

4  container.  Another would be if they were doing blister packs,

5  or sometimes called bubble packs, where the patient's

6  medications are divided into four or more containers.  Another

7  would be when robots -- a robotic processor is filling some of

8  the prescriptions in the pharmacy.

9  **Q.**    Professor Fassett, can you please explain to

10  Judge Anderson what a bubble pack is, or a blister pack, and

11  whether they're the same thing?

12  **A.**    When they first came out, they were sometimes called bingo

13  cards, because they're a card with rows of -- rows of blisters

14  that the individual pills are put in.  And one of the systems

15  would do a card for every day of the week, with the medication

16  on it.  And if you did a month's supply, you would have four

17  cards, one more each week, with one line for every day of the

18  week.  And they were cardboard backing and a top with little

19  plastic bubble, blisters.

20  **Q.**    What is the purpose, Professor Fassett, or what was the

21  purpose during 2006, 2013 of putting prescriptions in bubble

22  packs?

23  **A.**    To make it -- to help encourage the patient to make sure

24  that they get their medication exactly all the time and when

25  it's ordered.  Encourage what's sometimes called compliance or

 1  called adherence to therapy.

 2  **Q.**   Going back to the printing of the various items that you

 3  talked about, you explained to Judge Anderson the different

 4  types of items.  In your experience, Professor Fassett, to what

 5  extent, if any, would there sometimes be an extra label from

 6  the very start for the prescription itself that was never used?

 7  **A.**   Well, anytime that you -- so since every time you printed

 8  one sheet you printed a couple copies of the label or the label

 9  information, the purpose of having two on the first sheet is

10  that one would go on the prescription container, and the other

11  would typically be put onto the back of the hard copy of the

12  doctor's order to show what was actually printed during that

13  period of time.  That was the most common use.

14      Now, if you had two bottles and you needed a second label,

15  then to put a label on the second bottle, you would end up

16  printing two more copies of the label.  That would be one

17  example.

18          **THE COURT:**  Dr. Fassett, let me interrupt you.  I want

19  to be sure I understood what you said.

20      The first reason you might have two was one would go on

21  the container of the pill bottle, and one would go on the back

22  of the hard copy of the doctor's order?

23          **THE WITNESS:**  Yes, the prescription.

24          **THE COURT:**  And that would be maintained with the

25  pharmacy, that second one would?

1          **THE WITNESS:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Go ahead.

3   **BY MR. GREENBERG:**

4   **Q.**   Professor Fassett, to what extent, if any, based on your

5   experience, could someone who had access to the prescription

6   processing software print an extra set of all these items,

7   including the extra labels, from the very start?

8   **A.**   Anybody who was signed into the computer in a busy

9   pharmacy would have access to be able to print what's called a

10  label -- they would call it a "label only," which would

11  generate the label without processing a prescription.  And

12  anybody who had access to that computer could do it at any time

13  that they were -- had access to the computer.

14  **Q.**   All right.  Thank you for that, Professor Fassett.

15      I want to come back to the label-only function.  You have

16  identified some reasons -- Professor Fassett, you've identified

17  some reasons why extra copies of labels could be printed even

18  at the outset.  I want to now turn to reasons -- well,

19  actually, you've talked about --

20      (Interruption.)

21         **THE COURT:**  Sorry for that interruption.  Go ahead.

22  **BY MR. GREENBERG:**

23  **Q.**   All right.  Professor Fassett, in addition to the -- we've

24  covered printing labels at the very start of sort of the

25  process with the different items.  You've talked some about

1   blister packs, which are the same as bubble packs.

2       What other reasons, in your experience, Professor Fassett,

3   would or could extra labels be printed during 2006, 2013?

4   A.   Well, during that time period, they were -- very often

5   used fax machines to request refills from providers.  That was

6   starting to become more common than calling the physician's

7   office.  And one common use of them was to take a copy of the

8   label and put it on the fax form and then fax that to the

9   physician's office, rather than handwrite all the

10  information --

11  Q.   I'm sorry to interrupt you but just so we're clear, for

12  what purpose would the label be put on the fax?

13  A.   It would be a way of communicating to the prescriber both

14  the -- all the elements of the prescription, the name of the

15  patient, the name of the drug, and the directions and the

16  quantity, instead of having to somehow handwrite that in.

17  Q.   And this is to communicate for the purpose of requesting a

18  refill?

19  A.   Requesting a refill or providing information to the

20  physician's office when they call and say -- want that, yes.

21  Q.   And, Professor Fassett, you had mentioned earlier

22  something about a robot.  To what extent, if any, would extra

23  labels be printed at pharmacies that used a dispensing robot,

24  such as ScriptPro?

25  A.   Well, the ScriptPro system was designed so that from the

1  start to the finish it filled the container and applied the

2  label at the time that the container was filled before it got

3  out to be checked by the pharmacy and dispensed to the patient.

4  And for that purpose, it obviously had to have its own label

5  printer.  So it would print a copy of the label.  But the rest

6  of the information that was needed, including the information

7  to go to the patient, would have been printed on that single

8  sheet.  So you would have at least two copies of the label.

9  The sheet that would go to the patient with the information,

10  typically, the part with the labels and stuff would be torn off

11  and discarded.

12  **Q.**   And, Professor Fassett, based on your experience, to what

13  extent, if any, would or could extra labels for prescription be

14  printed after the date that a prescription was filled and

15  received by the patient?

16  **A.**   They would be printed any time you needed to reprint -- to

17  reprint any of the pieces that were on that sheet.  So one

18  example might be that -- claim -- you've got a list of your

19  claims back from the payor, and you look and you see that one

20  claim was paid for what you thought was billed incorrectly.  It

21  wasn't uncommon in those days to print off the copy of the

22  prescription and hand it to the person in the pharmacy that

23  handled the claims with a note saying, "Please check this."

24       So they were used for internal purposes like that.

25       And another common one would be a patient said, "Could I

1  get an extra container to carry with me?"  I know it was real

2  common in the pharmacies that I worked in that patients would

3  be traveling out of the country, and they wanted to take their

4  entire month's supply of medication with them.  But in most

5  countries, you need to have a container that has the original

6  prescription label on it if you want to avoid having your drugs

7  confiscated, as opposed to just carrying them in a little

8  baggy.

9      Somebody might want an extra copy of their receipt for

10  that prescription, or there might be a need for an extra copy

11  of the patient information.

12      Anytime there was a need anywhere in the pharmacy for a

13  record of that prescription without issuing -- without actually

14  processing a claim or filling another supply, they would print

15  that sheet off.

16  **Q.**   Okay.  And I want to circle back later, again, to the

17  situations where extra labels can be printed after the date a

18  prescription was received by the patient.

19      But going back to on the day a prescription was either

20  billed or filled or received, to what extent, if any, was it

21  common, in your experience, Professor Fassett, during the

22  relevant period for an extra label to be printed because at

23  least one prescription per patient was refrigerated?

24  **A.**   Well, that's -- yes, that would be pretty common in that

25  you would have -- you would have most of the patient's

1  prescriptions put in one container, one bag, for them to pick

2  up, but you would have to store them -- refrigerated

3  prescription in a refrigerator.  So you'd print off another

4  copy of the label and put a note on it and say "refrigerator."

5  You would stick that -- typically, that note or something would

6  be stuck on the outside of the bag that was going to be storing

7  the drug until the patient picked it up or perhaps on the

8  delivery bag.

9  **Q.**   And what was the purpose, Professor Fassett, during the

10  relevant period of putting an extra label copy on the

11  refrigerated medication?

12  **A.**   Well, to direct the person that's delivering, the

13  technician or the delivery person, to make sure that they went

14  to the refrigerator to get that medication.

15  **Q.**   And would that -- to what extent if any, would that also

16  alert whoever was delivering the prescription that there would

17  be one or more other medications in a different location?

18  **A.**   Well, that would be the purpose, yes.

19  **Q.**   Going back to the topic of bubble packs.  To what extent,

20  if any, in your experience, Professor Fassett, during 2006 to

21  2013, might a patient have more than one bubble pack even just

22  for the morning or even just for the night?

23  **A.**   Well, it depended on the system.  For some patients, if

24  they didn't have a very large number of medications, if they

25  only had one or two, you could fit them in a blister and you

1   could make it so that all of the meds that they took on Monday

2   morning were in the blister for Monday morning, and all the

3   ones at noon were for Monday noon, and all the ones for Monday

4   dinner were for Monday dinner and so on.

5       If they had more drugs, you couldn't do that and so you

6   have might have a card for each drug.

7       And then if you had a card for each drug, it would

8   typically -- if it was delivered to a patient, it was typically

9   a week's card.  And in nursing home settings, they would have

10  multiple cards that would be a month's supply on the container

11  of one drug.

12      So they would sort of select the right packaging to meet

13  the needs of that particular patient.  But very often, a

14  month's supply, which is the typical amount the insurance pays

15  for, would require more than one card.

16  Q.   So for patients with several co-morbidities or several

17  serious conditions, let's say HIV, hepatitis C, diabetes, high

18  blood pressure, cancer, psychiatric conditions, or some

19  combination of those or others, a single patient could have two

20  or three bubble packs just in the morning, right?

21  A.   Yes.  That's probably an example.  There's transplant

22  patients who have as many as 20 pills a day.

23  Q.   In patients with substance abuse issues who, because their

24  substance abuse contracted HIV and hepatitis C and then they're

25  also having a poor diet, so they have diabetes and high blood

1  pressure and they have heart conditions, that would be another

2  example where a patient might need two or more bubble packs

3  just in the morning, right?

4  A.   Unfortunately, yes.

5  Q.   Now, I want to go back to the -- well, I guess we're still

6  on the same general topic, but I want to go back to sort of the

7  timing issue about prescription processing software allowing

8  extra labels to be printed after the date of dispensing or

9  after the date of prescription was received.  Okay?

10  A.   Yes.

11  Q.   To what extent, if any, Professor Fassett, was another

12  reason that could happen or would happen is when a processee

13  [sic] resubmitted a claim to a payor or readjudicated a claim?

14  A.   I thought I mentioned that.

15      But one -- just one example of that is if somebody has a

16  prescription for a generic medication, that medication is

17  available from multiple different manufacturers.  So in my

18  experience, it's not uncommon the prescription order comes in,

19  the technician prints off all of the material, gets ready to

20  fill the prescription and discovers that they don't have enough

21  to fill it and the new bottle, the new source is from a

22  different manufacturer.

23      And the insurers require that you tell them the exact

24  manufacturer of each product that you use, using something

25  called the National Drug Code.

1    So if, in fact, the prescription -- the medication that

2  had arrived from the wholesaler is a different manufacturer

3  than what it says on the label, you have to reverse that claim,

4  put in the different National Drug Code into the claim,

5  resubmit it.  In part, because based on that National Drug

6  Code, the amount of reimbursement and the cost to the pharmacy

7  may be different.  So at that point, the previous sheet that's

8  been printed off would be discarded, and the new label with the

9  proper National Drug Code would be -- would be there.

10    And that's also important for the patient because, at that

11  point, that recognizes that they -- it also recognizes that

12  their medication may look a little different than it did

13  before.  And we've all seen those stickers on our medications

14  that say -- it looks different, but it's the same thing.

15  Q.  Professor Fassett, based on your experience, during the

16  relevant period, again, meaning 2006 through 2013, I believe

17  you said that anyone with access to the prescription processing

18  software at a pharmacy could print an extra label; did I hear

19  you correctly?  That was earlier.

20  A.  That was -- yeah, by experience was that anybody who had

21  access to the computer would need access because reprinting --

22  reprinting stuff was so ubiquitous during the day that you

23  just -- you just needed everybody to have access to it.

24  Q.  In your opinion, Professor Fassett, based on your

25  experience as well, because extra labels printing was so

1  ubiquitous, as you put it, management of pharmacies didn't

2  track every time or even any time particularly when someone

3  printed an extra label, right?

4  **A.**   In my experience during that time period, that was not

5  something that people paid a lot of attention to.  It was not

6  something people paid a lot of attention to.

7  **Q.**   To what extent, if any, Professor Fassett, would

8  management of a pharmacy during the relevant period, in your

9  opinion and based on your experience, track the use of the

10  label-only function absent a specific reason to do so?

11  **A.**   I don't recall ever -- even in my own management practice,

12  I don't recall ever having paid any attention to that during

13  that time period.

14  **Q.**   And your experience, am I correct in inferring, that is --

15  it reflects what is typical in the pharmacy industry based on

16  your experience as well?

17  **A.**   Yes.

18  **Q.**   And to what extent, if any, would the prescription

19  processing software system itself keep a record of when or

20  whether someone printed an extra label after the patient

21  received the prescription?

22  **A.**   As it turns out, every computer keeps a hidden log of

23  everything that's done on that computer, and these are often

24  used forensically.  But to get access to that requires real

25  expertise that most users don't have.  Even in large chains, in

1   my experience, to get access to the minute-by-minute activities
2   of the computer requires a special request to the IT
3   department.
4   Q.   So to kind of sum up this sort of topic, am I correct in
5   understanding you, Professor Fassett, that during 2006 through
6   2013, pharmacy management would have -- typically have no
7   reason or way of knowing when or whether an extra label was
8   printed for any particular prescription?
9   A.   In general, in my experience during that period of time,
10  they did not pay attention to that.
11  Q.   And that was just something that wasn't tracked at all?
12  A.   To my recollection, that's correct.
13  Q.   Professor Fassett, if you see -- in your experience, from
14  2006 to 2013, if you see a prescription label on a pharmacy bag
15  and the label has information for a patient and the specific
16  prescription, a specific medication, et cetera, and you see the
17  bag with the label with that information, to what extent, if
18  any, does that tell you what's in the bag?
19  A.   Well, ideally, it should reflect the contents, but it
20  doesn't have to.  The bag could easily be separate.
21  Q.   In your experience, Professor Fassett, is it accurate that
22  just seeing a label alone reveals nothing about whether a
23  patient [sic] was received by a patient?
24  A.   Whether a prescription was received by a patient?
25  Q.   Let me rephrase the question.

1    Professor Fassett, in your opinion and based on your

2  experience, from 2006 to 2013, to what extent, if any, does

3  simply seeing a label by itself tell you anything about whether

4  the patient got the prescription?

5  A.   Nothing.

6  Q.   And is the same true for seeing a label attached to a bag?

7  A.   That would be true.

8  Q.   Would it also be true, in your experience and based on

9  your opinion, Professor Fassett, that seeing a label -- a

10 prescription label attached to a bag would tell you nothing

11 about what's in the bag or whether anything is in the bag?

12 A.   That would be correct.

13 Q.   And Professor Fassett, just a few more questions, I think.

14    To determine whether a patient received a prescription,

15 can you tell if a patient, or could you tell during the

16 relevant period, 2006, 2013, whether a patient has received the

17 prescription without interviewing the patient or reviewing the

18 log used to track receipt?

19 A.   I don't know of any way that you could.

20 Q.   So I guess if I'm understanding correctly, you could not

21 tell whether a patient had received a prescription without

22 interviewing the patient or reviewing the log during 2006 to

23 2013?

24 A.   Or the patient's agent, that's correct.

25 Q.   And if you interviewed the patient during 2006 to 2013 and

1  the patient says they don't remember if they got a

2  prescription, the only way to determine whether they received

3  it is to look at the log, right?

4  A.   That would be true.

5        MR. GREENBERG:  Your Honor, this Court's indulgence so

6  I can confer briefly.

7        (Counsel conferring.)

8        MR. GREENBERG:  Nothing further at this time, Your

9  Honor.

10        THE COURT:  All right.

11        You may cross-examine.

12        MR. EISER:  Your Honor, could I have just a moment?

13        (Counsel conferring.)

14                            - - -

15                    **CROSS-EXAMINATION**

16                            - - -

17  BY MR. EISER:

18  Q.   Good morning, Professor Fassett.

19  A.   Good morning.

20  Q.   Good to see you again.

21        I'll pick up with the last question you just answered.

22        You were asked, "You can't tell if a prescription was

23  delivered unless you see a delivery log"; is that right?

24        MR. GREENBERG:  Objection.  Mischaracterizes the

25  testimony and but . . .

1              **THE COURT:**  He did say talk to the patient or look at

2  the log, didn't he?

3              **MR. EISER:**  Okay.

4  **BY MR. EISER:**

5  **Q.**   Those are the two ways, talk to the patient or the

6  delivery log?

7  **A.**   The delivery log is evidence that it was delivered.

8  Talking to the patient or their agent could be evidence.

9  **Q.**   All right.  If you have, you know, months' old

10  prescriptions, six months old, that have been refilled two and

11  three times, and it's still sitting there in the pharmacy,

12  that's a pretty good indication that those medications were not

13  delivered, isn't it?

14              **MR. GREENBERG:**  Object to the form.

15              **THE COURT:**  Overruled.

16              **THE WITNESS:**  That would not be a way of determining

17  whether it was delivered.  It would be a way to determine, I

18  guess, that it wasn't.

19  **BY MR. EISER:**

20  **Q.**   Right.  Okay.

21      Professor Fassett, you have never worked as a pharmacist

22  in Maryland; is that right?

23  **A.**   That's correct.

24  **Q.**   Or in any capacity in Maryland; is that right?

25  **A.**   Not to my recollection.

1  Q.    Okay.  Medicare is administered by regional administrators

2  under a contract with the medical providers and pharmacies; is

3  that right?

4  A.    Yes.

5  Q.    And you have not seen the contract governing Maryland

6  pharmacies, correct?

7  A.    During the time period, no.

8  Q.    You were asked by Mr. Greenberg to write a report for

9  Mr. Annappareddy's criminal fraud case; do you remember that?

10  A.    I do.

11  Q.    And you wrote a report in that case that is similar to the

12  ones for this malicious prosecution case, correct?

13  A.    I believe so, yes.

14  Q.    But you never testified in that criminal case; is that

15  right?

16  A.    That's correct.

17  Q.    And that report was never reviewed or addressed by any

18  other experts, correct?

19  A.    I don't know.

20  Q.    Okay.  And you've never testified in a criminal case,

21  correct?

22  A.    I've never testified in a criminal case?

23  Q.    Yes.

24  A.    I think I may have testified in a criminal case, yes.  I'd

25  have to look back at my records, which I don't have with me.

1   But I can't say that I never have.

2   **Q.**   Do you remember your deposition we took out in Spokane

3   back on September 30th, 2022?

4   **A.**   I do.

5   **Q.**   Okay.

6   **A.**   Mostly.

7   **Q.**   Do you remember I asked you that question:

8       "QUESTION:  Have you ever testified also in criminal

9   cases?"

10      And your answer was:

11      "ANSWER:  I don't think I've ever gotten to the point

12  where I gave either a deposition or trial testimony in a

13  criminal case to the best -- I've testified in administrative

14  law cases, but not criminal cases, no."

15      Do you remember that question and answer?

16  **A.**   Yes, I -- I do.  And that's the answer I gave you then, I

17  don't think it's inconsistent with what I said.  I can't say

18  that I never did.  But I don't remember that I have.

19  **Q.**   Okay.

20      The pharmacy industry, or practice of pharmacy, is

21  regulated extensively by statutory and regulatory law, correct?

22  **A.**   That's correct.

23  **Q.**   And a pharmacist's duty with regard to reversing claims to

24  Medicare and Medicaid pay for undelivered prescriptions, that

25  would be covered by law, right?

```
 1   A.   Or contract.
 2   Q.   Now, in writing that first report for the criminal case,
 3   what documents did you rely on in writing that first report for
 4   the criminal case?
 5   A.   As we sit here, sir, I don't recall, it's been a long time
 6   ago.
 7   Q.   Okay.  You didn't read any of the evidence or transcripts
 8   in that criminal case before preparing that first report,
 9   correct?
10   A.   I don't believe -- I don't recall that I did, no.
11   Q.   So the information you relied on was what Mr. Greenberg
12   told you, right?
13        MR. GREENBERG:  Objection, that's inaccurate based on
14   the contents of his report itself, which Government counsel has
15   had since June of last year.
16        THE COURT:  Well, it is cross-examination.  I'll allow
17   it for what it's worth.
18        Go ahead.
19        THE WITNESS:  I don't recall -- today, I don't recall,
20   in that original case, that I was given more than questions
21   about the material that I testified, that was in my current
22   report, which is what was -- what were the -- answering
23   questions about the things that I covered in the report under
24   the standard of care and based on my experience, generally.
25   BY MR. EISER:
```

1  Q.   And who provided you those questions that you answered?

2  A.   It would have been counsel for --

3  Q.   For?

4  A.   There have been more than one counsel -- it would have

5  been counsel for Mr. Annappareddy, I would think.  That's --

6  the people that retain me generally ask me -- ask me to do the

7  kinds of things I do in my report.

8  Q.   Okay.  You haven't read the complaint that brings us

9  together today in this malicious prosecution case; is that

10 right?

11 A.   Not to my recollection, no.

12 Q.   And you've never testified in a case involving a claim of

13 malicious prosecution, correct?

14 A.   I would think not, no.

15 Q.   Okay.  The only thing you read from the underlying

16 criminal case in forming your opinions here is Judge Russell's

17 opinion vacating the judgment; is that right?

18 A.   I think I saw that, yes.  I'm pretty sure I did, because I

19 believe I abstracted it for the American Society for Pharmacy

20 Law.

21 Q.   From that decision, you learned that the conviction was

22 vacated because of the accidental destruction of some documents

23 by the U.S. Attorney's Office and some errors in the claims in

24 the analysis for claims for payment?

25        MR. GREENBERG:  Objection.  Judge Russell did not find

1  the destruction of documents at the direction of Sandra

2  Wilkinson was, quote, "accidental."  It mischaracterizes.

3          THE COURT:  I will sustain that objection.  I do think

4  it mischaracterizes what happened.

5  BY MR. EISER:

6  Q.  Well, you did learn from Judge Russell's opinion that the

7  reason the decision was vacated, the conviction was vacated,

8  was a destruction of documents and errors in the analysis of

9  the claims for payment; is that right?

10          MR. GREENBERG:  Objection.  That mischaracterizes

11  Judge Russell's decision, which relied on --

12          THE COURT:  It speaks for itself, and I've read it

13  more than once.

14          MR. EISER:  I understand, Your Honor.  I'm trying to

15  get the basis for his opinions.  He did answer this question at

16  deposition so --

17          THE COURT:  Well, go ahead.  Ask him the question.

18  BY MR. EISER:

19  Q.  Okay.  What you learned from the criminal case was that it

20  was vacated because of the destruction of documents and errors

21  in the analysis for the claims for payment; is that right?

22  A.  I think that was the gist of what I was aware of, yes.

23  Q.  You're also aware that when the errors in the loss

24  analysis presented at trial were brought to the attention of

25  the Government, that the prosecution acknowledged those errors

```
 1   and agreed to vacate the judgment, that's in Judge Russell's

 2   opinion --

 3            MR. GREENBERG:  Objection, mischaracterizes the

 4   record.  There was a 15-plus month gap of where that happened,

 5   and that is just totally misconstruing what happened.

 6            MR. EISER:  Counsel has --

 7            THE COURT:  Well, do you acknowledge it was 15 months

 8   later when the Government made the acknowledgment?

 9            MR. EISER:  Yes, Your Honor.

10            THE COURT:  With that understanding, you can proceed.

11            MR. EISER:  My only question is about the speaking

12   objections.  Mr. Greenberg was objecting to them quite

13   vigorously last week, and now he seems to have fallen in love

14   with them.  I would object to that.

15            THE COURT:  All right.  Well, go ahead.

16   BY MR. EISER:

17   Q.   Now, are you aware that the loss analysis that was

18   presented at trial, at the criminal trial that Judge Russell

19   talked about, was entirely different from the loss analysis

20   that was submitted in the search warrant affidavit that is the

21   foundation of this case?

22            MR. GREENBERG:  Objection, Your Honor.  This is way

23   outside the scope of Professor Fassett's opinions.  I've let a

24   lot of this go --

25            THE COURT:  I think I tend to agree, Mr. Eiser.
```

1      MR. EISER:  Yes, Your Honor.

2      THE COURT:  I think we're going far afield of what he

3  testified to on direct.  So I'll sustain the objection, beyond

4  the scope of direct.

5  BY MR. EISER:

6  Q.  You have not read the MEDIC 1495, I just want to be clear

7  on that; is that correct?

8      MR. GREENBERG:  Objection, Your Honor.  This is

9  clearly beyond the scope of both Professor Fassett's report and

10 his direct.  I don't know what's happening here.

11     THE COURT:  Once again, aren't you going beyond what

12 he testified to on direct?

13     MR. EISER:  He's testified to a number of issues.

14     For example, he just testified extensively about software

15 prescription processing --

16     MR. GREENBERG:  I would suggest, Your Honor, that the

17 witness be excused if we're going to have these kinds of

18 debates.  But I also think this is pretty clearcut, pretty

19 clearly outside the scope.

20     THE COURT:  Let me see where we're going with this.

21 I'm dubious of whether we're going to go very far on this.  Let

22 me just see.  Go ahead.  Overruled for now.

23 BY MR. EISER:

24 Q.  For example, you talked for about a half hour on direct

25 about prescription processing software and circumstances where

1   it could print a label or print an extra label; do you remember

2   that testimony?

3   A.   I still do, yes.

4   Q.   And you have no idea what prescription processing software

5   they used at Pharmacare in 2011, '12, and '13, correct?

6   A.   That's correct.

7   Q.   Now, so you -- and you haven't read the search warrant

8   affidavit that brings us together; is that right?

9          MR. GREENBERG:  Objection, Your Honor.  Way outside

10   the scope of both the report and the --

11          THE COURT:  Sustained.  Sustained.

12   BY MR. EISER:

13   Q.   Well, just to be clear, you have no opinions about

14   anything to do with the operation of Pharmacare during the

15   relevant time period; is that right?

16          MR. GREENBERG:  Objection, that mischaracterizes in

17   part.  But . . .

18          THE COURT:  Well, I'll let the witness handle it any

19   way he wants to.

20          Overruled.

21          THE WITNESS:  Could you repeat the question.

22   BY MR. EISER:

23   Q.   You have no opinions about the operations of Pharmacare?

24   A.   I was not asked to do so, and I have not done so.

25   Q.   It would be inappropriate to be -- for a pharmacist to be

```
 1  paying kickbacks; is that right?
 2          MR. GREENBERG:  Objection, Your Honor.  Outside the
 3  scope of direct.  And I would ask at this point that Your Honor
 4  ask Government counsel to wrap it up if this is going to
 5  continue.
 6          THE COURT:  I do think that's beyond the scope of
 7  direct.
 8      Sustained.
 9          MR. EISER:  All right, Your Honor.
10      Your Honor, could I have a moment?
11          THE COURT:  All right.  Go ahead.
12      (Counsel conferring.)
13          MR. EISER:  Thank you, Your Honor.  That's all we
14  have.
15          THE COURT:  All right.
16      Any redirect?
17          MR. GREENBERG:  Yes, Your Honor, just very briefly.
18                          - - -
19                  REDIRECT EXAMINATION
20                          - - -
21  BY MR. GREENBERG:
22  Q.  You were asked about a hypothetical at the start of
23  Government counsel's examination involving a situation where
24  old prescriptions that were filled -- the same prescription was
25  filled two or three times were sitting around for long periods
```

1  of time, right?

2  **A.**   I think so, yes.

3  **Q.**   So that question, in that hypothetical, two or three

4  duplicates filled to the same prescription were sitting around;

5  that's how you understood it, right?

6  **A.**   I understood it that there were refills of a prescription

7  in the pharmacy or a duplicate, yes.

8  **Q.**   And so when you answered that question, you were -- you

9  were responding to the hypothetical as posed?

10  **A.**   That's correct.

11  **Q.**   And you agree -- in your experience, Professor Fassett, in

12  this unusual hypothetical where these same old prescription

13  filled two or three times was sitting around after of a very

14  long period of time, you would still need to follow up by

15  either interviewing the patient or looking at the log to see if

16  the patient had received the prescription, right?

17  **A.**   To determine if one had been delivered, yes.

18        **MR. GREENBERG:**  Nothing further, Your Honor.

19        **THE COURT:**  All right.

20     Thank you, sir.  You may step down.  You're excused.

21        **THE WITNESS:**  Thank you.

22     (Witness exits.)

23        **THE COURT:**  Please call your next witness.

24        **MR. GREENBERG:**  Your Honor, Plaintiff Reddy Vijay

25  Annappareddy calls former Assistant U.S. Attorney Sandra

```
 1  Wilkinson.
 2        (Witness enters.)
 3            THE CLERK:  Please remain standing, raise your right
 4  hand.
 5        (Witness sworn.)
 6            THE CLERK:  You may be seated.
 7        For the record, ma'am, could you please state and spell
 8  your first and last name, please.
 9            THE WITNESS:  Good morning.  Sandra Wilkinson,
10  W-i-l-k-i-n-s-o-n.
11            THE CLERK:  Thank you.
12                        -   -   -
13                    DIRECT EXAMINATION
14                        -   -   -
15  BY MR. GREENBERG:
16  Q.   Good morning, Ms. Wilkinson.
17  A.   Good morning, sir.
18  Q.   How you have been since your deposition last year?
19  A.   How have I been?
20  Q.   Yes.
21  A.   What do you mean?
22  Q.   Have you been well since your deposition last year?
23  A.   Yes, I've been well.  Thank you.
24  Q.   Ms. Wilkinson, you were the lead prosecutor in the
25  criminal case against Mr. Annappareddy, correct?
```

1   A.   I was.

2   Q.   And in that case, or to kick off that case, to initiate

3   that case, on July 23rd, 2013, you brought Special Agent Robert

4   Mosley before the grand jury, correct?

5   A.   I recall bringing Special Agent Mosley.  I'm not positive

6   of the date.

7   Q.   In the Pharmacare case, as in any case, Ms. Wilkinson, you

8   would not tolerate a case agent lying before the grand jury,

9   right?

10  A.   Of course not.

11  Q.   And you wouldn't have allowed an agent to present false

12  testimony before a grand jury in the first place if you had

13  known it was false, right?

14  A.   Correct.

15  Q.   It was your understanding, as the lead prosecutor

16  presenting Special Agent Mosley to the grand jury on July 23rd,

17  2013, that everything he said to the grand jury was truthful,

18  right?

19  A.   I believed it to be truthful, yes, sir.

20  Q.   And if you had any reason to believe it wasn't fully

21  truthful, you would have corrected it, right?

22  A.   Correct.

23  Q.   You were aware that on the same day that you presented

24  Special Agent Mosley's testimony to the grand jury earlier that

25  day, then Special Agent Maura Lating presented an affidavit as

part of a search warrant affidavit to Magistrate Judge Sullivan

for several Pharmacare locations, right?

A.   I know she was the affiant.  Again, I'm not 100 percent

sure of the dates and whether it was the same date or not.

Q.   Okay.  If you had known -- is it okay with you,

Ms. Wilkinson, if I refer to that affidavit as "the Lating

affidavit"?

A.   Certainly.

Q.   If you had known that anything in the Lating affidavit was

incorrect or inaccurate, you wouldn't have allowed then-Special

Agent Lating to submit it, would you?

A.   Correct.

Q.   You trusted Maura Lating to accurately present the facts

to the Court, meaning Magistrate Judge Sullivan, correct?

A.   Yes, of course.  That was her responsibility.

Q.   And as far as you knew, as of the date that then-Special

Agent Lating presented the affidavit, the Lating affidavit, you

had no reason to believe that she included incorrect

information in that affidavit, right?

A.   I had no reason to believe that.

Q.   The answer is yes?

A.   Yes.

Q.   You similarly had no reason to suspect that then-Special

Agent Mosley put any incorrect information in the parts of the

Lating affidavit that he was drafted, right?

1   A.   Correct.

2   Q.   As far as you knew, Ms. Wilkinson, as of the date the

3   Lating affidavit was presented, to the extent that other agents

4   or investigators assisted then-Special Agent Lating in drafting

5   the Lating affidavit, you had no reason to believe that any of

6   those persons provided inaccurate information to Lating, right?

7   A.   Yes.  At the time that it was submitted, of course.  We

8   all believed it to be truthful and accurate.

9   Q.   And when you say "we," I mean, you can only --

10  A.   Well, I can only speak for myself, that's correct, sir.  I

11  believed it to be.

12  Q.   Ms. Wilkinson, in terms to sum up this sort of topic, you

13  trusted Special Agent Lating as of July 2013, right?

14  A.   Yes.

15  Q.   And, more specifically, you trusted her accurately to

16  present the facts gathered in the investigation to the

17  magistrate judge, right?

18  A.   Yes.

19  Q.   I want to turn to your role as the lead prosecutor in

20  reviewing the Lating affidavit.

21       There was a second prosecutor named Catherine Schuster

22  Pascale working with you, right?

23  A.   Correct.

24  Q.   She was a Special Assistant U.S. Attorney?

25  A.   At some point she was designated a Special Assistant U.S.

1    Attorney.

2    Q.   Okay.  And her full-time job, her main job was working in

3    the Office of the Maryland Attorney General as an Assistant

4    Attorney General?

5    A.   Yes.

6    Q.   And you and Ms. Pascale, in reviewing the affidavit, you

7    read it for your own sense of whether there was probable cause,

8    you might reorganize it and correct some grammatical errors,

9    but you relied on the agent, Maura Lating, about the truth of

10   the statements, right?

11   A.   Well, she was the affiant.  But the way -- if I might

12   explain, Your Honor.  The way that the U.S. Attorney's Office

13   works is that when we read and submit an affidavit to the

14   court, we are not just reviewing it for grammatical errors or

15   corrections, we're reading it, yes, to make our own

16   determination of whether or not there was probable cause, but

17   we could have substantive suggestions and comments, we could

18   have things that we wanted added in there.  We could make sure

19   that we understand it substantively.

20        I think it's more than just reviewing it for typos and for

21   probable cause.  Like, there is a teamwork aspect to it.  And

22   we have -- in the U.S. Attorney's Office, we have a gatekeeper

23   function to the magistrate judges.

24   Q.   Ms. Wilkinson, in this case, however, you recall you've

25   testified at deposition about this case?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1    **A.**    I do.

2    **Q.**    And regardless of what your general practice was, in this

3    case, you merely reviewed the Lating affidavit for grammatical

4    errors, probable cause, and organization, right?

5    **A.**    In addition to what I just stated.  I think there were

6    times that I added things, assuming Ms. Lating agreed with it.

7    I recall specifically when there was a conflict in a report

8    that was also in the affidavit, asking them to make

9    clarifications with the witnesses, that sort of thing.

10   **Q.**    We're going to play a clip from your videotaped

11   deposition.

12        (Video playing.)

13   **BY MR. GREENBERG:**

14   **Q.**    Ms. Wilkinson, that was truthful testimony, right?

15   **A.**    Yes.

16   **Q.**    So you now agree that it was true -- the truth is that in

17   the Pharmacare case, you read the Lating affidavit for your own

18   sense of whether there was probable cause, you organized it,

19   you maybe corrected some grammatical errors, but you relied on

20   Maura Lating for the truth of the statements in the affidavit?

21   **A.**    Again, just to explain, yes, I think that what I'm saying

22   is not inconsistent with what I said here.  It depends on what

23   section of the affidavit you're referring to.  But certainly, I

24   read it to make sure that I understood it and if there were --

25   but she is the person to whom is making the swearing to the

```
 1   judge that the assertions are true.
 2        If you're -- I mean, I don't know how else to explain it
 3   more than that.  But I participate in the drafting of --
 4   drafting is the wrong word.  But of the -- it's a very long
 5   affidavit, and you have to make sure that you understand all of
 6   it.
 7   Q.   Okay.  But in terms of the substance and accuracy of the
 8   statements in the affidavit, you trusted the agents on that and
 9   those issues, right?
10   A.   Certainly.  They're the ones that are swearing to it, to
11   the judge.
12   Q.   Let's move on to the topic of now former Special
13   Agent Robert Mosley and MEDIC 1495.
14        Ms. Wilkinson, you relied on then-Special Agent Mosley to
15   provide accurate information regarding MEDIC 1495, right?
16   A.   I'm not exactly sure.  You -- meaning he would give me
17   their report.
18   Q.   Well, let me sort of back up.
19        We've established that you relied on Special Agent Mosley
20   to provide you with accurate information about anything in the
21   investigation, right?
22   A.   Yes, of course.
23   Q.   Okay.  So that would also apply to Special Agent Mosley's
24   communications with MEDIC about MEDIC 1495?
25   A.   Can you say that again.
```

```
1    Q.    Sure.
2          Just as you relied on Special Agent Mosley otherwise, you
3    relied on Special Agent Mosley to give you accurate information
4    about his communications with MEDIC regarding MEDIC 1495?
5    A.    Yes.
6    Q.    And you relied on Special Agent Mosley to accurately relay
7    to you what MEDIC told him, right?
8    A.    Yes.
9    Q.    And so you understood from Special Agent Mosley that there
10   were no double-counting or duplication issues in MEDIC 1495,
11   right?
12   A.    I never thought there was double-counting issues until we
13   were told that after the trial.  That's the first time I
14   learned that there were double-counting issues with the --
15   Q.    So the answer to my last question is yes?
16   A.    It's just how you were saying it.  I'm not sure whether he
17   ever said to me, you know, "Ms. Wilkinson there's no
18   double-counting issues."  I think we just assumed that all
19   auditors and people doing that type of work would not
20   double-count.
21   Q.    Well, and your understanding that you got specifically
22   from Special Agent Mosley is that MEDIC was not allowing any
23   duplicates, right?
24   A.    I think that that's what they're striving to do.  They
25   constantly go back and read and review their data, and they're
```

 1 | striving not to have double-counting.

 2 | **Q.**   And Special Agent Mosley told you that, right?

 3 | **A.**   I don't have a specific recollection of Agent Mosley

 4 | saying those words to me.  He would provide me with a report,

 5 | and there were other people who were looking at the data at the

 6 | time -- and I guess you're -- I'm assuming this is all around

 7 | the time of the Lating affidavit, is that what you're referring

 8 | to?  Not after the Lating affidavit?

 9 | **Q.**   Ma'am, I'm asking you about exactly what the question

10 | said.

11 | **A.**   At no time do I have a specific recollection of

12 | Agent Mosley saying those exact words to me.

13 |          **MR. GREENBERG:**  Court's indulgence.

14 |      (Counsel conferring.)

15 |          **MS. FARBER:**  Excuse me, Your Honor, while they're

16 | conferring, may I have the deposition cite for the clip that

17 | was played previously?

18 |          **THE COURT:**  That's a reasonable request.

19 |      If you could give her the page and line cite.

20 |          **MR. GREENBERG:**  Yeah, I'll give it to you in just a

21 | moment.  Actually, Brian can very well do that.

22 | **BY MR. GREENBERG:**

23 | **Q.**   Ms. Wilkinson, I don't think I have a whole lot more.  Let

24 | me switch to a different topic, and that's immigration.

25 |      You were not aware of any legal basis, after

```
 1  September 1st, 2016, for putting a hold on any immigration
 2  application by Mr. Annappareddy, right?
 3  A.    What is the significance of September 1, 2015?
 4  Q.    That's the date that Judge Russell --
 5  A.    That's the date of the hearing?
 6  Q.    -- ruled and --
 7  A.    Dismissing --
 8  Q.    -- you recall you were present?
 9  A.    Yes, I recall.
10  Q.    That's the date in which Judge Russell --
11  A.    Putting an immigration --
12  Q.    -- decided that the criminal case, the remaining charges
13  in the second superceding indictment had to be dismissed with
14  prejudice?
15  A.    Yes, I just didn't recall what the actual date was.  If
16  that's --
17  Q.    Let me rephrase the question.  Now that --
18        THE REPORTER:  One at a time.
19        MR. GREENBERG:  My apologies.
20  BY MR. GREENBERG:
21  Q.    You now understand why I'm asking about that date?
22  A.    Yes.
23  Q.    What that date is?
24  A.    Yes.
25  Q.    All right.  Let me rephrase the question.
```

1        Ms. Wilkinson, were you aware of any legal basis after
2    September 1st, 2016, for putting a hold on any immigration
3    application by Mr. Annappareddy?
4    **A.**    And what do you mean by "a hold"?  This is what I
5    remember.  I remember -- was it September 2015, that's after we
6    did the second superseding indictment, and that's when
7    Judge Russell dismissed that --
8              **MS. FARBER:**  Your Honor, going to object to this
9    question on lack of foundation.  It hasn't been established
10   that Ms. Wilkinson would be aware.
11             **THE COURT:**  Well, just, if she knows.
12       If you don't know, you can just indicate.
13             **THE WITNESS:**  Yeah, I -- I -- I have no recollection
14   of a hold on Mr. Annappareddy's immigration status.
15   **BY MR. GREENBERG:**
16   **Q.**    So that wasn't my question.  But to refresh your
17   recollection, why don't we play another video clip from your
18   deposition, see if that can refresh your memory.  All right?
19             **MS. FARBER:**  May I have the page and line?
20             **MR. GREENBERG:**  Yes, 158, lines 3 to 14.
21       (Video playing.)
22   **BY MR. GREENBERG:**
23   **Q.**    Does that refresh your recollection, Ms. Wilkinson?
24   **A.**    About whether or not there was a legal basis to put a hold
25   on his immigration status?

1  Q.    After September 1st, 2016, yes, the question I asked you

2  earlier.

3  A.    Didn't that say 2014?

4  Q.    Okay.  So rather than replaying the entire clip, I'm just

5  going to read the first part of it, and see if this refreshes

6  your recollection so we can try to move on.

7        The question, back then, you know, many months ago was,

8  quote:

9        "QUESTION:  Are you aware of any legal basis after

10 September 1st, 2016, for putting a hold on any immigration

11 application by Mr. Annappareddy?"

12       And you answered "No" before you went on, right?

13 A.    Yes, I answered "No."

14 Q.    And you stand by that testimony, right?

15 A.    Yes.  I guess the confusion that I'm having --

16 Q.    Ma'am --

17       MS. FARBER:  Your Honor, she should be permitted to

18 answer.

19       THE COURT:  Go ahead and finish your answer.  Go

20 ahead.

21       THE WITNESS:  I'm sorry, sir.  The confusion that I'm

22 having is that I know that in the investigation there were

23 evidence that Mr. Annappareddy had committed violations of

24 various immigration status.  There was evidence of that.  And

25 we had contemplated asking the grand jury to return various

1   immigration charges against him in the first indictment and

2   that we considered it as well after Judge Russell -- after we

3   voluntarily dismissed the indictment after trial before the

4   second superseding.  So when you say legal -- I don't know of

5   any hold on his immigration application.  But when you say --

6   like, I'm just confused because I do think there was some

7   evidence that he had violated some immigration.  But I don't

8   know of a hold, and I'm not even sure what that means.

9           MR. GREENBERG:  I'm going to move to strike all of

10  that answer as both nonresponsive and based on post-indictment

11  after-acquired evidence.

12          THE COURT:  Well, she just explained her confusion.

13      Overruled.

14  BY MR. GREENBERG:

15  Q.   Ms. Wilkinson, you know that the charge added post

16  indictment, years later, for purported visa fraud was dismissed

17  with prejudice by Judge Russell, right?

18  A.   I know that he dismissed the whole --

19  Q.   With prejudice, right?

20  A.   With prejudice.

21          MR. GREENBERG:  All right.  Let me just confer and see

22  if I have anything else.

23      (Counsel conferring.)

24          MR. GREENBERG:  Nothing further at this time, Your

25  Honor.

```
 1          THE COURT:  Let's go ahead and begin
 2   cross-examination.
 3                      - - -
 4                 CROSS-EXAMINATION
 5                      - - -
 6   BY MS. FARBER:
 7   Q.   Good morning, Ms. Wilkinson.
 8   A.   Good morning, Ms. Farber.
 9   Q.   When did you join the U.S. Attorney's Office?
10   A.   In September of 1994.
11   Q.   What kind of cases did you handle while you were an AUSA?
12   A.   Guns, drugs, violent crime, capital murder, fraud, public
13   corruption, child exploitation.  I mean, I was there for almost
14   30 years.
15   Q.   Did you ever hold any supervisory positions with the U.S.
16   Attorney's Office?
17   A.   I did.
18   Q.   And when did you hold those positions?
19   A.   In -- I think around 2005, then-U.S. Attorney Rod
20   Rosenstein appointed me to be the chief of major crimes in
21   Baltimore, and I moved my office from the Greenbelt Southern
22   Division up to Baltimore to head that section.
23   Q.   Did you have any experience with healthcare fraud cases
24   before you took on the Annappareddy case?
25   A.   I did.
```

1  Q.   Can you describe that experience.

2  A.   I had -- I had a number of trials against pharmacists and

3  doctors.  I prosecuted a cardiologist for putting unnecessary

4  stents in people's hearts.  I prosecuted a number of different

5  healthcare matters that resulted in plea agreements.  I

6  probably had four or five trials involving healthcare fraud.

7  And it was in my portfolio to -- as major crimes chief, to

8  review and authorize cases of other prosecutors in the office

9  that were going to handle healthcare fraud matters.

10 Q.   And how many, approximately, criminal investigations had

11 you handled before you took on the Annappareddy case?

12 A.   Hundreds.

13 Q.   Have you ever taught any classes in any aspect of criminal

14 law or practice?

15 A.   I -- I taught at -- a semester with a public offender --

16 assistant public defender John Chamble at Catholic University.

17 I taught at University of Maryland, a federal criminal

18 investigation class.  I taught, internally in the Office,

19 federal criminal investigative techniques for years, and that's

20 where we -- in-house training for new prosecutors.  I've taught

21 at various seminars for agents in a number of different

22 matters.

23 Q.   How did you become involved in the Annappareddy

24 prosecution?

25 A.   As best I can recall, the case was -- I can't recall if it

1   was brought to me by the civil section when a *qui tam* action

2   was filed, because that could be something that could happen

3   with a civil and criminal component to something.  Or if I got

4   a call directly from then-AUSA Judge DiPietro, asking me to

5   look at the case.  But at some point, I met Ms. Pascale and

6   Laurie Gutberlet and possibly another agent or two from there

7   in the context of those individuals as to whether or not there

8   were possible criminal aspects of what was then a civil *qui tam*

9   case.

10  Q.   What appealed to you, if anything, about the case?

11  A.   When I first met Agent Gutberlet -- well, I shouldn't say

12  agent, she was an investigator, but I was impressed with her

13  knowledge of the case, of her investigation to date.  I don't

14  always get cases that have been already formulated in some

15  ways.  She had already spoken to a number of witnesses, was

16  developing a confidential source.  She had reviewed claims

17  data, talked to a variety of different people and interviews,

18  and she just struck me as having her stuff together.  She

19  seemed very professional.  It was the first time I had ever met

20  her, but I knew that I thought I would like to work with her.

21  Q.   What charges were you considering at the time that you

22  came on board?

23  A.   Healthcare fraud, you know, and there are a number of

24  different charges, including immigration issues that came up in

25  the case, various ways of charging false statement, conspiracy,

1  adulterated product.  There was a number of different

2  allegations at the very beginning that gave us -- into looking

3  into various federal statutes that might apply.

4  Q.   Now, is dollar loss an element of any of the charges that

5  you pursued?

6        MR. GREENBERG:  I'm going to object to the extent this

7  calls for a legal conclusion.

8        THE COURT:  Overruled.

9        THE WITNESS:  Healthcare fraud, the statute itself, I

10 think 1340 -- I don't know, it's been a long time since I've

11 looked at it, and I've been retired a year, so forgive me if I

12 have the statute wrong.  But it does not require us to prove a

13 specific dollar amount.  1346.

14 BY MS. FARBER:

15 Q.   I'm going to show you a new exhibit.

16        MS. FARBER:  I believe we're on Defense Exhibit 100.

17 Is that right Ms. Herring?

18        THE WITNESS:  In the book or --

19        MS. FARBER:  No, I have it in my hot little hands, so

20 I'm going to bring it over to you.

21        MR. GREENBERG:  Counsel, what was this marked as?

22        MS. FARBER:  This is Defense Exhibit 100, sir.

23 BY MS. FARBER:

24 Q.   What is the document that I've just handed to you?

25 A.   The original indictment against Mr. Annappareddy and two

1  of his colleagues, Vipin Patel and Jigar Patel.

2  **Q.**   Okay.  And did you have a hand in drafting this

3  indictment?

4  **A.**   I'm certain that I wrote it.

5  **Q.**   Now, looking at the charges in the indictment, was

6  Mr. Annappareddy charged anywhere with stealing any amount of

7  money for his personal -- for his personal self?

8  **A.**   No.

9          **MS. FARBER:**  Your Honor, I'd like to move Defense

10  Exhibit 100 into evidence.

11          **THE COURT:**  Any objection?

12          **MR. GREENBERG:**  Just one moment, Your Honor.

13      I -- no, we don't object.  We support the admission of

14  this document.

15          **THE COURT:**  Admitted without objection.

16  **BY MS. FARBER:**

17  **Q.**   All right.  Ms. Wilkinson, please describe Robert Mosley

18  as an agent.

19  **A.**   At the time of the Annappareddy investigation and the

20  Pharmacare investigation, which is -- we really called it the

21  Pharmacare investigation, I had -- I had known Agent Mosley for

22  some years.  I had work with him in the context of other

23  investigations before.

24          **THE WITNESS:**  And I should say, Your Honor, that most

25  times in a healthcare fraud case, as well as other types of

1  white-collar crime, it's that kind of an alphabet soup of

2  agencies that can be involved in a case.  So I don't recall

3  ever having Robert, Agent Mosley, as a lead case agent, but was

4  always in a support position with another agent, maybe from

5  HHS, from Food and Drug Administration, from the FBI, from

6  Defense Criminal Investigative Service.  And I would describe

7  him as a genuinely honorable, extremely nice man, who wasn't

8  always as, you know -- I don't know if you've met any of the

9  people here, but Agent Lating is much more of -- an intensity

10 to her that has the knowledge and the substantive facts.

11 Robert is our person that can talk to people, and people like

12 him and talk to him, and get information, you know, like almost

13 to collect it.  But I don't -- yes, I would describe him in

14 that way.

15 **BY MS. FARBER:**

16 **Q.**   That goes to my next question, Ms. Wilkinson, which is

17 what was Agent Mosley's role on the Pharmacare investigation?

18 **A.**   We all had a number of different roles that we supported,

19 but my specific apropos of what is going on here is that he was

20 the collector of all of the data for all the different -- first

21 the MEDIC analysis and eventually for the in-house analysis

22 that the U.S. Attorney's Office did, the person that would call

23 and make sure they sent it, get the disks together, to make

24 copies of the disks, make sure that we had them for discovery,

25 make sure we had them for the agencies that were reviewing

1  them.  That was his job.

2  **Q.**   You've gone into this a little bit, but would you describe

3  Agent Lating to us.

4  **A.**   Agent Lating was a very dedicated, hardworking -- I'm not

5  sure I've met too many other agents who worked as hard as she

6  did.  She was very determined and smart and cared deeply about

7  what she did.  And had a lot on her plate.  And was a good,

8  good substantive agent that had a good handle on the laws and

9  what was required to prove a case of this magnitude.

10 **Q.**   What was Agent Lating's role on the Pharmacare

11 investigation?

12 **A.**   She was lead case agent.  When I say that, I don't know if

13 she was the lead case agent when it started, but I designated

14 her the lead case agent and the one that would be at trial

15 because you have to have one.  When you have a number of

16 different agencies working on the same case, you need one

17 person to be your go-to person that is kind of -- you know, can

18 then delegate other assignments to other agents, and that was

19 Agent Lating.

20 **Q.**   You mentioned former AUSA now Judge Michael DiPietro.

21 What was his role on the team?

22 **A.**   My recollect -- before he went on the bench, he was the

23 civil attorney that was assigned to this case.  And my

24 recollection is he was in it before me.  And the role of the

25 civil attorneys in a possibly parallel case like this, is that

1  he is looking at it from a completely different angle than we

2  are.  We're looking for evidence of criminal intent and

3  wrongdoing of fraud, so to speak, and he is looking for money

4  and what were the harms to various federal programs.

5      And he had experience working with this type of data and

6  claims information, and he became the person that I relied on

7  at the very beginning to ensure that I understood and that he

8  understood and what the possible dollar fraud was.

9  Q.   Now, thinking about the Pharmacare investigation team, was

10  every team member involved in every aspect of the

11  investigation?

12  A.   No.

13  Q.   Why?

14  A.   Because you can't, right.  There was too much to do.  We

15  had regular meetings.  And Ms. Pascale was particularly good at

16  doing to-do lists and getting us all so we know what was -- you

17  know, what was required of us.  But once we had that general

18  meeting, we were off all doing our various different roles in

19  the case and then everybody had something.  Jimmy from DCIS,

20  whose name escapes me right now because I'm nervous, did the

21  Eloise Lane analysis.  We had Robert doing the collection of

22  the claims data.  We had Ms. Arnold who would deal with

23  Ms. Ridolfi and other state issues.  We had Agent Lating who

24  probably dealt with just about everything else.  So there was a

25  number of different hands in it, so to speak.

1   **Q.**   Now, Ms. Wilkinson, what is a covert investigation?

2   **A.**   A covert is when the target doesn't know that we're

3   looking at him.

4   **Q.**   And before the Pharmacare search warrants were authorized,

5   was the Pharmacare investigation covert?

6   **A.**   We hope so.  Our -- our intention was that

7   Mr. Annappareddy not know that there was a federal

8   investigation, a criminal investigation of him.  And we hope

9   that in most of our white-collar cases if we're fortunate

10  enough to get it before the target knows.  Because there's so

11  many different types of investigative techniques you can use

12  prior to going over it; that is, doing a search warrant or

13  arrest or that sort of thing.

14      So, yes, we hoped that it was covert, and we intended for

15  it to be covert.

16  **Q.**   And what are those -- well, why was the investigation

17  covert, initially?

18  **A.**   To get as much evidence as we could for collection for a

19  possible search warrant.  Probable cause information to

20  corroborate the various different types of information that

21  we're getting.  To hopefully be able to do an extensive

22  interview with the target where we're prepared for it prior to

23  going overt.  That was the intention, to interview

24  Mr. Annappareddy the day we executed the search warrants and do

25  other interviews as well.

1          We tried to say covert to look at claims data.  And plus,

2     we're cognizant of our responsibility to have probable cause

3     before we go into a business, an operating business, and the

4     ramifications of a federal investigation into a business.  So

5     we take a number of different steps to make sure we're getting

6     good information, we're corroborating it internally, we're

7     collecting our own preparation for the day that we can

8     interview our main targets so we can cross-check and see who's

9     telling us the truth and who's not telling us the truth.  And

10    our goal, always, is to stay as covert as we can for as long as

11    we can.

12    Q.   Are there any concerns about interviewing current

13    employees of an organization while you are still in the covert

14    phase of an investigation?

15    A.   For that exact reason, absolutely.  So we try to pick and

16    choose the people that we think will talk to us, a, or won't

17    advise the target of what is going on is the most important

18    part of it.  So you don't always get to do that.  You sometimes

19    do, and you can interview some people.

20         For example, we had a *qui tam* relator here who was giving

21    us information.  Otherwise, we try to stick to some third

22    parties first.  See who -- for lack of a better word, who we

23    can pick off and see if they'll talk to us before.  I mean,

24    it's just like, you know, no different in a drug case, for

25    example, where we would try to find the delivery person and see

1   if they'll talk to us and start selling drugs, you know, at our

2   order and control before we go and take down the big

3   organization.  It's very similar technique.

4   Q.   And did you have the same concerns about requesting

5   documents from Pharmacare while you were still covert?

6   A.   Oh, yeah.  The exact same reason.  We wouldn't issue grand

7   jury subpoenas to the target and his business while we were

8   staying covert.  We would get our claims data and our

9   third-party data from other -- in other ways that we can.

10  Q.   What sort of evidence are you looking for in deciding

11  whether to pursue a search warrant?

12  A.   Well, when a case is authorized for investigation in the

13  U.S. Attorney's Office, we already have information that

14  somebody has committed a crime or possibly committed a crime.

15  And here, it was a *qui tam* suit.  And most *qui tams* in the U.S.

16  Attorney's Office are looked at by a criminal AUSA for

17  potential criminal prosecution.  And many of them don't end

18  that way because either there isn't that proof beyond -- you

19  know, at the end of the day, can we get proof beyond a

20  reasonable doubt that somebody has committed fraud.  But we're

21  looking for that nefarious type of behavior.  We're looking for

22  someone who had knowledge of what they were doing and intended

23  to cheat and lie to get -- you know, to get money from the

24  government.

25  Q.   Now, thinking about the Pharmacare investigation, were

1  AIDS drugs the only drugs that you were concerned about in the

2  investigation?

3  **A.**    No.

4  **Q.**    Why not?

5  **A.**    Because they weren't the only ones that we were told about

6  that were being -- I'll call it billed for services not

7  rendered and, essentially, these automatic refills that were

8  being done without providing the drugs or the prescriptions to

9  the individual customer.  So it wasn't just the AIDS drugs,

10 although those were expensive drugs and had kind of, you know,

11 for lack of a better word, sex appeal to them in the case

12 because of the nature of the drugs.

13      But if it had been baby aspirin and there were thousands

14 of pills that were, you know, prescribed for babies that never

15 got the aspirin, we would have been equally concerned about it.

16 **Q.**    How, if at all, was price per pill relevant to your

17 criminal investigation?

18 **A.**    So my --

19      **THE WITNESS:**  Your Honor, one of my -- I mean, I --

20 I've been a prosecutor a long time, but I am no brain surgeon.

21 And every time I met with the MEDIC, they had this very

22 convoluted way of trying to price out what the damages were.

23 And, to me -- because, you know, I have to eventually explain

24 it to a jury and a judge, I just wanted to know were they

25 dispensing pills that didn't go to the customers, right.  I

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1  didn't care if it was a dollar or a thousand dollars.

2       You know, in the world, you know, if it's, you know, much

3  more money, the judge will decide what the appropriate sentence

4  would be if we commit them.  But I cared about the pills.

5  Like, were they getting the pills that Pharmacare said they

6  were getting.

7       And MEDIC had this incredibly convoluted formula for

8  trying to figure out per -- what the loss was.  And it became

9  very frustrating to me as a -- I'm, you know, a prosecutor

10 because it's just -- I couldn't understand it.  And I remember

11 saying it on many, many occasions, "Do we have to do it this

12 way?  I don't care how much things cost.  I just care that

13 pills were not dispensed to the people that were supposed to be

14 receiving them."

15 Q.   Ms. Wilkinson, was a review of delivery logs necessary,

16 from your perspective, to get probable cause before pursuing a

17 search warrant?

18 A.   No.

19 Q.   Why not?

20 A.   Because the way that we understood a business like this to

21 be doing, that delivery logs are only good as the people that

22 are getting them to sign them or to look at them or to

23 review -- you know, the ones that go out there and get people

24 to sign it.  And that could be altered.  It could be -- I mean,

25 we're going to look at them once we find them, but we didn't

1  need them to be able to prove probable -- to collect enough

2  probable cause to be able to do a search warrant.

3  **Q.**   What about signature logs, so logs that a patient would

4  sign picking up a prescription at a pharmacy.  Were those

5  necessary to review before you pursued a search warrant?

6  **A.**   No.  Of course not.

7  **Q.**   And why do you say that?

8  **A.**   Again, probable cause -- we had -- we had two people in

9  the company, the *qui tam* relator, Mr. -- I can't say his last

10  name right now, and Ms. Ridolfi and customers and some other

11  employees who were telling us about the scheme that was going

12  on at Pharmacare.  For probable cause at this point, we're

13  looking for what we should be looking for in the pharmacy when

14  we do the search warrant.  We did not -- we knew we would find

15  some signature logs and delivery logs because they told us they

16  existed, but there was always information that they weren't

17  used all the time, that people weren't signing them or they

18  weren't regular part of their business.  And I think that's

19  what we eventually found out as well.

20  **Q.**   And did you ultimately find evidence that signature logs

21  had been forged?

22  **A.**   Yes.  I believe some of the customers told us that that

23  was not their signatures on the signature logs.

24  **Q.**   Was Craig Blomquist one of those people?

25  **A.**   Yes.

1  Q.   And what did your investigation leading up to the search

2  warrant ultimately demonstrate?

3  A.   Probable cause that Pharmacare had committed a crime

4  through Mr. Annappareddy and the assistance of the two

5  Mr. Patels.

6  Q.   That's Vipin and Jigar Patel?

7  A.   Yes.

8  Q.   Now, why did the Pharmacare case include a damages

9  analysis at all?

10  A.   Because at the end of the day, we would have to -- sitting

11  here today, and I look back in hindsight, I can recall several

12  times the case because of the complexity of it and the concern

13  of the jury that we not even use it at trial.  I mean, I

14  believe that I said on a number of occasions to our team, "I

15  don't even know why we're -- we don't need to prove this at

16  this point."  The evidence was coming in very well.  We had

17  proven the scheme to defraud.  We had proven the identity

18  theft.  We had Vipin testifying.  We had other people,

19  Mr. Mannava testifying.  We didn't need to prove the dollar

20  amount until sentencing became an issue in front of

21  Judge Russell, and then he could make that finding beyond a

22  much lower standard.  And we didn't have to prove it as an

23  element of the crime.

24  Q.   As of the date of the search warrant, what evidence did

25  you have of criminal intent other than the dollar value

1   analysis?

2   A.   What his employees were telling us.

3   Q.   His former employees?

4   A.   Yes.

5   Q.   And did you have claims data substantiating their

6   testimony?

7   A.   Yeah.  The best we could at that time, we corroborated

8   what a number of different employees and former employees were

9   saying.

10  Q.   Did you have undercover surveillance corroborating --

11  A.   Yes.

12  Q.   -- criminal intent?

13  A.   Yes.

14  Q.   Now, Ms. Wilkinson, if you'll turn to the binder that's in

15  front of you that doesn't have a cover on it.

16  A.   The big one?

17          MS. FARBER:  And if I can have put up Exhibit 42,

18  please.

19  BY MS. FARBER:

20  Q.   And turn to Tab 42.

21  A.   Okay.  I have it in front of me.

22  Q.   Ms. Wilkinson, do you see that cover email that is

23  Plaintiff's Exhibit 42?

24  A.   From Ms. Arnold?

25  Q.   The one below it, from Jeremy Dykes.

1  **A.**   And I'm in -- just to be sure, I'm in Plaintiff's

2  Exhibit 42?

3  **Q.**   Yes.  And there should be an email below Pam Arnold's

4  email from Jeremy Dykes.

5  **A.**   It's dated May 17th --

6  **Q.**   Yes, ma'am.

7  **A.**   -- 2013?

8  **Q.**   Yes.

9  **A.**   I see it.

10  **Q.**   This is Plaintiff's Exhibit 42.  And here's this -- here's

11  this cover email.  Okay.  Did you ever see Jeremy Dykes's --

12  well, let me show you the spreadsheet that's attached.

13      Have you seen this before?

14  **A.**   I've seen so many things that look like -- I'm not

15  100 percent positive.

16  **Q.**   Well, let me back up and ask you a more general question,

17  Ms. Wilkinson.  Does it make sense in this case, in determining

18  whether Mr. Annappareddy committed fraud to combine every

19  single drug of every single dosage and add them all up and see

20  what number you get?

21  **A.**   No.

22  **Q.**   And why doesn't that make sense?

23  **A.**   Because Mr. Annappareddy was operating a pharmacy, part of

24  which did some business, right.  So he was dispensing

25  medication to customers, right.  The issue was whether or not

1   he was doing automatic refills and the people were not getting

2   them.  So the question at that point becomes if you have -- if

3   you're expensing 100, you know, Tylenol, and you billed for a

4   thousand as if you dispensed a thousand Tylenol, does it matter

5   at all that you have Advil and all these other drugs when

6   you're billing for Tylenol and you don't have enough pills to

7   support what you billed for?  That just makes zero sense.

8        You have to -- you have to -- you have to bill what you're

9   selling or what you claim that you're selling, you have to have

10  the inventory to support that, right.

11       If you are selling -- you know, dispensing Tylenol, you

12  have to have the pills to expense the Tylenol.  It doesn't

13  matter if you have 10 million Advil in your pharmacy.  It just

14  doesn't make any sense.  You --

15  Q.   So in other -- I'm sorry Ms. Wilkinson.

16  A.   I'm just saying, you have to have the pills that you say

17  you are -- and most importantly, at the time that you're doing

18  it, right.  So if you get a thousand pills a month later, and

19  you go, "Oh, but I had a thousand pills a month later," you're

20  supposed to be dispensing them at the time you say you're

21  dispensing them.  And, to me, that was the bottom line to all

22  of this.

23  Q.   So, in other words, was it important to look at each drug

24  and each dosage separately?

25  A.   Of course.

**Q.**   Now, you talked a little bit about your review of the search warrant affidavit on your direct examination; do you recall that?

**A.**   Yes.

**Q.**   And you mentioned that part of what you did was review the affidavit for probable cause; is that right?

**A.**   Yes.

**Q.**   And what does a review of the affidavit for probable cause entail?

**A.**   We try to put ourselves in the position of the reviewing judge, who I believe was Judge Sullivan here, so that when he reads it, not only does it look nice and is rightly formatted, because our federal judges insist on that as well, and that, you know, there's no spelling errors and all that kind of stuff, but that it has information to believe that a judge will sign it because there's probable cause to believe a crime was committed.

And that, even most importantly, that what we are looking to seize in that attachment A or B, whatever we called it in this search warrant, that we have evidence as to each of the things and for the time frame that we want to seize it.

So, for example, you want to make sure if you're going to seize their computers, that you've put information in there about how computers were used to commit the fraud.  If you want to look for signature logs and delivery logs, you want to put

```
1   why we have probable cause to be able to look at that to
2   determine whether...
3       So we are looking for not -- does it read as if, you know,
4   supporting what you say you're asking for and what you're
5   looking to search for.
6   Q.   How many search warrant affidavits have you reviewed in
7   your time as an AUSA?
8   A.   Again, I would say hundreds, maybe even thousands.
9   Q.   Does a search warrant affidavit have to include every fact
10  that is known to the investigation team?
11  A.   Of course not.  And I believe it says that in the
12  affidavit.
13  Q.   Did the team meet to discuss the affidavit?
14  A.   Yes.
15  Q.   How frequently?
16  A.   I don't recall.  But certainly, we met to discuss the
17  affidavit.  We met to discuss the operation; meaning at the
18  time, we were going to ask the judge to review it and that we
19  were going to execute it.
20  Q.   Did you have more than one meeting to discuss the
21  affidavit?
22  A.   I'm certain we did.
23  Q.   Now, some of the prescription evidence in the affidavit is
24  from 2011.  Is that stale evidence in this case?
25  A.   Well, Judge Sullivan certainly didn't think it was stale.
```

1   But as a general proposition, when a company like this is
2   committing an ongoing scheme to defraud or there's probable
3   cause to believe that they did, even if the crime had ended in
4   2011, and we were looking at 2013, and there's information in
5   the affidavit that the judge can review that shows that the
6   company is required and would probably keep those type of
7   records back from 2011, it would not be stale.  We just have to
8   show that in the affidavit, right, that this is an ongoing
9   business, that it's the type of business that would keep and
10  retain records related to federal billing, insurance company
11  billing, patient information, such as a pharmacy, then even if
12  all the crime and criminal activity stopped in 2011, it would
13  not be stale in 2013 if we could prove those documents would
14  still be there.

15  Q.   Did you have concerns about Lisa Ridolfi's credibility?
16  A.   I never believed that she was not telling us the truth.
17  But I always take with a grain of salt whatever a witness tells
18  you, right.  I am always listening for holes, right, because
19  you want to make sure that they're telling the truth.
20  Q.   Why weren't you concerned about whether she was telling
21  the truth?
22  A.   Well, it was -- it was supportive of what other people
23  were saying.  It was cross-corroborative of what our *qui tam*
24  relator was saying, eventually what other witnesses were
25  saying, what cooperators were saying, what Mr. Patel said.

1  What -- it just was corroborated.

2  Q.   Now, which Pharmacare store had the most fraudulent

3  activity of all of the Pharmacare stores?

4  A.   I want to say Plumtree.

5  Q.   Was that the store Lisa Ridolfi worked?

6  A.   I believe so.

7  Q.   So did it ever occur to you that maybe Ms. Ridolfi was the

8  person who was committing all this fraud?

9  A.   No.

10 Q.   Why not?

11 A.   Because I met her, and I saw -- I saw no evidence of

12 motive or why she would ever want to do that.

13 Q.   And did you have evidence of motive for Mr. Annappareddy

14 committing this fraud?

15 A.   Yes.  Of course.  Yes.  He's the one making all the money.

16 Q.   Now, I'd like you to take a look at Plaintiff's

17 Exhibit 50, which is in that same -- that same Plaintiff's

18 exhibit binder that's unmarked at the front.

19       MS. FARBER:  And, Your Honor, these are text messages

20 between Pam Arnold and Lisa Ridolfi.

21       THE COURT:  Ms. Farber, let me say, we're approaching

22 two hours this morning, we need to get the court reporter a

23 break.  Can we break here, or are you right in the middle of

24 this?

25       MS. FARBER:  This would be a good time to take a

1  break.  There's not much more, but we should break.

2          **THE COURT:**  All right.  Let's take a 15-minute recess.

3          **THE CLERK:**  All rise.  This Honorable Court is now in

4  recess.

5      (Whereupon, a recess was taken from 10:53 a.m. to

6  11:06 a.m.)

7          **THE CLERK:**  All rise.  This Honorable Court resumes in

8  session.

9          **THE COURT:**  Be seated.

10     Please continue, Ms. Farber.

11 **BY MS. FARBER:**

12 **Q.**  Ms. Wilkinson, what, if any, instructions did Lisa Ridolfi

13 receive about communicating with Pam Arnold?

14 **A.**  To keep in touch with her, to let her know what was going

15 on.  I tried to streamline it so she was the only person that

16 Lisa would have -- Ms. Ridolfi would have communications with.

17 That -- you know, essentially to just do her job and report

18 what she was seeing.

19 **Q.**  Was it understood that text messages between Lisa and Pam

20 Arnold were being saved?

21 **A.**  Yes, I believe so.

22 **Q.**  Now, I'd like to direct your attention to Plaintiff's

23 Exhibit 137.  I'm not sure if that's in your unmarked binder

24 there.

25          **MS. FARBER:**  Plaintiff Counsel, has that binder been

 1  updated?

 2          **THE WITNESS:**  137?

 3  **BY MS. FARBER:**

 4  **Q.**   Yes.  Do you see a tab 137 in the unmarked black binder?

 5  **A.**   It ends in 124.

 6  **Q.**   Okay.  I will hand you a copy now.

 7  **A.**   Like, toward the first page, sorry.

 8  **Q.**   That's okay.

 9      All right.  I'm showing you what's been entered into

10  evidence as Plaintiff's Exhibit 137.

11  **A.**   Okay.

12  **Q.**   The document is Bates-stamped USFRAUD5232301.

13      Now, take a moment to look at this document, and then

14  please tell us what's going on here.

15  **A.**   It appears to me that at some point -- and I do have a

16  recollection of this -- that -- to go back for a minute.

17  Ms. Ridolfi had questions about her role in all of this and her

18  exposure and all that.  And I, as I do in many cases involving

19  working informant like this or a cooperating witness, suggest

20  that she have her own counsel because --

21          **MR. GREENBERG:**  Your Honor, I have to object that this

22  is inadmissible hearsay from Ms. Ridolfi.

23          **THE COURT:**  Aren't we going to hear from Ms. Arnold

24  later?

25          **MR. GREENBERG:**  We already have heard from Ms. Arnold.

```
 1              THE COURT:  I'm sorry, we've heard about this already
 2     from another witness.
 3              MS. FARBER:  Yes, Your Honor, that's correct.
 4     Ms. Wilkinson is the sender of the email dated Monday July 1st,
 5     2013.  So we have heard from Pam Arnold, and now we are --
 6              THE COURT:  Well, I'll let it in for what it's worth
 7     and what she knows about it.  Go ahead.
 8         Overruled.
 9     BY MS. FARBER:
10     Q.   Please continue.
11     A.   That, at some point, it became clear that Ms. Ridolfi
12     would be served with her own counsel because we can't advise
13     her about things.  We're not her lawyer.  And so I know that
14     Mr. White was appointed by the court to represent her.  And I
15     have a recollection of her expressing frustration at not being
16     able to get ahold of Mr. White, and, at some point, told her to
17     tell the judge if she wasn't hearing from her lawyer, since the
18     court is the ones that appoint and pay for the attorneys, to
19     let the Court know about what was going on.  And that's what
20     happened here.
21     Q.   What did you mean when you said concerns about her
22     exposure?
23     A.   Well, every -- everybody that was working at a company
24     like Pharmacare where the allegations were that the company was
25     engaging in a widespread fraud and might have knowledge of it
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1   and at some point even assisted in it had criminal exposure.

2   Q.   Now, I'd like to show you the second page of Exhibit 137,

3   if you'll turn to that page.  This is a handwritten letter from

4   Lisa Ridolfi to Judge Sullivan dated July 1st, 2013.

5        Do you see that?

6   A.   Yes.

7   Q.   Now, take a moment to look at this letter, and then let me

8   know if this letter affects your assessment of Lisa Ridolfi's

9   credibility.

10  A.   No.

11  Q.   And why not?

12  A.   To me, this letter is -- the only unusual aspect is that I

13  am seeing it from the witness, as opposed to the witness just

14  letting the judge know what's going on with her attorney.

15       But people have questions about the criminal justice

16  system all the time who aren't familiar with it.  That's why

17  they have a lawyer, to be able to answer those questions.  It

18  doesn't mean that they're not telling the truth or that -- it

19  doesn't have any significance of that.  They're just in an

20  unusual world, and it's scary, and it's -- it happens in almost

21  every case where I have a working informant where they just

22  want someone to tell them what's going on for them, not -- you

23  know, not the prosecutor, not the agent, just for them.

24  Q.   Did you have any concerns about Dennis Tokofsky, the

25  relator's credibility in this case?

1  A.   Not at all.

2  Q.   Why not?

3  A.   Because I met him, and I prepared him, and I -- he was

4  clear, and he didn't exaggerate or minimize.  He was

5  straightforward in what he advised us, he --

6       MR. GREENBERG:  Your Honor, I'm going to object that

7  this is getting into post-indictment evidence after-acquired.

8  I don't think the witness met with Mr. Tokofsky before sometime

9  after July 2013.

10      THE COURT:  You do need to confine your interactions

11  with him to preindictment or pre affidavit.

12      THE WITNESS:  Oh, I'm sorry Your Honor, was that the

13  question?  I'm sorry.

14  BY MS. FARBER:

15  Q.   No, that was my fault, Ms. Wilkinson.  I did not confine

16  my questions.  That was my fault.

17      Based on the investigation at the time of the search

18  warrant, did you have any concerns about Dennis Tokofsky's

19  credibility?

20  A.   No.  I'm not sure if I met him prior or not to the

21  indictment, but I do know that my colleagues had interviewed

22  him.

23  Q.   And the information that he provided, was that

24  corroborated?

25  A.   I believed it was.

1  **Q.**   Regarding the damages analysis, did you understand that
2  number to be a preliminary number or a final number?
3  **A.**   It was a very preliminary number.
4  **Q.**   Did you have any concerns about putting a preliminary
5  number into a search warrant affidavit?
6  **A.**   No.  As long as we articulated, which we did using words
7  such as "approximate" or "at the stage that we are," or
8  whatever other words that's similar to approximating how much
9  drugs go through a drug conspiracy, it's our best estimate.
10  Which, by the way, is what a judge can use in sentencing a
11  person, too, the best estimate of what the possible loss is.
12  **Q.**   Without evidence of dollar loss, could you still have
13  pursued a search warrant?
14  **A.**   Yes.
15  **Q.**   And why is that?
16  **A.**   Because we had a number of witnesses telling us that
17  Mr. Annappareddy was committing a fraud on a number of federal
18  government programs and private insurers, and they had been
19  corroborated.  We do drug cases where we don't have drugs, and
20  we do a probable cause, you know.  It's -- what's important is
21  what the people and the employees are saying and if it's
22  corroborated.
23         **MS. FARBER:**  Court's indulgence.
24      (Counsel conferring.)
25  **BY MS. FARBER:**

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1  Q.   Ms. Wilkinson, did you pursue charges against someone
2  named Vipin Patel?
3  A.   I did.
4  Q.   And why did you do that?
5  A.   Because he -- at the time, he was the person closest to
6  Mr. Annappareddy in terms of his role and what he was doing,
7  that he participated in the crime, and he was willing to
8  cooperate and all that.
9        THE WITNESS:  But he had to accept responsibility, in
10  my view, Your Honor, for the role that he played in all of
11  this.
12  BY MS. FARBER:
13  Q.   Who is Pragna Patel?
14  A.   His wife.
15  Q.   And is she also known as Ami?
16  A.   That is my recollection.
17  Q.   And is that spelled A-M-I?
18  A.   That's my recollection.
19  Q.   Did you ever tell Vipin Patel that the only way he would
20  be allowed to see his dying father would be if he pleaded
21  guilty in a criminal case?
22  A.   I have no recollection of telling him that.
23  Q.   Is that something you would do?
24  A.   I would never say it like that.
25  Q.   Would you allow a witness to go see a relative in India

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1   while they're under an indictment?

2   A.   I can't imagine being -- doing that.  Or even having the

3   ability to do that.

4   Q.   Why not?

5   A.   Because I needed to have control over his person, and if

6   he went to India, I would not.

7   Q.   You'd lose jurisdiction?

8   A.   I'd lose jurisdiction over him.

9   Q.   And did Vipin Patel cooperate with the criminal

10  investigation?

11  A.   He did.

12  Q.   How did he cooperate?

13  A.   He proffered and testified against Mr. Annappareddy.

14  Q.   How many times did he make a proffer to the government?

15  A.   I don't recall exactly, but I'm sure I met with him many

16  times.

17  Q.   And how long were these meetings, approximately?

18  A.   I'm certain they were hours.

19  Q.   And so for each of these multiple hours-long meetings,

20  Mr. Patel was providing information about Mr. Annappareddy's

21  criminal scheme?

22  A.   Yes.  And he was represented by the public defender's

23  office and, specifically, Ms. Oyer, who is a very reputable,

24  good defense attorney.

25  Q.   I'm showing you -- I'm putting on the projector what's

 1  been entered into evidence as Defense Exhibit 67.

 2  A.   Yes.

 3  Q.   And this'll be Tab 67 in the binder with the label on it.

 4  So you've got a binder that has a cover.  And it'll be Tab 67

 5  in that binder.

 6  A.   I can read it on here too, as well.

 7  Q.   Sure.

 8       If you'd like to independently flip through, you know

 9  where to find it.

10       What is this document that I've put on the projector

11  that's Defense Exhibit 67?

12  A.   Did you say Exhibit 57?

13  Q.   Sixty-seven.

14  A.   Sixty-seven.  Now, this binder doesn't go that far, so I

15  will look at the -- and I don't -- it's Mr. Patel's -- it

16  appears to be Mr. Patel's plea agreement.  I see my supervisor,

17  who was then the first assistant, Mr. Shenning's [ph] initials

18  at the top left-hand corner, approving it.

19  Q.   Now, I'm going to direct your attention to -- this is the

20  page that has at the top a header that says "Page 8 of 12."

21       Do you see that?

22  A.   I do.

23  Q.   And this is -- do you see where it says "Stipulated Facts

24  United States v. Vipinkumar Patel"?

25  A.   Yes.

1  Q.   And these stipulated facts last for about five pages, I'll

2  just quickly flip through them.  That's page 1.

3  A.   I recall them being lengthy.  That was my practice.

4           MR. GREENBERG:  Your Honor, I'm going to object on the

5  grounds that the date on this long postdates the indictment.

6           MS. FARBER:  Your Honor, they called Vipin Patel as a

7  witness, and Vipin -- well, I'm happy to put a longer objection

8  on the record without the witness --

9           THE COURT:  My ruling on the motion *in limine* did

10  leave the door open for post-indictment evidence regarding

11  credibility, and I think that's what we're going into now.

12           MS. FARBER:  Yes, Your Honor.

13           THE COURT:  I would overrule the objection.

14           MS. FARBER:  Thank you.

15  BY MS. FARBER:

16  Q.   Ms. Wilkinson, it's about five pages of stipulated

17  facts --

18  A.   Yes.

19  Q.   -- does that sound accurate?

20  A.   Yes.

21  Q.   Where did those facts come from?

22  A.   Well, Mr. Patel would tell the judge subsequently at the

23  plea that that's what happened, right, the facts as he knew it.

24  And also from the investigation.

25  Q.   Was 1803 Eloise Lane a location that was searched in this

1   case?

2   **A.**   Yes.

3            **MR. GREENBERG:**  I'm going to object on the grounds

4   previously stated, and also that this is inadmissible hearsay,

5   and also the question is leading.

6            **THE COURT:**  No, that is post affidavit.

7            **MS. FARBER:**  Your Honor, I'm happy to respond.  May

8   the witness leave the stand so I can respond.

9            **THE COURT:**  All right.  Step outside, if you would,

10  please, just a moment.

11           **THE WITNESS:**  In the vestibule?

12           **MS. FARBER:**  Yes, in the vestibule, thank you,

13  Ms. Wilkinson.

14      (Witness exits.)

15           **MS. FARBER:**  Your Honor, this does go to credibility.

16  Plaintiff called Dr. Vaidya as a witness, and Dr. Vaidya very

17  clearly testified that Mr. Annappareddy followed all policies

18  and procedures.  And then he also testified that storing drugs

19  on a toilet at one's home would not be consistent with

20  following policies and procedures.

21      What I'm going to introduce through this witness are

22  photos from a search of one of Mr. Annappareddy's homes, 1803

23  Eloise Lane, which show drugs stored on a toilet at a

24  residential home.  So Plaintiff has opened the door to this

25  testimony through Vaidya.  This goes to his credibility and to

 1  the weight the Court should give that testimony.

 2          **THE COURT:**  It goes to the credibility of the

 3  pharmacist, Dr. Vaidya?

 4          **MS. FARBER:**  Correct, Your Honor.  Dr. Vaidya

 5  testified exactly to this topic.

 6          **THE COURT:**  Mr. Greenberg?

 7          **MR. GREENBERG:**  Well, Your Honor, first of all, they

 8  had an opportunity when Vipin Patel was here to question him

 9  about this without now offering what's inadmissible hearsay to

10  try to do it.

11      Second of all, I don't really understand how this

12  post-indictment purported information that Patel was coerced

13  into providing somehow affects the credibility of Dr. Vaidya

14  about earlier events.  It doesn't make any sense.

15      Our testimony from Vipin Patel, I believe, was limited to

16  his awareness of events on or through July 23rd, 2013.  There

17  is no evidence that anyone ever asked Mr. Annappareddy to store

18  anything or let alone prescriptions at 1803 Eloise Lane.  1803

19  Eloise Lane was searched in August 2013.  It's fruit of the

20  poisonous tree because the information that led to that came

21  only because of the Lating affidavit and the wrongful

22  indictment.

23      There's all kinds of reasons why this is inadmissible.

24      And this is, I think, the second time there's been talk

25  about drugs on the toilet.  And I believe that both

1  mischaracterizes the evidence and is purportedly based on

2  after-acquired evidence.

3      And I would ask that this be stopped.

4          MS. FARBER:  Your Honor, if I may respond.

5      Plaintiff's counsel is correct that this is the second

6  time this has come up, and that's exactly why the door has been

7  opened.  They chose to call Dr. Vaidya to provide testimony

8  about Mr. Annappareddy's supposedly stellar ability to follow

9  pharmacy procedures.  And Dr. Vaidya testified that storing

10 drugs on a toilet in one's home does not follow policies and

11 procedures.  Evidence that that's exactly what Mr. Annappareddy

12 did is directly relevant to their own witness who they chose to

13 call.

14     And I don't think -- if I'm permitted to make an offer of

15 proof and show the Court the photo, I don't think that there is

16 any question that it's ambiguous about what's on the toilet.

17         THE COURT:  Mr. Greenberg also said it's going to come

18 in through hearsay.

19         MS. FARBER:  Your Honor, respectfully, I'm not sure

20 how the photos of 1803 Eloise Lane are hearsay.  I'm wondering

21 if perhaps Plaintiff's counsel was referring to the plea

22 agreement, which is already in evidence.  Maybe I'm

23 misunderstanding.  I'm just not sure how photos are hearsay.

24         THE COURT:  Well, it appears to me that the earlier

25 witness did give an opinion about the Plaintiff's following

 1   correct procedures to the letter, and he was asked about

 2   storing pharmacy products in a -- near a toilet or something.

 3   So I'm going to overrule the objection and allow it only, only

 4   insofar as it affects the credibility of the earlier witness we

 5   heard from, not for substantive evidence or proof of lack of

 6   probable cause, or anything such as that.  Only insofar as it

 7   affects credibility of an earlier witness called by the

 8   Plaintiff.

 9           MR. GREENBERG:  Your Honor, just a couple of points to

10   respond, and I would hope that Your Honor would give these

11   considerations because it's an important issue.

12       First of all, Dr. Vaidya was called as a rebuttal witness.

13           THE COURT:  Well, you can impeach a rebuttal witness.

14           MR. GREENBERG:  Okay.  But they didn't do that when he

15   was on the stand.

16       And second, this thing about drugs on a toilet --

17           THE COURT:  You don't have to impeach a person when

18   he's on the stand, necessarily.  If you want to hold back and

19   bring in a later witness, you can do that.

20           MR. GREENBERG:  All right.  Okay.

21       Now, second, there is no evidence that anyone ever, ever

22   said that Mr. Annappareddy was aware of drugs being put in

23   Eloise Lane or that they were there because of anything

24   Mr. Annappareddy said or did.  There's no evidence of that.

25       This plea agreement, moreover, is inadmissible hearsay.

```
 1   It's an out-of-court statement by Vipin Patel.  He testified
 2   about it, they could have asked him about it when he was on the
 3   stand, but they didn't.  And now it's an out-of-court
 4   statement, he's unavailable, and so it cannot be used for the
 5   truth.  And the --
 6            THE COURT:  I'm lost.  Did your side introduce the
 7   plea agreement?
 8            MR. GREENBERG:  No.
 9            MS. FARBER:  Your Honor, the plea agreement did come
10   in during Vipin Patel's testimony.  It's already an exhibit.
11   And Mr. Patel was questioned extensively about the contents of
12   the statement of facts contained in Defense Exhibit 67, so
13   that's not a correct representation.
14            MR. GREENBERG:  I don't think that's correct,
15   actually, and there's multiple things that I need to correct
16   now.
17      First of all, it's a Government exhibit, it's Government's
18   Exhibit 67.  I don't believe -- I certainly don't think it was
19   admitted or --
20            THE CLERK:  For the record, it is admitted.
21            MR. GREENBERG:  It is committed?
22            THE CLERK:  Yes.  As of June 5th.
23            MR. GREENBERG:  All right.  Oh, that's right.  It was
24   admitted because they crossed Vipin Patel on it.  So that's --
25   that must have been how it happened.  Now I recall.
```

1          So that's different now from using this statement with

2     this witness.  Because, I mean, Vipin Patel was in court at the

3     time this was shown to him, so that was a different use of the

4     statement.

5          But there's a sort of a more fundamental problem, and

6     that's that Dr. Vaidya was talking about what he knew about

7     Mr. Annappareddy up -- before Pharmacare was created and

8     through July 23rd, 2013, I believe.  I don't think he was

9     getting into all this sort of post-indictment, after-acquired

10    stuff.

11         Also, the second thing -- I said the thing that I was

12    saying came up the second time was not what counsel just said a

13    couple minutes ago, it was this thing about drugs on the

14    toilet.  And it bears repeating there is no evidence that that

15    is accurate.  Moreover, it is post-indictment, after-acquired

16    Eloise Lane August 2013.  And, most fundamentally, no one has

17    testified, and there's no evidence that Mr. Annappareddy had

18    anything to do with that.

19         **MS. FARBER:**  Your Honor, it feels like we're

20    conflating two things here.  The first is Vipin's plea

21    agreement and statement of facts, which are already in

22    evidence, which he was cross-examined about, and which, the

23    Court might recall, Mr. Patel's testimony that he made all of

24    that up or that the Government wrote -- you know, that wasn't

25    his words, it wasn't his information, you know, that he just

1  signed something that was handed to him.

2      So that -- the previous testimony that Ms. Wilkinson gave

3  that that information came from Mr. Patel is relevant to

4  Mr. Patel's own testimony about that, which Plaintiffs opened

5  the door to.

6      The second issue is the photo from 1803 Eloise Lane, which

7  Plaintiff also opened the door to in Dr. Vaidya's testimony

8  about Mr. Annappareddy's ability to follow policies and

9  procedures, and, specifically, whether leaving drugs on a

10  toilet at home would be a violation of procedure.  Now, whether

11  that's what happened or not, that -- this goes to weight and

12  not admissibility.  Mr. Annappareddy will be taking the stand.

13  We're all looking forward to his testimony.  And, certainly, he

14  will have an ability to explain the drugs on the toilet, Your

15  Honor.

16      (Counsel conferring.)

17          THE COURT:  Am I not correct that Eloise Lane was

18  owned by the Plaintiff?

19          MS. FARBER:  Yes, Your Honor.

20          MR. GREENBERG:  Actually, I believe it was owned by

21  his wife.  But that's, I guess, not really of any moment.  What

22  is of -- for moment, though, is that the reason we called

23  rebuttal witnesses out of the order is because of the European

24  vacation of Ms. Wilkinson and because of the European vacation

25  of Ms. Pascale.  They wouldn't be able to be doing this but for

 1   the European vacations.  If we called our rebuttal witnesses at

 2   the time they're ordinarily called in the trial, this couldn't

 3   happen because they wouldn't be able to have a preview of our

 4   rebuttal case while they're putting on their direct case.  For

 5   that reason alone, this should be shut down.

 6          MS. FARBER:  The Court ruled that those witnesses were

 7   not properly rebuttal witnesses, that they were substantive

 8   witness.  But as the Court has said, we're permitted to impeach

 9   these witnesses, and this goes -- Plaintiff has sprung these

10   rebuttal witnesses on us at the last minute.  And,

11   unfortunately for them, those rebuttal witnesses have opened

12   several doors related to their credibility for which the

13   evidence is relevant to that.  And the Court can certainly note

14   that it's limiting its consideration of this evidence to those

15   witnesses' credibility, but this is -- Plaintiffs made this

16   bed, and now they have to lay in it.

17          MR. GREENBERG:  So, Your Honor, as Your Honor knows

18   from being a judge for 37 years and being a very experienced

19   attorney before that, the defendant in a civil case doesn't get

20   rebuttal.  They don't get rebuttal.  We were forced to call

21   these witnesses out of order because of the scheduling issues

22   caused by the European vacations of this witness,

23   Sandra Wilkinson, and Cathy Pascale.

24       What's going on here now is they would never have had a

25   chance to do this but for those European vacations and but for

```
 1  us being forced to call witnesses out of order.  Respectfully,

 2  I believe counsel is misperceiving the Court's ruling on the

 3  nature of Dr. Vaidya's testimony and the nature of Vipin

 4  Patel's testimony.

 5       But putting that aside, the mere fact that they are now

 6  trying to put on a rebuttal case themselves in their direct in

 7  a civil case is a huge problem, and we object to it.

 8            THE COURT:  All right.  After hearing extensive debate

 9  on this issue, I'm going to sustain the objection.  The

10  evidence is already in.  I can consider it for what it's worth

11  after hearing earlier testimony.  So the objection is

12  sustained.

13       Bring the witness back.

14       (Witness enters.)

15            THE COURT:  Having said that, this subject matter

16  might be fair game for cross-examination when the Plaintiff

17  takes the stand, I want to make that clear.

18            MS. FARBER:  Yes, Your Honor.

19            THE COURT:  All right.

20            MS. FARBER:  Thank you.

21  BY MS. FARBER:

22  Q.   Ms. Wilkinson, did Agent Robert Mosley mislead you at any

23  point before the search warrant affidavit?

24  A.   I have no information that Robert misled me about

25  anything.
```

1  **Q.**   And did Agent Maura Lating mislead you prior to the search

2  warrant affidavit?

3  **A.**   I have no reason to believe that Agent Lating tried to or

4  ever did mislead me.

5          **MS. FARBER:**  No further questions.

6          **THE COURT:**  All right.

7      Any additional questioning?

8          **MR. GREENBERG:**  No, Your Honor.

9      Thank you, Ms. Wilkinson, for your time.

10         **THE COURT:**  Thank you.  You're excused.

11         **THE WITNESS:**  Thank you for allowing me to go on

12  vacation last week.  I appreciate that, Your Honor.

13      (Witness exits.)

14         **THE COURT:**  All right.  Next witness.

15         **MR. GREENBERG:**  Your Honor, I believe the next witness

16  is Cathy Pascale, who, I think, is still in Europe and is

17  coming back tomorrow evening.  And I believe -- our

18  understanding is that she's not available until Wednesday.

19         **THE COURT:**  We flew back up here yesterday on the

20  representation that you were going to call this mystery

21  witness, and he's not going to be called now.

22      So we got a two-day gap here?

23         **MR. GREENBERG:**  Well, Your Honor --

24         **THE COURT:**  When will she be here?

25         **MR. PHELPS:**  Ms. Pascale lands at midnight on the

1   13th.  I've told her that you want her here the afternoon of

2   the 14th.  That's what I texted her after we had that exchange

3   and she said she would be here the afternoon of the 14th.

4          **THE COURT:**  You can have her here Wednesday afternoon?

5          **MR. PHELPS:**  Yes, Your Honor.

6          **THE COURT:**  So we've got two and a half day gap.

7   Two days from today, yeah.

8          **MR. GREENBERG:**  Your Honor --

9          **THE COURT:**  It would have been nice to know that that

10  witness wasn't going to be called before we got on a plane to

11  fly back to Baltimore.

12     Let's put it on the record, this other witness, I've

13  forgotten his name, he's not going to be called at all?

14          **MR. FLOWERS:**  No, he's not going to be called at all.

15  It was the witness Wayne Dyke.  It was, as the Court will

16  recall, you know, we tried not to even tell the Court about

17  that we were going to call this witness because we were in flux

18  about, you know, whether we would call him, how that witness

19  would fit in this case.  As the Court is well aware, you know,

20  by virtue of the Court's writing and talking about the

21  *My Cousin Vinny* movie, that, you know, things change quickly

22  and you've got to be able to change your plan kind of in mid --

23  in mid-plan.

24          **THE COURT:**  I agree with you.  No problem there.  But

25  I've just got to say, it doesn't seem like, to me, there's been

```
1   hardly any surprises in this trial.  We had a three- to
2   four-week criminal trial.  We had copious discovery here.  The
3   OPR investigation interviewed all these people, and transcripts
4   were prepared.  I think both sides are over emphasizing the
5   element of surprise here.
6        So she'll be here Wednesday right after lunch?
7            MR. PHELPS:  I will tell her to do that Your Honor.
8   Would you like -- should we say 1:00 p.m.?
9            THE COURT:  Let's say 1:00.  How long do you think
10  she'll be on the stand?  Who's going to call her?
11           MR. GREENBERG:  Your Honor, we will call her
12  initially.  I would imagine that the length of her direct would
13  be similar, if not very similar, to Ms. Wilkinson's.
14           THE COURT:  So we can finish her Wednesday afternoon
15  probably?
16           MR. PHELPS:  Yes, I think so, Your Honor.
17           THE COURT:  So then that gives us two days for the
18  Plaintiff.
19           MR. GREENBERG:  Yes, Your Honor.  And I would think we
20  can at least probably start the Plaintiff's direct on
21  Wednesday.
22           THE COURT:  All right.  We're still on track to finish
23  by Friday, in other words?
24           MR. GREENBERG:  I think so, Your Honor.
25           THE COURT:  So let's just get on record, the only two
```

1   witnesses remaining are Ms. Pascale and Mr. Annappareddy, and

2   neither side foresees any additional rebuttal witnesses beyond

3   that?

4           **MR. PHELPS:**  None from the Government, Your Honor.

5           **MR. GREENBERG:**  That is correct, Your Honor.

6           **THE COURT:**  Well, the brief we got late last night

7   from the Plaintiff suggested you were squeezing up against the

8   time deadline I gave you, but you're not going to need all

9   those.  If we finish Friday, you're not going to need anything

10  like that, right?  Am I missing something?

11      The Plaintiff is sitting on 19 hours.  I told you I'd

12  think about giving you credit for the testimony of Mr. McCray

13  that I did not consider since it was post indictment.  We'll

14  just ballpark that at about an hour.  I don't think it was

15  actually an hour.  But I'll give you that hour back.  So you've

16  got 12 hours to go.  And if we come back on Wednesday, that

17  should be plenty of time to finish.

18          **MR. FLOWERS:**  I agree with Your Honor.  And I just

19  want to be kind of clear with Your Honor's ruling on

20  Mr. Ernest McCray.  The ruling was that the stuff that is kind

21  of post September 23rd, 2013, the Court is not going to

22  consider?

23          **THE COURT:**  Right.

24          **MR. FLOWERS:**  But, obviously, the stuff that was

25  before that --

```
 1          THE COURT:  Everything before that is certainly in,
 2   yes.  Maybe I wasn't clear.  I just draw the line at the date
 3   of the affidavit.
 4          MR. FLOWERS:  Right.  I think you probably were clear,
 5   and it's probably a user error, my fault.
 6          THE COURT:  And in that time, the things I disallow
 7   will not be counted against the Plaintiff's time.
 8          MR. FLOWERS:  Very well, Your Honor.
 9          MR. PHELPS:  Your Honor, if I could ask a question
10   about closing arguments.  You had referenced previously
11   openings, you thought, should be no more than an hour, but
12   probably less.  If Your Honor has any expectations for how long
13   closings could be.
14          THE COURT:  We could certainly justify more than an
15   hour, I just don't know if we could get it in Friday or not.
16   There's a local rule that says it's an hour, but I can waive
17   that.  You need more than an hour?
18          MR. PHELPS:  Your Honor, we'll do whatever you want,
19   we'll tailor it.  We just need to know that when we prep, if
20   we're running over an hour, whether or not that's going to be
21   acceptable.
22          THE COURT:  Well, it would help to know, if you know
23   how much time we'll have available Friday after the testimony.
24       Mr. Greenberg, how long do you think the Plaintiff will
25   need?
```

1          **MR. GREENBERG:**  Well, Your Honor, it's a little bit

2     difficult right now because the Government has indicated

3     repeatedly, including just with this last witness, that they

4     plan to ask Mr. Annappareddy about post-indictment events,

5     including Eloise Lane.  That would be a whole mini trial itself

6     if we get into Eloise Lane.  So that would require a lengthy

7     redirect, probably involving a number of spreadsheets to show

8     why the Eloise Lane Ryan analysis is false.  So it's really --

9     we really are in sort of a hamstrung position where we can't

10    predict right now.

11         If you're asking specifically about closing --

12          **THE COURT:**  That's what I'm asking about.

13          **MR. GREENBERG:**  Okay.  I would say no more than -- I

14    would say I can't imagine, based on what we know now, it would

15    be more than an hour.

16          **MR. PHELPS:**  We'll do our best to be similar.

17          **THE COURT:**  All right.  We'll count on one hour.

18         And understand, if we do not get to the closing arguments

19    on Friday, I don't see a problem with doing it by Zoom when I'm

20    back in Columbia.  Testimony is different, I need to observe

21    the demeanor of the witness and hear them firsthand.  Argument

22    by counsel is a lot different, in my view.  So just be aware

23    that that may happen if we run all day Friday.  We don't fly

24    back until Saturday morning, so we can go as late as necessary

25    on Friday.

```
 1              MR. GREENBERG:  We would, respectfully, ask to get the
 2   closings in on Friday.  I believe lead Government counsel has a
 3   trial coming up.  And, you know, the gap in time between --
 4              THE COURT:  Well, I would much prefer, even if we have
 5   to work very late Friday.
 6              MR. GREENBERG:  I think that would be best, Your
 7   Honor.  And respectfully, this issue about, you know,
 8   impeachment through post-indictment evidence, I think there's
 9   got to be some line drawn about how much they can do that.
10              THE COURT:  Well, let's just take it up as it comes.
11   I'm aware of your serious concerns about that.
12              MR. GREENBERG:  Thank you, Your Honor.
13              MR. PHELPS:  Your Honor, we will have a response to
14   the motion that was filed yesterday, we will have it filed by
15   the end of the day today.
16              THE COURT:  Well, actually, all the testimony
17   mentioned in the memorandum, I have allowed in.  The only thing
18   it asked for was more time over and above 35 hours.  But it
19   doesn't -- it looks like that's a moot point to me.  Am I
20   missing something here or not?
21        Mr. Greenberg, all the stuff you complained about and
22   suggested that it should come in, it came in, right?
23              MR. GREENBERG:  Well, I'll actually let Mr. Flowers
24   speak to this issue.
25              MR. FLOWERS:  Yeah, I mean, it certainly came in.  And
```

 1  if the Court's ruling is that it all comes in --

 2          THE COURT:  Whether that was rebuttal, proper

 3  rebuttal, or direct evidence, it doesn't really matter.  It's

 4  in, and you don't need the time, I don't think.

 5          MR. FLOWERS:  Well, I think that's correct, given

 6  where we are.  My concern is, however, if the Court determines

 7  that it is not proper rebuttal and the Government then argues

 8  they were surprised, I'm concerned about when that happens how

 9  that's going to look on appeals.  So our position is that this

10  is clearly rebuttal evidence, that there was no surprise, and

11  for all the reasons that we have outlined in the pleading that

12  we filed yesterday, this is appropriate rebuttal and that there

13  was no surprise to the Government, Your Honor.

14          THE COURT:  Do you want to brief it or not?

15          MR. PHELPS:  Your Honor, the brief is basically

16  written at this point.  I mean, we've objected to every one of

17  these witness.  We still object to them.  We're happy to file a

18  brief that conforms to our ongoing objection to any of these

19  witnesses being called.  We understand --

20          THE COURT:  You say they weren't rebuttal, they were

21  substantive witnesses.

22          MR. PHELPS:  They were substantive witnesses --

23          THE COURT:  But could the Plaintiff not have called

24  them as substantive witnesses?  I mean, the problem was you

25  didn't know who they were going to be, right?

1      **MR. PHELPS:**  Correct, Your Honor.  Not on the witness

2 list, never disclosed.  I mean, Vipin and Pragna Patel

3 testified on less than 24-hours' notice, Your Honor.

4      **THE COURT:**  Maybe you better write a brief then, to be

5 safe.  Let's do that.

6      **MS. FARBER:**  Your Honor, may I ask a point of

7 clarification.  The discussion just now related to whether all

8 of the statements in Plaintiff's brief, all of the testimony in

9 Plaintiff's rebuttal brief had been admitted, one of the

10 statements in that brief is Robert Mosley's statement at the

11 grand jury to Mr. McCray that what we wanted, what he was

12 pursuing was justice, and we personally love that statement,

13 but that is a post-indictment statement.  Is that in evidence?

14 Can we use that?

15      **THE COURT:**  Was it not objected to when it came in?

16      **MS. FARBER:**  Well, Your Honor, it occurred after the

17 indictment.

18      **THE COURT:**  I understand.

19      **MS. FARBER:**  And Plaintiff believes it goes to malice,

20 and we believe it establishes the opposite.  So the question is

21 just whether that is --

22      **THE COURT:**  Well, let me think about that, and we can

23 discuss that when the case is argued.  We can think about that.

24 All right?

25      **MR. FLOWERS:**  And just, as the Court is thinking about

1  that, again, we join hands with the Government on that.  We

2  believe that evidence should come in.  And, quite frankly, I

3  think it's easier if the Court would just allow all of

4  Mr. McCray's testimony to come in.  The key part that was post

5  indictment, the key part was really that discussion that he had

6  with Robert Mosley in the elevator.  And I understand what the

7  Government's position is on that.  We obviously have a

8  different position on that, and the Court will decide who's

9  correct with respect to Mr. Mosley's malice.  Perhaps that's an

10  issue that we don't have to debate, we don't have to litigate

11  because if they're on the same page as you come in with us,

12  again, that's something that we can move on from.

13       My only suggestions then, is if we're going to let that

14  piece of Ernest Mosley's [sic] testimony in post indictment, we

15  might as well let it all in.  And let us be able to argue about

16  the malice, how it goes to both Lating's malice and it also

17  goes to Mosley's malice.

18          MS. FARBER:  And that's the issue that the Court drew,

19  is that once we let everything in, then we -- that's already

20  well on record from the other day.

21       So I just wanted to clarify just that one statement

22  because that's in Plaintiff's brief, and I thought I heard

23  discussion about how all of the statements that were mentioned,

24  all of the testimony mentioned --

25          THE COURT:  Well, I might have overstated it then.

 1           MS. FARBER:  Okay.

 2           THE COURT:  I just read the memo this morning.  My law

 3   clerk read it last night.  It was filed 22 minutes to midnight.

 4   He read it last night.  I read it this morning, hurriedly.

 5           MS. FARBER:  Yes.

 6           THE COURT:  While we're here, let's talk about the

 7   parallel 1983 case.  I think a good idea, to just be thinking

 8   ahead, Mr. Greenberg suggested that necessarily the juries have

 9   got to be educated about a lot of concepts that I knew about

10   before this trial started.  And I've done this once before in a

11   case where I asked the lawyers to come up with a glossary of

12   terms to give the jury, a definition of what a *qui tam* action

13   is and maybe a description of what MEDIC is.  And I would think

14   that good lawyers should be able to sit down and come to a

15   correct statement of some of these terms.  There may not be

16   that many, but I'd like for you to be thinking about that.

17           MR. GREENBERG:  Your Honor, I think that's a fantastic

18   idea, and we would certainly join hands with Ms. Shiff to do

19   that.  I think that would move things along.

20           THE COURT:  And the second thing, I'd like --

21           MS. SHIFF:  Your Honor --

22           THE COURT:  Ms. Shiff, do you want to comment?

23           MS. SHIFF:  Your Honor, we would be in agreement, I

24   think assuming we can -- I think the definitions are pretty

25   standard and we could, hopefully, get, whether it's 10 or 20

1    terms, defined for the jury, and perhaps even distribute it or

2    make it available to them so that they have it for -- as a

3    reference material.

4            THE COURT:  All right.  Very good.

5        And the second thing is, I would like some prediction as

6    to what evidence will come in at a second jury trial over and

7    above what we've heard in this case?  Will there be any new

8    witnesses called I've not heard from?  I'm not going to hold

9    you to it.  But do you foresee that happening?

10           MR. GREENBERG:  Your Honor, I think it would be

11   virtually all of the same witnesses, but we would potentially

12   call a small number of additional witnesses.  I don't think

13   they would be lengthy, and I don't think they would affect the

14   overall time of the trial in any significant way based on what

15   I -- the information I have right now.

16       And -- yeah.

17           MS. SHIFF:  Sure.  Your Honor, I don't foresee at this

18   time calling any different witnesses, but it may depend on what

19   the Plaintiff -- who the Plaintiff adds as an additional

20   witness.  I would foresee the witness list actually becoming

21   shorter.

22           THE COURT:  Ms. Shiff, will you be alone or will you

23   have cocounsel with you?

24           MS. SHIFF:  Mr. Chasen will be with me.

25           MR. GREENBERG:  Your Honor, I would just add,

```
 1  actually, I think we may be able to avoid calling -- I mean --
 2  well, it would depend on Ms. Shiff, obviously, because they
 3  weren't our witness.  But folks like Jeremy Dykes,
 4  Judge DiPietro, I don't know that we would even need them.  So
 5  I think that would probably shorten the case.  There will be
 6  some time needed --
 7           THE COURT:  Well, you were the one last time that said
 8  it's going to be a lot longer.
 9           MR. GREENBERG:  Oh, no, I -- well, I was talking
10  about -- because there is going to be -- yes, and I stand by
11  that, Your Honor.  I mean, there is going to be additional time
12  needed to educate the jury.  I do think the glossary that Your
13  Honor suggested will reduce that time, hopefully in a very
14  significant way, and I think that's a great idea.  But, still,
15  the jury trial will necessarily have to be longer because no
16  juror is going to have four-years plus experience in this case.
17           THE COURT:  One other thing to think about might be
18  a -- I tried a securities fraud case once where this suit was
19  against the inside directors, the outside directors, the
20  auditing firm, the CEO, and we had a pie chart of the major
21  actors.  We actually blew it up on a 4-by-8 sheet that the
22  parties could use in opening statements to talk about the
23  different defendants because there were different liability
24  issues, some had a scienter requirement, some did not, and it
25  just kind of gave a mental picture of who all the major players
```

1  were.  Would that be helpful hearing in terms of the

2  investigators, the prosecutors, and so forth?

3          MR. GREENBERG:  We certainly think that would be very

4  helpful, and we'll be willing to work with Ms. Shiff on that.

5  And I think there's a way to do it in a, hopefully, neutral

6  fashion that will certainly help things along.

7          THE COURT:  All right.  It was actually color-coded

8  blocks with names and functions on it.

9          MS. SHIFF:  Your Honor, I think we could come up with

10  key -- like, some kind of key players' guide for the jury in

11  terms of who was employed by whom and what the specific titles

12  were and during what period, perhaps, even.

13          THE COURT:  Just one more thing, to the extent we have

14  scheduling problems with witnesses like we've had in this case,

15  we do have testimony from all the people here, and if they're

16  not available next time -- I'm talking about anybody, both

17  parties, if they're not available because they're in the

18  hospital or in Europe or something, we've got the testimony and

19  the cross-examination from this trial, so I just serve notice

20  that we shouldn't have any gaps in the next trial.

21          MS. SHIFF:  Sure.  Your Honor, my only concern would

22  be I haven't had the opportunity, Ms. Arnold hadn't had the

23  opportunity to cross-examine witnesses in this trial.  Although

24  the interest is similar, what I would do might be different

25  from what the United States' counsel has done.  And she would

1    like the opportunity.

2        **THE COURT:**  I think Rule 804 on prior testimony of an

3    unavailable witness directs us to somewhat of a similar motive

4    and inclination to cross-examine or examine.

5        **MS. SHIFF:**  Sure.  Your Honor, there's also additional

6    counts against Ms. Arnold that haven't been addressed in this

7    trial, and those witnesses haven't been necessarily questioned

8    on direct or cross-examine -- cross-examined.  So I don't know

9    at this -- I'm hoping it's not an issue, Your Honor.

10       **THE COURT:**  I'm not ruling on anything today, I'm just

11   thinking out loud.

12       **MS. SHIFF:**  I understand.

13       And my suggestion would be that perhaps before a trial

14   date is scheduled, that we talk with witnesses and make sure

15   there is availability of witnesses as of whenever we schedule

16   the trial so that we can move forward in the most expeditious

17   manner.  Because these witnesses, it's a written transcript,

18   it's not -- there's no video.  It would be -- it's potentially

19   problematic.  So ideally, it would be best if we could schedule

20   the trial in a way that would enable the necessary witnesses to

21   be here.

22       And that would benefit everybody because the Plaintiff can

23   present his case, all the direct comes first, then whatever

24   Ms. Arnold chooses to present, and then rebuttal, should there

25   be a need for any.

```
 1          THE COURT:  What about the issue of bifurcating the
 2   issues of liability and damages and getting a verdict on
 3   liability first, and then going into testimony on damages?
 4          MS. SHIFF:  Your Honor, we would not -- well, we --
 5   first, we hope we don't get to that point, let me say that for
 6   the record.  However, assuming -- knowing that that is a
 7   possibility, I would think that the damage evidence would take
 8   a day or less.
 9          THE COURT:  I think y'all told me that before.
10          MS. SHIFF:  Yes.  So I don't know, and I would -- it
11   would most likely, presumably, be the Plaintiff and the experts
12   who did not testify in this case on damages, but the positions
13   may be different for trial because a jury may need to hear from
14   live witnesses in terms of establishing credibility,
15   methodology, those types of things.
16          MR. GREENBERG:  Your Honor, if I may just briefly
17   respond.  I understand Your Honor is not making any decisions
18   on the evidence that's going to come in today.  But I would
19   just like to point out that, you know, some of these folks,
20   like Laurie Gutberlet, she's had her deposition taken, she came
21   and traveled here to testify, we paid for her to be here.  And
22   the Government counsel -- the Government and Defendant Arnold
23   have both an opportunity and similar motive.  They have been
24   coordinating throughout this case.  I believe, although I'm not
25   sure, that they have a joint defense agreement.  They've
```

1   certainly been coordinating as far as all indications, and I
2   don't know that there's, at least for some witness, any
3   daylight between them in what they would ask or what they would
4   do.
5        I also would say, Your Honor, respectfully, we would ask
6   that a date be set for the jury trial.  We think that, again,
7   Mr. Annappareddy has been waiting nearly 10 years for justice,
8   and we respectfully would ask that -- I know the Court is busy
9   for the rest of the summer, at least that's what I gathered
10  from some of the statements, but if there could be a trial
11  scheduled for, at least, say, September, that would be -- you
12  know, we would ask for that.
13          THE COURT:  Well, go back to what you said before
14  about they've had a chance to cross-examine all the witnesses.
15  For the prior testimony to come in under the 804 hearsay
16  exception, the witness has to be unavailable.
17          MR. GREENBERG:  Oh, yes, Your Honor, correct.  And so
18  if they want to bring, say, Laurie Gutberlet back for a third
19  round of examination, yes, they can certainly do that.  But --
20  yes.
21          MS. SHIFF:  Your Honor, if I may?
22          THE COURT:  Go ahead.
23          MS. SHIFF:  I just would like the Court to also
24  consider the issue that was raised by the Court last week with
25  regard to the appeal, if there is an appeal --

```
1            THE COURT:  I was about to raise that issue now.

2            MS. SHIFF:  If there is an appeal, Your Honor, it may

3   depend on what issues are appealed, because specific issues

4   have to be cited to the Fourth Circuit before briefing occurs.

5   So that issue -- it may be premature before we know what issues

6   are being presented, but certainly -- presumably, this Court

7   doesn't want to redo the bench trial, but it certainly wouldn't

8   be to have a second jury trial in this case.  And if any issue

9   is presented to the Fourth Circuit that might impact the

10  outcome of the jury trial, it's probably in the interest of

11  judicial economy.

12       Ms. Arnold would also like to have this matter resolved.

13  I know we've heard lots of arguments about the Plaintiffs had

14  this ongoing for as long as it's been ongoing for him.  But

15  Ms. Arnold has been a Defendant in this civil matter for just

16  under five years.  She's an individual.  She is sued in her

17  individual capacity.  She is personally at risk for the

18  judgment here.  She would like to have it resolved.

19       However, I do have her consent to represent to the Court

20  that she would prefer to have -- she doesn't want to have a

21  second jury trial.  She has to take off of work in order to

22  come -- travel to Maryland for one jury trial.  She doesn't

23  want to have to do that twice.  And --

24            THE COURT:  My law clerk and I discussed it, we

25  haven't researched it at all, the question of whether there
```

1   would be any issue preclusion if we let an appeal go up and

2   waited on that appeal to try the jury trial, but there

3   certainly could be some evidentiary rulings that could be

4   decided by the Fourth Circuit that might carry over to the

5   second.  Even if it was not issued preclusion, there could be

6   some evidentiary issues that might come into both trials.

7            MR. GREENBERG:  Your Honor, I think that's,

8   respectfully, unlikely, unless there are evidentiary issues

9   that I might not be seeing, and that's because there's no

10  malice element for the claims against Defendant Arnold.

11           With respect to the concept of an appeal, we believe that

12  would be fundamentally unfair to Mr. Annappareddy for the

13  reasons I stated before.  And also, because the reason that

14  witnesses' memories are fading.  And we saw this this morning

15  in realtime with Ms. Wilkinson.  She claimed not to remember

16  things that she did remember in her deposition.  I didn't get

17  into all of it in the interest of time.  But she actually

18  testified in her deposition that her memory is not as good and

19  wasn't as good in August of 2022 as it was six months earlier.

20  So that's a problem.

21           And you know, okay, maybe the appeal would be done in a

22  year, maybe not.  It might be longer.  We just don't know.  And

23  this is a case that we believe ought to go to trial

24  expeditiously and without an appeal delaying things and causing

25  witnesses' memories to fade even further.

1      **THE COURT:**  I'll take all that into consideration.

2      **MS. SHIFF:**  Thank you, Your Honor.

3      **THE COURT:**  Mr. Phelps, to go back, you are going to

4  file a brief in response to what we got last night?

5      **MR. PHELPS:**  We'll have it filed by the end of the

6  day, Your Honor.

7      **THE COURT:**  All right.  Do you want to come back and

8  argue tomorrow or do it Wednesday morning?  Probably Wednesday

9  morning.

10     **MR. PHELPS:**  Wednesday morning is fine Your Honor.  We

11 don't presently have any witnesses Wednesday morning.

12     **THE COURT:**  I'm just thinking 11:30 or something

13 Wednesday.  You said she'll be here at 1:00?

14     **MR. PHELPS:**  We'll have her here at 1:00, yes, Your

15 Honor.

16     **THE COURT:**  Do you want to take an early lunch and

17 come in at 12:30 to argue the motion?

18     **MR. PHELPS:**  Okay.

19     **THE COURT:**  We might need more than 30 minutes.

20     **MR. PHELPS:**  You know, Your Honor, I don't have

21 anything new to say, quite frankly, about this issue.

22 Everything that we're putting in our brief is just basically

23 distinguishing the few cases that they cite.  I think Your

24 Honor understands our position.  They're not rebuttal.  They're

25 being dropped on us at the last minute.  That's our case.  I

```
 1   don't have anything else to say.
 2           THE COURT:  But, I say again, to the extent it all
 3   depends on -- if it determines a time counted against the
 4   Plaintiff, I think it's going to be a moot point, probably.
 5           MR. PHELPS:  Your Honor, I don't relate it to time in
 6   the way that the Court or perhaps the Plaintiff does --
 7           THE COURT:  Right.  You just said a surprise
 8   witness --
 9           MR. PHELPS:  Correct.
10           THE COURT:  -- was not true rebuttal.
11           MR. PHELPS:  Correct.
12           THE COURT:  All right.  Well, I'll let you brief that.
13   I'll let you brief that.
14           MR. GREENBERG:  Your Honor, just one point that we may
15   not have put in our brief that I think is worth noting.  Three
16   of the four witnesses were named in our initial disclosures,
17   both Vipin Patel and Pragna Patel, and Ernest McCray.  In
18   addition, our brief did mention that Mr. Annappareddy, in his
19   deposition testimony, mentioned Dr. Vaidya.  He also mentioned
20   Ernest McCray.
21        But maybe more fundamentally, the whole point of surprise
22   doesn't apply to rebuttal witness, because they're rebuttal
23   witnesses, and so they don't have to be on the witness list.
24           THE COURT:  All right.  Let me say one more thing.
25   There's been a lot said about requiring Mr. Annappareddy to
```

 1  prove his innocence and back and forth about that.  My law

 2  clerk pointed out that the very first sentence of the complaint

 3  says the Plaintiff is an innocent man.  And then in the

 4  prosecution's opening statement they rejoined on that and said

 5  "You're not going to hear from a single witness to say the

 6  Plaintiff is innocent."  I think both sides need to just

 7  drop -- back off of that.  Guilt or innocence is not in front

 8  of me today.  It's not in front of me.  Mr. Annappareddy

 9  doesn't have to prove he's innocent.  It's not an element of

10  the claim here, and we don't need to have any semantical

11  arguments about that terminology.

12       Also, the memorandum filed last night said that the

13  Government's case got out of control by suggesting that the

14  Plaintiff, Mr. Annappareddy, was a horrible employer.  We did a

15  word search, those terms don't appear in any of the testimony.

16  There was some testimony about him yelling at employees and

17  things such as that.  But I don't think it's correct to say

18  that I allowed in evidence about his character as a horrible

19  employer.

20           MR. FLOWERS:  Yeah, Your Honor, and forgive me for the

21  imprecision.  It really is that -- the allegation is that

22  Mr. Annappareddy was housing slaves.  Do a word search on that,

23  that certainly comes up.  We should be more precise about that.

24  And I do think one can say if one is a slave master, one is a

25  horrible employer.  But that's where that came from, Your

1  Honor.

2       THE COURT:  All right.  One more thing, I don't want

3  to misspeak, what is the correct -- Mid Eastern employees is

4  not correct.  Some of his employees were from his home country,

5  they shared a common bond in respect, but what's the correct

6  terminology I should use?

7       MR. FLOWERS:  Indian.

8       THE COURT:  Indian.  Simple enough.

9       MR. FLOWERS:  And, quite frankly, we'll argue this in

10  closing, it's what Agent Lating, Robert Mosley, Lisa Ridolfi,

11  Dennis Tokofsky, they --

12       THE COURT:  They all used that term.  I understand.

13       MR. FLOWERS:  They knew better, and they should have

14  done better.

15       THE COURT:  All right.

16     One more thing before we break up.  Mr. Annappareddy's

17  status in this country, we don't know if a hold has been put on

18  it by anybody or why.  Is there anything I can do to unleash

19  that so he can go to a funeral if he needs to?  Has the

20  Plaintiff checked to see what the problem is?

21       MR. GREENBERG:  Your Honor, the Plaintiff has --

22       (Counsel conferring.)

23       THE COURT:  Yes, sir.

24       MR. GREENBERG:  To the extent that Your Honor can

25  direct USCIS to issue Mr. Annappareddy a Green Card, his

 1  application has been on hold for over -- well over a decade and
 2  maybe even two decades.
 3          THE COURT:  But you have challenged it
 4  administratively?
 5          MR. GREENBERG:  Your Honor, I believe, my
 6  understanding is he has immigration counsel who is challenging
 7  administratively.  But to the extent that Your Honor can step
 8  in and expedite this, that would certainly be --
 9          THE COURT:  I don't know -- that might be beyond my
10  jurisdiction.  I was just curious.  Let me think about that.
11          MR. GREENBERG:  And just one more point on that, Your
12  Honor, just to kind of highlight what's happened.
13      Mr. Annappareddy's wife has gotten a Green Card years ago,
14  while Mr. Annappareddy is still waiting.  The only difference
15  we can see is that Mr. Annappareddy was maliciously prosecuted,
16  wrongfully charged, wrongfully convicted, and his wife was not.
17          THE COURT:  All right.  Anything else we can take up
18  while you're all here?
19          MR. PHELPS:  No, Your Honor.  Thank you.
20          THE COURT:  My law clerk and I have visited all the
21  museums in Baltimore, already.  We've got a baseball game to go
22  to still.
23          MR. GREENBERG:  I was going to suggest that, Your
24  Honor, the Orioles are decent --
25          THE COURT:  I think it's Thursday and Friday.

1          All right.  We've got to decide when to come back.

2              MR. GREENBERG:  Your Honor, on that note, I would

3     respectfully suggest that we start earlier than 12:30, just

4     because I think maybe you've already covered this but --

5              THE COURT:  Yeah.  Who knows what might come up.

6     Let's come in at 10:00.

7              MR. GREENBERG:  I think that makes sense.

8              THE COURT:  10:00 Wednesday.  Very good.  We'll be in

9     recess until 10:00 this Wednesday.

10              THE CLERK:  All rise.  This Honorable Court is in

11     recess.

12          (Hearing concluded at 12:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4      I, Ronda J. Thomas, Registered Merit Reporter, Certified

 5  Realtime Reporter, in and for the United States District Court

 6  for the District of Maryland, do hereby certify, pursuant to 28

 7  U.S.C. § 753, that the foregoing is a true and correct

 8  transcript of the stenographically-reported proceedings held in

 9  the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12
                         Dated this 12th day of June 2023.
13

14

15                      _____

16                       Ronda J. Thomas, RMR, CRR
                          Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

**BY MR. EISER: [2]**
29/25 31/5
**BY MR. GREENBERG: [2]**
42/13 46/20
**BY MS. FARBER: [4]**
55/15 65/19 73/3 78/12
**MR. EISER: [12]** 9/20
11/11 25/12 26/3 31/14
32/6 32/9 32/11 33/1
33/13 35/9 35/13
**MR. FLOWERS: [12]**
92/14 94/18 94/24 95/4
95/8 97/25 98/5 99/25
112/20 113/7 113/9
113/13
**MR. GREENBERG: [76]** 3/12 9/15 10/1
11/14 25/5 25/8 25/24
26/14 29/13 30/25
31/10 32/3 32/22 33/8
33/16 34/9 34/16 35/2
35/17 36/18 36/24
45/13 45/20 46/19
47/20 49/9 49/21 49/24
53/6 53/21 54/12 73/21
73/25 76/6 81/4 82/3
83/7 85/9 85/14 85/20
86/8 86/14 86/21 86/23
88/20 89/17 91/8 91/15
91/23 92/8 93/11 93/19
93/24 94/5 96/1 96/13
97/1 97/6 97/12 97/23
101/17 102/10 102/25
103/9 104/3 106/16
107/17 109/7 111/14
113/21 113/24 114/5
114/11 114/23 115/2
115/7
**MR. PHELPS: [21]**
91/25 92/5 93/7 93/16
94/4 95/9 95/18 96/16
97/13 98/15 98/22 99/1
110/5 110/10 110/14
110/18 110/20 111/5
111/9 111/11 114/19
**MS. FARBER: [36]**
45/15 47/8 47/19 48/17
53/16 53/19 53/22 54/9
65/17 71/19 71/25
72/25 74/3 77/23 81/6
81/12 81/14 82/7 82/12
82/15 83/4 84/4 84/19
86/9 87/19 88/19 89/6
90/18 90/20 91/5 99/6
99/16 99/19 100/18
101/1 101/5
**MS. SHIFF: [14]**
101/1 101/23 102/17

102/24 104/9 104/21
105/5 105/12 106/4
106/10 107/21 107/23
108/2 110/2
**THE CLERK: [10]**
3/14 3/17 37/3 37/6
37/11 72/3 72/7 86/20
86/22 115/10
**THE COURT: [134]**
**THE REPORTER: [1]**
46/18
**THE WITNESS: [21]**
3/20 11/13 11/17 13/23
14/1 26/16 29/19 34/21
36/21 37/9 47/13 48/21
53/9 53/18 54/24 61/19
73/2 76/12 78/9 82/11
91/11

**'**

**'07 [1]** 5/6
**'12 [1]** 34/5
**'13 [1]** 34/5
**'99 [1]** 5/3

**1**

**10 [1]** 101/25
**10 million [1]** 67/13
**10 years [2]** 6/9 107/7
**100 [4]** 53/16 53/22
54/10 67/3
**100 percent [2]** 39/3
66/15
**101 [1]** 1/24
**10:00 [2]** 115/6 115/9
**10:00 Wednesday [1]**
115/8
**10:53 [1]** 72/5
**11:06 a.m [1]** 72/6
**11:30 [1]** 110/12
**12 [3]** 1/6 2/2 80/20
**12 hours [1]** 94/16
**124 [1]** 73/5
**12:05 p.m [1]** 115/12
**12:30 [1]** 115/3
**12:30 to [1]** 110/17
**12th [1]** 116/12
**1340 [1]** 53/10
**1346 [1]** 53/13
**137 [5]** 72/23 73/2
73/4 73/10 75/2
**13th [1]** 92/1
**14 [1]** 47/20
**1495 [6]** 33/6 43/13
43/15 43/24 44/4 44/10
**14th [2]** 92/2 92/3
**15 months [1]** 32/7
**15 years [1]** 6/19
**15-minute [1]** 72/2
**15-plus [1]** 32/4

**158 [1]** 47/20
**17th [1]** 66/5
**18-cv-3012-JFA [1]**
1/5
**1803 [5]** 81/25 82/22
83/18 83/18 88/6
**1803 Eloise [1]** 84/20
**19 hours [1]** 94/11
**1962 [1]** 5/17
**1969 [3]** 4/16 5/21
5/25
**1970s [1]** 6/25
**1980 [3]** 4/16 4/19
4/24
**1983 [1]** 101/7
**1994 [1]** 50/10
**1999 [1]** 4/24
**1:00 [3]** 93/9 110/13
110/14
**1:00 p.m [1]** 93/8
**1st [6]** 46/1 47/2 48/1
48/10 74/4 75/4

**2**

**20 [2]** 19/22 101/25
**2005 [2]** 5/3 50/19
**2006 [14]** 5/6 7/16
7/25 10/24 12/21 15/3
18/20 21/16 23/5 23/14
24/2 24/16 24/22 24/25
**2011 [4]** 69/24 70/4
70/7 70/12
**2011, '12 [1]** 34/5
**2013 [27]** 7/16 7/25
10/25 12/21 15/3 18/21
21/16 23/6 23/14 24/2
24/16 24/23 24/25 38/3
38/17 40/13 66/7 70/4
70/13 74/5 75/4 76/9
83/16 83/19 87/8 87/16
94/21
**2014 [2]** 4/11 48/3
**2015 [3]** 5/8 46/3 47/5
**2016 [4]** 46/1 47/2
48/1 48/10
**2022 [2]** 28/3 109/19
**2023 [3]** 1/6 2/2
116/12
**21201 [1]** 1/25
**22 minutes [1]** 101/3
**23rd [5]** 38/3 38/16
83/16 87/8 94/21
**24-hours' [1]** 99/3
**28 [1]** 116/6

**3**

**30 minutes [1]** 110/19
**30 years [1]** 50/14
**30th [1]** 28/3
**35 hours [1]** 97/18

**37 [1]** 2/7
**37 years [1]** 89/18

**4**

**42 [5]** 65/17 65/20
65/23 66/2 66/10
**4th [1]** 1/24

**5**

**50 [1]** 71/17
**50-plus [1]** 6/22
**57 [1]** 80/12
**5th [1]** 86/22

**6**

**61 years [1]** 5/18
**67 [6]** 80/1 80/3 80/4
80/11 86/12 86/18

**7**

**702 [1]** 9/24
**753 [1]** 116/7

**8**

**804 [1]** 105/2
**804 hearsay [1]**
107/15

**9**

**9:01 [2]** 1/7 3/1

**A**

**a.m [4]** 1/7 3/1 72/5
72/6
**ability [4]** 79/3 84/8
88/8 88/14
**able [13]** 14/9 58/21
63/1 63/2 69/1 74/16
75/17 88/25 89/3 92/22
100/15 101/14 103/1
**about [118]**
**above [4]** 1/9 97/18
102/7 116/9
**above-entitled [2]** 1/9
116/9
**absent [1]** 22/10
**absolutely [1]** 59/15
**abstracted [1]** 30/19
**abuse [2]** 19/23 19/24
**academia [1]** 4/20
**academic [1]** 4/21
**accept [1]** 78/9
**acceptable [1]** 95/21
**access [10]** 14/5 14/9
14/12 14/13 21/17
21/21 21/21 21/23
22/24 23/1
**accidental [2]** 30/22
31/2
**accredited [1]** 7/5
**accuracy [1]** 43/7

**accurate [8]** 11/8
23/21 40/8 43/15 43/20
44/3 81/19 87/15
**accurately [3]** 39/13
40/15 44/6
**acknowledge [1]** 32/7
**acknowledged [1]**
31/25
**acknowledgment [1]**
32/8
**acquired [5]** 49/11
76/7 84/2 87/9 87/15
**action [2]** 52/1 101/12
**activities [1]** 23/1
**activity [2]** 70/12 71/3
**actors [1]** 103/21
**actual [1]** 46/15
**actually [5]** 5/16
13/12 14/19 17/13
45/21 86/15 88/20
94/15 97/16 97/23
102/20 103/1 103/21
104/7 109/17
**add [2]** 66/19 102/25
**added [3]** 41/18 42/6
49/15
**addition [4]** 6/4 14/23
42/5 111/18
**additional [6]** 91/7
94/2 102/12 102/19
103/11 105/5
**address [1]** 3/8
**addressed [2]** 27/17
105/6
**adds [1]** 102/19
**adherence [1]** 13/1
**adjudication [1]** 8/12
**administered [1]** 27/1
**administration [2]**
5/22 55/5
**administrative [1]**
28/13
**administratively [2]**
114/4 114/7
**administrators [1]**
27/1
**admissibility [1]** 88/12
**admission [1]** 54/13
**admit [1]** 9/17
**admitted [5]** 54/15
86/19 86/20 86/24 99/9
**adulterated [1]** 53/1
**Advil [2]** 67/5 67/13
**advise [2]** 59/17 74/12
**advised [1]** 76/5
**affect [1]** 102/13
**affects [4]** 75/8 83/13
85/4 85/7
**affiant [2]** 39/3 41/11
**affidavit [43]** 32/20

**A**

**affidavit... [42]** 34/8
38/25 39/1 39/6 39/7
39/9 39/17 39/17 39/19
39/25 40/3 40/5 40/20
41/6 41/13 42/3 42/8
42/17 42/20 42/23 43/5
43/8 45/7 45/8 68/2
68/6 68/8 69/9 69/12
69/13 69/17 69/21
69/23 70/5 70/8 76/11
77/5 82/6 83/21 90/23
91/2 95/3
**affidavits [1]** 69/6
**afield [1]** 33/2
**after [28]** 16/14 17/17
20/8 20/9 22/20 36/13
44/13 45/8 45/25 47/1
47/5 48/1 48/9 49/2
49/2 49/3 49/11 76/7
76/9 84/2 87/9 87/15
90/8 90/11 92/2 93/6
95/23 99/16
**after-acquired [5]**
49/11 76/7 84/2 87/9
87/15
**afternoon [4]** 92/1
92/3 92/4 93/14
**again [14]** 5/7 17/16
21/16 25/20 33/11 39/3
42/21 43/25 63/8 69/8
100/1 100/12 107/6
111/2
**against [12]** 37/25
49/1 51/2 53/25 78/1
79/13 94/7 95/7 103/19
105/6 109/10 111/3
**agencies [3]** 55/2
55/25 56/16
**agent [51]** 24/24 26/8
38/3 38/5 38/8 38/11
38/16 38/24 38/25
39/11 39/17 39/24 40/4
40/13 41/9 43/13 43/14
43/19 43/23 44/2 44/3
44/6 44/9 44/22 45/2
45/3 45/12 52/6 52/11
52/12 54/18 54/21 55/3
55/3 55/4 55/9 55/17
56/3 56/4 56/8 56/10
56/12 56/13 56/14
56/19 57/23 75/23
90/22 91/1 91/3 113/10
**Agent Gutberlet [1]**
52/11
**Agent Lating [11]**
39/11 39/17 40/4 40/13
55/9 56/3 56/4 56/19
57/23 91/3 113/10
**Agent Lating's [1]**

56/10
**Agent Maura [1]** 38/25
**Agent Maura Lating
[1]** 91/1
**Agent Mosley [14]**
38/5 38/16 39/24 43/19
44/2 44/3 44/6 44/9
44/22 45/2 45/3 45/12
54/21 55/3
**Agent Mosley's [3]**
38/24 43/23 55/17
**Agent Robert [2]** 38/3
43/13
**Agent Robert Mosley
[1]** 90/22
**agents [5]** 40/3 43/8
51/21 56/5 56/18
**ago [5]** 11/20 29/6
48/7 87/13 114/13
**agree [5]** 32/25 36/11
42/16 92/24 94/18
**agreed [2]** 32/1 42/6
**agreement [8]** 80/16
84/22 85/25 86/7 86/9
87/21 101/23 106/25
**agreements [1]** 51/5
**ahead [14]** 3/9 14/2
14/21 29/18 31/17
32/15 33/22 35/11
48/19 48/20 50/1 74/7
101/8 107/22
**ahold [1]** 74/16
**aided [1]** 1/22
**AIDS [2]** 61/1 61/9
**al [1]** 1/6
**alert [1]** 18/16
**all [122]**
**allegation [1]** 112/21
**allegations [2]** 53/2
74/24
**allergy [1]** 5/10
**allow [5]** 8/2 29/16
78/25 85/3 100/3
**allowed [5]** 38/11
39/10 78/20 97/17
112/18
**allowing [3]** 20/7
44/22 91/11
**almost [5]** 50/13 55/12
75/20
**alone [4]** 23/22 83/18
89/5 102/22
**along [2]** 101/19 104/6
**alphabet [1]** 55/1
**already [12]** 52/14
52/15 60/13 73/25 74/1
84/22 86/10 87/21
90/10 100/19 114/21
115/4
**also [30]** 1/17 3/5 5/8

8/14 18/15 19/25 21/10
21/11 24/8 28/8 31/23
33/18 42/8 43/23 78/15
81/24 82/4 82/5 82/18
84/17 87/11 88/7
100/16 105/5 107/5
107/23 108/12 109/13
111/19 112/12
**altered [1]** 62/24
**although [8]** 61/10
104/23 106/24
**always [8]** 52/14 55/4
55/8 59/10 59/18 63/16
70/17 70/18
**am [10]** 4/9 6/9 22/14
23/4 61/20 70/18 75/13
88/17 94/10 97/19
**ambiguous [1]** 84/16
**America [1]** 1/14
**American [3]** 6/6 6/25
30/19
**Amerisource [1]** 9/8
**Ami [1]** 78/15
**among [1]** 8/22
**amount [5]** 19/14 21/6
53/13 54/6 64/20
**analysis [13]** 30/24
31/8 31/21 31/24 32/17
32/19 55/21 55/21
57/21 64/9 65/1 77/1
96/8
**ANDERSON [8]** 1/10
3/12 4/12 9/15 10/8
10/24 12/10 13/3
**angle [1]** 57/1
**ANNAPPAREDDY [45]**
1/3 1/17 3/13 30/5
36/25 37/25 46/2 47/3
48/11 48/23 50/24
51/11 51/23 53/25 54/6
54/19 58/7 58/24 64/4
66/18 66/23 71/13
77/17 78/6 79/13 82/17
83/17 84/11 85/22
85/24 87/7 87/17 88/12
94/1 96/4 107/7 109/12
111/18 111/25 112/8
112/14 112/22 113/25
114/14 114/15
**Annappareddy's [8]**
27/9 47/14 79/20 82/22
84/8 88/8 113/16
114/13
**another [11]** 12/4 12/6
16/25 17/14 18/3 20/1
20/11 47/17 52/6 55/4
74/2
**answer [12]** 10/20
28/10 28/11 28/15
28/16 31/15 39/21

111/22
**appoint [1]** 74/18
**appointed [2]** 50/20
74/14
**appreciate [1]** 91/12
**approaching [1]** 71/21
**appropriate [2]** 62/3
98/12
**approved [2]** 5/11
11/6
**approving [1]** 80/18
**approximate [1]** 77/7
**approximately [2]**
51/10 79/17
**approximating [1]**
77/8
**apropos [1]** 55/19
**are [49]** 4/1 6/22 7/3
7/3 11/20 12/6 12/14
15/1 22/23 26/5 32/17
41/14 43/1 43/10 48/9
52/23 57/2 58/16 59/12
59/13 60/10 60/16
62/21 62/22 67/11
67/17 68/18 69/3 71/19
71/23 74/5 77/7 77/21
82/21 84/20 84/23
87/21 90/5 93/4 94/1
96/9 98/6 101/24 108/3
108/6 109/8 109/14
110/3 114/24
**aren't [3]** 33/11 73/23
75/16
**argue [4]** 100/15 110/8
110/17 113/9
**argued [1]** 99/23
**argues [1]** 98/7
**Argument [1]** 96/21
**ARNOLD [16]** 1/6
57/22 65/24 71/20
72/13 72/20 73/23
73/25 74/5 104/22
105/6 105/24 106/22
108/12 108/15 109/10
**Arnold's [1]** 66/3
**around [5]** 35/25 36/4
36/13 45/6 50/19
**arrest [1]** 58/13
**arrived [1]** 21/2
**articulated [1]** 77/6
**as [111]** 4/10 6/3 6/8
7/19 9/6 9/14 9/17 9/17
9/19 11/16 15/1 15/24
17/7 19/22 19/22 21/25
22/1 22/16 22/22 26/21
29/5 36/9 38/7 38/15
38/25 39/6 39/16 39/16
39/16 40/2 40/2 40/2

**A**

as... **[79]** 40/13 40/19 41/3 44/2 49/2 49/10 51/7 51/25 52/7 52/18 53/21 54/18 54/25 54/25 55/3 55/7 55/8 56/5 56/5 58/18 58/18 58/25 59/10 59/10 59/10 59/10 62/9 62/21 63/19 64/22 64/24 67/4 68/13 68/20 69/3 69/7 70/1 70/11 73/10 73/18 75/13 77/6 77/6 77/7 78/15 80/1 80/6 81/6 81/23 82/16 85/4 85/6 85/6 85/12 86/22 89/8 89/17 92/15 92/19 96/24 96/24 97/10 98/24 99/25 100/11 100/15 102/2 102/5 102/19 105/15 107/1 107/1 108/14 108/14 109/18 109/19 109/19 112/17 112/18

aside **[1]** 90/5

ask **[16]** 30/6 30/6 31/17 35/3 35/4 66/16 69/18 84/3 95/9 96/4 97/1 99/6 107/3 107/5 107/8 107/12

asked **[11]** 25/22 27/8 28/7 34/24 35/22 48/1 83/17 85/1 86/2 97/18 101/11

asking **[8]** 42/8 45/9 46/21 48/25 52/4 69/4 96/11 96/12

aspect **[4]** 41/21 51/13 57/10 75/12

aspects **[1]** 52/8

aspirin **[2]** 61/13 61/15

assertions **[1]** 43/1

assessment **[1]** 75/8

assigned **[1]** 56/23

assignment **[1]** 7/10

assignments **[1]** 56/18

assistance **[1]** 64/4

assistant **[6]** 36/25 40/24 40/25 41/3 51/16 80/17

assisted **[2]** 40/4 75/1

Association **[1]** 7/1

assumed **[1]** 44/18

assuming **[4]** 42/6 45/6 101/24 106/6

assuring **[1]** 7/2

attached **[3]** 24/6 24/10 66/12

attachment **[1]** 68/19

attention **[7]** 22/5 22/6 22/12 23/10 31/24 72/22 80/19

attorney **[10]** 36/25 40/24 41/1 41/3 41/4 50/19 56/23 75/14 79/24 89/19

Attorney's **[8]** 30/23 41/12 41/22 50/9 50/16 55/22 60/13 60/16

attorneys **[2]** 56/25 74/18

auditing **[1]** 103/20

auditors **[1]** 44/19

August **[2]** 83/19 87/16 109/19

August 2013 **[2]** 83/19 87/16

AUSA **[5]** 50/11 52/4 56/20 60/16 69/7

authored **[1]** 6/13

authorize **[1]** 51/8

authorized **[2]** 58/4 60/12

automatic **[2]** 61/7 67/1

availability **[1]** 105/15

available **[7]** 3/4 20/17 91/18 95/23 102/2 104/16 104/17

avoid **[2]** 17/6 103/1

aware **[12]** 31/22 31/23 32/17 38/23 45/25 47/1 47/10 48/9 85/22 92/19 96/22 97/11

awareness **[1]** 83/16

**B**

babies **[1]** 61/14

baby **[1]** 61/13

back **[40]** 8/25 10/8 11/15 11/16 11/19 13/2 13/11 13/21 14/15 16/19 17/16 17/19 18/19 20/5 20/6 27/25 28/3 43/18 44/25 48/7 64/11 66/16 70/7 73/16 85/18 90/13 91/17 91/19 92/11 94/15 94/16 96/20 96/24 107/13 107/18 110/3 110/7 112/1 112/7 115/1

backing **[1]** 12/18

bag **[11]** 18/1 18/6 18/8 23/14 23/17 23/18 23/20 24/6 24/10 24/11 24/11

baggy **[1]** 17/8

ballpark **[1]** 94/14

Baltimore **[6]** 1/6 1/25 50/21 50/22 92/11 114/21

baseball **[1]** 114/21

based **[17]** 7/24 14/4 16/12 21/5 21/15 21/24 22/9 22/15 24/1 24/8 29/13 29/24 49/10 76/17 84/1 96/14 102/14

basically **[2]** 98/15 110/22

basis **[5]** 31/15 45/25 47/1 47/24 48/9

Bates **[1]** 73/12

Bates-stamped **[1]** 73/12

be **[197]**

bears **[1]** 87/14

became **[5]** 4/11 57/6 62/8 64/20 74/11

because **[65]** 7/4 11/3 12/13 17/22 19/23 21/5 21/10 21/21 21/25 30/18 30/22 31/20 49/6 52/2 56/15 57/14 57/20 58/10 60/18 61/5 61/12 61/23 62/10 62/20 63/15 64/10 64/12 66/23 68/13 68/16 70/18 71/11 73/20 74/12 76/3 77/16 78/5 79/5 83/20 83/21 85/11 85/23 86/24 87/2 88/23 88/24 89/3 89/21 92/17 96/2 100/11 100/22 103/2 103/10 103/15 103/23 104/17 105/17 105/22 106/13 108/3 109/9 109/13 111/22 115/4

become **[2]** 15/6 51/23

becomes **[1]** 67/2

becoming **[1]** 102/20

bed **[1]** 89/16

been **[45]** 4/15 5/18 7/6 7/10 9/16 16/7 21/8 26/10 29/5 30/2 30/4 30/5 36/17 37/18 37/19 37/22 37/23 47/9 52/14 53/10 53/11 61/13 61/15 61/20 63/21 72/25 73/9 77/18 80/1 83/24 84/6 86/25 92/9 92/25 99/9 105/6 105/7 106/23 107/1 107/7 108/14 108/15 111/25 113/17 114/1

before **[39]** 1/10 5/11

16/2 21/13 29/8 38/4 38/8 38/12 48/12 49/3 50/24 51/11 54/23 56/22 56/24 58/14 58/10 59/3 59/23 60/2 62/16 63/5 66/13 76/8 87/7 89/19 90/23 92/10 94/25 95/1 101/10 101/10 105/13 106/9 107/13 108/14 108/5 109/13 113/16

begin **[1]** 50/1

beginning **[2]** 53/2 57/7

Behalf **[2]** 1/12 1/14

behavior **[1]** 60/21

being **[14]** 5/10 61/6 61/8 72/20 74/15 79/2 81/3 85/22 89/18 89/18 90/1 98/19 108/6 110/25

believe **[34]** 21/16 27/13 29/10 30/19 38/20 39/18 39/20 40/5 53/16 63/22 64/14 68/11 68/15 68/16 69/11 70/3 71/6 72/21 81/15 83/25 86/18 87/8 88/20 90/2 91/3 91/15 91/17 97/2 99/20 100/2 106/24 109/11 109/23 114/5

believed **[5]** 38/19 40/8 40/11 70/16 76/25

believes **[1]** 99/19

below **[2]** 65/25 66/3

bench **[3]** 1/9 56/22 108/7

beneficiary **[1]** 10/13

benefit **[1]** 105/22

Bergen **[1]** 9/8

best **[8]** 28/13 51/25 65/7 77/9 77/11 96/16 97/6 105/19

better **[5]** 59/22 61/11 99/4 113/13 113/14

between **[5]** 10/9 71/20 72/19 97/3 107/3

beyond **[5]** 33/3 33/9 33/11 35/6 60/18 60/19 64/21 94/2 114/9

bifurcating **[1]** 106/1

big **[2]** 60/2 65/16

bill **[1]** 67/8

billed **[5]** 16/20 17/20 61/6 67/3 67/7

billing **[3]** 67/6 70/10 70/11

binder **[9]** 65/14 71/18 72/23 72/25 73/4 80/3

80/4 80/5 80/14

bingo **[1]** 12/12

bit **[3]** 56/2 68/1 96/1

black **[1]** 73/4

blew **[1]** 103/21

blister **[5]** 12/4 12/10 15/1 18/25 19/2

blisters **[2]** 12/13 12/19

blocks **[1]** 104/8

Blomquist **[1]** 63/24

blood **[2]** 19/18 19/25

board **[1]** 52/22

bond **[1]** 113/5

book **[2]** 6/16 53/18

both **[13]** 4/24 15/13 33/9 34/10 49/10 83/25 93/4 100/16 104/16 106/23 109/6 111/17 112/6

bottle **[4]** 11/25 13/15 13/21 20/21

bottles **[1]** 13/14

bottom **[1]** 67/21

brain **[1]** 61/20

brand **[1]** 11/3

break **[5]** 71/23 71/23 72/1 72/1 113/16

Brian **[1]** 45/21

brief **[16]** 3/6 94/6 98/14 98/15 98/18 99/4 99/8 99/9 99/10 100/22 110/4 110/22 111/12 111/13 111/15 111/18

briefing **[1]** 108/4

briefly **[4]** 11/19 25/6 35/17 106/16

bring **[4]** 53/20 85/19 90/13 107/18

bringing **[1]** 38/5

brings **[2]** 30/8 34/8

brought **[3]** 31/24 38/3 52/1

bubble **[9]** 12/5 12/10 12/19 12/21 15/1 18/19 18/21 19/20 20/2

business **[10]** 5/21 59/3 59/3 59/4 60/7 62/20 63/18 66/24 70/9 70/9

busy **[2]** 14/8 107/8

**C**

call **[17]** 3/11 14/10 15/20 36/23 52/4 55/22 61/6 84/7 84/13 89/20 90/1 91/20 92/17 92/18 93/10 93/11 102/12

called **[24]** 9/7 9/11 12/5 12/12 12/25 13/1

# C

called... [18] 14/9
20/25 54/20 68/19 81/6
82/16 85/7 85/12 88/22
89/1 89/2 91/21 92/10
92/13 92/14 98/19
98/23 102/8
calling [3] 15/6 102/18
103/1
calls [3] 3/13 36/25
53/7
came [13] 4/3 4/6
12/12 52/22 52/24
83/20 87/12 88/3 97/22
97/25 99/15 106/20
112/25
can [64] 3/10 4/12 9/2
10/6 10/8 10/23 12/9
17/17 24/15 25/6 32/10
40/9 40/10 43/25 45/21
47/12 47/18 48/6 51/1
51/25 55/2 55/11 56/17
58/11 59/7 59/8 59/10
59/11 59/19 59/23 60/9
60/19 64/11 65/17 70/5
71/23 77/10 80/6 82/8
85/13 85/19 89/13
90/10 92/4 93/14 93/20
95/16 96/24 97/9 99/14
99/22 99/23 100/12
101/24 105/16 105/22
107/19 112/24 113/18
113/19 113/24 114/7
114/15 114/17
can't [10] 25/22 28/1
28/17 51/25 57/14 63/9
74/12 79/2 96/9 96/14
cancer [1] 19/18
cannot [1] 86/4
capacity [2] 26/24
108/17
capital [1] 50/12
card [8] 12/13 12/15
19/6 19/7 19/9 19/15
113/25 114/13
cardboard [1] 12/18
cardiologist [1] 51/3
cards [3] 12/13 12/17
19/10
care [6] 6/22 6/24
29/24 62/1 62/12 62/12
cared [2] 56/6 62/4
career [3] 4/13 4/21
4/23
carry [2] 17/1 109/4
carrying [1] 17/7
case [83] 7/10 9/16
9/22 27/9 27/11 27/12
27/14 27/20 27/22
27/24 28/13 29/2 29/4

29/8 29/20 30/9 30/12
30/16 31/19 32/21
37/25 38/2 38/2 38/3
38/7 38/7 38/8 41/24
41/25 42/3 42/17 46/12
50/24 51/11 51/25 52/5
52/9 52/10 52/13 52/25
54/25 55/2 55/3 56/9
56/12 56/13 56/14
56/16 56/23 56/25
57/19 59/24 60/12
61/11 64/8 64/12 66/17
69/24 75/21 75/25
78/21 82/1 89/4 89/4
89/19 90/6 90/7 92/19
99/23 101/7 101/11
102/7 103/5 103/16
103/18 104/14 105/23
106/12 106/24 108/8
109/23 110/25 112/13
cases [11] 28/9 28/14
28/14 50/11 50/23 51/8
52/14 58/9 73/18 77/19
110/23
categories [1] 7/8
Catherine [1] 40/21
Catholic [1] 51/16
Cathy [2] 89/23 91/16
cause [19] 41/7 41/16
41/21 42/4 42/18 58/19
59/2 62/16 63/2 63/8
63/12 64/3 68/6 68/8
68/16 69/1 70/3 77/20
85/6
caused [1] 89/22
causing [1] 109/24
CEO [1] 103/20
Cerner [2] 9/10 9/13
certain [5] 7/11 7/14
54/4 69/22 79/18
certainly [21] 39/8
42/23 43/10 69/16
69/25 86/18 88/13
89/13 95/1 95/14 97/25
101/18 104/3 104/6
107/1 107/19 108/6
108/7 109/3 112/23
114/8
CERTIFICATE [1]
115/14
Certified [1] 116/4
certify [1] 116/6
cetera [1] 23/16
chains [1] 22/25
challenged [1] 114/3
challenging [1] 114/6
Chamble [1] 51/16
chance [3] 3/7 89/25
107/14
change [2] 92/21

92/22
character [1] 112/18
characteristic [1] 8/18
charge [1] 49/15
charged [2] 54/6
114/16
charges [7] 46/12 49/1
52/21 52/24 53/4 54/5
78/1
charging [1] 52/25
chart [1] 103/20
Chasen [1] 102/24
cheat [1] 60/23
check [2] 16/23 59/8
checked [2] 16/3
113/20
chief [2] 50/20 51/7
child [1] 50/13
choose [1] 59/16
chooses [1] 105/24
chose [2] 84/7 84/12
circle [2] 11/19 17/16
Circuit [3] 108/4 108/9
109/4
circumstances [1]
33/25
cite [3] 45/16 45/19
110/23
cited [1] 108/4
civil [9] 1/4 52/1 52/3
52/8 56/23 56/25 89/19
90/7 108/15
claim [20] 10/4 10/10
10/11 10/17 10/19
10/25 11/2 11/4 11/5
11/10 16/18 16/20
17/14 20/13 20/13 21/3
21/4 30/12 67/9 112/10
claimed [1] 109/15
claims [14] 16/19
16/23 28/23 30/23
30/24 31/9 31/21 52/16
57/6 57/22 59/1 60/8
65/5 109/10
clarification [1] 99/7
clarifications [1] 42/9
clarify [2] 10/22
100/21
class [1] 51/18
classes [1] 51/13
cleaning [1] 5/16
clear [9] 15/11 33/6
34/13 74/11 76/4 90/17
94/19 95/2 95/4
clearcut [1] 33/18
clearly [4] 33/9 33/19
82/17 98/10
clerk [4] 101/3 108/24
112/2 114/20
clip [4] 42/10 45/16

47/17 48/4
closest [1] 78/5
closing [4] 95/10
96/11 96/18 113/10
closings [2] 95/13
97/2
co [1] 19/16
co-morbidities [1]
19/16
cocounsel [1] 102/23
Code [4] 20/25 21/4
21/6 21/9
coded [1] 104/7
coerced [1] 83/12
cognizant [1] 59/2
collar [2] 55/1 58/9
colleagues [2] 54/1
76/21
collect [2] 55/13 63/1
collecting [1] 59/7
collection [2] 57/21
58/18
collector [1] 55/20
color [1] 104/7
color-coded [1] 104/7
Columbia [1] 96/20
combination [1] 19/19
combine [1] 66/18
come [24] 4/5 14/15
81/21 84/6 84/17 86/9
94/16 97/22 100/2
100/4 100/11 101/11
101/14 102/6 104/9
106/18 107/15 108/22
109/6 110/7 110/17
115/1 115/5 115/6
comes [5] 20/18 97/10
98/1 105/23 112/23
coming [3] 64/16
91/17 97/3
comment [1] 101/22
comments [1] 41/17
commit [2] 62/4 68/24
committed [8] 48/23
60/14 60/14 60/20 64/3
66/18 68/17 86/21
committing [4] 70/2
71/8 71/14 77/17
common [10] 9/2 12/2
13/13 15/6 15/7 16/25
17/2 17/21 17/24 113/5
communicate [1]
15/17
communicating [2]
15/13 72/13
communications [3]
43/24 44/4 72/16
community [5] 4/17
4/18 5/1 5/5 5/7
companies [1] 9/9

company [7] 9/10 63/9
70/1 70/6 70/10 74/23
74/24
complained [1] 97/21
complaint [2] 30/8
112/2
completely [1] 57/1
completion [1] 10/18
complexity [1] 64/12
compliance [2] 6/15
12/25
component [1] 52/3
computer [9] 1/22
6/15 14/8 14/12 14/13
21/21 22/22 22/23 23/2
Computer-aided [1]
1/22
computers [2] 68/23
68/24
concept [1] 109/11
concepts [1] 101/9
concern [3] 64/12
98/6 104/21
concerned [4] 61/1
61/15 70/20 98/8
concerns [8] 59/12
60/4 70/15 74/21 75/24
76/18 77/4 97/11
concluded [1] 115/12
conclusion [1] 53/7
conditions [3] 19/17
19/18 20/1
confer [2] 25/6 49/21
conference [2] 9/16
116/10
conferring [9] 25/7
25/13 35/12 45/14
45/16 49/23 77/24
88/16 113/22
confidential [1] 52/16
confine [2] 76/10
76/15
confiscated [1] 17/7
conflating [1] 87/20
conflict [1] 42/7
conformance [1]
116/10
conforms [1] 98/18
confused [1] 49/6
confusion [3] 48/15
48/21 49/12
connected [1] 9/21
connection [1] 10/9
consent [1] 108/19
consider [4] 90/10
94/13 94/22 107/24
consideration [2]
89/14 110/1
considerations [1]
85/11

**C**

considered [1] 49/2
considering [1] 52/21
consistent [1] 82/19
conspiracy [2] 52/25 77/9
constantly [1] 44/25
consulting [1] 5/8
contained [1] 86/12
container [9] 12/4 13/10 13/21 16/1 16/2 17/1 17/5 18/1 19/10
containers [1] 12/6
containing [1] 8/23
contemplated [1] 48/25
contents [3] 23/19 29/14 86/11
context [2] 52/7 54/22
continue [3] 35/5 72/10 74/10
continued [2] 1/9 5/1
continuously [1] 4/16
contract [3] 27/2 27/5 29/1
contracted [1] 19/24
control [3] 60/2 79/5 112/13
convicted [1] 114/16
conviction [2] 30/21 31/7
convoluted [2] 61/22 62/7
cooperate [3] 78/8 79/9 79/12
cooperating [1] 73/19
cooperators [1] 70/25
coordinating [2] 106/24 107/1
copies [8] 8/9 8/21 8/23 13/8 13/16 14/17 16/8 55/24
copious [1] 93/2
copy [11] 11/23 13/11 13/22 15/7 16/5 16/21 17/9 17/10 18/4 18/10 73/6
corner [1] 80/18
correct [55] 4/3 4/4 7/13 8/24 11/17 22/14 23/4 23/12 24/12 24/24 26/23 27/6 27/12 27/16 27/18 27/21 28/21 28/22 29/9 30/13 33/7 34/5 34/6 36/10 37/25 38/4 38/14 38/22 39/12 39/14 40/1 40/10 40/23 41/8 74/3 83/4 84/5 85/1 86/13 86/14 86/15 88/17 94/5 98/5 99/1

100/9 101/15 107/17 111/9 111/11 112/17 113/3 113/4 113/5 116/7
corrected [2] 38/21 42/19
corrections [1] 41/15
correctly [5] 7/17 8/20 9/12 21/19 24/20
corroborate [1] 58/20
corroborated [5] 65/7 71/1 76/24 77/19 77/22
corroborating [2] 59/6 65/10
corroborative [1] 70/23
corruption [1] 50/13
cost [2] 21/6 62/12
could [52] 3/18 11/13 11/14 11/25 14/5 14/12 14/17 15/3 16/13 16/25 18/25 19/1 19/19 20/12 21/18 23/20 24/15 24/19 24/20 25/12 26/8 34/1 34/21 35/10 37/7 41/17 41/17 41/18 45/19 52/2 52/2 58/18 62/24 62/24 64/21 65/7 70/13 77/12 86/2 95/9 95/13 95/14 95/15 98/23 101/25 103/22 104/9 105/19 107/10 109/3 109/3 109/5
couldn't [3] 19/5 62/10 89/2
counsel [27] 25/7 25/13 29/14 30/2 30/4 30/5 32/6 35/4 35/12 45/14 49/23 53/21 72/25 73/20 74/12 77/24 84/5 84/21 87/12 88/16 90/2 96/22 97/2 104/25 106/22 113/22 114/6
counsel's [1] 35/23
count [2] 44/20 96/17
counted [2] 95/7 111/3
counting [5] 44/10 44/12 44/14 44/18 45/1
countries [1] 17/5
country [3] 17/3 113/4 113/17
counts [1] 105/6
couple [3] 13/8 85/9 87/13
course [8] 38/10 39/15 40/7 43/22 63/6 67/25 69/11 71/15
court [36] 1/1 11/14

39/14 41/14 71/22 72/3 72/7 74/14 74/18 74/19 83/1 84/15 86/1 86/3 87/2 87/23 89/6 89/8 89/13 92/15 92/16 92/19 94/21 98/6 99/25 100/3 100/8 100/18 107/8 107/23 107/24 108/6 108/19 111/6 115/10 116/5
Court's [6] 25/5 45/13 77/23 90/2 92/20 98/1
Cousin [1] 92/21
cover [4] 65/15 65/22 66/11 80/4
covered [6] 9/16 11/4 14/24 28/25 29/23 115/4
covert [11] 58/1 58/2 58/5 58/14 58/15 58/17 59/1 59/10 59/13 60/5 60/8
Craig [1] 63/24
created [1] 87/7
credibility [14] 70/15 75/9 75/25 76/19 81/11 82/15 82/25 83/2 83/13 85/4 85/7 89/12 89/15 106/14
credit [1] 94/12
crime [10] 50/12 55/1 60/14 60/14 64/3 64/23 68/16 70/3 74/12 78/7
crimes [2] 50/20 51/7
criminal [37] 27/9 27/14 27/20 27/22 27/24 28/8 28/13 28/14 29/2 29/4 29/8 30/16 31/19 32/18 37/25 46/12 51/10 51/13 51/17 51/19 52/3 52/8 55/6 57/2 58/8 60/16 60/17 61/17 64/25 65/12 70/12 75/1 75/15 78/21 79/9 79/21 93/2
cross [17] 2/5 2/8 25/11 25/15 29/16 50/2 50/4 59/8 70/23 87/22 90/16 104/19 104/23 105/4 105/8 105/8 107/14
cross-check [1] 59/8
cross-corroborative [1] 70/23
cross-examination [6] 25/15 29/16 50/2 50/4 90/16 104/19
cross-examine [5] 25/11 104/23 105/4 105/8 107/14

cross-examined [2] 87/22 105/8
crossed [1] 86/24
CRR [2] 1/23 116/16
curious [1] 114/10
current [2] 29/21 59/12
currently [1] 6/9
curriculum [1] 7/5
customer [1] 61/9
customers [4] 61/25 63/10 63/22 66/25
cv [1] 1/5

**D**

damage [1] 106/7
damages [6] 61/22 64/8 77/1 106/2 106/3 106/12
data [10] 44/25 45/5 52/17 55/20 57/5 57/22 59/1 60/8 60/9 65/5
dated [4] 66/5 74/4 75/4 116/12
dates [1] 39/4
day [20] 1/3 12/15 12/17 17/19 19/22 21/22 38/23 38/25 58/24 59/7 60/19 64/10 91/22 92/6 96/23 97/15 100/20 106/8 110/6 116/12
daylight [1] 107/3
days [3] 16/21 92/7 93/17
DCIS [1] 57/19
deadline [1] 94/8
deal [1] 57/22
dealt [1] 57/24
dean [2] 4/10 5/3
debate [2] 90/8 100/10
debates [1] 33/18
decade [1] 114/1
decades [1] 114/2
decent [1] 114/24
decide [3] 62/3 100/8 115/1
decided [2] 46/12 109/4
deciding [1] 60/10
decision [3] 30/21 31/7 31/11
decisions [1] 106/17
dedicated [1] 56/4

deeply [1] 56/6
defendant [5] 1/14 89/19 106/22 108/15 109/10
defendants [2] 1/7 103/23
defender [1] 51/16
defender's [1] 79/22
defense [9] 53/16 53/22 54/9 55/6 79/24 80/1 80/11 86/12 106/25
defined [1] 102/1
definition [1] 101/12
definitions [1] 101/24
defraud [2] 64/17 70/2
degree [1] 5/20
degrees [1] 5/21
delaying [1] 109/24
delegate [1] 56/18
delivered [6] 19/8 25/23 26/7 26/13 26/17 36/17
delivering [2] 18/12 18/16
delivery [11] 10/19 18/8 18/13 25/23 26/6 26/7 59/25 62/15 62/21 63/15 68/25
demeanor [1] 96/21
demonstrate [1] 64/2
Dennis [3] 75/24 76/18 113/11
Dennis Tokofsky [1] 75/24
department [1] 23/3
depend [3] 102/18 103/2 108/3
depended [1] 18/23
depends [2] 42/22 111/3
deposition [13] 28/2 28/12 31/16 37/18 37/22 41/25 42/11 45/16 47/18 106/20 109/16 109/18 111/19
describe [5] 51/1 54/17 55/6 55/13 56/2
described [2] 6/5 8/22
description [1] 101/13
designated [2] 40/25 56/13
designed [4] 8/2 8/5 8/6 15/25
destruction [4] 30/22 31/1 31/8 31/20
determination [1] 41/16
determine [6] 10/13 24/14 25/2 26/17 36/17

**D**

determine... [1] 69/2
determined [1] 56/6
determines [2] 98/6
111/3
determining [2] 26/16
66/17
developed [1] 9/9
developing [1] 52/16
developments [1] 3/3
diabetes [2] 19/17
19/25
did [82] 4/5 5/4 5/6
5/19 5/23 12/16 21/12
21/18 23/10 26/1 28/18
29/3 29/10 30/18 30/25
31/6 31/15 47/6 50/9
50/11 50/15 50/17
50/18 50/23 50/25
51/23 54/2 55/22 56/6
56/7 57/20 60/4 63/14
63/20 64/1 64/8 64/24
65/5 65/10 66/11 66/24
68/5 69/13 69/20 69/22
70/3 70/15 71/7 71/13
72/12 74/21 75/24
76/15 76/18 77/1 77/4
77/6 78/1 78/3 78/4
78/19 79/9 79/11 79/12
79/14 80/12 81/9 81/21
84/12 84/25 85/24 86/6
86/9 90/22 91/1 91/4
94/13 103/24 106/12
109/16 111/18 112/14
didn't [18] 5/5 18/24
22/1 26/2 29/7 46/15
48/3 61/25 62/1 62/25
64/19 64/22 69/25 76/4
85/14 86/3 98/25
109/16
diet [1] 19/25
difference [1] 114/14
different [40] 8/17
11/20 13/3 14/25 18/17
20/17 20/22 21/2 21/4
21/7 21/12 21/14 32/19
45/24 51/4 51/21 52/17
52/24 53/1 55/18 55/20
56/16 57/1 57/18 57/25
58/11 58/20 59/5 59/24
65/8 87/1 87/3 96/20
96/22 100/8 102/18
103/23 103/23 104/24
106/13
difficult [1] 96/2
dinner [2] 19/4 19/4
DiPietro [3] 52/4 56/20
103/4
direct [23] 2/5 2/7 3/23
18/12 33/3 33/4 33/10

33/12 33/24 35/3 35/7
37/13 68/2 72/22 80/19
89/4 90/6 93/12 93/20
98/3 105/8 105/23
113/25
direction [1] 31/1
directions [1] 15/15
directly [2] 52/4 84/12
director [1] 6/9
directors [2] 103/19
103/19
directs [1] 105/3
disallow [1] 95/6
discarded [1] 11/7
16/11 21/8
disclosed [1] 99/2
disclosures [1]
111/16
discovers [1] 20/20
discovery [2] 55/24
93/2
discuss [6] 3/10 69/13
69/16 69/17 69/20
99/23
discussed [1] 108/24
discussion [3] 99/7
100/5 100/23
disks [2] 55/23 55/24
dismissed [5] 46/13
47/7 49/3 49/16 49/18
Dismissing [1] 46/7
dispensed [4] 5/10
16/3 62/13 67/4
dispensing [7] 15/23
20/8 61/25 66/24 67/11
67/20 67/21
distinguishing [1]
110/23
distribute [1] 102/1
DISTRICT [4] 1/1 1/1
116/5 116/6
divided [1] 12/6
DIVISION [2] 1/2 50/22
do [90] 4/7 4/7 12/15
14/12 19/5 22/10 27/9
27/10 28/2 28/4 28/7
28/15 28/16 30/6 30/7
31/3 32/7 34/1 34/3
34/14 34/24 35/6 37/21
42/1 44/24 45/11 45/21
47/4 49/6 57/14 57/16
58/21 58/24 59/18
59/19 62/11 62/11 63/2
63/7 63/14 65/22 68/2
71/12 72/17 73/4 73/15
73/18 75/5 76/10 76/21
77/19 77/20 78/4 78/23
79/3 80/21 80/22 80/23
83/10 85/14 85/19
87/18 89/25 93/7 93/9

95/18 95/24 96/16
96/18 97/9 98/14 99/5
101/18 101/22 102/9
103/12 104/5 104/15
104/24 107/4 107/19
108/19 108/23 110/7
110/8 110/16 112/22
112/24 113/18 116/6
doctor's [2] 13/12
13/22
doctors [1] 51/3
document [5] 53/24
54/14 73/12 73/13
80/10
documents [1] 29/3
30/22 31/1 31/8 31/20
60/5 70/13
does [17] 10/3 10/20
11/9 23/18 24/2 47/23
53/12 66/17 67/4 68/8
68/12 69/3 69/9 81/19
82/15 84/10 111/6
doesn't [19] 23/20
58/2 65/15 66/22 67/12
67/14 75/18 75/19
80/14 83/14 89/19
92/25 97/19 98/3 108/7
108/20 108/22 111/22
112/9
doing [14] 12/4 44/19
57/16 57/18 57/21
58/12 60/22 62/21 67/1
67/17 78/6 79/2 88/25
96/19
dollar [7] 53/4 53/13
57/8 62/1 64/19 64/25
77/12
dollars [1] 62/1
don't [81] 9/7 10/6
20/20 22/11 22/12
22/25 24/19 25/1 27/19
27/25 28/11 28/17
28/18 29/5 29/10 29/10
29/19 29/19 33/10 43/2
45/3 45/23 47/12 47/17
49/4 49/7 52/13 53/10
54/13 55/2 55/8 55/13
56/12 59/18 60/17
62/12 64/15 64/15 67/6
69/16 76/8 77/19 79/15
80/15 83/11 84/14
84/15 85/17 86/14
86/18 86/18 87/8 89/20
94/14 95/15 96/19
96/23 98/4 98/4 100/10
100/10 102/12 102/13
102/17 103/4 105/8
106/5 106/10 107/2
109/22 110/11 110/20
111/1 111/5 111/23

112/10 112/15 112/17
113/2 113/17 114/9
done [8] 6/6 22/23
34/24 61/8 101/10
104/25 109/21 113/14
door [5] 81/10 82/24
84/6 88/5 88/7
doors [1] 89/12
dosage [2] 66/19
67/24
double [6] 44/10 44/12
44/14 44/18 44/20 45/1
double-count [1]
44/20
double-counting [5]
44/10 44/12 44/14
44/18 45/1
doubt [1] 60/20
down [4] 36/20 60/2
89/5 101/14
Dr. [13] 13/18 82/16
82/16 83/3 83/4 83/13
84/7 84/9 85/12 87/6
88/7 90/3 111/19
Dr. Fassett [1] 13/18
Dr. Vaidya [10] 82/16
82/16 83/3 83/4 83/13
84/7 84/9 85/12 87/6
111/19
Dr. Vaidya's [2] 88/7
90/3
drafted [1] 39/25
drafting [4] 40/4 43/3
43/4 54/2
Drake [1] 4/25
draw [1] 95/2
drawer [1] 8/17
drawn [1] 97/9
drew [1] 100/18
drop [1] 112/7
dropped [1] 110/25
drug [19] 6/17 7/3
11/3 11/5 15/15 18/7
19/6 19/7 19/11 20/25
21/4 21/5 21/9 55/5
59/24 66/19 67/23 77/9
77/19
drugs [22] 17/6 19/5
50/12 60/1 61/1 61/1
61/8 61/9 61/10 61/12
67/5 77/9 77/19 82/18
82/23 83/25 84/10
85/16 85/22 87/13 88/9
88/14
dubious [1] 33/21
duplicate [1] 36/7
duplicates [2] 36/4
44/23
duplication [1] 44/10
during [31] 4/18 4/21

5/4 5/6 7/25 8/3 9/3 9/5
9/10 10/12 12/21 13/12
15/3 15/4 17/21 18/9
18/20 21/15 21/22 22/4
22/8 22/12 23/5 23/9
24/15 24/22 24/25 27/7
34/14 86/10 104/12
duties [1] 7/1
duty [1] 28/23
dying [1] 78/20
Dyke [1] 92/15
Dykes [3] 65/25 66/4
103/3
Dykes's [1] 66/11

**E**

each [8] 12/17 19/6
19/7 20/24 67/23 67/24
68/20 79/19
earlier [11] 15/21
21/19 38/24 48/2 83/14
84/24 85/4 85/7 90/11
109/19 115/3
early [2] 6/25 110/16
easier [1] 100/3
easily [1] 23/20
Eastern [1] 113/3
economy [1] 108/11
edit [1] 6/10
editorial [1] 6/9
educate [1] 103/12
educated [1] 101/9
effect [1] 6/17
effective [1] 7/3
EISER [3] 1/16 2/5
32/25
either [4] 17/19 28/12
36/15 60/18
element [5] 53/4 64/23
93/5 109/10 112/9
elements [1] 15/14
elevator [1] 100/6
eligible [1] 10/14
Eloise [13] 57/21
81/25 82/23 83/18
83/19 84/20 85/23
87/16 88/6 88/17 96/5
96/6 96/8
else [5] 43/2 49/22
57/24 111/1 114/17
email [5] 65/22 66/3
66/4 66/11 74/4
emeritus [2] 4/9 4/11
emphasizing [1] 93/4
employed [1] 104/11
employees [10] 59/13
63/11 65/2 65/3 65/8
65/8 77/21 112/16
113/3 113/4
employer [3] 112/14

**E**

employer... [2] 112/19 112/25
enable [1] 105/20
encourage [2] 12/23 12/25
end [6] 13/15 60/17 60/19 64/10 97/15 110/5
ended [1] 70/3
ends [1] 73/5
engaging [1] 74/25
enough [5] 20/20 58/10 63/1 67/6 113/8
ensure [1] 57/7
entail [1] 68/9
entered [2] 73/9 80/1
enters [2] 37/2 90/14
entire [2] 17/4 48/4
entirely [1] 32/19
entitled [2] 1/9 116/9
enunciated [1] 6/25
equally [1] 61/15
Ernest [4] 94/20 100/14 111/17 111/20
Ernest McCray [2] 111/17 111/20
error [1] 95/5
errors [10] 30/23 31/8 31/20 31/23 31/25 41/8 41/14 42/4 42/19 68/14
escapes [1] 57/20
ESQUIRE [5] 1/13 1/13 1/15 1/15 1/16
essentially [2] 61/7 72/17
established [2] 43/19 47/9
establishes [1] 99/20
establishing [1] 106/14
estimate [2] 77/9 77/11
et [2] 1/6 23/16
ethics [1] 4/23
Europe [2] 91/16 104/18
European [5] 88/23 88/24 89/1 89/22 89/25
even [24] 10/19 14/17 18/21 18/22 22/2 22/11 22/25 49/8 64/13 64/15 68/18 69/8 70/3 70/11 75/1 79/2 92/16 97/4 102/1 103/4 104/12 109/5 109/25 114/2
evening [1] 91/17
events [3] 83/14 83/16 96/4
eventually [4] 55/21

61/23 63/19 70/24
ever [17] 22/11 22/12 28/8 28/11 44/17 50/15 51/13 52/19 55/3 66/11 71/7 71/12 78/19 83/17 85/21 85/21 91/4
every [15] 8/18 12/15 12/17 13/7 22/2 22/22 57/10 57/10 61/21 66/18 66/19 69/9 74/23 75/21 98/16
everybody [4] 21/23 57/19 74/23 105/22
everything [6] 22/23 38/17 57/24 95/1 100/19 110/22
evidence [48] 9/25 26/7 26/8 29/7 48/23 48/24 49/7 49/11 54/10 57/2 58/18 60/10 63/20 64/16 64/24 68/20 69/23 69/24 71/11 71/13 73/10 76/7 77/12 80/1 81/10 83/17 84/1 84/2 84/11 84/22 85/5 85/21 85/24 87/14 87/17 87/22 89/13 89/14 90/10 97/8 98/3 98/10 99/13 100/2 102/6 106/7 106/18 112/18
evidentiary [1] 109/3 109/6 109/8
exact [4] 20/23 45/12 59/15 60/6
exactly [7] 12/24 43/16 45/9 79/15 83/5 84/6 84/11
exaggerate [1] 76/4
examination [12] 3/23 25/15 29/16 35/19 35/23 37/13 50/2 50/4 68/2 90/16 104/19 107/19
examine [6] 25/11 104/23 105/4 105/4 105/8 107/14
examined [2] 87/22 105/8
example [11] 11/3 13/17 16/18 19/21 20/2 20/15 33/14 33/24 59/20 59/25 68/22
exception [1] 107/16
exchange [1] 92/2
Excuse [1] 45/15
excused [3] 33/17 36/20 91/10
execute [1] 69/19
executed [1] 58/24

**exhibit [20]** 53/15 53/16 53/22 54/10 65/17 65/23 66/2 66/10 71/17 71/18 72/23 73/10 75/2 80/1 80/11 80/12 86/10 86/12 86/17 86/18
**Exhibit 100 [3]** 53/16 53/22 54/10
**Exhibit 137 [3]** 72/23 73/10 75/2
**Exhibit 42 [4]** 65/17 65/23 66/2 66/10
**Exhibit 50 [1]** 71/17
**Exhibit 57 [1]** 80/12
**Exhibit 67 [4]** 80/1 80/11 86/12 86/18
existed [1] 63/16
exits [3] 36/22 82/14 91/13
expectations [1] 95/12
expected [1] 7/1
expedite [1] 114/8
expeditious [1] 105/16
expeditiously [1] 109/24
expense [1] 67/12
expensing [1] 67/3
expensive [1] 61/10
experience [31] 4/14 6/4 6/21 7/24 11/24 13/4 14/5 15/2 16/12 17/21 18/20 20/18 21/15 21/20 21/25 22/4 22/9 22/14 22/16 23/1 23/9 23/13 23/21 24/2 24/8 29/24 36/11 50/23 51/1 57/5 103/16
experienced [1] 89/18
expert [2] 3/5 9/18
expertise [2] 7/24 22/25
experts [2] 27/18 106/11
explain [8] 10/8 10/23 12/9 41/12 42/21 43/2 61/23 88/14
explained [2] 13/3 49/12
exploitation [1] 50/13
exposure [3] 73/18 74/22 75/1
expressing [1] 74/15
extensive [2] 58/21 90/8
extensively [3] 28/21 33/14 86/11
extent [27] 6/1 6/5

6/12 6/22 7/25 8/25 10/3 10/24 11/23 13/5 14/4 15/22 16/13 17/20 18/15 18/19 20/11 22/7 22/18 23/17 24/2 40/3 53/6 104/13 111/2 113/24 114/7
extra [23] 7/23 11/23 11/25 13/5 14/6 14/7 14/17 15/3 15/22 16/13 17/1 17/9 17/10 17/17 17/22 18/10 20/8 21/18 21/25 22/3 22/20 23/7 34/1
extremely [1] 55/7

**F**

F-A-S-S-E-T-T [1] 3/20
fact [5] 9/21 11/9 21/1 69/9 90/5
facts [11] 9/22 39/13 40/16 55/10 80/23 81/1 81/17 81/21 81/23 86/12 87/21
faculty [1] 4/19
fade [1] 109/25
fading [1] 109/14
fair [1] 90/16
fallen [1] 32/13
false [4] 38/11 38/13 52/25 96/8
familiar [1] 75/16
fantastic [1] 101/17
far [6] 33/2 33/21 39/16 40/2 80/14 107/1
FARBER [7] 1/15 2/8 50/8 71/21 72/10
fashion [1] 104/6
Fassett [48] 2/4 3/13 3/20 4/1 4/12 5/13 5/19 5/23 6/4 6/12 6/21 7/6 7/24 8/20 9/1 9/13 9/17 10/3 10/23 11/8 11/19 12/9 12/20 13/4 13/18 14/4 14/14 14/16 14/23 15/2 15/21 16/12 17/21 18/9 18/20 20/11 21/15 21/24 22/7 23/5 23/13 23/21 24/1 24/9 24/13 25/18 26/21 36/11
Fassett's [2] 32/23 33/9
father [1] 78/20
fault [3] 76/15 76/16 95/5
fax [4] 15/5 15/8 15/8 15/12
FBI [1] 55/5
federal [11] 1/24 51/17 51/19 53/3 57/4 58/7

59/4 68/13 70/10 77/17 116/16
feels [1] 87/19
few [4] 3/3 11/20 24/13 110/23
figure [1] 62/8
file [2] 98/17 110/4
filed [7] 52/2 97/14 97/14 98/12 101/3 110/5 112/12
fill [2] 20/20 20/21
filled [8] 16/1 16/2 16/14 17/20 35/24 35/25 36/4 36/13
filling [2] 12/7 17/14
final [1] 77/2
find [6] 30/25 59/25 62/25 63/14 63/20 80/9
finding [1] 64/21
fine [4] 4/2 7/9 7/20 110/10
finish [6] 16/1 48/19 93/14 93/22 94/9 94/17
firm [1] 103/20
first [28] 3/8 3/19 3/21 12/12 13/9 13/20 29/2 29/3 29/8 37/8 38/12 44/13 48/5 49/1 52/11 52/19 55/20 59/22 73/7 80/17 83/7 85/12 86/17 87/20 105/23 106/3 106/5 112/2
firsthand [1] 96/21
fit [2] 18/25 92/19
five [4] 51/6 81/1 81/16 108/16
five years [1] 108/16
flew [1] 91/19
flip [2] 80/8 81/2
Floor [1] 1/24
FLOWERS [2] 1/13 97/23
flux [1] 92/17
fly [2] 92/11 96/23
focus [2] 7/8 7/21
focused [1] 9/20
folks [2] 103/3 106/19
follow [4] 36/14 84/8 84/10 88/8
followed [1] 82/17
following [2] 82/20 84/25
Food [1] 55/5
forced [2] 89/20 90/1
foregoing [1] 116/7
forensically [1] 22/24
foresee [3] 102/9 102/17 102/20
foresees [1] 94/2
forged [1] 63/21

**F**

**forgive [2]** 53/11 112/20
**forgotten [1]** 92/13
**form [2]** 15/8 26/14
**formality [1]** 9/17
**formally [1]** 6/24
**format [1]** 116/9
**formatted [1]** 68/12
**former [5]** 36/25 43/12 56/20 65/3 65/8
**forming [1]** 30/16
**formula [1]** 62/7
**formulated [1]** 52/14
**forth [2]** 104/2 112/1
**fortunate [1]** 58/9
**forward [2]** 88/13 105/16
**found [1]** 63/19
**foundation [2]** 32/21 47/9
**four [6]** 12/6 12/16 51/6 93/2 103/16 111/16
**four-week [1]** 93/2
**four-years [1]** 103/16
**Fourth [3]** 108/4 108/9 109/4
**frame [1]** 68/21
**frankly [3]** 100/2 110/21 113/9
**fraud [19]** 27/9 49/16 50/12 50/23 51/6 51/9 52/23 53/9 54/25 57/3 57/8 60/20 66/18 68/24 71/8 71/14 74/25 77/17 103/18
**fraudulent [1]** 71/2
**frequently [1]** 69/15
**Friday [10]** 93/23 94/9 95/15 95/23 96/19 96/23 96/25 97/2 97/5 114/25
**front [6]** 64/20 65/15 65/21 71/18 112/7 112/8
**fruit [1]** 83/19
**frustrating [1]** 62/9
**frustration [1]** 74/15
**full [1]** 41/2
**full-time [1]** 41/2
**fully [1]** 38/20
**function [3]** 14/15 22/10 41/23
**functions [1]** 104/8
**fundamental [1]** 87/5
**fundamentally [3]** 87/16 109/12 111/21
**funeral [1]** 113/19
**further [5]** 25/8 36/18 49/24 91/5 109/25

**G**

**game [2]** 90/16 114/21
**gap [4]** 32/4 91/22 92/6 97/3
**gaps [1]** 104/20
**gatekeeper [1]** 41/22
**gathered [2]** 40/16 107/9
**gave [6]** 28/12 28/16 53/2 88/2 94/8 103/25
**general [8]** 20/6 23/9 41/3 41/4 42/2 57/17 66/16 70/1
**generally [2]** 29/24 30/6
**generate [2]** 11/6 14/11
**generation [1]** 7/23
**generic [2]** 11/5 20/16
**genuinely [1]** 55/7
**get [34]** 3/9 5/20 12/24 17/1 18/14 22/24 23/1 31/15 52/14 55/12 55/23 58/10 58/18 59/18 60/8 60/19 60/23 60/23 62/16 62/23 66/20 67/18 71/22 74/16 89/19 89/20 93/25 95/15 96/6 96/18 97/1 101/25 106/5 109/16
**gets [1]** 20/19
**getting [10]** 57/16 58/21 59/5 62/5 62/6 62/22 67/1 76/7 87/9 106/2
**gist [1]** 31/22
**give [10]** 4/12 43/16 44/3 45/19 45/20 83/1 84/25 85/10 94/15 101/12
**given [3]** 8/15 29/20 98/5
**gives [1]** 93/17
**giving [2]** 59/20 94/12
**glossary [2]** 101/11 103/12
**go [42]** 13/10 13/20 13/21 14/2 14/21 16/7 16/9 20/5 20/6 29/18 31/17 32/15 32/24 33/21 33/22 35/11 44/25 48/19 48/19 50/1 56/17 59/3 60/2 61/25 62/23 67/19 73/16 74/7 77/9 78/25 80/14 82/15 91/11 94/16 96/24 107/13 107/22 109/1

**go-to [1]** 56/17
**goal [1]** 59/10
**goes [8]** 55/16 82/25 83/2 88/11 89/9 99/19 100/16 100/17
**going [69]** 7/7 13/2 17/19 18/6 18/19 33/2 33/11 33/17 33/20 33/21 35/4 42/10 47/8 48/5 49/9 51/9 53/6 53/15 53/20 55/19 58/12 58/23 59/17 62/25 63/11 68/22 69/18 69/19 72/14 73/14 73/23 74/19 75/14 75/22 76/6 80/19 81/4 81/11 82/3 82/21 84/17 85/3 89/24 90/9 91/20 91/21 92/10 92/13 92/14 92/17 93/10 94/8 94/9 94/21 95/20 98/9 98/25 100/13 102/8 103/8 103/10 103/11 103/16 106/3 106/18 110/3 111/4 112/5 114/23
**gone [1]** 56/2
**good [25]** 3/2 4/1 25/18 25/19 25/20 26/12 37/9 37/16 37/17 50/7 50/8 56/7 56/8 56/8 57/15 59/6 62/21 71/25 79/24 101/7 101/14 102/4 109/18 109/19 115/8
**got [24]** 3/3 6/14 16/2 16/18 24/4 25/1 44/21 52/3 61/15 80/4 91/22 92/6 92/10 92/22 92/25 94/6 94/16 97/9 101/9 104/18 110/4 112/13 114/21 115/1
**gotten [2]** 28/11 114/13
**governing [1]** 27/5
**government [19]** 3/7 29/14 31/25 32/8 35/4 35/23 60/24 77/18 79/14 86/17 87/24 94/4 96/2 97/2 98/7 98/13 100/1 106/22 106/22
**Government's [3]** 86/17 100/7 112/13
**grain [1]** 70/17
**grammatical [4]** 41/8 41/14 42/3 42/19
**grand [9]** 38/4 38/8 38/12 38/16 38/17

**38/24 48/25 60/6 99/11**
**great [1]** 103/14
**Green [2]** 113/25 114/13
**Greenbelt [1]** 50/21
**GREENBERG [12]** 1/13 2/5 2/6 2/7 27/8 29/11 32/12 83/6 84/17 95/24 97/21 101/8
**grounds [2]** 81/5 82/3
**guess [7]** 5/18 20/5 24/20 26/18 45/6 48/15 88/21
**guide [1]** 104/10
**Guilt [1]** 112/7
**guilty [1]** 78/21
**Guns [1]** 50/12
**Gutberlet [4]** 52/6 52/11 106/20 107/18

**H**

**had [94]** 3/7 6/9 9/6 9/8 10/17 13/14 14/5 14/12 14/13 15/21 16/4 18/25 19/5 19/7 21/2 21/20 24/21 29/15 36/16 36/17 38/12 38/20 39/5 39/9 39/18 39/20 39/23 40/5 46/13 48/23 48/25 49/7 51/2 51/2 51/6 51/10 52/15 52/16 52/19 54/21 54/21 54/22 55/18 55/24 55/25 56/7 56/8 57/5 57/15 57/17 57/19 57/21 57/22 57/23 59/20 60/22 61/10 61/13 61/21 62/7 63/8 63/8 63/21 64/3 64/16 64/17 64/18 64/18 67/19 70/3 71/2 73/17 75/1 76/21 77/16 77/18 78/9 83/8 87/17 89/24 92/2 93/1 93/2 95/10 99/9 100/5 103/20 103/24 104/14 104/22 104/22 106/20 107/14 108/13
**hadn't [1]** 104/22
**half [2]** 33/24 92/6
**hamstrung [1]** 96/9
**hand [6]** 3/15 16/22 37/4 54/2 73/6 80/18
**handed [2]** 53/24 88/1
**handle [4]** 34/18 50/11 51/9 56/8
**handled [2]** 16/23 51/11
**hands [4]** 53/19 57/25 100/1 101/18

**handwrite [2]** 15/9 15/16
**handwritten [1]** 75/3
**happen [5]** 20/12 20/12 52/2 89/3 96/23
**happened [8]** 31/4 32/4 32/5 74/20 81/23 86/25 88/11 114/12
**happening [2]** 33/10 102/9
**happens [2]** 75/20 98/8
**happy [3]** 81/7 82/7 98/17
**hard [3]** 13/11 13/22 56/5
**hardly [1]** 93/1
**hardworking [1]** 56/4
**harms [1]** 57/4
**has [35]** 3/7 7/10 17/5 20/15 23/15 24/16 29/14 32/6 55/10 60/14 60/20 68/15 72/25 80/4 80/20 82/24 84/6 84/6 87/16 89/8 89/9 95/12 96/2 97/2 104/25 107/7 107/16 108/15 108/21 113/17 113/19 113/21 114/1 114/6 114/13
**hasn't [2]** 9/21 47/9
**have [199]**
**haven't [6]** 30/8 34/7 104/22 105/6 105/7 108/25
**having [11]** 13/9 15/16 17/6 19/25 22/12 48/15 48/22 52/18 55/3 79/2 90/15
**he [69]** 9/21 26/1 26/2 31/15 32/13 33/2 33/12 33/14 34/19 38/17 39/25 43/16 44/16 45/4 49/7 49/18 55/19 56/22 56/22 56/24 57/1 57/3 57/5 57/6 57/7 64/21 66/24 67/1 68/11 76/3 76/4 76/4 76/5 76/5 76/23 78/5 78/5 78/6 78/7 78/7 78/9 78/10 78/19 78/20 79/6 79/11 79/12 79/13 79/14 79/22 81/23 82/18 85/1 85/14 86/1 86/2 87/6 87/8 87/22 87/23 87/25 88/13 99/11 100/5 101/4 111/19 113/19 113/19 114/6
**he's [9]** 9/18 33/13 71/15 85/18 86/4 91/21 92/13 92/14 112/9

## H

**head [1]** 50/22
**header [1]** 80/20
**healthcare [7]** 50/23 51/5 51/6 51/9 52/23 53/9 54/25
**hear [5]** 21/18 73/23 96/21 106/13 112/5
**heard [10]** 8/20 9/12 73/25 74/1 74/5 85/5 100/22 102/7 102/8 108/13
**hearing [6]** 46/5 74/17 90/8 90/11 104/1 115/12
**hearsay [8]** 73/22 82/4 83/9 84/18 84/20 84/23 85/25 107/15
**heart [1]** 20/1
**hearts [1]** 51/4
**held [2]** 6/6 116/8
**help [3]** 12/23 95/22 104/6
**helpful [2]** 104/1 104/4
**hepatitis [2]** 19/17 19/24
**her [47]** 39/15 40/15 41/2 41/2 45/19 49/12 52/12 52/13 52/18 52/20 52/20 55/10 56/7 56/14 71/11 72/14 72/14 72/17 73/17 73/17 73/20 74/12 74/13 74/13 74/14 74/15 74/16 74/17 74/21 75/14 92/1 92/1 92/2 92/4 93/7 93/10 93/11 93/12 93/14 106/20 106/21 108/16 108/19 109/16 109/18 109/18 110/14
**here [39]** 4/3 9/6 29/5 30/16 33/10 42/22 55/9 55/19 59/20 60/15 64/11 68/11 71/23 73/14 74/20 80/6 83/8 87/20 89/24 91/19 91/22 91/24 92/1 92/3 92/4 93/2 93/5 93/6 97/20 101/6 104/15 105/21 106/21 106/21 108/18 110/13 110/14 112/10 114/18
**here's [2]** 66/10 66/10
**hereby [1]** 116/6
**Herring [1]** 53/17
**HHS [1]** 55/5
**hidden [1]** 22/22
**high [4]** 5/16 5/17 19/17 19/25

**highlight [1]** 114/12
**him [25]** 31/17 44/7 49/1 54/22 55/7 55/12 55/12 55/13 58/3 58/8 76/3 76/3 76/11 76/20 76/22 78/22 79/8 79/15 83/8 86/2 87/3 88/1 92/18 108/14 112/16
**hindsight [1]** 64/11
**his [35]** 9/21 29/14 31/15 33/10 44/4 47/25 49/5 54/1 54/7 54/7 56/1 56/21 60/7 63/9 65/2 65/3 78/6 78/14 78/20 79/5 82/25 83/16 87/25 87/25 88/11 88/21 92/13 105/23 111/18 112/11 112/18 113/4 113/4 113/25 114/16
**HIV [2]** 19/17 19/24
**hold [14]** 46/1 47/2 47/4 47/14 47/24 48/10 49/5 49/8 50/15 50/18 85/18 102/8 113/17 114/1
**holes [1]** 70/18
**Hollister [1]** 5/9
**Hollister-Stier [1]** 5/9
**home [6]** 19/9 82/19 82/24 84/10 88/10 113/4
**homes [1]** 82/22
**Honor [120]**
**Honor's [1]** 94/19
**honorable [5]** 1/10 55/7 72/3 72/7 115/10
**hope [4]** 58/6 58/8 85/10 106/5
**hoped [1]** 58/14
**hopefully [4]** 58/21 101/25 103/13 104/5
**hoping [3]** 105/9
**horrible [3]** 112/14 112/18 112/25
**hospital [1]** 104/18
**hot [1]** 53/19
**hour [11]** 33/24 94/14 94/15 94/15 95/11 95/15 95/16 95/17 95/20 96/15 96/17
**hours [6]** 71/22 79/18 79/19 94/11 94/16 97/12
**hours' [1]** 99/3
**hours-long [1]** 79/19
**house [2]** 51/20 55/21
**housing [1]** 112/22
**how [31]** 4/1 5/13 36/5 37/18 37/19 43/2 44/16

51/10 51/23 61/16 62/12 68/24 69/6 69/15 77/8 79/12 79/14 79/17 83/11 84/20 84/23 86/25 92/18 93/9 95/12 95/23 95/24 97/9 98/8 100/16 100/23
**however [4]** 41/24 98/6 106/6 108/19
**huge [1]** 90/7
**hundred [1]** 6/14
**hundreds [2]** 51/12 69/8
**hurriedly [1]** 101/4
**hypothetical [4]** 35/22 36/3 36/9 36/12

## I

**I'd [10]** 3/8 27/24 54/9 71/16 72/22 75/2 79/8 94/11 101/16 101/20
**I'll [14]** 9/17 25/21 29/16 33/3 34/18 45/20 61/6 74/6 81/1 94/15 97/23 110/1 111/12 111/13
**I'm [70]** 6/3 15/11 24/20 30/18 31/14 33/21 38/5 39/3 42/21 43/16 44/16 45/6 45/9 46/21 48/4 48/15 48/21 48/21 49/6 49/8 49/9 53/6 53/15 53/20 54/4 56/4 57/20 62/9 66/1 66/1 66/14 67/15 67/16 69/22 72/23 73/9 74/1 76/6 76/12 76/13 76/20 79/15 79/18 79/25 79/25 80/19 81/4 81/7 82/3 82/7 82/21 84/14 84/19 84/20 84/22 84/23 85/3 86/6 90/9 96/12 96/19 97/11 98/8 102/8 104/16 105/9 105/10 105/10 106/24 110/12
**I've [20]** 6/14 27/22 28/11 28/13 31/12 32/23 37/23 51/20 53/10 53/11 53/24 56/5 61/20 66/14 80/10 92/1 92/12 92/25 101/10 102/8
**idea [4]** 34/4 101/7 101/18 103/14
**ideally [2]** 23/19 105/19
**identified [2]** 14/16 14/16
**identity [1]** 64/17

**imagine [3]** 79/2 93/12 96/14
**immigration [13]** 45/24 46/1 46/11 47/2 47/14 47/25 48/10 48/24 49/1 49/5 49/7 52/24 114/6
**impact [1]** 108/9
**impeach [3]** 85/13 85/17 89/8
**impeachment [1]** 97/8
**important [5]** 21/10 59/17 67/23 77/20 85/11
**importantly [2]** 67/17 68/18
**imprecision [1]** 112/21
**impressed [1]** 52/12
**inaccurate [3]** 29/13 39/10 40/6
**inadmissible [5]** 73/22 82/4 83/9 83/23 85/25
**inappropriate [1]** 34/25
**inclination [1]** 105/4
**include [2]** 64/8 69/9
**included [1]** 39/18
**includes [1]** 6/11
**including [7]** 4/13 8/9 14/7 16/6 52/24 96/3 96/5
**inconsistent [2]** 28/17 42/22
**incorrect [3]** 39/10 39/18 39/24
**incorrectly [1]** 16/20
**incredibly [1]** 62/7
**independently [1]** 80/8
**INDEX [1]** 2/1
**India [2]** 78/25 79/6
**Indian [2]** 113/7 113/8
**indicate [1]** 47/12
**indicated [1]** 96/2
**indication [1]** 26/12
**indications [1]** 107/1
**indictment [25]** 46/13 47/6 49/1 49/3 49/10 49/16 53/25 54/3 54/5 76/7 76/21 79/1 81/5 81/10 83/12 83/22 87/9 87/15 94/13 96/4 97/8 99/13 99/17 100/5 100/14
**individual [4]** 12/14 61/9 108/16 108/17
**individuals [1]** 52/7
**indulgence [3]** 25/5 45/13 77/23

**industry [5]** 4/13 5/14 6/23 22/15 28/20
**inferring [1]** 22/14
**informant [2]** 73/19 75/21
**information [40]** 4/22 8/10 8/15 8/24 13/9 15/10 15/19 16/6 16/6 16/9 17/11 23/15 23/17 29/11 39/19 39/24 40/6 43/15 43/20 44/3 55/12 57/6 58/19 58/20 59/6 59/21 60/13 63/16 68/15 68/23 70/4 70/11 76/23 79/20 83/12 83/20 87/25 88/3 90/24 102/15
**initial [1]** 111/16
**initially [2]** 58/17 93/12
**initials [1]** 80/17
**initiate [1]** 38/2
**innocence [2]** 112/1 112/7
**innocent [3]** 112/3 112/6 112/9
**inside [1]** 103/19
**insist [1]** 68/13
**insofar [2]** 85/4 85/6
**instead [1]** 15/16
**instructions [1]** 72/12
**insurance [3]** 8/12 19/14 70/10
**insurers [2]** 20/23 77/18
**intended [2]** 58/14 60/22
**intensity [1]** 55/9
**intent [3]** 57/2 64/25 65/12
**intention [2]** 58/6 58/23
**interactions [1]** 76/10
**interest [3]** 104/24 108/10 109/17
**internal [1]** 16/24
**internally [2]** 51/18 59/6
**interrupt [2]** 13/18 15/11
**interruption [2]** 14/20 14/21
**interventions [1]** 6/17
**interview [4]** 58/22 58/23 59/8 59/19
**interviewed [3]** 24/25 76/21 93/3
**interviewing [4]** 24/17 24/22 36/15 59/12
**interviews [2]** 52/17

**I**

interviews... [1] 58/25
introduce [2] 82/21
86/6
inventory [1] 67/10
investigation [29]
40/16 43/21 48/22
51/18 52/13 54/19
54/20 54/21 55/17
56/11 57/9 57/11 58/1
58/5 58/8 58/8 58/16
59/4 59/14 60/12 60/25
61/2 61/17 64/1 69/10
76/17 79/10 81/24 93/3
investigations [2]
51/10 54/23
investigative [3] 51/19
55/6 58/11
investigator [1] 52/12
investigators [2] 40/4
104/2
involved [5] 7/2 10/12
51/23 55/2 57/10
involving [5] 30/12
35/23 51/6 73/18 96/7
is [225]
isn't [2] 26/13 60/18
issue [20] 20/7 60/6
64/20 66/25 85/11 88/6
90/9 97/7 97/24 100/10
100/18 105/9 106/1
107/24 108/1 108/5
108/8 109/1 110/21
113/25
issued [1] 109/5
issues [21] 3/7 6/13
6/14 9/18 19/23 33/13
43/9 44/10 44/12 44/14
44/18 52/24 57/23
89/21 103/24 106/2
108/3 108/3 108/5
109/6 109/8
issuing [1] 17/13
it [288]
it'll [1] 80/4
it's [60] 3/20 5/18 7/16
12/25 20/18 21/14
26/11 28/17 29/5 29/17
41/20 43/4 44/16 53/10
55/1 59/24 60/3 62/2
62/10 66/5 70/9 74/6
75/20 75/20 77/9 77/20
77/21 80/15 81/16
83/19 84/16 84/17
85/11 86/1 86/3 86/10
86/17 86/17 89/14
90/10 95/5 95/16 96/1
96/8 98/3 100/3 101/25
103/8 105/9 105/17
105/18 105/18 108/10

**J**

Jeremy [4] 65/25 66/4
66/11 103/3
JFA [1] 1/5
Jigar [2] 54/1 64/6
Jimmy [1] 57/19
job [4] 41/2 41/2 56/1
72/17
John [1] 51/16
join [3] 50/9 100/1
101/18
joined [1] 4/19
joint [1] 106/25
JOSEPH [1] 1/10
JOSHUA [1] 1/13
journal [1] 6/11
JR [1] 1/10
judge [41] 3/12 4/12
9/15 10/8 10/24 12/10
13/3 30/16 30/25 31/6
31/11 32/1 32/18 39/1
39/14 40/17 43/1 43/11
46/4 46/10 47/7 49/2
49/17 52/4 56/20 61/24
62/3 64/21 68/11 68/11
68/15 69/18 69/25 70/5
74/17 75/4 75/14 77/10
81/22 89/18 103/4
Judge Anderson [7]
3/12 4/12 9/15 10/8
10/24 12/10 13/3
Judge DiPietro [2]
52/4 103/4
Judge Michael [1]
56/20
Judge Russell [8]
30/25 32/18 46/4 46/10
47/7 49/2 49/17 64/21
Judge Russell's [4]
30/16 31/6 31/11 32/1
Judge Sullivan [5]
39/1 39/14 68/11 69/25
75/4
judges [2] 41/23 68/13
judgment [3] 30/17
32/1 108/18
judicial [2] 108/11
116/10
July [8] 38/3 38/16

**K**

keep [4] 22/19 70/6
70/9 72/14
keeps [1] 22/22
key [4] 100/4 100/5

40/13 74/4 75/4 76/9
83/16 87/8
July 1st [2] 74/4 75/4
July 2013 [2] 40/13
76/9
July 23rd [4] 38/3
38/16 83/16 87/8
June [5] 1/6 2/2 29/15
86/22 116/12
June 5th [1] 86/22
juries [1] 101/8
jurisdiction [3] 79/7
79/8 114/10
juror [1] 103/16
jury [24] 38/4 38/8
38/12 38/16 38/17
38/24 48/25 60/7 61/24
64/13 99/11 101/12
102/1 102/6 103/12
103/15 104/10 106/13
107/6 108/8 108/10
108/21 108/22 109/2
just [102] 4/3 5/5 7/7
9/16 15/11 17/7 18/21
18/22 19/20 20/3 20/15
21/23 21/23 23/11
23/22 24/13 25/12
25/21 32/5 33/6 33/14
33/22 34/13 35/17
41/14 41/20 42/5 42/21
44/2 44/16 44/18 45/20
46/15 47/11 47/12 48/4
49/6 49/12 49/21 52/18
53/24 54/12 57/24
59/24 61/9 61/24 62/10
62/12 66/1 67/7 67/13
67/16 70/7 71/1 72/17
75/13 75/19 75/21
75/23 81/2 82/10 84/23
85/9 87/12 87/25 92/25
93/25 94/14 94/18 95/2
95/15 95/19 96/3 96/22
97/10 99/7 99/21 99/25
100/3 100/21 100/21
101/2 101/7 102/25
103/25 104/13 104/19
105/10 106/16 106/19
107/23 108/15 109/22
110/12 110/22 111/7
111/14 112/6 114/10
114/11 114/12 115/3
justice [3] 75/15 99/12
107/7
justify [1] 95/14

104/10 104/10
kick [1] 38/2
kickbacks [1] 35/1
kind [12] 23/4 50/11
55/1 56/17 61/10 68/14
92/22 94/19 94/20
103/25 104/10 114/12
kinds [3] 30/7 33/17
83/23
knew [8] 39/16 40/2
52/20 63/14 81/23 87/6
101/9 113/13
know [83] 17/1 24/19
26/9 27/19 33/10 39/3
43/2 44/17 47/12 48/7
48/22 49/4 49/8 49/15
49/18 52/23 53/10 55/8
55/8 55/12 56/12 56/17
57/16 57/17 58/2 58/7
59/24 60/1 60/19 60/23
61/10 61/14 61/23
61/24 62/2 62/2 62/2
62/9 62/23 64/15 67/3
67/11 68/14 69/3 72/14
72/17 74/13 74/19 75/8
75/14 75/23 76/21
77/20 80/8 87/24 87/25
92/9 92/16 92/18 92/19
92/21 95/15 95/19
95/22 95/22 96/14 97/3
97/7 98/25 103/4 105/8
106/10 106/19 107/2
107/8 107/12 108/5
108/13 109/21 109/22
110/20 113/17 114/9
knowing [2] 23/7
106/6
knowledge [4] 52/13
55/10 60/22 74/25
known [6] 38/13 39/5
39/9 54/21 69/10 78/15
knows [5] 47/11 58/10
74/7 89/17 115/5
KOBIE [1] 1/13

**L**

label [51] 8/10 8/21
8/24 10/4 10/5 10/9
10/16 10/18 10/25 11/6
11/7 11/9 11/24 13/5
13/8 13/8 13/14 13/15
13/16 14/10 14/10
14/11 14/15 15/8 15/12
16/2 16/4 16/5 16/8
17/6 17/22 18/4 18/10
21/3 21/8 21/18 22/3
22/10 22/20 23/7 23/14
23/15 23/17 23/22 24/3
24/6 24/9 24/10 34/1
34/1 80/3

label-only [2] 14/15
22/10
labels [13] 7/23 8/2
8/8 14/7 14/17 14/24
15/3 15/23 16/10 16/13
17/17 20/8 21/25
Laboratories [1] 5/9
lack [4] 47/9 59/22
61/11 85/5
lands [1] 91/25
Lane [13] 57/21 81/25
82/23 83/18 83/19
84/20 85/23 87/16 88/6
88/17 96/5 96/6 96/8
large [2] 18/24 22/25
last [25] 3/3 3/6 3/19
4/3 6/19 25/21 29/15
32/13 37/8 37/18 37/22
44/15 63/9 81/1 89/10
91/12 94/6 96/3 101/3
101/4 103/7 107/24
110/4 110/25 112/12
late [4] 3/6 94/6 96/24
97/5
later [8] 4/23 17/16
32/8 49/16 67/18 67/19
73/24 85/19
Lating [30] 38/25 39/6
39/9 39/11 39/13 39/17
39/17 39/25 40/3 40/4
40/5 40/6 40/13 40/20
41/9 42/3 42/6 42/17
42/20 45/7 45/8 55/9
56/3 56/4 56/19 57/23
83/21 91/1 91/3 113/10
Lating's [2] 56/10
100/16
Laurie [3] 52/6 106/20
107/18
law [12] 4/23 6/7 6/20
28/14 28/21 28/25
30/20 51/14 101/2
108/24 112/1 114/20
LAWRENCE [1] 1/16
laws [1] 56/8
lawyer [3] 74/13 74/17
75/17
lawyers [2] 101/11
101/14
lay [1] 89/16
lead [8] 37/24 38/15
40/19 55/3 56/12 56/13
56/14 97/2
leadership [1] 5/22
leading [3] 11/11 64/1
82/5
learn [1] 31/6
learned [3] 30/21
31/19 44/14
least [11] 7/19 7/21

**L**

least... [9] 8/9 8/21
10/21 16/8 17/23 93/20
107/2 107/9 107/11
leave [2] 81/10 82/8
leaving [1] 88/9
led [1] 83/20
left [1] 80/18
left-hand [1] 80/18
legal [6] 45/25 47/1
47/24 48/9 49/4 53/7
length [1] 93/12
lengthy [3] 81/3 96/6
102/13
less [3] 95/12 99/3
106/8
let [33] 8/25 10/21
13/18 23/25 32/23
33/20 33/21 34/18
43/18 45/23 46/17
46/25 49/21 66/12
66/16 71/21 72/14 74/6
74/19 75/7 83/18 97/23
99/22 100/13 100/15
100/15 100/19 106/5
109/1 111/12 111/13
111/24 114/10
let's [13] 3/8 10/8
19/17 43/12 50/1 72/2
92/12 93/9 93/25 97/10
99/5 101/6 115/6
letter [5] 75/3 75/7
75/8 75/12 85/1
letting [1] 75/14
liability [3] 103/23
106/2 106/3
license [2] 5/24 6/2
licensed [2] 4/15 6/3
lie [1] 60/23
like [38] 16/24 41/21
49/6 52/20 54/9 55/11
55/12 56/25 59/24 62/5
62/20 66/14 70/1 71/16
72/22 73/7 73/19 74/24
75/2 78/24 80/8 87/19
92/25 93/8 94/10 97/19
101/16 101/20 102/5
103/3 104/10 104/14
105/1 106/19 106/20
107/23 108/12 108/18
likely [1] 106/11
limine [1] 81/9
limited [2] 7/10 83/15
limiting [1] 89/14
line [6] 12/17 45/19
47/19 67/21 95/2 97/9
lines [1] 47/20
lines 3 [1] 47/20
Lisa [9] 70/15 71/5
71/20 72/12 72/16

72/19 75/4 75/8 113/10
list [4] 16/18 99/2
102/20 111/23
listening [1] 70/18
lists [1] 57/16
litigate [1] 100/10
little [7] 12/18 17/7
21/12 53/19 56/2 68/1
96/1
live [1] 106/14
local [1] 95/16
location [2] 18/17
81/25
locations [1] 39/2
log [10] 8/13 22/22
24/18 24/22 25/3 25/23
26/2 26/6 26/7 36/15
logs [10] 62/15 62/21
63/3 63/3 63/15 63/15
63/20 63/23 68/25
68/25
Lombard [1] 1/24
long [15] 29/5 35/25
36/14 43/4 53/10 59/10
61/20 77/6 79/17 79/19
81/5 93/9 95/12 95/24
108/14
longer [5] 8/15 81/7
103/8 103/15 109/22
look [20] 16/19 21/12
25/3 26/1 27/25 52/5
59/1 62/22 62/25 64/11
66/14 67/23 68/12
68/25 69/1 71/16 73/13
75/7 80/15 98/9
looked [2] 53/11 60/16
looking [18] 36/15
45/5 53/2 54/5 57/1
57/2 57/3 58/3 60/10
60/21 60/21 63/13
63/13 68/18 69/3 69/5
70/4 88/13
looks [2] 21/14 97/19
lose [2] 79/7 79/8
loss [7] 31/23 32/17
32/19 53/4 62/8 77/11
77/12
lost [1] 86/6
lot [9] 22/5 22/6 32/24
45/23 56/7 96/22 101/9
103/8 111/25
lots [1] 108/13
loud [1] 105/11
love [2] 32/13 99/12
lower [1] 64/22
lunch [2] 93/6 110/16
lying [1] 38/8

**M**

ma'am [4] 37/7 45/9

48/16 66/6
machines [1] 15/5
made [3] 32/8 87/23
89/15
magistrate [4] 39/1
39/14 40/17 41/23
magnitude [1] 56/9
main [2] 41/2 59/8
maintained [2] 6/1
13/24
major [9] 6/20 8/4 9/5
9/9 9/12 50/20 51/7
103/20 103/25
make [26] 12/23 12/23
18/13 19/11 41/15 41/18
42/8 42/24 43/5 55/23
55/23 55/24 55/25 59/5
64/21 66/17 66/22
67/14 68/22 70/19
79/14 83/14 84/14
90/17 102/2 105/14
makes [2] 67/7 115/7
making [3] 42/25
71/15 106/17
malice [6] 99/19 100/9
100/16 100/16 100/17
109/10
malicious [3] 27/12
30/9 30/13
maliciously [1] 114/15
man [2] 55/7 112/3
managed [1] 4/18
management [5] 4/23
22/1 22/8 22/11 23/6
Mannava [1] 64/19
manner [1] 105/17
manufacturer [4] 5/12
20/22 20/24 21/2
manufacturers [1]
20/17
many [15] 5/13 19/22
48/7 51/10 56/5 58/11
60/17 62/11 62/11
66/14 69/6 73/18 79/14
79/15 101/16
marked [1] 53/21
MARYLAND [10] 1/1
1/6 1/25 26/22 26/24
27/5 41/3 51/17 108/22
116/6
master [1] 112/24
material [3] 20/19
29/21 102/3
matter [8] 1/9 67/4
67/13 90/15 98/3
108/12 108/15 116/9
matters [4] 3/10 51/5
51/9 51/22
MATTHEW [1] 1/15
Maura [5] 38/25 39/13

41/9 42/20 91/1
may [26] 3/17 9/15
9/24 21/7 21/12 25/11
27/24 36/20 37/6 45/16
47/19 66/5 82/7 84/4
96/23 99/6 101/15
102/18 103/1 106/13
106/13 106/16 107/21
108/2 108/5 111/14
May 17th [1] 66/5
maybe [14] 7/8 42/19
55/4 69/8 71/7 84/22
95/2 99/4 101/13
109/21 109/22 111/21
114/2 115/4
McCray [5] 94/12
94/20 99/11 111/17
111/20
McCray's [1] 100/4
McKesson [1] 9/7
me [54] 8/25 10/21
13/18 17/1 23/25 27/25
30/6 30/6 30/6 33/20
33/22 43/16 43/18
44/17 45/4 45/4 45/12
45/15 45/24 46/17
46/25 49/21 50/20 52/1
52/4 52/18 53/11 56/24
57/20 61/23 62/9 65/21
66/12 66/16 67/21
71/21 73/15 75/7 75/12
84/24 90/24 91/4 91/11
92/25 97/19 99/22
102/24 106/5 106/9
111/24 112/8 112/8
112/20 114/10
mean [18] 37/21 40/9
43/2 47/4 50/13 59/23
61/19 62/24 64/13
74/21 75/18 87/2 97/25
98/16 98/24 99/2 103/1
103/11
meaning [5] 11/24
21/16 39/14 43/16
69/17
means [1] 49/8
MEDIC [14] 33/6 43/13
43/15 43/24 43/24 44/4
44/4 44/7 44/10 44/22
55/21 61/21 62/7
101/13
MEDIC 1495 [1] 33/6
Medicaid [1] 28/24
medical [1] 27/2
Medicare [2] 27/1
28/24
medication [11] 12/15
12/24 17/4 18/11 18/14
20/16 20/16 21/1 21/12
23/16 66/25

medications [5] 12/6
18/17 18/24 21/13
26/12
meds [1] 19/1
meet [2] 19/12 69/13
meeting [2] 57/18
69/20
meetings [3] 57/15
79/17 79/19
member [1] 57/10
memo [1] 101/2
memorandum [2]
97/17 112/12
memories [2] 109/14
109/25
memory [2] 47/18
109/18
mental [1] 103/25
mention [1] 111/18
mentioned [10] 11/22
15/21 20/14 56/20 68/5
97/17 100/23 100/24
111/19 111/19
mere [2] 11/9 90/5
merely [1] 42/3
Merit [1] 116/4
messages [2] 71/19
72/19
met [13] 52/5 52/11
52/19 55/8 56/5 61/21
69/16 69/17 71/11 76/3
76/8 76/20 79/15
methodology [1]
106/15
Michael [1] 56/20
mid [3] 92/22 92/23
113/3
mid-plan [1] 92/23
middle [1] 71/23
midnight [2] 91/25
101/3
might [27] 11/2 11/2
13/20 16/18 17/9 17/10
18/21 19/6 20/2 41/8
41/11 53/3 74/25 87/23
90/16 100/15 100/25
103/17 104/24 108/9
109/4 109/6 109/9
109/22 110/19 114/9
115/5
million [1] 67/13
mini [1] 96/5
minimize [1] 76/4
minute [6] 23/1 23/1
72/2 73/16 89/10
110/25
minutes [4] 11/20
87/13 101/3 110/19
mirror [1] 7/18
misadventures [1]

**M**

misadventures... [1]
6/18

mischaracterizes [7]
25/24 31/2 31/4 31/10
32/3 34/16 84/1

misconstruing [1]
32/5

mislead [3] 90/22 91/1
91/4

misled [1] 90/24

misperceiving [1]
90/2

missing [2] 94/10
97/20

misspeak [1] 113/3

misunderstanding [1]
84/23

MOLISSA [1] 1/15

moment [9] 25/12
35/10 45/21 54/12
73/13 75/7 82/10 88/21
88/22

Monday [6] 19/1 19/2
19/3 19/3 19/4 74/4

money [5] 54/7 57/3
60/23 62/3 71/15

month [3] 32/4 67/18
67/19

month's [4] 12/16 17/4
19/10 19/14

monthly [1] 6/11

months [4] 26/10 32/7
48/7 109/19

months' [1] 26/9

moot [2] 97/19 111/4

morbidities [1] 19/16

more [40] 9/2 12/2
12/3 12/6 12/17 13/16
15/6 18/17 18/21 19/5
19/15 20/2 24/13 29/20
30/4 31/13 40/15 41/20
43/3 45/23 55/9 62/3
66/16 69/20 72/1 87/5
95/11 95/14 95/17
96/13 96/15 97/18
104/13 110/19 111/21
111/24 112/23 113/2
113/16 114/11

moreover [2] 85/25
87/15

morning [23] 3/2 4/1
18/22 19/2 19/2 19/20
20/3 25/18 25/19 37/9
37/16 37/17 50/7 50/8
71/22 96/24 101/2
101/4 109/14 110/8
110/9 110/10 110/11

Mosley [21] 38/4 38/5
38/16 39/24 43/13

43/14 43/19 44/2 44/3
44/6 44/9 44/22 45/2
45/3 45/12 54/17 54/21
55/3 90/22 100/6
113/10

Mosley's [7] 38/24
43/23 55/17 99/10
100/9 100/14 100/17

most [14] 13/13 17/4
17/25 22/25 54/24 58/9
59/17 60/15 67/17
68/18 71/2 87/16
105/16 106/11

Mostly [1] 28/6

motion [4] 9/20 81/9
97/14 110/17

motions [1] 7/7

motive [4] 71/12 71/13
105/3 106/23

move [9] 3/9 9/17
43/12 48/6 49/9 54/9
100/12 101/19 105/16

moved [1] 50/21

movie [1] 92/21

Mr [5] 2/5 2/5 2/6 2/7
63/9

Mr. [77] 27/8 27/9
29/11 30/5 32/12 32/25
37/25 46/2 47/3 47/14
48/11 48/23 53/25 54/6
58/7 58/24 64/4 64/5
64/19 66/18 66/23
70/25 71/13 74/14
74/16 76/8 77/17 78/6
79/13 79/20 79/20
80/15 80/16 80/17
81/22 82/17 82/22 83/6
83/17 84/8 84/11 84/17
85/22 85/24 86/11 87/7
87/17 87/23 88/3 88/4
88/8 88/12 94/1 94/12
94/20 95/24 96/4 97/21
97/23 99/11 100/4
100/9 101/8 102/24
107/7 109/12 110/3
111/18 111/25 112/8
112/14 112/22 113/16
113/25 114/13 114/14
114/15

Mr. Annappareddy
[37] 30/5 37/25 46/2
47/3 48/11 48/23 53/25
54/6 58/7 58/24 64/4
66/18 66/23 71/13
77/17 78/6 79/13 82/17
83/17 84/11 85/22
85/24 87/7 87/17 88/12
94/1 96/4 107/7 109/12
111/18 111/25 112/8
112/14 112/22 113/25

114/14 114/15

Mr. Annappareddy's
[8] 27/9 47/14 79/20
82/22 84/8 88/8 113/16
114/13

Mr. Chasen [1] 102/24

Mr. Eiser [1] 32/25

Mr. Ernest McCray [1]
94/20

Mr. Flowers [1] 97/23

Mr. Greenberg [8]
27/8 29/11 32/12 83/6
84/17 95/24 97/21
101/8

Mr. Mannava [1] 64/19

Mr. McCray [2] 94/12
99/11

Mr. McCray's [1]
100/4

Mr. Mosley's [1] 100/9

Mr. Patel [5] 70/25
79/20 81/22 86/11 88/3

Mr. Patel's [4] 80/15
80/16 87/23 88/4

Mr. Patels [1] 64/5

Mr. Phelps [1] 110/3

Mr. Shenning's [1]
80/17

Mr. Tokofsky [1] 76/8

Mr. White [2] 74/14
74/16

Ms [1] 2/8

Ms. [70] 3/4 37/16
37/24 38/7 39/6 40/2
40/12 41/6 41/24 42/6
42/14 43/14 44/17
45/23 47/1 47/10 47/23
49/15 50/7 50/8 52/5
53/17 54/17 55/16
57/15 57/22 57/23 58/1
62/15 63/10 65/14
65/22 65/24 66/17
67/15 71/7 71/21 72/10
72/12 72/16 73/17
73/22 73/23 73/25 74/4
74/11 76/15 78/1 79/23
81/16 82/13 88/2 88/24
88/25 90/22 91/9 91/25
93/13 94/1 101/18
101/22 102/22 103/2
104/4 104/22 105/6
105/24 108/12 108/15
109/15

Ms. Arnold [9] 57/22
65/24 73/23 73/25
104/22 105/6 105/24
108/12 108/15

Ms. Farber [3] 50/8
71/21 72/10

Ms. Herring [1] 53/17

Ms. Lating [1] 42/6

Ms. Oyer [1] 79/23

Ms. Pascale [6] 41/6
52/5 57/15 88/25 91/25
94/1

Ms. Ridolfi [7] 57/23
63/10 71/7 72/16 73/17
73/22 74/11

Ms. Shiff [5] 101/18
101/22 102/22 103/2
104/4

Ms. Wilkinson [36]
3/4 37/16 37/24 38/7
39/6 40/2 40/12 41/24
42/14 43/14 44/17
45/23 47/1 47/10 47/23
49/15 50/7 54/17 55/16
58/1 62/15 65/14 65/22
66/17 67/15 72/12 74/4
76/15 78/1 81/16 82/13
88/2 88/24 90/22 91/9
109/15

Ms. Wilkinson's [1]
93/13

much [11] 55/9 57/14
58/18 62/2 62/12 64/22
72/1 77/8 95/23 97/4
97/9

multiple [8] 5/15 8/2
8/5 8/8 19/10 20/17
79/19 86/15

murder [1] 50/12

museums [1] 114/21

must [1] 86/25

my [50] 4/21 4/23
20/17 22/4 22/11 23/1
23/9 23/12 26/25 27/25
29/21 29/24 30/7 30/11
32/11 44/15 46/19
47/16 50/21 51/7 53/19
55/16 55/19 56/22
56/23 61/18 61/19
76/15 76/16 76/16
76/21 78/10 78/16
78/18 80/16 81/3 81/9
92/21 95/5 96/22 98/6
100/13 101/2 104/21
105/13 108/24 112/1
114/5 114/9 114/22

My Cousin [1] 92/21

myself [1] 40/10

mystery [1] 91/20

**N**

name [10] 3/19 3/21
9/2 11/3 15/14 15/15
37/8 57/20 63/10 92/13

named [3] 40/21 78/2
111/16

names [2] 9/7 104/8

national [6] 6/24 7/5
20/25 21/4 21/5 21/9

nationwide [2] 6/23
7/3

nature [3] 61/12 90/3
90/3

near [1] 85/2

nearly [1] 107/7

necessarily [5] 10/19
85/18 101/8 103/15
105/7

necessary [4] 62/15
63/5 96/24 105/20

need [26] 17/5 17/10
17/12 20/2 21/21 36/14
56/16 63/1 64/15 64/19
71/22 76/10 86/15 94/8
94/9 95/17 95/19 95/25
96/20 98/4 103/4
105/25 106/13 110/19
112/6 112/10

needed [7] 13/14 16/6
16/16 21/23 79/5 103/6
103/12

needs [2] 19/13
113/19

nefarious [1] 60/21

neither [1] 94/2

nervous [1] 57/20

neutral [1] 104/5

never [15] 13/6 26/21
27/14 27/17 27/20
27/22 28/1 28/18 30/12
44/12 61/14 70/16
78/24 89/24 99/2

new [9] 11/5 11/6
20/21 20/21 21/8 51/20
51/25 102/17 110/21

newsletter [1] 6/11

next [8] 3/11 6/19
36/23 55/16 91/14
91/15 104/16 104/20

nice [3] 55/7 68/12
92/9

night [8] 3/6 4/3 18/22
94/6 101/3 101/4 110/4
112/12

no [62] 1/4 9/20 23/6
27/7 28/14 29/10 30/11
30/14 34/4 34/13 34/23
39/18 39/20 39/23 40/5
44/10 44/17 45/11
47/13 48/12 48/13
53/19 54/8 54/13 57/12
59/24 61/3 61/20 62/18
63/6 66/21 68/14 71/9
71/11 75/10 76/15
76/20 77/6 78/22 82/6
83/17 85/21 85/24 86/8
87/14 87/16 87/17

**N**

no... **[15]** 90/24 91/3 91/5 91/8 92/14 92/24 95/11 96/13 98/10 98/13 103/9 103/15 105/18 109/9 114/19
**None [1]** 94/4
**nonresponsive [1]** 49/10
**noon [2]** 19/3 19/3
**NORTHERN [1]** 1/2
**not [140]**
**note [5]** 16/23 18/4 18/5 89/13 115/2
**notes [1]** 1/22
**nothing [6]** 23/22 24/5 24/10 25/8 36/18 49/24
**notice [2]** 99/3 104/19
**noting [1]** 111/15
**now [56]** 3/4 7/6 7/10 13/14 14/18 20/5 29/2 32/13 32/17 33/22 34/7 42/16 43/12 46/17 46/21 53/4 54/5 56/20 57/9 57/20 58/1 60/25 63/10 64/8 65/14 68/1 69/23 71/2 71/16 72/3 72/22 73/6 73/13 74/5 75/2 75/7 80/14 80/19 81/11 83/9 85/21 86/3 86/16 86/25 87/1 88/10 89/16 89/24 90/5 91/21 96/2 96/10 96/14 99/7 102/15 108/1
**number [24]** 18/24 33/13 51/2 51/4 51/21 52/15 52/23 53/1 55/18 56/15 57/25 59/5 64/14 65/8 66/20 77/2 77/2 77/2 77/3 77/5 77/16 77/17 96/7 102/12
**nursing [1]** 19/9

**O**

**object [11]** 26/14 32/14 47/8 53/6 54/13 73/21 76/6 81/4 82/3 90/7 98/17
**objected [2]** 98/16 99/15
**objecting [1]** 32/12
**objection [22]** 9/19 11/11 25/24 29/13 30/25 31/3 31/10 32/3 32/22 33/3 33/8 34/9 34/16 35/2 54/11 54/15 81/7 81/13 85/3 90/9 90/11 98/18
**objections [1]** 32/12
**observe [1]** 96/20

**obtain [1]** 5/24
**obviously [4]** 16/4 94/24 100/7 103/2
**occasions [2]** 62/11 64/14
**occupation [1]** 4/7
**occur [2]** 10/14 71/7
**occurred [1]** 99/16
**occurs [1]** 108/4
**off [12]** 8/14 16/10 16/21 17/15 18/3 20/19 21/8 38/2 57/18 59/23 108/21 112/7
**offender [1]** 51/15
**offer [1]** 84/14
**offering [2]** 7/11 83/9
**office [16]** 15/7 15/9 15/20 30/23 41/3 41/12 41/22 50/9 50/16 50/21 51/8 51/18 55/22 60/13 60/16 79/23
**Official [3]** 1/24 116/1 116/16
**often [5]** 10/12 10/14 15/4 19/13 22/23
**Oh [6]** 60/6 67/19 76/12 86/23 103/9 107/17
**okay [32]** 7/21 11/22 17/16 20/9 26/3 26/20 27/1 27/20 28/5 28/19 29/7 30/8 30/15 31/19 39/5 39/5 41/2 43/7 43/23 48/4 54/2 65/21 66/11 73/6 73/8 73/11 85/14 85/20 96/13 101/1 109/21 110/18
**old [4]** 26/9 26/10 35/24 36/12
**once [7]** 31/13 33/11 57/17 62/25 100/19 101/10 103/18
**one [62]** 5/14 7/8 8/9 8/16 11/25 11/25 12/2 12/3 12/14 12/17 12/17 13/8 13/10 13/16 13/20 13/21 13/25 15/7 16/17 16/19 16/25 17/23 18/1 18/1 18/17 18/21 18/25 19/11 19/15 20/15 20/15 30/4 36/17 46/18 54/12 56/14 56/15 56/16 61/19 63/24 65/16 65/25 69/20 71/15 82/22 87/16 96/17 98/16 99/9 100/21 103/7 103/17 104/13 108/22 111/14 111/24 112/24 112/24 112/24 113/2 113/16

114/11
**one hour [1]** 96/17
**one's [2]** 82/19 84/10
**ones [9]** 9/12 12/3 19/3 19/3 27/12 43/10 61/5 62/23 74/18
**ongoing [5]** 70/2 70/8 98/18 108/14 108/14
**only [25]** 14/10 14/15 18/25 22/10 25/2 30/15 32/11 40/9 40/10 61/1 61/5 62/21 68/12 72/15 75/12 78/19 83/21 85/3 85/3 85/6 93/25 97/17 100/13 104/21 114/14
**open [1]** 81/10
**opened [5]** 82/24 84/7 88/4 88/7 89/11
**opening [2]** 103/22 112/4
**openings [1]** 95/11
**operating [2]** 59/3 66/23
**operation [2]** 34/14 69/17
**operations [1]** 34/23
**opinion [10]** 7/11 11/8 21/24 22/9 24/1 24/9 30/17 31/6 32/2 84/25
**opinions [9]** 7/6 7/14 7/22 9/21 30/16 31/15 32/23 34/13 34/23
**opportunity [5]** 83/8 104/22 104/23 105/1 106/23
**opposed [2]** 17/7 75/13
**opposite [1]** 99/20
**OPR [1]** 93/3
**order [8]** 13/12 13/22 20/18 60/2 88/23 89/21 90/1 108/21
**ordered [1]** 12/25
**ordinarily [1]** 89/2
**organization [4]** 6/10 42/4 59/13 60/3
**organization's [1]** 6/8
**organized [1]** 42/18
**original [4]** 11/7 17/5 29/20 53/25
**Orioles [1]** 114/24
**other [32]** 5/14 9/9 11/25 13/10 15/2 18/17 27/18 40/3 45/5 51/8 54/22 54/25 56/5 56/18 56/18 57/23 58/25 60/9 60/9 63/10 64/18 64/25 67/5 67/15 67/23 70/22 70/24 77/8 92/12 93/23 100/20 103/17

**others [2]** 3/10 19/19
**otherwise [2]** 44/2 59/21
**ought [1]** 109/23
**our [33]** 9/20 21/13 41/15 55/11 57/18 58/6 58/6 58/9 59/2 59/7 59/8 59/10 60/1 60/8 60/8 64/14 68/13 70/23 77/9 83/15 89/3 89/3 91/17 96/16 98/9 98/18 103/3 110/22 110/24 110/25 111/15 111/16 111/18
**ourselves [1]** 68/10
**out [21]** 8/19 10/15 10/18 12/12 16/3 17/3 22/22 28/2 61/22 62/8 62/23 63/19 86/1 86/3 88/23 89/21 90/1 105/11 106/19 112/2 112/13
**outcome [1]** 108/10
**outlined [1]** 98/11
**outset [1]** 14/18
**outside [7]** 18/6 32/23 33/19 34/9 35/2 82/9 103/19
**over [12]** 6/21 53/20 58/12 79/5 79/8 93/4 95/20 97/18 102/6 109/4 114/1 114/1
**overall [1]** 102/14
**overrule [2]** 81/13 85/3
**Overruled [7]** 11/12 26/15 33/22 34/20 49/13 53/8 74/8
**overstated [1]** 100/25
**overt [1]** 58/23
**overview [1]** 4/13
**owes [1]** 7/2
**own [12]** 9/6 9/8 16/4 22/11 41/7 41/15 42/17 59/7 73/20 74/12 84/12 88/4
**owned [2]** 88/18 88/20
**Oyer [1]** 79/23

**P**

**p.m [2]** 93/8 115/12
**pack [2]** 12/10 12/10 18/21
**packaging [1]** 19/12
**packs [8]** 12/4 12/5 12/22 15/1 15/1 18/19 19/20 20/2
**page [13]** 2/3 8/16 8/16 45/19 47/19 73/7 75/2 75/3 80/20 80/20

81/2 100/11 116/9
**page 1 [1]** 81/2
**Page 8 [1]** 80/20
**pages [2]** 81/1 81/16
**paid [5]** 16/20 22/5 22/6 22/12 106/21
**PAM [6]** 1/6 66/3 71/20 72/13 72/19 74/5
**paper [3]** 8/6 8/7 8/17
**parallel [2]** 56/25 101/7
**part [13]** 5/1 10/21 16/10 21/5 34/17 39/1 48/5 59/18 63/18 66/23 68/5 100/4 100/5
**part-time [1]** 5/1
**participate [1]** 43/3
**participated [1]** 78/7
**particular [4]** 7/23 11/3 19/13 23/8
**particularly [2]** 22/2 57/15
**parties [3]** 59/22 103/22 104/17
**parts [1]** 39/24
**party [2]** 10/11 60/9
**Pascale [9]** 40/22 41/6 52/5 57/15 88/25 89/23 91/16 91/25 94/1
**past [1]** 6/21
**Patel [23]** 54/1 54/1 64/6 70/25 78/2 78/13 78/19 79/9 79/20 80/24 81/6 81/22 83/8 83/12 83/15 86/1 86/1 86/24 87/2 88/3 99/2 111/17 111/17
**Patel's [6]** 80/15 80/16 86/10 87/23 88/4 90/4
**Patels [1]** 64/5
**patient [41]** 7/2 8/15 10/13 12/23 13/15 16/3 16/7 16/9 16/15 16/25 17/11 17/18 17/23 18/7 18/21 19/8 19/13 19/19 20/2 21/10 22/20 23/15 23/23 23/23 23/24 24/4 24/14 24/15 24/16 24/17 24/21 24/22 24/25 25/1 26/1 26/5 26/8 36/15 36/16 63/3 70/11
**patient's [3]** 12/5 17/25 24/24
**patients [6]** 5/10 17/2 18/23 19/16 19/22 19/23
**pay [3]** 23/10 28/24 74/18
**paying [1]** 35/1

**P**

payment [3] 30/24
31/9 31/21
payor [3] 10/12 16/19
20/13
pays [1] 19/14
people [24] 22/5 22/6
30/6 44/19 45/5 52/17
55/9 55/11 55/11 59/16
59/19 62/13 62/21
62/23 63/8 63/17 63/24
64/18 67/1 70/22 75/15
77/21 93/3 104/15
people's [1] 51/4
per [3] 17/23 61/16
62/8
percent [2] 39/3 66/15
perhaps [7] 18/7
84/21 100/9 102/1
104/12 105/13 111/6
period [27] 4/18 7/11
7/14 7/15 7/19 7/19
7/25 8/3 9/4 9/5 9/10
10/12 10/24 13/13 15/4
17/22 18/10 21/16 22/4
22/8 22/13 23/9 24/16
27/7 34/15 36/14
104/12
periods [1] 35/25
permitted [3] 48/17
84/14 89/8
person [16] 16/22
18/12 18/13 42/25
55/11 55/22 56/17
56/17 57/6 59/25 71/8
72/15 77/11 78/5 79/5
85/17
personal [2] 54/7 54/7
personally [2] 99/12
108/17
persons [1] 40/6
perspective [1] 62/16
ph [1] 80/17
Pharmacare [23] 34/5
34/14 34/23 38/7 39/2
42/17 54/20 54/21
55/17 56/10 57/9 58/4
58/5 60/5 60/25 62/5
63/12 64/3 64/8 71/2
71/3 74/24 87/7
pharmaceutical [1]
6/15
pharmacies [9] 5/5
5/7 8/2 8/3 15/23 17/2
22/1 27/2 27/6
pharmacist [10] 5/9
5/20 5/24 6/3 6/17 7/1
7/1 26/21 34/25 83/3
pharmacist's [1]
28/23

pharmacists [1] 51/2
pharmacy [44] 3/5 4/9
4/13 4/17 4/18 4/21
4/22 4/23 5/1 5/3 5/14
5/17 5/17 6/7 6/13 6/16
6/20 6/23 7/4 9/18 12/8
13/25 14/9 16/3 16/22
17/12 21/6 21/18 22/8
22/15 23/6 23/14 26/11
28/20 28/20 30/19 36/7
63/4 63/13 66/23 67/13
70/11 84/9 85/2
phase [1] 59/14
PHELPS [2] 1/15
110/3
photo [2] 84/15 88/6
photos [3] 82/22
84/20 84/23
physician's [3] 15/6
15/9 15/20
pick [4] 18/1 25/21
59/15 59/23
picked [1] 18/7
picking [1] 63/4
picture [1] 103/25
pie [1] 103/20
piece [1] 100/14
pieces [1] 16/17
pill [2] 13/21 61/16
pills [12] 12/14 19/22
61/14 61/25 62/4 62/5
62/13 67/6 67/12 67/16
67/18 67/19
place [1] 38/12
placed [1] 8/13
Plaintiff [29] 1/4 1/12
3/12 36/24 72/25 82/16
82/24 85/8 88/7 88/18
89/9 90/16 93/18 94/7
94/11 95/24 98/23
99/19 102/19 102/19
105/22 106/11 111/4
111/6 112/3 112/6
112/14 113/20 113/21
PLAINTIFF'S [18] 2/3
3/5 3/6 65/23 66/1
66/10 71/16 71/17
72/22 73/10 84/5 84/21
84/25 93/20 95/7 99/8
99/9 100/22
Plaintiffs [3] 88/4
89/15 108/13
plan [3] 92/22 92/23
96/4
plane [1] 92/10
plastic [1] 12/19
plate [1] 56/7
play [2] 42/10 47/17
played [2] 45/17 78/10
players [2] 9/9 103/25

players' [1] 104/10
playing [2] 42/12
47/21
plea [8] 51/5 80/16
81/23 84/21 85/25 86/7
86/9 87/20
pleaded [1] 78/20
pleading [1] 98/11
please [21] 3/2 3/11
3/14 3/18 4/12 9/2 10/7
10/23 11/14 12/9 16/23
36/23 37/3 37/7 37/8
54/17 65/18 72/10
73/14 74/10 82/10
plenty [1] 94/17
Plumtree [1] 71/4
plus [4] 6/22 32/4 59/1
103/16
point [25] 5/19 5/23
21/7 21/11 28/11 35/3
40/25 52/5 63/12 64/16
67/2 73/15 74/11 74/16
75/1 90/23 97/19 98/16
99/6 106/5 106/19
111/4 111/14 111/21
114/11
pointed [1] 112/2
points [1] 85/9
poisonous [1] 83/20
policies [4] 82/17
82/20 84/10 88/8
policy [1] 5/22
poor [1] 19/25
portfolio [1] 51/7
posed [1] 36/9
position [8] 6/6 55/4
68/10 96/9 98/9 100/7
100/8 110/24
positions [3] 50/15
50/18 106/12
positive [2] 38/5 66/15
possibility [1] 106/7
possible [4] 52/8 57/8
58/19 77/11
possibly [3] 52/6
56/25 60/14
post [15] 49/10 49/15
76/7 81/10 82/6 83/12
87/9 87/15 94/13 94/21
96/4 97/8 99/13 100/4
100/14
post-indictment [9]
49/10 76/7 81/10 83/12
87/9 87/15 96/4 97/8
99/13
postdates [1] 81/5
potential [1] 60/17
potentially [2] 102/11
105/18
practice [11] 4/15 4/22

5/1 5/4 5/6 7/7 22/11
28/20 42/2 51/14 81/3
practiced [1] 4/17
Pragna [3] 78/13 99/2
111/17
pre [2] 10/13 76/11
pre-submission [1]
10/13
precise [1] 112/23
preclusion [2] 109/1
109/5
predict [1] 96/10
prediction [1] 102/5
prefer [2] 97/4 108/20
preindictment [1]
76/11
prejudice [4] 46/14
49/17 49/19 49/20
preliminary [1] 77/2
77/3 77/4
premature [1] 108/5
prep [1] 95/19
preparation [1] 59/7
prepared [3] 58/22
76/3 93/4
preparing [1] 29/8
preprinted [1] 8/7
prescribed [1] 61/14
prescriber [1] 15/13
prescription [62] 4/22
7/22 7/23 8/1 8/4 8/10
8/14 8/21 9/2 10/10
10/15 10/19 11/21
11/25 12/3 13/6 13/10
13/23 14/5 14/11 15/14
16/13 16/14 16/22 17/6
17/10 17/13 17/18
17/19 17/23 18/3 18/16
20/7 20/9 20/16 20/18
20/20 21/1 21/17 22/18
22/21 23/8 23/14 23/16
23/24 24/4 24/10 24/14
24/17 24/21 25/2 25/22
33/15 33/25 34/4 35/24
36/4 36/6 36/12 36/16
63/4 69/23
prescriptions [9] 5/10
12/8 12/21 18/1 26/10
28/24 35/24 61/8 108/9
present [8] 1/17 6/2
38/11 39/13 40/16 46/8
105/23 105/24
presented [8] 31/24
32/18 38/23 38/25
39/17 40/3 108/6 108/9
presenting [1] 38/16
presently [1] 110/11
pressure [2] 19/18
20/1
presumably [2]

106/11 108/6
pretrial [2] 7/7 9/16
pretty [6] 17/24 26/12
30/18 33/18 33/18
101/24
preview [1] 89/3
previous [2] 21/7 88/2
previously [3] 45/17
82/4 95/10
price [2] 61/16 61/22
primarily [3] 4/17 5/1
5/7
Prime [1] 9/10
PrimeRX [1] 9/13
print [12] 8/6 8/14
8/16 14/6 14/9 16/5
16/21 17/14 18/3 21/18
34/1 34/1
printed [26] 8/2 8/5
8/5 8/21 10/5 10/18
11/1 11/7 11/9 11/21
13/7 13/8 13/12 14/17
15/3 15/23 16/7 16/14
16/16 17/17 17/22 20/8
21/8 22/3 22/20 23/8
printer [3] 8/16 8/17
16/5
printing [7] 10/4 10/9
10/15 13/2 13/16 14/24
21/25
prints [1] 20/19
prior [6] 58/12 58/22
76/20 91/1 105/2
107/15
private [1] 77/18
probable [20] 41/7
41/16 41/21 42/4 42/18
58/19 59/2 62/16 63/1
63/2 63/8 63/12 64/3
68/6 68/8 68/16 69/1
70/2 77/20 85/6
probably [14] 19/21
51/6 57/24 70/6 93/15
93/20 95/4 95/5 95/12
96/7 103/5 108/10
110/8 111/4
problem [7] 87/5 90/7
92/24 96/19 98/24
109/20 113/20
problematic [1]
105/19
problems [1] 104/14
procedure [1] 88/10
procedures [6] 82/18
82/20 84/9 84/11 85/1
88/9
proceed [2] 9/24
32/10
proceedings [1] 116/8
process [2] 10/11

**P**

**process...** [1] 14/25
**processee** [1] 20/12
**processing** [15] 4/22
8/1 8/4 9/3 10/15 11/21
14/6 14/11 17/14 20/7
21/17 22/19 33/15
33/25 34/4
**processor** [1] 12/7
**product** [2] 20/24 53/1
**products** [1] 85/2
**professional** [1] 52/19
**professor** [51] 3/13
4/1 4/9 4/10 4/11 4/12
4/14 5/13 5/19 5/23 6/4
6/12 6/21 7/6 7/24 8/20
8/25 9/13 9/17 10/3
10/23 11/8 11/19 12/9
12/20 13/4 14/4 14/14
14/16 14/23 15/2 15/21
16/12 17/21 18/9 18/20
20/11 21/15 21/24 22/7
23/5 23/13 23/21 24/1
24/9 24/25 25/18 26/21
32/23 33/9 36/11
**Professor Fassett** [1]
4/1
**proffer** [1] 79/14
**proffered** [1] 79/13
**programs** [3] 7/4 57/4
77/18
**projector** [2] 79/25
80/10
**proof** [4] 60/18 60/19
84/15 85/5
**proper** [3] 21/9 98/2
98/7
**properly** [1] 89/7
**proposition** [1] 70/1
**prosecuted** [3] 51/3
51/4 114/15
**prosecution** [6] 27/12
30/9 30/13 31/25 51/24
60/17
**prosecution's** [1]
112/4
**prosecutor** [7] 37/24
38/15 40/19 40/21
61/20 62/9 75/23
**prosecutors** [3] 51/8
51/20 104/2
**prove** [9] 53/12 56/9
63/1 64/15 64/19 64/22
70/13 112/1 112/9
**proven** [2] 64/17
64/17
**provide** [4] 43/15
43/20 45/4 84/7
**provided** [3] 30/1 40/6
76/23

**providers** [2] 15/5
27/2
**providing** [4] 15/19
61/8 79/20 83/13
**psychiatric** [1] 19/18
**public** [4] 50/12 51/15
51/16 79/22
**publications** [3] 6/10
6/13 6/14
**purported** [2] 49/16
83/12
**purportedly** [1] 84/1
**purpose** [8] 12/20
12/21 13/9 15/12 15/17
16/4 18/9 18/18
**purposes** [1] 16/24
**pursuant** [1] 116/6
**pursue** [2] 60/11 78/1
**pursued** [3] 53/6 63/5
77/13
**pursuing** [2] 62/16
99/12
**put** [22] 12/14 13/11
13/15 15/8 15/12 18/1
18/4 21/4 22/1 39/24
47/24 65/17 68/10
68/23 68/25 80/10 81/7
85/22 90/6 92/12
111/15 113/17
**putting** [12] 12/21
18/10 46/1 46/11 47/2
48/10 51/3 77/4 79/25
89/4 90/5 110/22

**Q**

**qualifications** [1] 9/19
**quantity** [1] 15/16
**question** [34] 10/6
10/20 11/13 11/15
23/25 25/21 28/7 28/8
28/15 31/15 31/17
32/11 34/21 36/3 36/8
44/15 45/9 46/17 46/25
47/9 47/16 48/1 48/7
48/9 55/16 66/16 67/2
76/13 82/5 83/8 84/16
95/9 99/20 108/25
**questioned** [2] 86/11
105/7
**questioning** [1] 91/7
**questions** [9] 24/13
29/20 29/23 30/1 73/17
75/15 75/17 76/16 91/5
**qui** [8] 52/1 52/8 59/20
60/15 60/15 63/9 70/23
101/12
**qui tam** [4] 52/8 59/20
60/15 70/23
**qui tams** [1] 60/15
**quickly** [2] 81/2 92/21

**quite** [4] 32/12 100/2
110/21 113/9
**quote** [2] 31/2 48/8

**R**

**raise** [3] 3/14 37/3
108/11
**raised** [1] 107/24
**ramifications** [1] 59/4
**ranging** [1] 6/14
**rather** [3] 3/8 15/9
48/4
**read** [20] 11/14 11/16
29/7 30/8 30/15 31/12
33/6 34/7 41/7 41/13
42/17 42/24 44/25 48/5
69/3 80/6 101/2 101/3
101/4 101/4
**reading** [1] 41/15
**readjudicated** [1]
20/13
**reads** [1] 68/12
**ready** [1] 20/19
**real** [2] 17/1 22/24
**really** [9] 6/25 54/20
83/11 88/21 96/8 96/9
98/3 100/5 112/21
**realtime** [1] 109/15
116/5
**reason** [17] 11/1 13/20
20/12 22/10 23/7 31/7
38/20 39/18 39/20
39/23 40/5 59/15 60/6
88/22 89/5 91/3 109/13
**reasonable** [2] 45/18
60/20
**reasons** [8] 12/1 14/16
14/17 14/18 15/2 83/23
98/11 109/13
**rebuttal** [25] 3/7 85/12
85/13 88/23 89/1 89/4
89/7 89/10 89/13 89/20
89/20 90/6 94/2 98/2
98/3 98/7 98/10 98/12
98/20 99/9 105/24
110/24 111/10 111/22
111/22
**recall** [26] 7/16 9/7
9/14 22/11 22/12 29/5
29/10 29/19 29/19 38/5
41/24 42/7 46/8 46/9
46/15 51/25 51/25 55/2
64/11 68/3 69/16 79/15
81/3 86/25 87/23 92/16
**receipt** [2] 17/9 24/18
**receipts** [1] 8/11
**receive** [1] 72/13
**received** [14] 3/6 8/14
16/15 17/18 17/20 20/9
22/21 23/23 23/24

24/14 24/16 24/21 25/2
36/16
**receiving** [1] 62/14
**recess** [5] 72/2 72/4
72/5 115/9 115/11
**recognizes** [2] 21/11
21/11
**recollect** [1] 56/22
**recollection** [15]
23/12 26/25 30/11 45/3
45/11 47/13 47/17
47/23 48/6 56/24 73/16
74/15 78/16 78/18
78/22
**record** [12] 3/18 8/11
17/13 22/19 32/4 37/7
81/8 86/20 92/12 93/25
100/20 106/6
**records** [3] 27/25 70/7
70/10
**REDDY** [3] 1/3 1/17
36/24
**redirect** [4] 2/6 35/16
35/19 96/7
**redo** [1] 108/7
**reduce** [1] 103/13
**refer** [2] 7/19 39/6
**reference** [1] 102/3
**referenced** [1] 95/10
**referring** [3] 42/23
45/7 84/21
**refill** [2] 15/18 15/19
**refilled** [1] 26/10
**refills** [4] 15/5 36/6
61/7 67/1
**reflect** [2] 10/18 23/19
**reflects** [1] 22/15
**refresh** [3] 47/16
47/18 47/23
**refreshes** [1] 48/5
**refrigerated** [3] 17/23
18/2 18/11
**refrigerator** [3] 18/3
18/4 18/14
**regard** [2] 28/23
107/25
**regarding** [4] 43/15
44/4 77/1 81/10
**regardless** [1] 42/2
**regional** [1] 27/1
**Registered** [1] 116/4
**regular** [2] 57/15
63/18
**regulated** [1] 28/21
**regulations** [1] 116/10
**regulatory** [1] 28/21
**reimbursement** [1]
21/6
**rejected** [1] 10/17
**rejoined** [1] 112/4

**relate** [1] 111/5
**related** [4] 6/13 70/10
89/12 99/7
**relating** [1] 7/22
**relative** [1] 78/25
**relator** [3] 59/20 63/9
70/24
**relator's** [1] 75/25
**relay** [1] 44/6
**relevant** [14] 7/19 7/25
9/3 10/12 17/22 18/10
21/16 22/8 24/16 34/15
61/16 84/12 88/3 89/13
**relied** [10] 29/11 31/11
41/9 42/19 43/14 43/19
44/2 44/3 44/6 57/6
**rely** [1] 29/3
**remain** [2] 3/14 37/3
**remaining** [2] 46/12
94/1
**remember** [13] 7/17
25/1 27/9 28/2 28/7
28/15 28/18 34/1 47/5
47/5 62/10 109/15
109/16
**rendered** [1] 61/7
**reorganize** [1] 41/8
**repeat** [2] 11/13 34/21
**repeatedly** [1] 96/3
**repeating** [1] 87/14
**rephrase** [1] 10/6
23/25 46/17 46/25
**replaying** [1] 48/4
**report** [17] 7/18 27/8
27/11 27/17 29/2 29/3
29/8 29/14 29/22 29/23
30/7 33/9 34/10 42/7
43/17 45/4 72/17
**reported** [1] 1/23
116/8
**reporter** [8] 1/24 11/14
11/16 71/22 116/1
116/4 116/5 116/16
**represent** [2] 74/14
108/19
**representation** [2]
86/13 91/20
**represented** [1] 79/22
**reprint** [2] 16/16 16/17
**reprinting** [2] 21/21
21/22
**reputable** [1] 79/23
**request** [3] 15/5 23/2
45/18
**requested** [1] 11/16
**requesting** [3] 15/17
15/19 60/4
**require** [4] 19/15
20/23 53/12 96/6
**required** [4] 12/3 56/9

**R**

required... **[2]** 57/17
70/6
requirement **[1]**
103/24
requires **[2]** 22/24
23/2
requiring **[1]** 111/25
researched **[1]** 108/25
residential **[1]** 82/24
resolved **[2]** 108/12
108/18
respect **[3]** 100/9
109/11 113/5
respectfully **[8]** 84/19
90/1 97/1 97/7 107/5
107/8 109/8 115/3
respond **[6]** 3/8 82/7
82/8 84/4 85/10 106/17
responding **[1]** 36/9
response **[2]** 97/13
110/4
responsibilities **[1]**
7/2
responsibility **[3]**
39/15 59/2 78/9
rest **[2]** 16/5 107/9
resubmit **[1]** 21/5
resubmitted **[2]** 10/17
20/13
resulted **[1]** 51/5
resumes **[1]** 72/7
retain **[2]** 30/6 70/10
retired **[2]** 4/20 53/11
return **[1]** 48/25
returns **[1]** 6/15
reveals **[1]** 23/22
reverse **[2]** 11/4 21/3
reversed **[2]** 10/25
11/2
reversing **[1]** 28/23
review **[10]** 44/25 51/8
62/15 62/23 63/5 68/1
68/5 68/8 69/18 70/5
reviewed **[5]** 5/9 27/17
42/3 52/16 69/6
reviewing **[8]** 24/17
24/22 40/20 41/6 41/14
41/20 55/25 68/10
Ridolfi **[12]** 57/23
63/10 71/5 71/7 71/20
72/12 72/16 73/17
73/22 74/11 75/4
113/10
Ridolfi's **[2]** 70/15
75/8
right **[119]**
rightly **[1]** 68/12
rise **[3]** 72/3 72/7
115/10

risk **[1]** 108/17
RMR **[2]** 1/23 116/16
Robert **[11]** 38/3 43/13
54/17 55/3 55/11 57/21
90/22 90/24 99/10
100/6 113/10
robot **[2]** 15/22 15/23
robotic **[1]** 12/7
robots **[1]** 12/7
Rod **[1]** 50/19
role **[8]** 40/19 55/17
56/10 56/21 56/24
73/17 78/6 78/10
roles **[2]** 55/18 57/18
Ronda **[3]** 1/23 116/4
116/16
Rosenstein **[1]** 50/20
roughly **[1]** 7/16
round **[1]** 107/19
rows **[2]** 12/13 12/13
rule **[3]** 9/24 95/16
105/2
Rule 702 **[1]** 9/24
Rule 804 **[1]** 105/2
ruled **[2]** 46/6 89/6
Rules **[1]** 9/24
ruling **[6]** 81/9 90/2
94/19 94/20 98/1
105/10
rulings **[1]** 109/3
run **[1]** 96/23
running **[1]** 95/20
Russell **[8]** 30/25
32/18 46/4 46/10 47/7
49/2 49/17 64/21
Russell's **[4]** 30/16
31/6 31/11 32/1
RX30 **[2]** 9/11 9/13
Ryan **[1]** 96/8

**S**

safe **[2]** 7/3 99/5
said **[28]** 11/20 13/19
16/25 21/17 28/17
38/17 42/22 44/17
45/10 62/5 64/14 70/25
74/21 84/17 85/22
85/24 87/11 87/12 89/8
90/15 92/3 103/7
107/13 110/13 111/7
111/25 112/4 112/12
salt **[1]** 70/17
same **[18]** 10/14 12/11
15/1 20/6 21/14 24/6
35/24 36/4 36/12 38/23
39/4 56/16 60/4 60/6
71/17 71/17 100/11
102/11
second **[23]** 8/16
13/14 13/15 13/25
40/21 46/13 47/6 49/4
Sandra **[5]** 2/7 31/1
36/25 37/9 89/23

Sandra Wilkinson **[1]**
89/23
Saturday **[1]** 96/24
save **[1]** 6/17
saved **[1]** 72/20
saw **[4]** 30/18 71/11
71/11 109/14
say **[44]** 7/14 15/20
18/4 19/17 21/14 26/1
28/1 28/17 40/9 43/25
48/3 49/4 49/5 52/11
54/24 56/12 59/1 63/7
63/9 67/16 67/20 69/4
69/8 71/4 71/21 78/24
80/12 92/25 93/8 93/9
96/13 96/14 98/20
106/5 107/5 107/11
107/18 110/21 111/1
111/2 111/24 112/5
112/17 112/24
saying **[14]** 16/23
42/21 44/16 45/4 45/12
62/11 65/9 67/16 70/23
70/24 70/25 70/25
77/21 87/12
says **[7]** 21/3 25/1
69/11 80/20 80/23
95/16 112/3
scary **[1]** 75/20
schedule **[2]** 105/15
105/19
scheduled **[2]** 105/14
107/11
scheduling **[2]** 89/21
104/14
scheme **[4]** 63/11
64/17 70/2 79/21
school **[2]** 5/16 5/17
Schuster **[1]** 40/21
scienter **[1]** 103/24
scope **[7]** 32/23 33/4
33/9 33/19 34/10 35/3
35/6
ScriptPro **[2]** 15/24
15/25
search **[27]** 32/20 34/7
39/1 58/4 58/12 58/19
58/24 60/11 62/17 63/2
63/5 63/14 64/1 64/24
68/2 68/20 69/5 69/6
69/9 76/17 77/5 77/13
82/22 90/23 91/1
112/15 112/22
searched **[2]** 81/25
83/19
seated **[4]** 3/2 3/17
37/6 72/9

75/2 83/11 83/24 84/5
85/16 85/21 87/11
87/12 88/6 101/20
102/5 102/6 102/8
108/21 109/5
section **[3]** 42/23
50/22 52/1
securities **[1]** 103/18
see **[30]** 16/19 23/13
23/14 23/16 25/20
25/23 33/20 33/22
36/15 47/18 48/5 49/21
59/8 59/22 59/23 59/25
65/22 66/9 66/11 66/19
73/4 75/5 78/20 78/25
80/16 80/21 80/23
96/19 113/20 114/15
seeing **[7]** 23/22 24/3
24/6 24/9 72/18 75/13
109/9
seem **[1]** 92/25
seemed **[1]** 52/19
seems **[1]** 32/13
seen **[4]** 21/13 27/5
66/13 66/14
seize **[3]** 68/19 68/21
68/23
select **[1]** 19/12
self **[1]** 54/7
selling **[4]** 60/1 67/9
67/9 67/11
semantical **[1]** 112/10
semester **[1]** 51/15
seminars **[1]** 51/21
sender **[1]** 74/4
sense **[8]** 41/7 42/18
66/17 66/22 67/7 67/14
83/14 115/7
sent **[1]** 55/23
sentence **[2]** 62/3
112/2
sentencing **[2]** 64/20
77/10
separate **[1]** 23/20
separately **[1]** 67/24
September **[10]** 28/3
46/1 46/3 47/2 47/5
48/1 48/10 50/10 94/21
107/11
September 1 **[1]** 46/3
September 1st **[4]**
46/1 47/2 48/1 48/10
September 2015 **[1]**
47/5
September 23rd **[1]**
94/21
September 30th **[1]**
28/3
serious **[2]** 19/17
97/11

serve **[1]** 104/19
served **[3]** 4/10 6/8
74/12
Service **[1]** 55/6
services **[1]** 61/6
session **[1]** 72/8
set **[2]** 14/6 107/6
settings **[3]** 4/17 5/2
19/9
seven **[2]** 80/13 80/14
several **[7]** 4/17 12/2
19/16 19/16 39/2 64/11
89/12
sex **[1]** 61/11
shared **[1]** 113/5
she **[43]** 39/3 39/18
40/24 40/25 41/11
42/25 47/11 48/17
49/12 52/12 52/15
52/16 52/18 52/18 56/5
56/6 56/7 56/12 56/13
70/16 70/20 71/12
72/15 72/18 73/20 74/7
74/17 78/15 91/24 92/3
92/3 104/25 106/20
108/16 108/17 108/18
108/20 108/20 108/21
108/22 109/15 109/16
109/17
she'll **[3]** 93/6 93/10
110/13
she's **[3]** 91/18 106/20
108/16
sheet **[10]** 8/6 8/9 13/8
13/9 16/8 16/9 16/17
17/15 21/7 103/21
Shenning's **[1]** 80/17
Shiff **[5]** 101/18
101/22 102/22 103/2
104/4
shipped **[1]** 5/11
shorten **[1]** 103/5
shorter **[1]** 102/21
should **[19]** 7/14 23/19
48/17 54/24 63/13 66/3
72/1 83/1 89/5 93/8
94/17 95/11 97/22
100/2 101/14 105/24
112/23 113/6 113/13
shouldn't **[2]** 52/11
104/20
show **[8]** 13/12 53/15
66/12 70/8 75/2 82/23
84/15 96/7
showing **[2]** 73/9
79/25
shown **[1]** 87/3
shows **[1]** 70/5
shut **[1]** 89/5
sic **[3]** 20/13 23/23

**S**

**sic... [1]** 100/14
**side [2]** 86/6 94/2
**sides [2]** 93/4 112/6
**sign [4]** 62/22 62/24 63/4 68/16
**signature [6]** 8/13 63/3 63/15 63/20 63/23 68/25
**signatures [1]** 63/23
**signed [2]** 14/8 88/1
**significance [2]** 46/3 75/19
**significant [2]** 102/14 103/14
**signing [1]** 63/17
**similar [9]** 27/11 60/3 77/8 93/13 93/13 96/16 104/24 105/3 106/23
**similarly [1]** 39/23
**Simple [1]** 113/8
**simply [1]** 24/3
**since [9]** 3/3 4/16 13/7 29/15 37/18 37/22 53/10 74/17 94/13
**single [7]** 8/6 8/6 16/7 19/19 66/19 66/19 112/5
**sir [11]** 3/14 3/17 4/15 29/5 36/20 37/17 38/19 40/10 48/21 53/22 113/23
**sit [3]** 9/6 29/5 101/14
**sitting [6]** 26/11 35/25 36/4 36/13 64/10 94/11
**situation [1]** 35/23
**situations [2]** 12/2 17/17
**six [3]** 6/11 26/10 109/19
**six months [2]** 26/10 109/19
**Sixty [2]** 80/13 80/14
**Sixty-seven [2]** 80/13 80/14
**slave [1]** 112/24
**slaves [1]** 112/22
**small [1]** 102/12
**smart [1]** 56/6
**so [124]**
**Society [2]** 6/7 30/19
**software [13]** 7/22 8/1 8/4 9/3 11/21 11/22 14/6 20/7 21/18 22/19 33/14 33/25 34/4
**some [44]** 7/7 9/2 9/5 12/7 14/16 14/17 14/25 18/23 19/18 30/22 30/23 40/25 41/8 42/19 49/6 49/7 52/5 52/14

54/22 59/19 59/21 63/10 63/15 63/22 66/24 69/23 73/15 74/11 74/16 75/1 97/9 101/15 102/5 103/6 103/24 103/24 104/10 106/19 107/2 107/10 109/3 109/6 112/16 113/4
**somebody [4]** 17/9 20/15 60/14 60/20
**somehow [2]** 15/16 83/13
**someone [6]** 14/5 22/2 22/20 60/22 75/22 78/1
**something [18]** 10/22 15/22 18/5 20/24 22/5 22/6 23/11 52/2 52/3 57/19 78/23 85/2 88/1 94/10 97/20 100/12 104/18 110/12
**sometime [1]** 76/8
**sometimes [7]** 4/25 7/19 12/5 12/12 12/25 13/5 59/18
**somewhat [1]** 105/3
**sorry [8]** 14/21 15/11 48/21 67/15 73/7 74/1 76/12 76/13
**sort [14]** 10/8 10/21 14/24 19/12 20/6 23/4 40/12 42/9 43/18 58/13 60/10 87/5 87/9 96/9
**sound [2]** 81/19
**soup [1]** 55/1
**source [2]** 20/21 52/16
**Southern [1]** 50/21
**speak [4]** 40/10 57/3 57/25 97/24
**speaking [1]** 32/11
**speaks [1]** 31/12
**special [23]** 23/2 38/3 38/5 38/16 38/24 38/25 39/10 39/16 39/23 40/4 40/13 40/24 40/25 43/12 43/14 43/19 43/23 44/2 44/3 44/6 44/9 44/22 45/2
**specific [9]** 22/10 23/15 23/16 45/3 45/11 53/13 55/19 104/11 108/3
**specifically [6]** 40/15 42/7 44/21 79/23 88/9 96/11
**spell [2]** 3/18 37/7
**spelled [1]** 78/17
**spelling [1]** 68/14
**Spokane [3]** 4/6 4/8 28/2

**spoken [1]** 52/15
**spreadsheet [1]** 66/12
**spreadsheets [1]** 96/7
**sprung [1]** 89/9
**squeezing [1]** 94/7
**stage [1]** 77/7
**stale [4]** 69/24 69/25 70/7 70/13
**stamped [1]** 73/12
**stand [9]** 48/14 82/8 85/15 85/18 86/3 88/12 90/17 93/10 103/10
**standard [4]** 6/24 29/24 64/22 101/25
**standards [1]** 6/22
**standing [2]** 3/14 37/3
**start [10]** 11/24 12/1 13/6 14/7 14/24 16/1 35/22 60/1 93/20 115/3
**started [4]** 5/16 5/17 56/13 101/10
**starting [1]** 15/6
**state [6]** 3/18 4/10 4/15 5/4 37/7 57/23
**stated [3]** 42/5 82/4 109/13
**statement [13]** 52/25 86/1 86/4 86/12 87/1 87/4 87/21 99/10 99/12 99/13 100/21 101/15 112/4
**statements [8]** 41/10 42/20 43/8 99/8 99/10 100/23 103/22 107/10
**STATES [5]** 1/1 1/14 80/24 116/5 116/11
**States' [1]** 104/25
**status [4]** 47/14 47/25 48/24 113/17
**statute [2]** 53/9 53/12
**statutes [1]** 53/3
**statutory [1]** 28/21
**stay [1]** 59/10
**stayed [1]** 4/20
**staying [1]** 60/8
**stealing [1]** 54/6
**stellar [1]** 84/8
**stenographically [1]** 116/8
**stenographically-repo rted [1]** 116/8
**stenotype [1]** 1/22
**stents [1]** 51/4
**step [3]** 36/20 82/9 114/7
**steps [1]** 59/5
**stick [2]** 18/5 59/21
**sticker [1]** 8/12
**stickers [2]** 8/7 21/13
**Stier [1]** 5/9

**still [15]** 6/3 20/5 26/11 34/3 36/14 59/13 60/5 70/14 77/12 91/16 93/22 98/17 103/14 114/14 114/22
**stipulated [3]** 80/23 81/1 81/16
**stopped [2]** 70/12 84/3
**store [4]** 18/2 71/2 71/5 83/17
**stored [1]** 82/23
**stores [1]** 71/3
**storing [4]** 18/6 82/18 84/9 85/2
**straightforward [1]** 76/5
**streamline [1]** 72/15
**Street [1]** 1/24
**strike [1]** 49/9
**striving [2]** 44/24 45/1
**struck [1]** 52/18
**stuck [1]** 18/6
**studies [1]** 5/22
**stuff [8]** 16/10 21/22 52/18 68/15 87/10 94/20 94/24 97/21
**subject [2]** 7/7 90/15
**submission [1]** 10/13
**submit [3]** 11/5 39/11 41/13
**submitted [4]** 10/5 11/10 32/20 40/7
**submitting [2]** 10/9 10/11
**subpoenas [1]** 60/7
**subsequently [2]** 5/21 81/22
**substance [3]** 19/23 19/24 43/7
**substantiating [1]** 65/5
**substantive [8]** 41/17 55/10 56/8 85/5 89/7 98/21 98/22 98/24
**substantively [1]** 41/19
**such [5]** 15/24 70/11 77/7 85/6 112/17
**sued [1]** 108/16
**suggest [4]** 33/16 73/19 114/23 115/3
**suggested [4]** 94/7 97/22 101/8 103/13
**suggesting [1]** 112/13
**suggestion [1]** 105/13
**suggestions [2]** 41/17 100/13
**suit [2]** 60/15 103/18
**Sullivan [5]** 39/1 39/14

**sum [2]** 23/4 40/12
**summer [2]** 4/25 107/9
**summers [1]** 5/6
**superceding [1]** 46/13
**superseding [2]** 47/6 49/4
**supervisor [1]** 80/16
**supervisory [1]** 50/15
**supply [5]** 12/16 17/4 17/14 19/10 19/14
**support [2]** 54/13 55/4 67/7 67/10
**supported [1]** 55/18
**supporting [1]** 69/4
**supportive [1]** 70/22
**supposed [2]** 62/13 67/20
**supposedly [1]** 84/8
**sure [31]** 12/23 13/19 18/13 10/18 39/4 41/18 42/24 43/5 43/16 44/1 44/16 49/8 55/23 55/24 55/25 56/5 59/5 66/1 68/22 70/19 72/23 76/20 79/15 80/7 84/19 84/23 102/17 104/21 105/5 105/14 106/25
**surgeon [1]** 61/20
**surprise [5]** 93/5 98/10 98/13 111/7 111/21
**surprised [1]** 98/8
**surprises [1]** 93/1
**surveillance [1]** 65/10
**suspect [1]** 39/23
**sustain [3]** 31/3 33/3 90/9
**sustained [4]** 34/11 34/11 35/8 90/12
**swearing [2]** 42/25 43/10
**switch [1]** 45/24
**sworn [2]** 3/16 37/5
**system [8]** 8/18 9/6 15/25 18/23 22/19 75/16
**systems [8]** 4/22 7/22 8/1 8/4 9/3 9/8 11/22 12/14

**T**

**tab [4]** 65/20 73/4 80/3 80/4
**Tab 42 [1]** 65/20
**Tab 67 [2]** 80/3 80/4
**tailor [1]** 95/19
**take [16]** 15/7 17/3 59/5 60/2 70/17 71/14

**T**

take... [10] 71/25 72/2
73/13 75/7 97/10 106/7
108/21 110/1 110/16
114/17
taken [2] 72/5 106/20
takes [1] 90/17
taking [1] 88/12
talk [11] 26/1 26/5
55/11 55/12 59/16
59/23 60/1 83/24 101/6
103/22 105/14
talked [7] 13/3 14/19
14/25 32/19 33/24
52/17 68/1
talking [5] 26/8 87/6
92/20 103/9 104/16
tam [7] 52/1 52/8
59/20 60/15 63/9 70/23
101/12
tams [1] 60/15
target [5] 58/2 58/10
58/22 59/17 60/7
targets [1] 59/8
taught [7] 4/21 7/4
51/13 51/15 51/17
51/18 51/20
teaching [1] 4/14
team [6] 56/21 57/9
57/10 64/14 69/10
69/13
teamwork [1] 41/21
technician [3] 10/15
18/13 20/19
technique [1] 60/3
techniques [2] 51/19
58/11
tell [17] 10/4 11/9
20/23 23/18 24/3 24/10
24/15 24/15 24/21
25/22 73/14 74/17
75/22 78/19 81/22
92/16 93/7
telling [10] 59/9 59/9
63/11 65/2 70/16 70/19
70/20 75/18 77/16
78/22
tells [1] 70/17
tend [1] 32/25
term [1] 113/12
terminology [2]
112/11 113/6
terms [10] 40/12 43/7
78/6 101/12 101/15
102/1 104/1 104/11
106/14 112/15
testified [22] 27/14
27/20 27/22 27/24 28/8
28/13 29/21 30/12 33/3
33/12 33/13 33/14

41/25 79/13 82/17
82/18 83/5 84/9 86/1
87/17 99/3 109/18
testify [2] 106/12
106/21
testifying [3] 9/18
64/18 64/19
testimony [37] 25/25
28/12 34/2 38/12 38/24
42/14 48/14 65/6 82/25
83/1 83/15 84/7 86/10
87/23 88/2 88/4 88/7
88/13 90/3 90/4 90/11
94/12 95/23 96/20
97/16 99/8 100/4
100/14 100/24 104/15
104/18 105/2 106/3
107/15 111/19 112/15
112/16
text [2] 71/19 72/19
textbook [1] 6/20
texted [1] 92/2
than [25] 8/15 12/3
15/6 15/9 18/21 19/15
21/3 21/12 29/20 30/4
31/13 41/20 43/3 48/4
57/1 64/25 69/20 95/11
95/14 95/17 96/13
96/15 99/3 110/19
115/3
thank [17] 4/2 10/1
14/14 35/13 36/20
36/21 37/11 37/23
81/14 82/12 90/20 91/9
91/10 91/11 97/12
110/2 114/19
that [709]
that's [84] 4/4 7/9 7/13
8/24 11/17 17/24 18/12
19/21 21/7 21/10 22/23
23/12 24/24 26/12
26/23 27/16 28/16
28/22 29/13 30/5 32/1
34/6 35/6 35/13 36/5
36/10 40/10 44/13
44/24 45/18 45/24 46/4
46/5 46/10 46/16 47/5
47/6 51/19 63/18 64/6
65/14 66/12 71/18
72/23 73/8 74/3 74/19
75/16 77/8 78/18 80/11
81/2 81/11 81/23 84/6
84/11 86/13 86/14
86/23 86/24 87/1 87/6
88/11 88/21 92/2 95/20
96/12 97/19 98/5 98/9
100/9 100/12 100/18
100/19 100/22 101/17
103/14 106/18 107/9
109/7 109/9 109/20

110/25 112/25
theft [1] 64/18
their [19] 6/10 9/6 9/8
12/24 17/3 17/9 19/23
21/12 26/8 43/17 44/25
63/18 63/23 65/6 68/23
84/12 89/4 89/12 90/6
them [44] 3/9 5/11 9/7
9/9 15/7 17/4 17/7 18/1
18/2 18/25 20/23 32/12
32/14 42/8 55/24 55/25
56/1 60/17 61/11 62/4
62/14 62/22 62/22
62/22 62/25 62/25 63/1
63/17 66/19 67/2 67/20
67/21 75/22 75/22
75/23 81/2 81/3 89/11
96/21 98/17 98/24
102/2 103/4 107/3
themselves [1] 90/6
then [43] 3/9 3/10 5/8
6/19 8/14 8/16 9/8
10/17 11/4 11/6 13/15
15/8 19/7 19/24 28/16
38/25 39/10 39/16
39/23 40/4 43/14 48/7
50/19 52/4 52/8 56/18
57/19 64/21 70/11
73/13 75/7 80/17 82/18
93/17 98/7 99/4 100/13
100/19 100/25 105/23
105/24 106/13 112/3
then-AUSA [1] 52/4
then-Special [4] 39/10
39/16 39/23 40/4
then-Special Agent
Mosley [1] 43/14
then-U.S [1] 50/19
therapy [2] 7/3 13/1
there [79] 8/8 8/11
8/11 8/12 8/19 8/20
8/23 9/8 11/23 11/24
12/2 13/5 17/10 17/12
18/16 21/9 26/11 30/4
32/4 36/6 40/21 41/7
41/16 41/18 41/21 42/5
42/7 42/18 42/24 44/9
44/12 44/14 45/5 47/24
48/22 48/24 49/6 50/13
52/6 52/7 52/23 53/1
57/14 57/24 58/7 59/12
60/18 61/13 62/23
63/16 66/3 68/23 70/14
72/24 83/16 84/15
85/21 85/23 87/14
92/24 98/10 98/12
101/15 102/7 103/5
103/10 103/11 103/23
105/15 105/24 107/10
107/25 108/2 108/25

109/2 109/5 109/8
112/16 113/18
there's [25] 6/24 7/5
19/21 44/17 58/10
68/14 68/16 70/2 70/4
72/1 83/23 83/24 85/24
86/15 87/5 87/17 92/25
95/16 97/8 104/5 105/5
105/18 107/2 109/9
111/25
these [22] 3/9 3/10
14/6 22/23 33/17 36/12
61/7 67/5 71/19 79/17
79/19 81/1 85/10 89/9
89/9 89/21 93/3 98/17
98/18 101/15 105/17
106/19
they [94] 5/11 8/6 9/7
10/11 11/4 11/4 11/6
12/4 12/12 12/12 12/18
12/24 14/10 14/13 15/4
15/20 16/16 16/24 17/3
17/14 18/13 18/24
18/24 19/1 19/5 19/9
19/12 19/25 20/1 20/20
21/11 23/10 25/1 25/1
25/2 34/5 44/24 55/23
60/22 61/5 61/21 61/24
62/5 62/5 63/15 63/15
63/16 63/17 70/3 75/17
75/21 77/18 79/18 81/6
83/7 84/7 84/12 85/14
85/23 86/2 86/3 86/24
88/25 89/3 89/7 89/16
89/20 89/24 90/5 96/3
97/9 98/8 98/20 98/20
98/22 98/25 102/2
102/13 102/13 103/2
106/23 106/25 107/3
107/3 107/18 107/19
110/23 111/23 112/4
113/5 113/11 113/12
113/13 113/13
they'll [2] 59/23 60/1
they're [20] 12/11
12/13 19/24 43/10
44/24 44/25 45/15
70/19 75/18 75/19 79/1
89/2 89/4 100/11
104/15 104/17 104/17
110/24 110/24 111/22
they've [2] 106/25
107/14
thing [18] 3/8 12/11
21/14 30/15 42/9 58/13
85/16 87/11 87/11
87/13 97/17 101/20
102/5 103/17 104/13
111/24 113/2 113/16
things [18] 29/23 30/7

41/18 42/6 62/12 66/14
68/21 74/13 86/15
87/20 92/21 95/6
101/19 104/6 106/15
109/16 109/24 112/17
think [86] 9/5 9/15
10/21 24/13 27/24
28/11 28/17 30/5 30/14
30/18 31/3 31/22 32/25
33/2 33/18 35/6 36/2
41/20 42/5 42/21 44/18
44/24 45/23 49/6 50/19
53/10 59/16 63/18
69/25 76/8 81/11 83/24
84/14 84/15 86/14
86/18 87/8 91/16 93/4
93/9 93/16 93/19 93/24
94/12 94/14 95/4 95/24
97/6 97/8 98/4 98/5
99/22 99/23 100/3
101/7 101/13 101/17
101/19 101/24 101/24
102/10 102/12 102/13
103/1 103/5 103/12
103/14 103/17 104/3
104/5 104/9 105/2
106/7 106/9 107/6
109/7 110/23 111/4
111/15 112/6 112/17
112/24 114/10 114/25
115/4 115/7
thinking [7] 57/9
60/25 99/25 101/7
101/16 105/11 110/12
third [4] 10/11 59/21
60/9 107/18
third-party [2] 10/11
60/9
this [157]
this'll [1] 80/3
Thomas [3] 1/23 116/4
116/16
those [30] 6/16 16/21
19/19 21/13 26/5 26/12
30/1 31/25 40/6 43/9
45/4 45/12 50/18 52/7
58/16 61/10 63/4 63/24
70/6 70/13 75/7 81/21
89/6 89/11 89/14 89/25
94/9 105/7 106/15
112/15
though [1] 88/22
thought [6] 16/20
20/14 44/12 52/20
95/11 100/22
thousand [5] 62/1
67/4 67/4 67/18 67/19
thousands [2] 61/13
69/8
three [10] 9/5 9/9 9/12

## T

**three... [7]** 19/20 26/11 35/25 36/3 36/13 93/1 111/15
**through [13]** 6/2 21/16 23/5 64/4 77/9 80/8 81/2 82/21 82/25 83/16 84/18 87/8 97/8
**throughout [2]** 7/4 106/24
**Thursday [1]** 114/25
**time [78]** 4/18 5/1 5/4 5/5 5/19 5/23 7/11 7/14 7/15 9/10 10/14 12/24 13/7 13/13 14/12 15/4 16/2 16/16 22/2 22/2 22/4 22/13 23/9 25/8 27/7 29/5 34/15 36/1 36/14 40/7 41/2 44/13 45/6 45/7 45/11 46/18 49/24 52/19 52/21 53/10 54/19 61/20 61/21 63/17 65/7 67/17 67/20 68/21 69/7 69/18 71/25 75/16 76/17 78/5 83/24 84/6 87/3 87/12 89/2 91/9 94/8 94/17 95/6 95/7 95/23 97/3 97/18 98/4 102/14 102/18 103/6 103/7 103/11 103/13 104/16 109/17 111/3 111/5
**times [9]** 6/11 26/11 35/25 36/13 42/6 54/25 64/12 79/14 79/16
**timing [1]** 20/7
**titles [1]** 104/11
**today [12]** 3/4 3/5 3/10 4/1 29/19 30/9 64/11 92/7 97/15 105/10 106/18 112/8
**together [4]** 30/9 34/8 52/18 55/23
**toilet [10]** 82/19 82/23 83/25 84/10 84/16 85/2 85/16 87/14 88/10 88/14
**Tokofsky [3]** 75/24 76/8 113/11
**Tokofsky's [1]** 76/18
**told [11]** 29/12 44/7 44/13 45/2 61/5 63/15 63/22 74/16 92/1 94/11 106/9
**tolerate [1]** 38/8
**tomorrow [2]** 91/17 110/8
**too [4]** 56/5 57/14 77/11 80/6
**took [4]** 19/1 28/2

**50/24 51/11**
**top [3]** 12/18 80/18 80/20
**topic [7]** 18/19 20/6 23/4 40/12 43/12 45/24 83/5
**torn [1]** 16/10
**totally [1]** 32/5
**touch [1]** 72/14
**toward [1]** 73/7
**track [4]** 22/2 22/9 24/18 93/22
**tracked [1]** 23/11
**training [1]** 51/20
**transcript [3]** 105/17 116/8 116/9
**transcription [1]** 1/22
**transcripts [2]** 29/7 93/3
**transplant [1]** 19/21
**travel [1]** 108/22
**traveled [1]** 106/21
**traveling [1]** 17/3
**treasurer [1]** 6/8
**treatment [1]** 5/11
**tree [1]** 83/20
**trial [36]** 1/3 1/9 28/12 31/24 32/18 32/18 44/13 49/3 56/14 64/13 89/2 93/1 93/2 96/5 97/3 101/10 102/6 102/14 103/15 104/19 104/20 104/23 105/7 105/13 105/16 105/20 106/13 107/16 107/10 108/7 108/8 108/10 108/21 108/22 109/2 109/23
**trials [3]** 51/2 51/6 109/6
**tried [5]** 59/1 72/15 91/3 92/16 103/18
**true [8]** 24/6 24/7 24/8 25/4 42/16 43/1 111/10 116/7
**truly [1]** 7/3
**trusted [4]** 39/13 40/13 40/15 43/8
**truth [10]** 41/9 42/16 42/20 59/9 59/9 70/16 70/19 70/21 75/18 86/5
**truthful [5]** 38/17 38/19 38/21 40/8 42/14
**try [8]** 10/21 48/6 59/15 59/21 59/25 68/10 83/10 109/2
**trying [4]** 31/14 61/22 62/8 90/6
**turn [6]** 7/21 14/18 40/19 65/14 65/20 75/3

**turns [1]** 22/22
**twice [1]** 108/23
**two [30]** 6/10 7/8 8/9 8/21 8/23 13/9 13/14 13/16 13/20 16/8 18/25 19/19 20/2 26/5 26/10 35/25 36/3 36/13 52/6 53/25 63/8 64/4 71/22 87/20 91/22 92/6 92/7 93/17 93/25 114/2
**two days [2]** 92/7 93/17
**two decades [1]** 114/2
**two hours [1]** 71/22
**two-day [1]** 91/22
**Tylenol [5]** 67/3 67/4 67/6 67/11 67/12
**type [5]** 44/19 57/5 60/21 70/6 70/9
**types [7]** 6/5 11/21 13/4 54/25 58/11 58/20 106/15
**typical [2]** 19/14 22/15
**typically [9]** 8/5 8/12 8/23 13/11 16/10 18/5 19/8 19/8 23/6
**typos [1]** 41/20

## U

**U.S [12]** 30/23 36/25 40/24 40/25 41/12 41/22 50/9 50/15 50/19 55/22 60/13 60/15
**U.S.C [1]** 116/7
**ubiquitous [2]** 21/22 22/1
**ultimately [2]** 63/20 64/2
**unavailable [3]** 86/4 105/3 107/16
**uncommon [2]** 16/21 20/18
**undelivered [1]** 28/24
**under [6]** 9/24 27/2 29/23 79/1 107/15 108/16
**undercover [1]** 65/10
**underlying [1]** 30/15
**understand [16]** 3/4 10/6 31/14 41/19 43/5 46/21 62/10 77/1 83/11 96/18 98/19 99/18 100/6 105/12 106/17 113/12
**understanding [7]** 23/5 24/20 32/10 38/15 44/21 91/18 114/6
**understands [1]** 110/24
**understood [9]** 13/19

**36/5 36/6 42/24 44/9 57/7 57/8 62/20 72/19**
**unfair [1]** 109/12
**unfortunately [2]** 20/4 89/11
**uniformed [1]** 7/5
**uniformly [1]** 7/4
**UNITED [6]** 1/1 1/14 80/24 104/25 116/5 116/11
**University [7]** 4/10 4/19 4/24 4/25 5/4 51/16 51/17
**unleash [1]** 113/18
**unless [2]** 25/23 109/8
**unlikely [1]** 109/8
**unmarked [3]** 71/18 72/23 73/4
**unnecessary [1]** 51/3
**until [10]** 4/10 4/16 4/20 5/8 18/7 44/12 64/20 91/18 96/24 115/9
**unusual [3]** 36/12 75/12 75/20
**up [38]** 3/9 4/16 5/8 5/16 8/25 10/8 13/15 18/2 18/7 23/4 25/21 35/4 36/14 40/12 43/18 50/22 52/24 63/4 64/1 65/17 66/16 66/19 84/6 87/7 87/12 87/24 91/19 94/7 97/3 97/10 101/11 103/21 104/9 109/1 112/23 113/16 114/17 115/5
**updated [1]** 73/1
**us [28]** 30/8 34/8 53/2 53/12 56/3 57/16 57/17 59/9 59/9 59/16 59/21 59/23 60/1 63/11 63/15 63/22 65/2 70/16 73/14 76/5 77/16 89/10 90/1 93/17 100/11 100/15 105/3 110/25
**USCIS [1]** 113/25
**use [11]** 13/13 15/7 20/24 22/9 58/11 64/13 77/10 87/3 99/14 103/22 113/6
**used [14]** 8/1 8/3 9/3 13/6 15/5 15/23 16/24 22/24 24/18 34/5 63/17 68/24 86/4 113/12
**user [1]** 95/5
**users [1]** 22/25
**USFRAUD5232301 [1]** 73/12
**using [1]** 8/16 20/24 77/6 87/1

## V

**vacate [1]** 32/1
**vacated [4]** 30/22 31/7 31/7 31/20
**vacating [1]** 30/17
**vacation [3]** 88/24 88/24 91/12
**vacations [3]** 89/1 89/22 89/25
**Vaidya [11]** 82/16 82/16 82/25 83/3 83/4 83/13 84/7 84/9 85/12 87/6 111/19
**Vaidya's [2]** 88/7 90/3
**value [1]** 64/25
**variety [1]** 52/17
**various [11]** 8/8 8/22 13/2 48/24 48/25 51/21 52/25 53/3 57/4 57/18 58/20
**verdict [1]** 106/2
**version [1]** 11/5
**very [35]** 10/12 11/24 12/1 13/6 14/7 14/24 15/4 18/24 19/13 33/21 35/17 36/13 43/4 45/21 52/19 53/2 56/4 56/6 57/7 60/3 61/21 62/9 64/16 77/3 79/23 82/16 89/18 93/13 95/8 97/5 102/4 103/13 104/3 112/2 115/8
**vestibule [2]** 82/11 82/12
**video [4]** 42/12 47/17 47/21 105/18
**videotaped [1]** 42/10
**view [2]** 78/10 96/22
**vigorously [1]** 32/13
**VIJAY [4]** 1/3 1/17 3/12 36/24
**Vinny [1]** 92/21
**violated [1]** 49/7
**violation [1]** 88/10
**violations [1]** 48/23
**violent [1]** 50/12
**Vipin [17]** 54/1 64/6 64/18 78/2 78/19 79/9 81/6 81/7 83/8 83/15 86/1 86/10 86/24 87/2 90/3 99/2 111/17
**Vipin's [1]** 87/20
**Vipinkumar [1]** 80/24
**virtually [3]** 8/3 8/18 102/11
**virtue [1]** 92/20
**visa [1]** 49/16
**visited [1]** 114/20
**voluntarily [1]** 49/3
**vs [1]** 1/5

# W

**W-i-l-k-i-n-s-o-n [1]** 37/10

**waited [1]** 109/2

**waiting [2]** 107/7 114/14

**waive [1]** 95/16

**want [35]** 7/21 11/19 13/18 14/15 14/18 15/20 17/6 17/9 17/16 20/5 20/6 33/6 40/19 68/21 68/22 68/24 68/25 70/19 71/4 71/12 75/22 85/18 90/17 92/1 94/19 95/18 98/14 101/22 107/18 108/7 108/20 108/23 110/7 110/16 113/2

**wanted [5]** 17/3 41/18 61/24 99/11 100/21

**wants [1]** 34/19

**warrant [21]** 32/20 34/7 39/1 58/12 58/19 60/11 62/17 63/2 63/5 63/14 64/2 64/24 68/2 68/20 69/6 69/9 76/18 77/5 77/13 90/23 91/2

**warrants [2]** 58/4 58/24

**was [277]**

**Washington [8]** 4/6 4/8 4/9 4/16 4/19 4/24 5/3 6/20

**wasn't [14]** 9/17 16/21 23/11 26/18 38/20 47/16 55/7 61/9 74/17 87/24 87/25 92/10 95/2 109/19

**way [24]** 5/14 15/13 23/7 24/19 25/2 26/16 26/17 32/22 34/9 34/19 41/11 41/12 55/14 60/18 61/22 62/12 62/20 77/10 78/19 102/14 103/14 104/5 105/20 111/6

**Wayne [1]** 92/15

**ways [5]** 5/15 26/5 52/15 52/25 60/9

**we [227]**

**we'll [12]** 3/10 94/13 95/18 95/19 95/23 96/16 96/17 104/4 110/5 110/14 113/9 115/8

**we're [36]** 7/7 15/11 20/5 33/2 33/17 33/20 33/21 41/15 42/10 53/16 57/2 58/2 58/9 58/21 58/22 59/2 59/5

**59/6 59/6 60/20 60/21 62/25 63/12 64/15 71/21 74/13 81/11 87/19 88/13 89/8 93/22 95/20 98/17 100/13 101/6 110/22**

**we've [13]** 3/3 14/23 21/13 43/19 74/1 92/6 98/16 102/7 104/14 104/18 108/13 114/21 115/1

**Wednesday [13]** 91/18 92/4 93/6 93/14 93/21 94/16 110/8 110/8 110/10 110/11 110/13 115/8 115/9

**week [8]** 3/3 12/15 12/17 12/18 32/13 91/12 93/2 107/24

**week's [1]** 19/9

**weekends [1]** 4/25

**weight [2]** 83/1 88/11

**well [80]** 4/9 5/16 6/8 7/16 8/3 9/5 9/24 11/2 13/7 14/18 15/4 15/25 17/24 18/12 18/18 18/23 20/5 21/25 22/16 23/19 29/16 31/6 31/17 32/7 32/15 34/13 34/18 37/22 37/23 40/10 41/11 43/18 44/21 45/21 47/11 49/2 49/12 52/11 54/25 58/16 58/25 60/12 63/19 64/16 66/12 66/16 68/13 69/25 70/22 74/6 74/23 80/6 81/7 81/22 83/7 84/24 85/13 91/23 92/19 94/6 95/8 95/22 96/1 97/4 97/10 97/16 97/23 98/5 99/16 99/22 100/15 100/20 100/25 103/2 103/7 103/9 106/4 107/13 111/12 114/1

**went [4]** 18/13 48/12 56/22 79/6

**were [109]** 5/10 5/11 6/17 8/1 8/5 8/6 9/3 9/9 9/10 9/13 11/6 12/4 12/12 12/18 14/13 15/4 16/17 16/24 19/2 19/3 19/4 25/22 26/12 27/8 29/22 31/24 35/22 35/24 35/25 36/4 36/6 36/8 36/9 37/24 38/23 42/5 42/24 44/10 44/13 44/14 44/16 45/5 45/5 45/25 46/8 47/1 48/22 50/11 51/9 52/8 52/21**

**55/25 57/4 57/18 58/4 60/5 60/7 60/22 60/25 61/1 61/5 61/6 61/7 61/10 61/13 61/14 61/22 61/24 62/5 62/6 62/13 62/13 63/4 63/11 65/2 65/8 67/1 68/24 69/18 69/19 70/4 70/23 70/24 70/25 72/20 74/24 79/17 79/18 85/23 89/6 89/7 89/20 91/20 92/17 92/17 93/4 94/7 95/4 98/8 98/20 98/22 98/25 100/23 103/7 103/23 104/1 104/12 111/16 113/4**

**weren't [7]** 61/5 63/16 63/17 63/18 70/20 98/20 103/3

**what [164]**

**what's [16]** 12/25 14/9 23/18 24/11 33/10 73/9 73/14 75/14 75/22 77/20 79/25 83/9 84/16 89/24 113/5 114/12

**whatever [5]** 68/19 70/17 77/8 95/18 105/23

**when [45]** 4/11 8/13 12/7 12/12 12/24 15/20 20/12 22/2 22/19 23/7 31/23 32/8 36/8 40/9 41/13 42/7 47/6 49/4 49/5 50/9 50/18 52/1 52/11 56/12 56/13 56/15 58/2 60/12 63/13 67/5 68/11 70/1 74/21 83/8 85/14 85/17 86/2 90/16 91/24 95/19 96/19 98/8 99/15 99/23 115/1

**whenever [1]** 105/15

**where [27]** 4/5 4/10 5/9 12/5 17/17 20/2 28/12 32/4 33/20 33/25 35/23 36/12 51/20 58/22 59/25 74/24 75/21 75/21 77/19 80/9 80/23 81/21 96/9 98/6 101/11 103/18 112/25

**Whereupon [1]** 72/5

**whether [37]** 10/4 10/13 11/10 12/11 22/20 23/7 23/22 23/24 24/3 24/11 24/14 24/16 24/21 25/2 26/17 33/21 39/4 41/7 41/16 42/18 44/16 47/24 52/7 60/11 66/18 66/25 69/2 70/20 88/9 88/10 92/18 95/20**

**98/2 99/7 99/21 101/25 108/25**

**which [25]** 6/10 9/18 14/10 15/1 19/14 27/25 29/14 29/22 31/11 46/10 54/20 55/16 66/24 71/2 71/17 77/6 77/10 82/23 84/22 87/21 87/22 87/22 88/4 88/6 89/12

**while [10]** 45/15 50/11 59/13 60/5 60/7 79/1 89/4 101/6 114/14 114/18

**white [4]** 55/1 58/9 74/14 74/16

**white-collar [2]** 55/1 58/9

**who [32]** 14/5 14/8 14/12 19/22 19/23 21/20 30/1 45/5 55/7 56/5 57/22 57/23 59/20 59/22 59/22 60/22 63/11 68/11 71/8 75/16 78/13 79/23 80/17 84/12 91/16 98/25 102/19 103/25 104/11 106/12 114/6 115/5

**who's [4]** 59/8 59/9 93/10 100/8

**whoever [1]** 18/16

**whole [4]** 45/23 49/18 96/5 111/21

**wholesaler [1]** 21/2

**wholesalers [1]** 9/6

**whom [2]** 42/25 104/11

**whose [1]** 57/20

**why [25]** 14/17 46/21 47/17 57/13 58/16 61/4 62/19 63/7 64/8 64/15 66/22 69/1 70/20 71/10 71/12 75/11 75/16 76/2 77/15 78/4 79/4 83/23 84/6 96/8 113/18

**widespread [1]** 74/25

**wife [4]** 78/14 88/21 114/13 114/16

**Wilkinson [41]** 2/7 3/4 31/2 37/1 37/9 37/16 37/24 38/7 39/6 40/2 40/12 41/24 42/14 43/14 44/17 45/23 47/1 47/10 47/23 49/15 50/7 54/17 55/16 58/1 62/15 65/14 65/22 66/17 67/15 72/12 74/4 76/15 78/1 81/16 82/13 88/2 88/24 89/23 90/22 91/9 109/15

**Wilkinson's [1]** 93/13

**will [27]** 8/8 31/3 59/16 62/3 68/15 73/6 80/15 88/12 88/14 91/24 92/15 93/7 93/11 95/7 95/24 97/13 97/14 100/8 102/6 102/7 102/22 102/22 102/24 103/5 103/13 103/15 104/6

**William [3]** 2/4 3/13 3/20

**willing [2]** 78/7 104/4

**without [11]** 14/11 17/13 17/13 24/17 24/21 54/15 61/8 77/12 81/8 83/9 109/24

**witness [56]** 3/11 3/16 33/17 34/18 36/22 36/23 37/2 37/5 70/17 73/19 74/2 75/13 75/13 76/8 78/25 81/7 81/8 82/8 82/14 82/16 82/21 84/12 84/25 85/4 85/7 85/12 85/13 85/19 87/2 89/8 89/22 90/13 90/14 91/13 91/14 91/15 91/21 92/10 92/12 92/15 92/17 92/18 96/3 96/21 98/17 99/1 102/20 102/20 103/3 105/3 107/2 107/16 111/8 111/22 111/23 112/5

**witnesses [37]** 2/3 3/9 42/9 52/15 70/24 77/16 88/23 89/1 89/6 89/7 89/9 89/10 89/11 89/21 90/1 94/1 94/2 98/19 98/21 98/22 98/24 102/8 102/11 102/12 102/18 104/14 104/23 105/7 105/14 105/15 105/17 105/20 106/14 107/14 110/11 111/16 111/23

**witnesses' [3]** 89/15 109/14 109/25

**won't [1]** 59/16

**wondering [1]** 84/20

**word [5]** 43/4 59/22 61/11 112/15 112/22

**words [7]** 45/4 45/12 67/23 77/6 77/8 87/25 93/23

**work [9]** 4/14 6/5 6/6 44/19 52/20 54/22 97/5 104/4 108/21

**worked [5]** 5/14 17/2 26/21 56/5 71/5

**W**

**working [7]** 40/22
41/2 56/16 57/5 73/19
74/23 75/21
**works [1]** 41/13
**world [2]** 62/2 75/20
**worth [4]** 29/17 74/6
90/10 111/15
**would [204]**
**wouldn't [7]** 10/18
38/11 39/10 60/6 88/25
89/3 108/7
**wrap [1]** 35/4
**write [2]** 27/8 99/4
**writing [3]** 29/2 29/3
92/20
**written [3]** 6/19 98/16
105/17
**wrong [2]** 43/4 53/12
**wrongdoing [1]** 57/3
**wrongful [1]** 83/21
**wrongfully [2]** 114/16
114/16
**wrote [4]** 6/16 27/11
54/4 87/24

**Y**

**y'all [1]** 106/9
**yeah [10]** 21/20 45/20
47/13 60/6 65/7 92/7
97/25 102/16 112/20
115/5
**year [6]** 6/11 29/15
37/18 37/22 53/11
109/22
**years [14]** 5/13 5/18
6/9 6/19 6/22 49/16
50/14 51/19 54/22
89/18 103/16 107/7
108/16 114/13
**yelling [1]** 112/16
**yes [95]** 4/15 9/14
10/7 13/23 14/1 15/20
17/24 18/18 19/21 20/4
20/10 22/17 27/4 27/13
27/23 27/24 28/16
30/18 31/22 32/9 33/1
34/3 35/17 36/2 36/7
36/17 37/20 37/23
38/19 39/15 39/21
39/22 40/7 40/14 40/18
41/5 41/15 42/15 42/21
43/22 44/5 44/8 44/15
46/9 46/15 46/22 46/24
47/20 48/1 48/13 48/15
55/13 58/14 63/22
63/25 64/7 65/4 65/11
65/13 66/3 66/6 66/8
68/4 68/7 69/14 71/15
71/15 72/21 73/4 74/3

75/6 77/14 79/22 80/2
80/25 81/12 81/18
81/20 82/2 82/12 86/22
88/19 90/18 92/5 93/16
93/19 95/2 101/5
103/10 106/10 107/17
107/19 107/20 110/14
113/23
**yesterday [3]** 91/19
97/14 98/12
**you [424]**
**you'd [3]** 18/3 79/7
80/8
**you'll [2]** 65/14 75/3
**you're [22]** 31/23
36/20 42/23 43/2 45/6
45/7 67/3 67/6 67/8
67/9 67/17 67/19 67/20
68/22 69/4 69/4 91/10
94/8 94/9 96/11 112/5
114/18
**you've [15]** 6/5 14/16
14/19 14/25 16/18
27/20 30/12 41/24 55/8
56/2 68/23 80/4 92/22
94/15 115/4
**your [198]**

**Z**

**zero [1]** 67/7
**Zoom [1]** 96/19