**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| Reddy Vijay Annappareddy, | C/A No. 1:18-cv-03012-JFA |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND** |
| | **CONCLUSIONS OF LAW** |
| Maura Lating, *et al.*, | |
| Defendants. | |

This matter is currently before the court on the recently concluded bench trial of the claims against the United States (the "Government") remaining in this action. The parties presented evidence from May 31, 2023, through June 16, 2023. After receiving the testimony, carefully considering all of the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted. For the reasons explained below, the court finds the Government not liable for Plaintiff's claims of malicious prosecution.

## I.    PROCEDURAL HISTORY

Prior to delving into the testimony and exhibits presented during this bench trial, a brief recitation of the complex procedural history is necessary to fully understand the issues remaining in this action.

Plaintiff Annappareddy was the owner of a chain of pharmacies known as Pharmacare in Maryland and nearby states when he was prosecuted for Medicaid fraud. Allegations against Plaintiff centered on a scheme wherein Pharmacare was billing Medicaid for automatically refilled prescriptions and then not reversing the claims when the prescriptions were not picked up or delivered to patients A district court ultimately dismissed the criminal charges against him, finding that the Government had used flawed analyses of the pharmacies' inventory and billing practices to convict Annappareddy at trial, and then destroyed relevant evidence while a motion for a new trial was pending.

After the criminal case against him was dismissed, Annappareddy filed a wide-ranging civil complaint in this court, seeking compensatory and punitive damages from multiple defendants. According to Annappareddy, state and federal investigators and prosecutors, working together, violated his rights under the federal Constitution and Maryland law by fabricating evidence against him and then destroying exculpatory evidence when it seemed their malfeasance might come to light. Within the claims remaining in this action, Annappareddy seeks relief against an individual state officer, Pam Arnold, under §1983 and Maryland state law, and against the United States under the Federal Tort Claims Act ("FTCA").

Plaintiff filed his original complaint on October 1, 2018. (ECF No. 1). After various extensions, the named defendants were ordered to respond by April 22, 2019.[1] (ECF No.

---

[1] After entry of this order directing the defendants to answer or otherwise respond, all judges within the District of Maryland were recused from this matter. The Chief Judge of the Fourth Circuit Court of Appeals then asked the undersigned to accept appointment to this case. This court agreed to do so, and this matter was then reassigned to the undersigned on February 19, 2019.

34). Prior to that deadline however, Plaintiff amended his complaint to add claims under the FTCA and add the United States as a defendant. After multiple motions to dismiss were filed, the court dismissed five of the eight original defendants in full and several other claims against the remaining defendants. (ECF No. 106).

The parties then pursued an interlocutory appeal, challenging several rulings within that order. The Fourth Circuit affirmed this court's rulings with the exception that Defendant Catherine Pascale was granted prosecutorial immunity that had previously been denied by this court. (ECF No. 171). Thus, only two defendants, Pam Arnold and the Government, remained once the matter was remanded back to this court.

After discovery concluded, all parties moved for summary judgment. Thereafter, the court issued orders granting summary judgment on several of the claims against the two remaining defendants. (ECF Nos. 282 & 284). However, several claims remained against Arnold and the Government.

The court then bifurcated the action against the two defendants given that the claims against the Government were to be tried non-jury[2] and those against Arnold were subject to a jury trial. (ECF No. 295). The court then proceeded with the instant bench trial. Prior to trial, the court issued time limitations on the presentation of evidence. (ECF No. 296). Each side was granted 30 hours in which to present evidence. During trial, Plaintiff was

---

[2] Pursuant to the FTCA, claims against the Government are to "be tried by the court without a jury." 28 U.S.C.A. § 2402. Section 1983 claims are tried to a jury. This court unsuccessfully attempted to consolidate the two cases by asking if Arnold would consent to a bench trial, or alternatively, if the Government would agree to an advisory jury trial. Upon receiving negative responses on both counts, this court scheduled the case against the Government to be tried first.

granted an additional five hours for rebuttal testimony. However, Plaintiff presented his entire case within his original 30-hour allotment and did not need any of the additional five hours.[3] The Government utilized 12 hours and 23 minutes.

The court would also note that logistical issues arose on the first day of trial and continued throughout its duration. Two witnesses–prosecutors from Annappareddy's criminal trial–were unavailable for the first two weeks of trial. Given Plaintiff's strong desire to have Annappareddy testify last, the parties agreed to call witnesses out of normal order. The court offered to receive evidence and testimony readily available and then break until the prosecutors could return to allow the trial to proceed in its normal course. However, Plaintiff declined this invitation and agreed that witnesses, including those used for rebuttal[4] and the Government's case-in-chief, could be called out of order so long as

---

[3] The court calculates that Plaintiff used 29 hours and 55 minutes of time to present his case. Plaintiff was granted an additional five hours for rebuttal which became unnecessary as Plaintiff presented his full case within the original 30 hours allotted. Additionally, the court gave Plaintiff a thirty-minute credit for time used eliciting testimony which was later determined inadmissible. Again, this additional time went unused by Plaintiff. Moreover, Plaintiff expended a considerable amount of time offering testimony that had no relevance to those issues remaining in this case. For instance, Plaintiff spent much time recounting his childhood in India and describing his extended family in great detail. Such tangents in no way aided the court, as the fact finder, in determining the ultimate issues.

[4] Several of the witnesses Plaintiff presented as rebuttal witnesses were produced with less than 24 hours' notice to the Government. Additionally, Plaintiff discussed the possibility of calling a "mystery" witness over the course of several days while refusing to identify him. Once Plaintiff was ordered to reveal the witness's identity, Plaintiff later declined to call him. Based on Plaintiff's representation that each of these witnesses were called for rebuttal purposes, the court allowed their testimony despite late notice.

Annappareddy was allowed to testify last.[5] Thus, the court received testimony from 19 witnesses over the three-week trial.

Plaintiff presented this evidence in an effort to support the two remaining claims of malicious prosecution asserted pursuant to the FTCA. Specifically, the Plaintiff's Amended Complaint contains the following FTCA claims against the Government:

- Claim 21–Malicious Prosecution by Instituting the Search Warrants that Destroyed Pharmacare (Based on the Wrongful Acts and Omissions of Defendants Lating and Mosley);

- Claim 22–Malicious Prosecution by Instituting the Original Criminal Proceedings and Criminal Processes (Based on the Wrongful Acts and Omissions of Defendants Lating and Mosley).

(ECF No. 46, p. 100–106).

## II.   FINDINGS OF FACT

Over the course of three weeks, the court heard testimony from 19 witnesses and reviewed scores of exhibits.[6] The court will first outline the relevant timeline of events to provide a general overview of the facts found. Thereafter, the court will address each witness presented to provide greater insight into credibility determinations and specific

---

[5] The court received verbal confirmation from Annappareddy himself that he agreed to proceeding in this fashion.

[6] Despite this case nearing five years in litigation, Plaintiff introduced new exhibits after the court-ordered deadline and throughout trial. Although many of these exhibits were wholly irrelevant, such as photos of the Plaintiff's grandparents and multiple photos of the Plaintiff in childhood, the court declined to exclude any exhibit on timeliness grounds.

facts associated with each witness. The relevant evidence extracted from each witness and exhibit is outlined below.[7] The court finds the relevant facts as follows:

A. The Pharmacare Investigation

Around 2006, Plaintiff, a pharmacist born in India, founded a pharmacy company in Maryland known as Pharmacare which expanded into a chain of nine pharmacy locations in several states. In mid-2012, the State of Maryland's Medicaid Fraud Control Unit ("MFCU") began investigating Pharmacare after a former employee accused Plaintiff of billing for prescriptions that were refilled, but never picked up or delivered to patients.

The investigation began when the chief investigator of MFCU, Peggy Gayhardt, received a telephone call from Dennis Tokofsky, the former Chief Operating Officer for Pharmacare. Tokofsky alleged that Pharmacare was billing Medicaid for prescriptions and then not reversing the claims when the prescriptions were not picked up or delivered to patients. Pharmacare's business model included practices wherein prescriptions were automatically refilled and delivered free of charge. During the relevant period, automatic refills and deliveries were not in themselves illegal. However, the allegations were that Pharmacare was routinely billing for prescriptions which were automatically refilled and then not reversing those billings when delivery drivers could not effectuate deliveries or patients failed to pick them up. Those undelivered and unreversed medications were then

---

[7] In addition to comparing trial testimony with competing attestations and written evidence, the court was able to make credibility determinations by observing each witness's tone and demeanor through direct and cross-examination.

either returned to stock to be dispensed again or left to pile up in bins around the pharmacy until they were disposed of.

In June 2012, Tokofsky filed a *qui tam* action in the United Stated District Court for the District of Maryland. Around that time, MFCU investigator Laurie Gutberlet began investigating Tokofsky's claims by conducting background research of Pharmacare and identifying individuals to interview. She conducted the initial in-person interview with Tokofsky on June 18, 2012–just before Tokofsky filed the *qui tam* action.[8]

By August 2012, MFCU was coordinating efforts investigating Pharmacare with the U.S. Attorney's Office in Maryland. During the late summer and fall of 2012, Gutberlet continued her interviews of former and current Pharmacare employees. She also completed her preliminary background investigation on Pharmacare and key personnel and performed an analysis of paid claims. Investigative efforts continued through the end of 2012 which included additional interviews and planning for undercover and surveillance operations. Investigative agents also performed mail covers and trash pulls of certain Pharmacare locations.[9]

In January 2013, the Criminal Division of the U.S. Attorney's office and its federal investigators joined the case. Specifically, Assistant U.S. Attorney Sandra Wilkinson, Defense Criminal Investigative Service Special Agent James Ryan, and FBI Special Agent

---

[8] The *qui tam* complaint was signed on June 19, 2012, but was electronically filed with the court on June 22, 2012.

[9] "Mail covers" is an investigative technique that consists of reviewing the mail sent via the United States Postal Service to one or more specific addresses prior to its delivery. "Trash pulls" were simply the retrieval of subject trash bags from large commercial dumpsters.

Maura Lating joined the investigation. Assistant Attorney General Catherine Pascale, who had been investigating the case for the State of Maryland, was eventually appointed as a Special Assistant U.S. Attorney ("SAUSA"). Department of Health and Human Services Special Agent Robert Mosley and Civil AUSA Michael DiPietro had already been a part of the investigation as a result of Tokofsky's *qui tam* complaint.

Wilkinson led the prosecutorial team and Lating was designated to draft an affidavit to be used in support of the search and seizure warrants for Pharmacare (the "Lating Affidavit"). After Gutberlet resigned from the MFCU and left the team, Lating became the leader of the non-attorney team members. Lating prepared the Affidavit based, in part, on numerous witness interviews, including accounts from Pharmacare employees and patients. Much of the information utilized by Lating in preparing the Affidavit was procured by Gutberlet prior to Lating's involvement with the investigation.

Additionally, the Lating Affidavit included prescription "shortage" and "loss" calculations gleaned from an "in-and-out analysis"[10] known as "MEDIC 1495." The entity known as MEDIC was the Government's contractor used in analyzing Pharmacare's prescription billing records. Agent Mosley was responsible for providing data to MEDIC for use in its analysis. Throughout the investigation, members of the investigative team and prosecutors met regularly to discuss information learned and plan further investigative steps. Additionally, Lating circulated drafts of the Affidavit for review by the prosecutors

---

[10] This type of analysis compares the number of units (i.e., pills, capsules, tablets, etc.) of certain medications submitted for reimbursement with the number of units acquired from wholesalers.

as well as the non-attorney members of the investigative team. The prosecutors and investigative team members provided comments about the form and substance of the Affidavit which Lating used to make revisions.

On July 23, 2013, the Lating Affidavit was presented to a federal Magistrate Judge in Baltimore who issued search and seizure warrants for multiple Pharmacare facilities. Concurrently, the grand jury returned an indictment against Annappareddy. Information within the Lating Affidavit served as the basis for much for the evidence presented to the grand jury.[11] The search and seizures occurred on July 25, 2013. As a result, much, if not all, of Pharmacare's computers and medication stock were seized by the Government. Unable to operate, Pharmacare closed shortly thereafter.

Preparation for the criminal trial against Annappareddy, including additional investigative efforts, continued through 2013. However, all claims based upon actions occurring after the presentation of the Lating Affidavit to the Magistrate Judge and grand jury indictment were dismissed prior to this bench trial. (ECF No. 284). Accordingly, those actions occurring after July 23, 2013, were deemed irrelevant for purposes of determining liability as to the claims remaining in this action. Nevertheless, both parties presented evidence of information learned and actions taken after this date for a variety of other purposes including to prove damages and to impeach testifying witnesses.

Annappareddy was ultimately convicted of criminal health care fraud and identity theft. However, on September 1, 2016, the Honorable George L. Russell III dismissed the

---

[11] Mosley testified before the grand jury using the Lating Affidavit as an outline for his testimony.

convictions against Annappareddy with prejudice for a variety of reasons. In making this ruling, Judge Russell did not consider any issues related to the Lating Affidavit.

B. Plaintiff's Claims

As stated above, Plaintiff's remaining claims for malicious prosecution focus on those actions taken by Agents Mosley and Lating prior to July 23, 2013. Therefore, much of Plaintiff's evidence at trial centered on what Mosley and Lating knew, or should have known, prior to the indictment, and the information they relayed, or should have relayed, to investigative team members and prosecutors during that time.

The crux of Plaintiff's claims is that probable cause did not exist to arrest Annappareddy or search his pharmacies once exculpatory information is accounted for and erroneous inculpatory information is excised from the Lating Affidavit. The specific areas of information within the Lating Affidavit that Plaintiff contends are problematic include: (1) information provided by former Pharmacare employees Dennis Tokofsky and Lisa Ridolfi; (2) inclusion of a 14-day requirement for prescription reversals; (3) errors in the MEDIC 1495 analysis; and (4) the choice to disregard exculpatory information such as delivery logs, audio recordings, and the like. Each of these areas of concern is addressed in turn.

1. Tokofsky and Ridolfi

The Lating Affidavit includes accounts from individuals identified as "CS #1" and "CS #2".[12] It is undisputed that CS #1 is former Pharmacare chief operating officer Dennis

---

[12] "CS" was the abbreviation used for confidential source.

Tokofsky, and CS #2 is Pharmacare pharmacist, Lisa Ridolfi. Ridolfi was actively employed at the "Plumtree" Pharmacare location throughout the investigation. Tokofsky and Ridolfi individually met with agents, including Gutberlet, on numerous occasions to report, among other things, a scheme involving billing for medications which were often filled via automatic refills and then not reversing the billing for prescriptions that went undelivered to patients. Many of these medications were reportedly billed to Medicare or Medicaid. Both Tokofsky and Ridolfi reported that certain Pharmacare employees, specifically those from India,[13] were mainly responsible for processing the refills, billing, and reversals. In trial, Plaintiff emphasized the fact that Ridolfi and Tokofsky, who are both Caucasian, labeled this group of employees as "middle eastern," which is an incorrect term to describe individuals originating from India. This emphasis was part of Plaintiff's effort to paint Tokofsky and Ridolfi as biased employees acting with racial animus towards Annappareddy.

Along with racial animus, Plaintiff elicited other evidence of potential biases of Tokofsky and Ridolfi. For instance, Ridolfi and Tokofsky had received performance warnings about their job performance while at Pharmacare.[14] Both also had financial

---

[13] It is undisputed that Annappareddy acted as a sponsor to numerous employees from India for purposes of their H1B visas. He also provided several of these employees with housing and transportation. Tokofsky described these employees as "enslaved" or indentured servants beholden to Annappareddy. Annappareddy described the relationship as one of pure benevolence. Regardless of Annappareddy's actual intent, investigators could reasonably believe he retained some amount of leverage over several Indian employees by way of housing, transportation, employment, and visa sponsorship.

[14] Although Plaintiff argued that Ridolfi received written performance warnings in February 2012 and August 2012 that she failed to inform investigators of, the evidence is not so clear. At least in relation to the August warning, the email containing the warning indicated that Pharmacare

motives such as a desire to become a *qui tam* whistle blower. Tokofsky did file a *qui tam* suit and this fact was acknowledged in the Lating Affidavit. Ridolfi expressed a desire to become a *qui tam* whistle blower in a letter written to a federal Magistrate Judge. Ridolfi was a mother of two children going through a divorce at the time she was employed at Pharmacare and money was tight.

Plaintiff made other efforts to weaken Tokofsky and Ridolfi's credibility throughout trial. For instance, Plaintiff argued that Tokofsky told the unemployment office he was fired from Pharmacare, but told investigators he quit. Tokofsky also told investigators during his first interview that he could not recall specifics when describing aged prescriptions he had discovered in the pharmacy. This seemingly contradicted the allegations in his *qui tam* complaint, dated one day later, wherein he identified multiple aged prescriptions by date and prescription number.

Agents, including Mosley and Lating, were admittedly aware of some of these alleged biases and inconsistencies. Specifically, agents knew Tokofsky was a *qui tam* relator and that Ridolfi was going through a divorce. Agents arguably were also aware of the inconsistencies in Tokofsky's recollection of specific prescription information and that Ridolfi had a desire to become a whistleblower. Ridolfi also informed investigators about receiving one performance warning on December 17, 2012. However, agents appeared

---

employees had drafted the warning, but not yet shown it to Ridolfi. (Pl. Ex. 19). Thus, it is unclear if Ridolfi knew of the August warning when she began speaking to investigators. However, even assuming Ridolfi knew of her performance warnings and failed to tell investigators, investigators, including Lating, could still reasonably rely on her information as credible. As explained throughout this order, there was simply too much corroboration by independent sources to credibly argue that investigators had no right to rely on her information.

unaware of other potential biases such as two other performance warnings Ridolfi received. Nevertheless, Plaintiff argues that this information should have been known to investigators, given that it was referenced within one or more of the tens of thousands of emails produced via a subpoena to Google prior to the indictment.

Plaintiff also attempted to show that investigators were aware Ridolfi was hiding evidence. In a recording Ridolfi made of her conversation with another Pharmacare employee, Ridolfi stated that "we gotta hide prescriptions." Lating transcribed this conversation and was aware of its contents. Plaintiff averred this was proof Ridolfi was hiding prescriptions to prevent reversals in order to manufacture evidence of fraud. Thus, Plaintiff contends Lating could not reasonably rely on Ridolfi. Lating explained that she did not find this comment nefarious in any way because she knew from multiple sources that once attention was brought to the clutter caused by undelivered prescriptions, Annappareddy would move the bins to a discrete location without proper reversals. Additionally, Lating explained that Ridolfi needed to move prescriptions so Annappareddy would not become angry. The court finds this explanation more than plausible as Annappareddy himself admitted to yelling at employees and described himself as a "jerk." Thus, Lating believed Ridolfi made this comment in the context of simply moving the prescriptions to another location in the pharmacy. Therefore, investigators could reasonably rely on this explanation without questioning Ridolfi's credibility.

In another effort to belie Ridolfi's credibility, Plaintiff argued that Ridolfi manufactured evidence of fraud by printing labels of old prescriptions and placing them in trash bags. Those bags were later retrieved by agents, specifically Lating, after being

disposed of in a commercial dumpster outside of a Pharmacare location. Ridolfi reported to agents, namely Arnold, that an Indian employee removed these labels from bottles of old prescriptions that had not been delivered or reversed and disposed of without effectuating proper reversals. The trash contained numerous prescriptions labels, some of which appeared to have been peeled off of bottles and others remained on their original backing. However, the ones on their original backing appeared to have been torn from a bag of prescriptions to which they had been stapled. Plaintiff argues that the existence of labels not peeled off of bottles and still on their original backing shows that Ridolfi printed extra labels of aged prescriptions and then placed them in the trash as manufactured evidence of fraud. The court disagrees. Other than Plaintiff's bare assertions on this theory, there is no credible evidence that Ridolfi fabricated evidence of fraud or that Lating should have been aware of such fabrication. The labels on their backing had been torn from prescription bags and discarded along with labels peeled from bottles. All of these labels which were retrieved from the trash are consistent with Ridolfi's reporting that labels were being removed and disposed of without performing reversals. It was reasonable for Lating to rely on this physical evidence as further corroboration of fraud.

Gutberlet, Lating, and Arnold, along with several other investigative agents, testified that they would have liked to have known about all potential biases or inconsistencies from these individuals as they were gathering facts prior to the indictment. However, each investigator also testified that knowledge of these potential biases would not have affected their credibility determinations or the information within the Lating Affidavit given the wide and varied sources of corroboration. Therefore, Plaintiff's

attempts to show Tokofsky and Ridolfi's information as unreliable based on possible biases or alleged inconsistencies fall short. Moreover, investigators testified that regardless of whether information came from a potentially biased witness or not, they always worked to corroborate the information provided through other sources.

Accordingly, investigators continuously worked to corroborate the information provided by Ridolfi and Tokofsky through a variety of sources. First, Tokofsky and Ridolfi provided accounts consistent with each other and there was no evidence of collusion between the two. Additionally, Ridolfi provided to investigators photographs of prescriptions that had not been delivered and were over 60 days old.

In an additional effort to corroborate this information, investigators utilized fake patient profiles in an undercover operation at three separate Pharmacare locations. Although two of the three locations presented with fictitious prescriptions yielded no evidence of fraud, one location continuously billed for automatic refills without reversing charges despite the fact that the patient never received the medication. That location was the Plumtree store where Ridolfi worked.

Investigators additionally spoke with actual patients of Pharmacare and pharmacists from separate pharmacies who reported similar instances of Pharmacare billing for prescriptions that had automatically been refilled and not reversing the charges. In some instances, these refills were for medications that had been discontinued or previously refused. In other instances, these automatic refills caused patients to be unable to acquire refills of prescriptions they believed were still available at later dates or at separate pharmacies. Investigators further corroborated patient accounts with paid claims data they

acquired through independent sources. One such patient was Craig Blomquist. The Government presented Blomquist within its case-in-chief in this action and his experience is described in greater detail below. Suffice it to say, Blomquist's experience was indicative of the exact scenarios described by Tokofsky and Ridolfi. His testimony and supporting documentation carried great weight in supporting the belief investigators held in Tokofsky and Ridolfi.

In addition to Tokofsky and Ridolfi, investigators interviewed other former Pharmacare employees including Caitlin Biemer, Mary Sue Cramer, Candice Covahey, and Nikkia Dansbury. Biemer's recitation of events was consistent with Ridolfi and Tokofsky's testimony concerning the use of Indian technicians who failed to perform reversals and accounts of overflowing bins of old prescriptions. Dansbury, a clinical liaison for Pharmacare, provided accounts of bins containing old non-delivered prescriptions that she believed were not reversed. Mary Sue Cramer, a prior compliance officer with Pharmacare, provided consistent accounts of aged prescriptions billed to Medicaid recipients that were not reversed. She also provided accounts of pharmacy technicians unwilling to follow proper procedures or undertake corrective measures. She additionally provided photos of the aged prescriptions to investigators. Cramer reiterated that Annappareddy appeared to strategically place Indian employees in certain pharmacy locations to effectuate his schemes. Former employee Daniel Walker was also interviewed as part of the pre-indictment investigation. He provided further corroboration by recounting numerous actions he believed were nefarious. He reiterated that Annappareddy employed Indian workers and exerted control over them.

16

All told, the court finds that the multitude of corroborating information garnered from a variety of unrelated sources more than justified investigative agents' beliefs that Tokofsky and Ridolfi were reliable informants providing credible information. It was clear from the evidence presented during this trial that agents acknowledged potential biases and worked to verify the information provided so as to present the court with an accurate accounting of those facts needed to establish probable cause.

2. <u>14-day Return Period</u>

The Lating Affidavit states that if "a customer does not pick up his/her prescription within 14 days, (i.e., fails to return to the pharmacy to pick up the medication), the pharmacy is required to reverse the transaction with the Prescription Insurance Program so that the Prescription Insurance Program does not pay a pharmacy for medications that were not dispensed to an insured." (Lating Aff. ¶ 13).

Plaintiff avers that any reference to a 14-day prescription reversal window should be removed from the Lating Affidavit entirely. It is uncontested that there was no federal law requiring a pharmacy to reverse undelivered prescriptions within 14 days at the time the Lating Affidavit was submitted. Although several individuals, including Tokofsky, stated that prescriptions were required to be reversed within 14 days, no such legal requirement existed.[15]

Instead, each person to testify regarding the 14-day reversal window, including investigators and Annappareddy, identified this two-week policy as an industry standard.

---

[15] In reality, the legally required return window was 60 days. 42 U.S.C. § 1320a-7k(d)(1), (2)(A).

Accordingly, although there was no legal requirement to perform reversals within 14 days, it was reasonable to utilize the 14-day period as an applicable standard when describing pharmacy operations. Therefore, intentional and repeated violations of the 14-day period, while not itself illegal, could readily be construed as nefarious.

Moreover, as the Government argued, Plaintiff's fixation on an allegedly misleading 14-day requirement is a bit of a red herring. The Affidavit included multiple accounts of prescriptions that were 6 to 12 months old sitting in bins, obviously undelivered and not reversed. (Lating Aff. ¶¶ 21, 33 & 34). Thus, even if the Lating Affidavit had omitted any reference to a 14-day industry standard completely or replaced it with a 60-day legal requirement, the existence of prescriptions over 60 days old would still be an indication of fraudulent billing practices.

### 3.  MEDIC 1495

In the early stages of the criminal investigation, the Government contracted with an entity known as MEDIC[16] to perform an analysis of medications purchased by Pharmacare compared to prescriptions distributed. Assistant Attorney General Jeremy Dykes, Assistant U.S. Attorney Michael DiPeitro, and Special Agent Robert Mosley were the main individuals tasked with coordinating with MEDIC and reviewing MEDIC analyses.

MEDIC prepared an analysis known as MEDIC 1495 which reported several shortages of certain medications. In essence, selling more medications than were purchased by a pharmacy is termed a "shortage" and is indicative of fraud. A pharmacy cannot sell

---

[16] MEDIC is an acronym for Medicare Drug Integrity Contractor.

what it does not possess. Any dollar amount associated with a shortage was termed a "loss." In other words, loss represented the amount of money fraudulently obtained. Although several MEDIC reports were generated in preparation for Annappareddy's criminal trial, only one, MEDIC 1495, was in existence prior to the Lating Affidavit. Thus, MEDIC 1495 is the only analysis relevant here. Each of the calculations in MEDIC 1495 compared the number of units (i.e., pills, capsules, tablets, etc.) of certain medications for which a Pharmacare store submitted reimbursement claims with the numbers of units of those medications that the store acquired. This comparison is commonly referred to as an "in-and-out analysis." Stated differently, MEDIC 1495 shortage calculations were created by obtaining the number of pills Pharmacare purchased from its suppliers and subtracting the number of pills Pharmacare billed for.

MEDIC 1495 performed this in-and-out analysis for 76 different prescription drugs across Pharmacare's nine locations. However, only four drugs were specifically identified in the Lating Affidavit. (Lating Aff. ¶ 15). MEDIC 1495 found shortages of some form of drug at each of the nine Pharmacare locations. The Lating Affidavit alleges that Plaintiff, through Pharmacare, engaged in a scheme to defraud that targeted low-income patients who were Medicaid recipients and were often prescribed more expensive medications — referred to internally as "Med 4's." (Lating Aff. ¶ 11)("Pharmacare internally refers to these more expensive (e.g. high dollar cancer and HIV related prescription medications) as 'Med 4's.'"). The Lating Affidavit further alleges that Pharmacare "collectively" and nine of its stores had "losses" and "shortages" for many such medications, meaning that

Pharmacare submitted claims for — and was paid for — more units of these medications than it acquired. (*Id.* at ¶¶ 14-17; ¶ 50(b)).

Specifically, the Lating Affidavit states:

15.      Each of the nine Pharmacare locations examined reflected a shortage of some form of drugs reviewed that is, the number of dosage units purportedly dispensed from a particular location and billed to Prescription Insurance Programs exceeded the number of dosage units ordered by Pharmacare locations from its wholesale suppliers and delivered to that location. For instance, for all of the Pharmacare locations reviewed, Pharmacare was collectively short 27,818 units of the drug Kaletra, TAB 200-50MG; 9,600 units short of the drug Abilify SOL 1MG/ML; 12,939 units short of the drug Lidoderm DIS 5%; and 12,033 units short of the drug Norvir, CAP100MG. For these four medications alone, the potential fraud loss as a result of the fraudulent billings to Prescription Insurance Programs is approximately $401,000. In total, 59 of the 76 prescription medications reviewed have thus far shown a shortage at one or more Pharmacare locations, with a total potential fraud loss as of October 31, 2012 of approximately $2,672,067 for the nine locations examined. For purposes of this affidavit, the Target Locations #2 and #3 reflected shortages not limited to but to include the following:

a. **Target Location #2:** For the time period March 8, 2011 through October 31, 2012, Target Location #2 (Plumtree) was short 18,960 pills for the drug Kaletra resulting in an estimated overpayment by the Prescription Insurance Programs of approximately $116,000 for that medication alone. Target Location #2 did not have adequate purchases to support payments for 56 of the 69 drugs reviewed that were sold out of that location.

b. **Target Location #3**: For the time period January 3, 2007 through October 31, 2012, Target Location #3 was short 8,468 pills for the drug Kaletra resulting in an estimated overpayment by Prescription Insurance Programs of approximately $52,000 for that medication alone. Target Location #3 did not have adequate purchases to support payments for 19 of the 71 drugs reviewed. Thus far, the overall approximate dollar loss to the Prescription Insurance Programs for prescription medications for which Target Locations # 2 and #3 did not have sufficient inventory thus far is $1,637,526.6

c. **Target Location #6**: For the time period March 12, 2012 through October 31, 2012, Target Location 46, Pharmacare at Park Heights did not

have adequate purchases to support payments for <u>7 of 21 prescription</u> medications reviewed. The overall approximate dollar loss to the Prescription Insurance Programs for the 7 drugs for which Target Location #6 did not have sufficient inventory is approximately $30,982.53.

**16.    Pharmacare at Mt. Claire.** For the time period October 10, 2011 through October 31, 2012, Pharmacare at Mt. Claire did not have adequate purchases to support <u>30 of the 37 prescription</u> medications reviewed. The overall approximate dollar loss to the Prescription Insurance Program for the 30 drugs for which Pharmacare at Mt. Claire did not have sufficient inventory is $535,260.17.

(Lating Aff. ¶¶ 15–16)(emphasis added via underlined text, bold in original).

However, MEDIC 1495 contained inaccuracies. On the purchasing, or "in" side of the analysis, MEDIC 1495 used purchasing data from all of the suppliers and distributors from whom Pharmacare purchased prescription drugs. On the dispensing, or "out" side, MEDIC 1495 used claims from five governmental insurers. MEDIC 1495 then added in insurance claims for medication billed to the Maryland AIDS Drug Assistance Program ("MADAP"). The review did not include claims data from every insurer, public or private, who paid for prescription drugs dispensed by Pharmacare.

MADAP served as a secondary payor for several prescriptions in which governmental insurers were the primary payor. Therefore, inclusion of MADAP data resulted in a double counting of some of the AIDS/HIV[17] drugs initially included in the original claims data. Consequently, inclusion of MADAP claims artificially inflated the shortage calculations for certain HIV medications. Plaintiff's expert, Jed Smith,

---

[17] The parties used the terms "HIV" and "AIDS" interchangeably throughout the bench trial when discussing corresponding medications. For ease of reference, the court will use only HIV within this order.

highlighted this error by analyzing the top seven HIV drugs Pharmacare sold. His analysis showed that, when all MADAP claims were removed and store transfers were accounted for, there was a surplus for the top seven HIV drugs. However, this expert could not quantify the precise error rate in MEDIC 1495 or provide an accurate figure of the drugs actually bought and sold by Pharmacare. He simply provided new calculations by removing the entirety of MADAP claims. Smith's testimony revealed that he could not be certain all MADAP claims were indeed duplicates of other claims already accounted for in MEDIC 1495. Thus, the problem with Smith's methodology is that it assumes all MADAP claims were duplicative. Consequently, he incorrectly removed the entirety of that data set in coming to his conclusions. However, there is no indication that all of MADAP claims were duplicative. Thus, removal of all MADAP data is an overcorrection that works in Plaintiff's favor.

Moreover, Smith's expert opinion left unchallenged all non-HIV drugs. The court notes that Smith selected the top seven HIV drugs for use in his analysis. Because MEDIC 1495 contained overlap with the Maryland *AIDS* Drug Assistance Program (again "MADAP"), Smith was able to maximize the appearance of an error by only selecting HIV drugs. It is true that HIV medications were expensive medications and as such, they were a priority during the criminal investigation. However, as multiple witnesses testified, investigators were concerned with fraud across all types of medications, not just HIV medications. This is reflected in the specific identification of non-HIV medications in the Lating Affidavit. Plaintiff's expert failed to perform his corrective analysis on any non-

22

HIV medication which would have included several of the drugs specifically referenced in the Lating Affidavit including Abilify and Lidoderm.

Plaintiff presented no credible evidence that investigators were aware of the duplication caused by the inclusion of MADAP claims. Investigators instead relied upon MEDIC, as a contracted expert, to determine the integrity of the data used in its analysis. Additionally, as stated in the Lating Affidavit, several sources of payor information were excluded from MEDIC 1495. Had MEDIC 1495 included private insurance claims, then the shortage numbers would have become larger.

Plaintiff's expert, Smith, also opines that MEDIC 1495's analysis is flawed for failure to combine data from each Pharmacare location which would allow one store's surplus to offset another location's shortage. Testimony showed that Pharmacare could transfer prescriptions between stores as needed. Annappareddy also explained that whenever a new pharmacy was opened, that pharmacy was essentially given an interest-free loan from drug distributors to purchase medication on credit for the first nine months. This was known as "dating." To take full economic advantage of this opportunity, Annappareddy used this credit to purchase expensive medications which he would then transfer to his other locations as needed. Investigators were aware that medications could be transferred between stores. However, they were unaware to what extent medications were actually transferred or if transfers were commonly done between stores in different states. Were investigators to account for transfers by looking at Pharmacare stocks collectively, shortages at some locations could have been offset by surpluses at other locations. However, even when looking at all Pharmacare stores collectively, shortages for

some medications would remain. Although MEDIC 1495 failed to account for transfers, several calculations within the Lating Affidavit, specifically paragraph 15, did indeed count transfers.

Thus, the court finds that even though MEDIC 1495 contained errors, if corrected, some form of shortage for certain medications would still have been shown. Accordingly, investigative agents were not reckless in believing that some shortage of medications existed.

Plaintiff attempted to show that Agent Mosley was aware of this potential for erroneous overlap and double counting, yet intentionally misled MEDIC and other agents into believing that he had analyzed the data and removed duplicate entries. Stated differently, Plaintiff contends Mosley duped others into believing he had performed deduplications on the data received from various sources prior to sending it to MEDIC so he could rig the numbers. However, witness after witness belied this assertion by confirming that Mosley, although an experienced investigator, did not have the technical expertise to perform any such analysis. Instead, Mosley acted merely as a logistical liaison gathering raw data from various governmental sources and then sending it to MEDIC for use in its analysis. Thus, no other investigative team member or prosecutor believed, understood, or expected Mosley to be performing any technical analysis. Consequently, the court finds that Mosley did not mislead others, either intentionally or recklessly, into believing he performed deduplication or that MEDIC 1495 contained no errors.

The court also finds that any of the "loss" calculations included in the Lating Affidavit can be removed with no consequence. It is undisputed that monetary loss was not

an element of the fraud crimes Annappareddy was to be charged with. Thus, any monetary figure of loss associated with any medication shortage is wholly irrelevant to a probable cause analysis. Consequently, the court declines to issue any further findings as to loss amounts or supposed impacts to the Government resulting from or associated with MEDIC 1495.[18] Even if it were necessary to further expound upon loss figures in the Affidavit, the conclusion related to shortage would be similarly applicable here. Although the loss associated with the MEDIC 1495 analysis suffered inaccuracies, some amount of loss would have been shown had proper calculations been performed.

Additionally, Plaintiff attempted to imply that throughout the investigation agents were concerned only with "MED-4" drugs and thus any reference to non-Med-4 medications should be ignored. MED-4 was a term used internally at Pharmacare to refer to certain types of drugs including HIV, cancer, antipsychotics, and hepatitis drugs. Often, these medications were more expensive than other types. MED-4 was a general term used to describe these medications, in part, to help protect patient privacy. Although MED-4 medications were certainly a major point of interest, numerous witnesses testified that investigators were concerned with fraud across any type of medication regardless of whether Pharmacare labeled it a MED-4 or its ultimate cost. Similarly, HIV medications

---

[18] Plaintiff argued that Lating and Mosley knew by May 2013 that it would be false to state that MEDIC 1495 represents any "loss" or "losses" to government programs. When MEDIC emailed the final version of those invoice reviews on May 9, 2013, its cover letter warned that MEDIC 1495 "does not represent the impact to the government." Later evidence, including emails from MEDIC employee Don Degroff specifically referencing loss figures for use in the Affidavit, belie this assertion. However, a finding as to this contention is unnecessary considering loss or impact to the Government would not affect probable cause.

made up a large portion of Pharmacare's overall revenue. Therefore, they necessarily became a focal point throughout the investigation. However, investigators never limited their concerns or beliefs of fraudulent activity to HIV or other drugs labeled as MED-4s. Accordingly, any specific medication's description as a MED-4 is essentially irrelevant in a probable cause determination.

### 4. Exculpatory Information

Throughout this trial, Plaintiff elicited testimony of various other alleged investigative errors and omissions. For instance, Plaintiff referenced several steps he believed investigators should have taken such as obtaining copies of prescription delivery logs or speaking to Pharmacare delivery drivers to confirm witness accounts that prescriptions went undelivered. Additionally, Plaintiff avers investigators should have interviewed more witnesses such as pharmacy technicians or employees such as Neveen Abdallah, a part-time Pharmacare employee who also worked as a fraud inspector for the state of Maryland.

Additionally, Plaintiff pointed out that although the undercover operations were conducted at three separate Pharmacare locations, fraudulent billing activity only occurred at one. Plaintiff averred that the two failed operations should have been included in the Lating Affidavit as exculpatory evidence. The court disagrees. It is undisputed that Annappareddy properly billed some clients throughout the investigation. The fact that two stores did not fraudulently bill for two prescriptions is hardly exculpatory.

Another source of information that Plaintiff emphasized throughout this bench trial was the fact that Ridolfi wore a wire and recorded numerous conversations with

Pharmacare employees and Annappareddy himself. Although hours of conversations were recorded, no recordings were referenced in the Lating Affidavit. Plaintiff avers that hours of recordings showing no evidence of fraud is an exculpatory fact ignored by investigators. The court disagrees. It is unsurprising that investigators would not have expected Annappareddy, who allegedly had a close cohort of Indian employees executing his fraud scheme, to openly explain to Ridolfi his plans to defraud the Government as if he were Batman's nemesis laying out his mischievous campaigns.

Plaintiff also argues that investigators should have interviewed delivery drivers and acquired delivery logs prior to presenting the Lating Affidavit to further corroborate witness accounts that prescriptions were being billed and not reversed despite a failure to deliver. Initially, witnesses explained that investigators were selective in those they interviewed early on to maintain the covert nature of the investigation. Additionally, Lating explained that she had more than enough corroboration to support probable cause before submitting the Affidavit and that she further expected delivery logs to be acquired as part of the search and seizure process. Plaintiff attempted to argue that the only way to truly confirm patients never received their medications was to check delivery logs. However, as several witnesses acknowledged, the presence of months-old prescriptions sitting in bins scattered about the pharmacy floor is a clear indicator that the prescriptions were in fact not delivered. Thus, the court does not find it was necessary to acquire delivery logs or interview drivers prior to submitting the Affidavit.

C.  Witness Summaries

1.  Laurie Gutberlet

Gutberlet was an investigator for the MFCU during the initial phase of the Pharmacare investigation. At the outset of this trial, the Government represented that no single person contributed more to the investigation and information ultimately used in the Lating Affidavit than Gutberlet. The court agrees with that characterization. Gutberlet presented as a thorough and competent investigator whose reports could reasonably be relied on by others. Gutberlet performed numerous interviews with several witnesses including Tokofsky and Ridolfi which resulted in more than 100 pages of interview reports. Gutberlet testified that she was repeatedly able to corroborate information Ridolfi and Tokofsky provided through various independent sources such as patient interviews and paid claims data.

Gutberlet was able to corroborate some of these reports by interviewing Pharmacare patients. She further confirmed these reports by accessing patients records and accounts. One such patient was Craig Blomquist. As explained below, Craig Blomquist presented as a credible witness whose experience exemplified many of the exact allegations of fraud reported to Gutberlet. As outlined above, Gutberlet also corroborated information by interviewing prior Pharmacare employees and pharmacists from other pharmacies.

Gutberlet also described an undercover operation in which two MFCU investigators, along with a state police officer, posed as patients who filled prescriptions at several Pharmacare locations. One of the fictitious patients was billed for prescriptions that were not delivered. These prescriptions were filled at the Plumtree store — the same store where

Ridolfi worked. The other two undercover operations yielded no incriminating evidence as their prescription requests were rejected.

Despite the voluminous investigative efforts Gutberlet performed in this matter, she left the MFCU in April 2013, several months before the Lating Affidavit was finalized. Prior to leaving, Gutberlet had several meetings with other team members, including Lating and Mosley, to convey as much information about the investigation as possible.

Gutberlet, along with all other witnesses, identified the 14-day reversal period mentioned in the Lating Affidavit as an "industry standard." In other words, Gutberlet understood the 14-day window in which pharmacies worked to reverse undelivered prescriptions to be common practice among most pharmacies and did not believe it to be a federal law or regulation.

Gutberlet presented as a credible witness who offered truthful testimony.

## 2. Maura Lating

Maura Lating served as the lead federal investigator after federal agencies became involved. She was responsible for drafting the so-called "Lating Affidavit" that was presented to the federal Magistrate Judge to procure the Pharmacare search warrants. She joined the investigation in January 2013 and her drafting efforts began around February 2013. She had no knowledge or relationship with Annappareddy or Pharmacare prior to working on this investigation. In addition to drafting the Affidavit, Lating also personally conducted several interviews, trash pulls, and surveillance.

Although Lating was responsible for drafting and signing the Affidavit, it became apparent throughout trial that the Lating Affidavit, much like the Pharmacare investigation itself, was very much a team effort. Lating utilized information from numerous sources such as her own personal interviews and research, MEDIC 1495, Gutberlet memos, roundtable discussions, and the like when drafting her affidavit. The investigative team would conduct weekly meeting to discuss investigative efforts. Over several months, the Affidavit went through multiple rounds of review and edits by numerous investigators and prosecutors.

It was apparent from her testimony that Lating, an agent with 25 years of experience, took her duties as a federal agent very seriously throughout this investigation. One example of her diligence was shown in her effort to resolve an apparent conflict in one paragraph of the Affidavit just days before it was presented to the Magistrate Judge. In this instance, as Pam Arnold was reviewing a draft of the Lating Affidavit she noted that a certain paragraph averred Ridolfi was personally told by Annappareddy not to do reversals. As Arnold recalled, this was incorrect because Ridolfi had not been told directly, but rather pharmacy technicians had been instructed not to do reversals. In response to Arnold's comment, Sandra Wilkinson noted that earlier reports from Gutberlet stated Ridolfi was told personally. Upon learning of this discrepancy, Lating took it upon herself to personally interview Ridolfi again to ensure the information she expressed in the Affidavit was true. Lating was accompanied by Mosley and Arnold at this interview.

As outlined above, Lating's ability to corroborate information provided by Tokofsky and Ridolfi allowed Lating to reasonably rely on their accounts. Stated

differently, the court finds Lating believed Ridolfi and Tokofsky and that Lating did not mislead other team members, prosecutors, or the Magistrate Judge, either intentionally or recklessly, when drafting the Affidavit.

Lating also emphasized other events that corroborated Ridolfi's reports and solidified her earnest belief that probable cause existed that Pharmacare was engaging in fraudulent billing practices. One instance involved late-night billing activity after Ridolfi had closed the pharmacy. Separately, in March and May of 2013, Ridolfi used a hidden camera to record numerous bags of undelivered medications that dated back to 2012.

Plaintiff also attempted to imply Lating acted maliciously by unnecessarily including one pharmacy location, known as Caremerica, as a target location within the Lating Affidavit. According to Plaintiff, Caremerica was a newer closed-door specialty[19] Pharmacy that opened in December 2012 and took over most of Pharmacare's Med-4 billings in early 2013. Because MEDIC 1495's analysis did not include prescriptions from 2013, Plaintiff argues it could not be useful in establishing probable cause at Caremerica.

However, Lating explained that the Affidavit was based on the physical location (*i.e.*, a building on Old Emmerton Road) as opposed to any trade name given to a specific pharmacy location. Evidence showed that prescriptions were transferred from the Pharmacare pharmacy at Old Emmerton to the Plumtree location once the Old Emmerton location closed in January 2012. That physical location on Old Emmerton Road was then

---

[19] "Closed-door" refers to a pharmacy that does not accept walk-in patients and is generally not open to the public. "Specialty" refers to a pharmacy's specialized status which allows it to dispense certain prescription not available at all other pharmacies.

remodeled and opened under the name Caremerica as a closed-door specialty pharmacy. After Caremerica opened in December 2012, numerous prescriptions–including a majority of MED-4s–were transferred from Plumtree to Caremerica. Therefore, Plaintiff's efforts to portray a newly opened pharmacy labeled Caremerica as a standalone institution free from any connection with other Pharmacare operations or fraudulent activity is unavailing. Given these transfers of prescriptions with Pharmacare stores, the court finds it reasonable that investigators believed evidence of fraud, namely undelivered prescriptions and billing records, would be located at the Caremerica store location.

Prior to submitting the Lating Affidavit, Lating prepared a separate affidavit in support of a search warrant to Google for production of emails associated with 14 Pharmacare email addresses. After a delay in receiving these emails, Lating attempted to speed up the production process by emailing a list of search terms to Google with a request that emails containing those terms go ahead and be produced to allow for early review. In response, Google complied with the initial request and produced all emails–over 50,000– associated with the 14 email addresses in mid-June 2013. Throughout trial, Plaintiff attempted to impute all knowledge from any email containing a search term from the list sent to Google, to every investigative team member, including Lating. In other words, Plaintiff avers that because investigators had access to these thousands of emails, they each should have been acutely aware of each email's contents, along with the significance thereof. The court declines to impute such knowledge to Lating or other investigative members. Lating repeatedly testified that team members could conduct any searches of these emails utilizing any terms they saw fit. The list provided to Google was merely a list

32

of relevant terms used to expedite production of certain emails to allow for an early review of what was sure to be a large production of emails. Lating never ordered other team members to use this specific list of terms when performing substantive searches. Even so, the production from Google contained thousands of emails. It would be patently unreasonable to impute each piece of exculpatory information that could be extrapolated from each email to every investigator who had access to them.[20]

Even if this court were to impute knowledge of these emails to Lating, Plaintiff presented these emails for the main purpose of showing that Lating must have been aware that Tokofsky and Ridolfi harbored certain biases against Annappareddy or were otherwise uncredible. For instance, Plaintiff avers Lating should have been aware emails showed Ridolfi received a performance warning in February 2012. (Pl. Ex. 8). However, as stated above, Lating acknowledged the existence of biases and was nevertheless reasonable in her reliance on Tokofsky and Ridolfi given the magnitude of corroborating evidence she received from various sources.

Additionally, several of these emails provided support for Tokofsky's and Ridolfi's assertions. For example, emails from Ridolfi to Annappareddy indicated that she was concerned with automatic billing without client consent and having prescriptions that were issued under her name transferred to other locations without her knowledge. (Def. Ex. 101, 102, & 105). Another email discussed patients continuing to receive prescription deliveries

---

[20] "Although an officer may not disregard readily available exculpatory evidence of which the officer had been made aware, an officer's failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause." *Smith v. Reddy*, 101 F.3d 351, 357 (4th Cir. 1996).

despite the fact that those prescriptions had been discontinued. (Def. Ex. 109). An email from Caitlin Biemer to Annappareddy corroborated her reports to investigators regarding aged prescriptions not being reversed. (Def. Ex. 112).

In all, the court finds Lating's testimony credible. Her belief that probable cause existed was supported by numerous independent sources. There is no indication that she intentionally or recklessly misrepresented facts, included erroneous inculpatory facts, excluded material exculpatory facts, or acted with malice when preparing and presenting the Lating Affidavit.

### 3. Robert Mosley

Robert Mosley was an agent with the United States Department of Health and Human Services throughout the Pharmacare investigation. Mosley served as the point person between MEDIC and the investigative team. Throughout this litigation, Plaintiff has characterized Mosley as a federal investigator who mislead federal prosecutors mainly by representing that he conducted some level of analysis or manipulation of the data received from various organizations such as Maryland Medicaid that he then passed to MEDIC. For Plaintiff's theory to work, he necessarily must show that Mosley was aware of inaccuracies yet intentionally, or at least recklessly, mislead prosecutors into believing that MEDIC 1495 was accurate.

However, testimony from numerous witnesses showed that Mosley was a transparent pass through—a fact which all other investigators and prosecutors were aware of. Mosley simply collected data from multiple sources and provided that same data,

without manipulation or alteration, to MEDIC for use in its analysis. When MEDIC asked for additional information, Mosley reached out to other investigators for answers which he then relayed back to MEDIC. Each witness to speak on the subject reported that Mosley did not have the knowledge or experience to perform any data manipulation such as deduplication. DiPietro went as far as describing Mosley as a "gofer" when discussing his coordination efforts with MEDIC. Mosley himself reported that he did not do any data manipulation and instead relied solely on MEDIC to analyze the raw data he provided. Mosley believed MEDIC, as an expert in this type of analysis, would account for store transfers and review the data for duplications. Mosley believed the information provided in MEDIC 1495 was accurate at the time the Affidavit was presented. The court finds this testimony credible. Thus, neither Mosley nor Lating had reason to doubt the accuracy of MEDIC 1495 when relaying information and drafting the Lating Affidavit.

Plaintiff presented no credible evidence to prove Mosley purposely or recklessly manipulated data in an effort to mislead prosecutors or the grand jury prior to the indictment. Moreover, there is no evidence Mosley acted with any malice. Plaintiff attempted to argue Mosley artificially manipulated or inflated data so as to win some type of non-descript award. However, there is no evidence Mosley engaged in any deceit for his own personal gain. The record is absent of any believable evidence that Mosley, an investigator with 18 years of experience, would jeopardize his career by providing false information just to win some hypothetical award.

In addition to serving as a liaison to MEDIC, Mosley also performed mail covers, conducted surveillance, engaged in trash pulls, and aided other investigative endeavors. On

July 23, 2013, Mosley testified in front of the grand jury that ultimately returned an indictment for Annappareddy. Although Mosley himself testified, he utilized the Lating Affidavit as the basis for much of his testimony. Plaintiff presented no credible evidence that Mosley lied or intentionally mislead the grand jury.

### 4. Jed Smith

Plaintiff presented expert Jed Smith who is a CPA that heads his firm's pharmacy sector. In essence, Smith opined that the shortage calculations contained in the Lating Affidavit were derived from MEDIC 1495 which had significant data and methodological flaws which make those calculations unreliable for purposes of evaluating the existence of any shortages or quantifying the impact of any purported shortages.[21]

The two errors Smith identifies in MEDIC 1495 are: (1) double-counting errors involving claims submitted to MADAP; and (2) the fact that each of the Pharmacare locations were reviewed separately which fails to account for store transfers.

To demonstrate the falsity of the shortage and loss numbers in the Lating Affidavit, Smith reviewed MEDIC 1495's results for the top seven HIV medications "to determine the impact on any shortages if MADAP were excluded . . . and if Pharmacare were analyzed on a whole rather than as individual stores to account for transfers." (Pl. Ex. 142, at ¶ 18). When correcting for these errors, Smith avers there were no shortages for any of these

---

[21] Smith was originally retained to perform a review of the analysis and calculations the Government presented in Annappareddy's criminal trial. Although attached to his expert report and considered when formulating his opinions here, any analysis or conclusions relating to the data presented at the criminal trial are irrelevant to the issues remaining in this civil trial.

seven HIV medications. (*Id*.). Moreover, Smith testified that if MADAP claims were removed in their entirety, and the pill counts were aggregated across all stores, then there would have been a surplus of these seven HIV drugs.

However, the court did not find Smith's opinions particularly helpful. As the Government pointed out, Smith only analyzed the top seven HIV drugs which all showed a surplus when "corrected" pursuant to his new methodology. Had Smith analyzed the eighth drug in that list, a shortage would have existed even under the new methodology. Curiously, Smith did not calculate two of the four drugs specifically identified in the Lating Affidavit.[22] Because MEDIC 1495 contained overlap with the Maryland *AIDS* Drug Assistance Program (again "MADAP"), Smith was able to maximize the appearance of an error by only selecting HIV drugs. The two drugs mentioned in the Affidavit which were omitted from Smith's report, Abilify and Lidoderm, were not HIV drugs. Smith could offer no opinion as to any other drug analyzed in MEDIC 1495.

Moreover, Smith assumed that all MADAP claims were duplicative and therefore he removed the entirety of that data set in coming to his conclusions. However, there is no indication that all MADAP claims were duplicative. Thus, removal of all MADAP data is an overcorrection that works in Plaintiff's favor. It is true that Smith employed corrective methodology to account for the two errors he identified in MEDIC 1495. However, he

---

[22] Of note, Smith claimed both in this trial and within his expert report that he has analyzed over two billion pharmacy claims within his 8–10-year career as a consultant. Thus, he could have easily performed additional calculations of all other drugs referenced in MEDIC 1495. As an aside, the court finds Smith's claim that he reviewed billions of claims farcical at best when considering 2 billion seconds equates to 63.37 years.

ultimately admitted that he did not know the actual shortage calculations for any drug referenced in MEDIC 1495.

Although the court accepts Smith's premise that MEDIC 1495 contained errors, the court cannot accept his conclusion that MEDIC 1495 should be deemed completely unreliable for purposes of evaluating the existence of any shortages or quantifying the impact of any purported shortages.

Smith's narrowly tailored review of a small portion of the overall data using his selective methodology on only HIV medications does little to modify the overall conclusion that Pharmacare, as a whole, had shortages for some medications and surpluses of other medications. Any shortage, regardless of the amount, type, or expense of the medication, would support a belief that Pharmacare was engaging in fraud.

### 5. Vipinkumar Patel

Vipinkumar Patel ("Vipin") was presented in this trial on short notice as a "rebuttal" witness.[23] Vipin, originally from India, was employed at Pharmacare as a pharmacy technician throughout the Pharmacare investigation. Vipin was indicted as part of the investigation into Pharmacare. Although Vipin pleaded guilty to making false statements related to healthcare fraud, he was later allowed to withdraw his plea once Annappareddy's criminal conviction was vacated. While testifying here, Vipin admitted to committing

---

[23] Although labeled as rebuttal witnesses by Plaintiff, the court later deemed Vipin and his wife's testimony not to be true rebuttal as it merely reinforced evidence elicited in Plaintiff's case-in-chief and was not wholly responsive to new material elicited by the Government. This determination later became irrelevant as the testimony was allowed into evidence and Plaintiff did not expend the total time given to present his case.

perjury on no less than three occasions. Vipin averred that he was forced into pleading guilty because federal agents, Lating chief among them, threatened to indict his wife and promised him a return trip to India to see his ailing father. Accordingly, Vipin averred that he lied to investigators during proffers,[24] lied to federal prosecutors in his written plea agreement, lied to a federal judge when pleading guilty, and lied under oath when testifying in Annappareddy's criminal trial.

Vipin now avers that all of his prior testimony adverse to Annappareddy was untrue and he simply told federal agents what they wanted to hear. Conveniently, the statute of limitations for perjury has expired for all of Vipin's admitted perjury relating to his and Annappareddy's criminal prosecution.

As a pharmacy technician, Vipin was tasked with billing for and filling prescriptions. Vipin testified that pharmacists would normally assign reversals to pharmacy technicians, but Ridolfi would not allow technicians to do reversals and would instead retain that responsibility for herself. Vipin averred Ridolfi treated white employees better than Indian employees. In general, Vipin testified that Annappareddy was an honest business owner who always put the customer first and treated his employees well. Vipin alleged that Annappareddy never engaged in fraud, nor asked him to perform and fraudulent activities.

Vipin admitted that Annappareddy would yell at employees, but only to emphasize the importance of their work and the need to minimize mistakes. Annappareddy served as

---

[24] Vipin engaged in numerous proffer sessions for several hours while represented by defense counsel.

the sponsor for Vipin's H1B visa. Additionally, Annappareddy provided housing for Vipin and his family.

The court does not find Vipin's testimony in favor of Annappareddy credible. Vipin admitted to committing perjury on numerous occasions, but now avers his testimony in favor of Annappareddy is truthful. Vipin's ever-evolving testimony renders his credibility virtually non-existent. Additionally, Vipin provided detailed factual accounts of Annappareddy's operations in his proffers with Government agents. These detailed factual accounts, which were supported by documentary evidence, belie his contention that he merely recited what federal agents told him to say.

### 6.  Pragnaben Patel

Pragnaben Patel ("Pragna") is Vipin's wife. She also worked as a technician at Pharmacare from 2009 through 2012. Pragna is also from India. Much of her testimony overlapped with Vipin's. Specifically, Pragna reiterated that Ridolfi treated white employees more favorably and that Annappareddy was a generous employer. Pragna likewise averred that investigative agents, including Lating and Wilkinson, attempted to force her to testify falsely.

The court likewise does not find Pragna's testimony credible. The bias in favor of her husband and against the Government gave her very little credence.

### 7.  Pam Arnold

Pam Arnold was an investigator for the MFCU throughout the Pharmacare investigation. Arnold served as Ridolfi's primary point of contact after Gutberlet retired.

Arnold also participated in the investigation by conducting interviews of prior patients and employees, posing as a patient in the undercover operation, working with Ridolfi, and providing feedback on drafts of the Lating Affidavit. The court found her testimony reliable.

In one such contribution to the investigation, Arnold pointed out that the current draft of the Lating Affidavit recounted Ridolfi being told personally not to perform reversals. Arnold's recollection differed in that Ridolfi was not told personally, but learned from pharmacy technicians who were told not to perform reversals. As a result of Arnold's input, additional research was performed and Lating interviewed Ridolfi. The Affidavit was then revised to resolve the inconsistency. This incident exemplifies the fluid and collaborative process the investigators engaged in as Lating was drafting the Affidavit.

Throughout litigation, much ado was made about Arnold's email dated May 17, 2013 (Pl. Ex. 42) in which she stated, "This is not what we hoped for." This statement was typed in an email Arnold sent to Lating which also forwarded an in-and-out analysis from Jeremy Dykes. The spreadsheet attached to the email showed a "Grand Total" of roughly 1.3 million. Arnold testified that upon reviewing the spreadsheet, she mistakenly thought the grand total of 1.3 million was a dollar figure representing the loss to the Government. This amount was much lower than what she had expected based on her investigation to date. However, Arnold explained that the 1.3 million figure was in reality a total of pills, not dollars. Thus, she was mistaken when drafting the message to Lating.

Plaintiff argued that Arnold's statement expressing that the total was not what she had "hoped" for is indicative of malice. In essence, Plaintiff avers that Arnold, Lating,

Mosley, and others were hoping to prosecute a big case and plowed ahead despite the absence of probable cause or the wide-spread fraud they were hoping for. The court does not find this statement indicative of malice. Arnold explained that she was mistaken in reviewing the spreadsheet and did not "hope" they could prosecute Annappareddy. She explained that she was merely expressing her expectation that the estimated loss amount would be higher based on the evidence received to date. The court finds this explanation, and Arnold's testimony in general, to be credible.

### 8. Dr. Neelesh Vaidya

Plaintiff presented Dr. Neelesh Vaidya on short notice as a rebuttal witness to bolster Annappareddy's character. Dr. Vaidya, a pharmacist at the University of Maryland Medical Center, served as a supervisor to Annappareddy early in his career and a mentor throughout his building of Pharmacare. Dr. Vaidya testified generally to Annappareddy's strong work ethic and honesty.

Dr. Vaidya knew very little of Annappareddy's actual business practices or the allegations related to his criminal action. Dr. Vaidya presented as a credible witness who had positive things to say about Annappareddy. However, his knowledge was limited mainly to a time prior to the events in questions. Therefore his testimony was of little use.

### 9. Michael DiPietro

Michael Dipietro was an attorney within the civil division of the U.S. Attorney's office during the Pharmacare investigation. DiPietro began working on the Pharmacare matter as a result of Tokofsky's *qui tam* complaint. Throughout the criminal investigation,

DiPietro worked with Mosley to facilitate the flow of data to MEDIC and relay MEDIC analysis to investigative team members.

DiPietro confirmed that MEDIC 1495 performed a "per-store" analysis which looked at each Pharmacare location independently. However, investigators prepared further analysis that looked at Pharmacare globally to account for the possibility that separate locations transferred medications amongst themselves. During the investigation, agents were unaware to what extent medications were actually transferred between stores.

DiPeitro further confirmed that MEDIC 1495 was a preliminary report that did not include all relevant sources of data. He expected shortage calculations to increase once all data was properly accounted for.

DiPeitro presented as a credible witness.

10. <u>James Ryan</u>

Defense Criminal Investigative Service Special Agent James Ryan began working with the Pharmacare investigative team in January 2013. In general, Ryan testified that other members of the investigative team, namely Lating and Mosley, were experienced, reliable, and trustworthy.

As part of the investigative team, Ryan performed surveillance and trash pulls prior to the indictment. He was often accompanied by other agents during surveillance. His observations during surveillance outings and trash pulls corroborated the information Tokofsky provided to investigators. Specifically, Ryan saw afterhours activity at pharmacies which comported with allegations of late-night billing practices.

Ryan reiterated other agents' testimony in stating that no one doubted the existence of probable cause given the multitude of corroborating witness accounts from varying sources including a COO, a pharmacist, pharmacy employees, patients, and the like.

The court found Ryan's testimony credible.

11.  Craig Blomquist

Craig Blomquist was presented as part of the Government's case-in-chief. Blomquist, acting for his minor daughter, was a Pharmacare patient during the criminal investigation. Investigators interviewed Blomquist prior to presenting the Lating Affidavit to the Magistrate Judge. Blomquist presented as a sincere witness with no apparent connection to any party in this action.[25] His trial testimony, consistent with his interviews with investigators, was supported by numerous documents including prescription labels and billing records.

Blomquist recounted an experience he had at Pharmacare when attempting to refill a prescription for his minor daughter prior to a family vacation. Upon attempting to refill a prescription for an asthma inhaler, he was told no more refills for this particular prescription existed. However, Blomquist, who kept meticulous records, knew this to be inaccurate as he should have had three refills available. After failed attempts to have the prescription refilled over the phone, Blomquist visited the Pharmacare store in person.

---

[25] Blomquist testified to knowing Ridolfi merely because their children attended the same school. Outside of this, Blomquist testified to having no relationship with Ridolfi or any other Pharmacare employee. Thus, the court finds that he had no apparent biases or inclination to any person involved in this litigation.

Blomquist was again told he had no available refills despite the fact that he presented his last prescription box which showed three refills available. After extended discussions with an Indian pharmacy technician, Blomquist was eventually given a prescription refill with an incorrect date. Blomquist received the prescription in July 2012, but it was dated November 17, 2011.

Gutberlet was able to compare Blomquist's personal records with those she obtained from independent sources to show that Pharmacare had indeed billed the Blomquist's insurance for several prescriptions that had not been requested or picked up. Blomquist's account of being billed for prescriptions that had been filled via automatic refill but never actually delivered provided corroboration for the exact type of scheme recounted by Ridolfi and Tokofsky.

Plaintiff attempted to argue that Blomquist's testimony was irrelevant because he utilized a private insurer and had prescriptions for medications not categorized as Med-4s. Plaintiff's argument misses the mark. As explained above, investigators were concerned with fraud across all medications, not just Med-4s. Moreover, it is true that the charges against Annappareddy were based on fraud to governmental agencies, not private insurers. However, patient accounts of the exact type of fraud scheme reported by other witnesses, regardless of insurer, surely served as corroboration to investigations. Thus, Blomquist's testimony was relevant.

Just as with the investigative agents within this action, the court found Blomquist extremely credible.

12. Ernest McCray

Ernest McCray was another witness presented by Plaintiff on short notice. McCray served as a delivery driver for Pharmacare from 2009 until it closed in 2013. He testified generally about his role as a delivery driver, the use of delivery logs, and his relationship with Annappareddy. McCray averred Annappareddy was a good boss that never suggested McCray engage in any fraudulent activities. McCray also intimated that Ridolfi had racial bias against Indian employees given several racist remarks he had overheard her say.

Although he initially had only positive things to say about Annappareddy and their working relationship, McCray was readily impeached with his prior testimony before the grand jury. McCray admitted he thought Annappareddy was a jerk. When testifying before the grand jury, McCray stated that Annappareddy was so untrustworthy, McCray felt the need to wear a tape recorder when speaking with Annappareddy. Moreover, although McCray initially testified that Annappareddy was generally a good employer, McCray told the grand jury that Indian employees "can't take a piss without [Annappareddy's] permission." McCray also told the grand jury that Annappareddy had leverage over Indian employees given that Annappareddy was their visa sponsor. Given this conflicting testimony, McCray's trial testimony was given little to no weight.[26]

---

[26] McCray also offered additional evidence of post-indictment conversations he had with Lating and Mosley which became the subject of extended debate. Plaintiff insisted that such evidence was admissible under Federal Rule of Evidence 404(b). However, consistent with previous rulings which disallowed post-indictment evidence to show malice or probable cause, the court declined to consider such post-indictment statements. Regardless of whether the testimony had been allowed, McCray's assertions would have been given no weight when considering the vast inconsistencies exposed by the Government on cross-examination.

13. Jeremy Dykes

Jeremy Dykes was an Assistant Attorney General for the state of Maryland during the Pharmacare investigation. One of his responsibilities during the investigation was to gather data from state agencies that paid prescriptions claims filed by Pharmacare. He also assisted in collecting data from Maryland's managed care organizations ("MCOs").

The data that Dykes gathered was provided to Mosley who then passed it on to MEDIC. Dykes testified that Mosley was an honest and hard-working agent. Dykes reiterated that Mosley was not expected to perform any analysis of the data he gathered. Instead, Mosley merely served as a conduit passing information to MEDIC and everyone relied on MEDIC to analyze the data for integrity. Dykes also testified that after the team received MEDIC 1495, he used that data to create a spreadsheet which combined all nine Pharmacare locations so the team could analyze the data collectively.[27]

Dykes presented as a credible witness.

14.  William Fassett

Plaintiff presented Professor William Fassett as an expert in pharmacy operations. Although he had a knowledge of general pharmacy practices, he had no knowledge of the practices specific to Pharmacare. For instance, Fassett testified about pharmacy software, but was unaware of what type of software Pharmacare actually utilized within its various pharmacies. The bulk of Fasset's testimony centered on the fact that pharmacy software

---

[27] The Lating Affidavit included location specific numbers which were derived directly from MEDIC 1495 and also included aggregate totals which were derived from the analysis prepared by Jeremy Dykes.

generally allowed pharmacy personnel to print extra labels for prescriptions at any time for any reason.

Although seemingly credible, Fassett's opinions were of virtually no help in this matter.

### 15. Melissa Rapoza

Melissa Rapoza was a MEDIC employee tasked with performing the in-and-out analysis, also known as invoice reconciliations, during the Pharmacare investigation. Rapoza explained that MEDIC analysis compared invoices of medication purchases from various wholesalers to prescription drug event records. Rapoza worked with Mosley who provided data to MEDIC. Rapoza appeared credible.

### 16. Lori Cannata

Like Rapoza, Lori Cannata (previously Lori Gillin) was a MEDIC employee who worked on MEDIC 1495. Cannata, who worked under Rapoza during the relevant period, reiterated much of Rapoza's testimony. Specifically, Cannata recalls coordinating almost exclusively with Mosley when performing the requested in-and-out analysis on Pharmacare. Cannata explained that MADAP data was used in MEDIC 1495 and she had no knowledge that this data contained possibly duplicative claims information. Cannata averred that data sets that pose a risk of double counting should not be used in an invoice review. She too appeared credible.

### 17.  Sandra Wilkinson

Sandra Wilkinson was the lead federal prosecutor during the Pharmacare investigation and Annappareddy's criminal trial. Wilkinson confirmed that she relied on Lating to provide accurate information in the process of drafting and presenting the Lating Affidavit. She also testified that she relied on Mosley and believed he was telling the truth in his grand jury testimony. As with other members of the investigative team, Wilkinson testified that the investigation and drafting of the Lating Affidavit was a team effort that included collaborations by various agents and prosecutors through numerous drafts. She believed the Lating Affidavit was wholly supportive of probable cause.

Wilkinson expressed that she had no reason to doubt the credibility of Tokofsky or Ridolfi throughout the investigation because a vast majority of the information provided was corroborated by other sources.

The court found Wilkinson to be credible, but she offered little useful information over and above that provided by others.

### 18.  Catherine Pascale

Catherine Pascale worked as a prosecutor for the Maryland Attorney General's office in the early stages of the Pharmacare investigation. She became a Special United States Assistant Attorney once the investigation transitioned to the federal prosecutors. Pascale's testimony mirrored that provided by Wilkinson. Specifically, Pascale confirmed that she relied on Lating to provide accurate information in the process of drafting the

Lating Affidavit. Additionally, she trusted and relied on Mosley to provide accurate information throughout the investigation.

The court likewise found Pascale to be credible, but she offered little useful information over and above that provided by others.

### 19. Reddy Vijay Annappareddy

Plaintiff's final witness was Annappareddy himself. A significant portion of his testimony was irrelevant to the issues remaining in this case. For instance, Annappareddy recounted his childhood in India and described his extended family in great detail.

Additionally, much of Annappareddy's testimony was used to establish his claimed damages. Because the court finds that Plaintiff failed to prove his claims for malicious prosecution, the court declines to make any findings associated with damages.[28]

Essentially, Annappareddy testified that the entire Lating Affidavit was filled with lies and false statements fed to investigators by Tokofsky and Ridolfi all in an effort to get back at Annappareddy and get rich quick. Annappareddy painted Tokofsky as a jaded employee who quit before being fired because he could not accept constructive criticism. He described Ridolfi as an incompetent racist who needed cash amidst her divorce. According to Plaintiff, Tokofsky and Ridolfi ran to investigators seeking retribution against Annappareddy. Then, Lating and Mosley, eager to break a big case regardless of merit, threw caution and care to the wind in pursuit of meritless criminal charges against

---

[28] Both parties submitted additional expert reports and briefing on the issue of damages prior to trial. Because Plaintiff has failed to establish liability, the court declines to consider this additional damages information.

Annappareddy. Annappareddy further averred that these investigators then themselves manipulated data, ignored exculpatory evidence, recklessly passed on false information from witnesses, and then intentionally lied to prosecutors and the federal court ostensibly to win some mythical award. The record simply does not reflect such a scheme as described by Annappareddy.

The court had difficulty giving Annappareddy's testimony credence at any point. To state the obvious, Annappareddy had a significant financial incentive to give favorable testimony and harbored a substantial amount of animosity towards all members of the investigative team. However, certain portions of his testimony the court found overly concerning.

In one such instance, Annappareddy averred that Ridolfi had asked him to lie about her wages and hours of employment (fraudulently reducing her hours/wages) in an effort to minimize her financial status vis-á-vis that of her husband. This would allow her to get a more favorable determination in her ongoing divorce proceedings.[29] Annappareddy supported this testimony with an email from Ridolfi to Annappareddy. However, the email presented told a different story altogether. The email stated:

> Reddy,
>
> I have my divorce trial this week. I have to give them my pay stubs. I have a large number of checks where I got paid over 80 hrs because you guys needed me to work in Bel Air. But now my hours will be 80 or fewer. Is there

---

[29] Specifically, Annappareddy answered "yes" when asked if there was an instance "where Lisa Ridolfi asked you to help her sort of manipulate or seem to reduce her earnings for purposes of her getting a better deal in her divorce proceeding?"

any way you can write a letter explaining that the overtime was in the past and now the hours are a maximum of 80 but most likely less than 80.

    Lisa

(Pl. Ex. 173). [30]

The court finds that this email in no way supports Annappareddy's assertions that Ridolfi asked him to manipulate her income or falsify her wages in an effort to receive a better outcome in her divorce proceedings. Instead, this appears to be Ridolfi's effort to provide the court with a more accurate picture of her current and future financial status. Annappareddy's attempt to weaken Ridolfi's credibility based on this email falls flat and instead, causes this court to question the reliability of Annappareddy's version of events in all regards. Moreover, even though he used this email to characterize Ridolfi as a fraudster and a liar, Plaintiff went on to present an email sent just the next day wherein Ridolfi thanked Annappareddy for purchasing several iPads for Christmas gifts for her children. It strains credulity to argue an employer would purchase expensive gifts for an employee's children one day after being asked to aid that same employee in committing perjury and fraud before the court.

In all, the court found Annappareddy's version of events less credible than the competing versions offered by members of the investigative team, namely Mosley and Lating.

---

[30] This email was included with the 50,000 emails produced pursuant to a subpoena to Google. Plaintiff again argued that investigators should have known of this email and deduced Ridolfi was requesting Annappareddy's aid in her allegedly fraudulent endeavors despite its benign composition. The court finds this argument untenable.

## III.    CONCLUSIONS OF LAW

The two claims at issue in this trial are both for Maryland common law malicious prosecution against the Government pursuant to the FTCA. One claim seeks damages resulting from the search and seizures performed at Pharmacare pharmacies and the other seeks damages resulting from Annappareddy's criminal indictment. These claims can be adjudicated together as the facts and law applicable to each are virtually identical.[31]

A. <u>FTCA</u>

Under the FTCA, 28 U.S.C. §§ 1346(b), 2401(b), and 2671–2680, the United States is liable for personal injury caused by the negligent or wrongful act or omission of a federal employee under circumstances where the United States, if a private person, would be liable to the claimant according to the law of the place where the act or omission occurred.

Malicious prosecution claims are generally prohibited under the FTCA. *See* 28 U.S.C. § 2680(h). However, the FTCA provides a limited exception to this prohibition as it relates to "investigative or law enforcement officers . . . who [are] empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Plaintiff, therefore, has limited his malicious prosecution allegations to only those claims arising out of the conduct of agents Lating and Mosley.

These FTCA claims are governed by the law of Maryland, where the alleged tortious acts occurred. *Tinch v. United States*, 189 F. Supp. 2d 313, 317 (D. Md. 2002) (citing 28

---

[31] The Lating Affidavit was attached to the application for the search and seizure warrant and served as the outline for Mosley's testimony before the grand jury. Thus, the facts and circumstances underlying each claim are nearly indistinguishable.

U.S.C. §§ 1346(b); 2647). The elements of malicious prosecution under Maryland law are: (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) without probable cause; (3) with malice, or with a motive other than to bring the offender to justice; and (4) termination of the proceedings in favor of the plaintiff. *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000). The parties agree that Plaintiff can satisfy elements 1 and 4. Thus, the only issues that remain are (2) probable cause and (3) malice.[32]

B.  Probable Cause

The definition of probable cause for a malicious prosecution claim under Maryland law is the same as for a Fourth Amendment claim. *See DiPino v. Davis,* 729 A.2d 354, 358, 361, 366-68 (Md. 1999) (applying the Supreme Court's standard for "probable cause" under the Fourth Amendment to the plaintiff's Fourth Amendment claim and his malicious prosecution claim.). Therefore, as previously determined by this court, the standard elucidated in *Franks v. Delaware*, 438 U.S. 154 (1978)[33] is applicable in the probable cause determination, which is just one element of the Maryland tort of malicious prosecution. Accordingly, Maryland state law applies to Plaintiff's malicious prosecution claims and *Franks* serves a supplemental role in the probable cause analysis. All other elements of this tort, namely malice, remain essential to Plaintiff's claim.

---

[32] As noted several times throughout trial, Annappareddy's actual guilt or innocence of the crimes originally charged against him is irrelevant to these claims.

[33] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court developed a two-prong test clarifying what a criminal defendant must show when challenging the veracity of statements made in an affidavit supporting a search warrant. If both prongs are met, the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 155–56.

The first prong of the *Franks* test requires showing that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016). "Reckless disregard" means "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017).

The *Franks* test "applies not only to cases in which an agent includes affirmatively false statements in a warrant affidavit, but also when an agent omits relevant facts from the affidavit." *Lull*, 824 F.3d at 114 (citing *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)). A claim based on an omission requires showing that the agent "intentionally and/or recklessly omitted information that was material to the determination of probable cause." *Id.*

The second prong requires showing that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Lull*, 824 F.3d at 114. "To determine materiality, the Court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Humbert*, 866 F.3d at 556.

The term "probable cause" refers to "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. Defilippo,* 443 U.S. 31, 37 (1979); *see also DiPino v. Davis*, 354 Md. 18, 32, 729 A.2d 354, 361 (1999) (Probable cause "is defined in

terms of facts and circumstances sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.") (cleaned up). Probable cause is determined by considering "the totality of the circumstances." *Wadkins v. Arnold,* 214 F.3d 535, 539 (4th Cir. 2000). Probable cause "is a nontechnical conception of a reasonable ground for belief of guilt." *DiPino*, 354 Md. at 32, 729 A.2d at 361 (citations omitted).

Generally, in determining whether probable cause exists, a court should only consider the information actually presented to the magistrate judge during the warrant application process. *United States v. Lull*, 824 F.3d 109, 119 n.3 (4th Cir. 2016) (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004)); s*ee also Hassan v. Shams,* No. 1295 Sept. Term 2015, 2016 WL 3961198, at *7 (Md. Ct. Spec. App. July 20, 2016)("When determining the existence of probable cause for a malicious prosecution claim, 'the focus is on those facts known to, and genuinely believed by, the one initiating or continuing the prosecution when it is initiated or continued.'") (quoting *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 495, 471 A.2d 297, 302–03 (1984)).

To challenge probable cause, a plaintiff must present evidence showing a "deliberate falsehood or of reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Thus, Annappareddy must show more than "negligence or innocent mistake." *Id.*

C.  Malice

Maryland Courts define the element of malice required for malicious prosecution as "a wrongful or improper motive in initiating legal proceedings against the plaintiff." *Montgomery Ward v. Wilson*, 664 A.2d 916, 924 (Md. 1995). In the malicious prosecution

56

context, malice means "that the party was actuated by an improper motive, and proof of malice does not require evidence of spite, hatred, personal enmity or a desire for revenge." *Id.* at 925 (internal quotation omitted). "Mere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Id.* Further, Maryland courts have also held that "the 'malice' element of malicious prosecution may be inferred from a lack of probable cause." *Okwa v. Harper*, 360 Md. 161, 188, 757 A.2d 118, 133 (2000) (internal citations and quotations omitted).[34]

### D. Plaintiff's Contentions

As emphasized in closing arguments, Plaintiff's claims centered on five distinct areas of concern: (1) information provided by Tokofsky and Ridolfi; (2) use of a 14-day reversal window; (3) MEDIC transfer errors; (4) MEDIC double counting errors; and (5) information disregarded such as delivery logs, audio recordings, and un-interviewed witnesses. Plaintiff contends that probable cause is nonexistent when the Lating Affidavit omits false inculpatory information and includes material exculpatory information related to these specific areas. The court disagrees.

---

[34] The inference of malice that flows from lack of probable cause is permissive and not mandatory. *Montgomery Ward v. Wilson*, 339 Md. 701, 735, 664 A.2d 916, 933 (1995) ("Under certain circumstances, the validity of inferring a wrongful motive from lack of probable cause may be questionable. Since lack of probable cause to institute a prosecution might result from negligence, the lack of probable cause does not necessarily indicate a wrongful motive."); *Wesko v. G. E. M., Inc.*, 272 Md. 192, 197, 321 A.2d 529, 532 (1974) ("While malice can be inferred from want of probable cause, it is no more than a permissible inference, sometimes loosely characterized as prima facie evidence, subject to negation by proof that there was no actual malice on the defendant's part.") (internal citations omitted).

1.  Ridolfi and Tokofsky

Lating and Mosley did not recklessly or intentionally include materially false statements from Tokofsky or Ridolfi in the Affidavit. As detailed above, investigators believed Tokofsky and Ridolfi were reliable informants. This belief was bolstered by the use of various methods to corroborate the information provided by Tokofsky and Ridolfi. Those methods included: interviewing five other previous Pharmacare employees; interviewing pharmacists from other pharmacies; interviewing patients; obtaining paid claims data; conducting surveillance; performing trash pulls; and conducting mail covers. Each of these steps provided additional corroboration for the fraud scheme recounted by Tokofsky and Ridolfi.

Although Plaintiff attempted to show that Tokofsky and Ridolfi could not be trusted, investigators testified that they never thought Tokofsky or Ridolfi were lying to them or were otherwise unreliable. Plaintiff presented no credible evidence that Lating and Mosley ever entertained serious doubts as to the truth of the information provided. Moreover, the mountain of corroboration they unearthed proves that Lating and Mosley had no obvious reasons to doubt the accuracy of the information they reported and ultimately included in the Lating Affidavit.[35] Consequently, the court concludes that the information attributable to Tokofsky and Ridolfi was not improperly included in the Lating Affidavit.

---

[35] Even if Lating and Mosley had concerns as to Ridolfi and Tokofsky's reliability, a vast majority of the information in the Lating Affidavit was corroborated by independent sources. Accordingly, it still could have been included in the Lating Affidavit. *See United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) ("We therefore set aside the information provided *exclusively* by the informant and next consider whether the remaining information supports a finding of probable cause.") (emphasis added); *see also Illinois v. Gates*, 462 U.S. 213, 246 n.14 (1983) ("We have never

Thus, Plaintiff has failed to show that information provided by Tokofsky and Ridolfi should be excised from the Lating Affidavit.

### 2. 14-Day Standard

Plaintiff averred that any reference to a 14-day standard is a materially false assertion included in the Lating Affidavit because no such standard ever existed. The court disagrees. Every single witness, Annappareddy included, to speak on this subject outlined the 14-day rule as an industry standard which required pharmacy personnel to reverse the billing for any prescription more than 14 days old. The Lating Affidavit never represented that the 14-day period was a law. Instead, it merely represented the 14-day window as a requirement. (Lating Aff. ¶ 13)("If a customer does not pick up his/her prescription within 14 days, (i.e. fails to return to the pharmacy to pick up the medication), the pharmacy is required to reverse the transaction with the Prescription Insurance Program so that the Prescription Insurance Program does not pay a pharmacy for medications that were not dispensed to an insured."). Thus, inclusion of this reversal window was not a false statement recklessly included in the Affidavit.

Even if the Affidavit had included additional language to further clarify that a 14-day window was an "industry standard", the fact that evidence showed this standard was continually violated could reasonably support a suspicion of fraud.

---

required that informants used by the police be infallible."); *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996) (holding that it was reasonable to believe a witness when "many of the details of her statement were confirmed by disinterested observers" and "her account [was] consistent with [] eyewitness accounts.").

Moreover, evidence showed the existence of undelivered prescriptions much older than the legally required 60-day reversal period. This fact was also referenced in the Lating Affidavit. Thus, the Affidavit would still support probable cause even if the 14-day period were removed or replaced with a legally required 60-day period. Accordingly, the Lating Affidavit's reference to a 14-day period is not a material misrepresentation which would negate a finding of probable cause.

### 3.   MEDIC 1495 Inaccuracies

One of Plaintiff's largest qualms with MEDIC 1495 is that it performed a store-by-store analysis which failed to account for transfers. Although true, investigators went a step beyond MEDIC 1495 and aggregated totals to account for the possibility of transfers. Some of these totals were included in the Lating Affidavit. Additionally, Plaintiff takes issue with the double counting caused by inclusion of MADAP claims. However, Plaintiff fails to mention that MADAP claims could only cause duplication of HIV medications. MEDIC 1495 examined over 70 medications, of which only a fraction were HIV drugs.

The court acknowledges that MEDIC 1495 contained duplication errors and was far from telling the complete picture of Pharmacare's actual operation. However, there is no indication investigators were aware of the duplication inaccuracies in MEDIC 1495 prior to the criminal indictment. Plaintiff therefore failed to prove either Lating or Mosley entertained serious doubts as to the truth of MEDIC 1495 or had obvious reasons to doubt the accuracy of reports. Moreover, investigators knew that MEDIC 1495 was a preliminary

report they expected would change once all data was accounted for. The Lating Affidavit acknowledged this by stating that several data sources had yet to be included.

Furthermore, even if MEDIC 1495 had been corrected as Plaintiff and his expert suggest, some shortage for some medications would have been shown. This is reflected in the Affidavit's inclusion of Pharmacare's collective stocks of certain medications including Abilify and Liboderm. Any shortage, regardless of amount, associated cost, or type of medication, would be indicative of fraud and supportive of probable cause. Thus, the court cannot conclude that reliance on the figures in the MEDIC 1495 analysis constitutes the knowing inclusion of an erroneous material fact within the Lating Affidavit.

Additionally, all references to any supposed loss amounts can be excluded without consequence as loss was not an element of the crimes Annappareddy was charged with. Stated differently, the loss figures within the Affidavit were not material to a finding of probable cause.

Moreover, it appears that MEDIC 1495 as a whole, was ordered to allow investigators to quantify the amount of alleged fraud.[36] However, amount of loss or scale of fraud is not an element of the crimes alleged. Investigators were only required to show probable cause Annappareddy engaged in a scheme to defraud any health care benefit program in connection with the delivery of or payment for health care benefits items or services. 18 U.S.C. § 1347. Thus, the fraud scheme outlined in the Affidavit would have been supportive of probable cause without the use of any MEDIC analysis. In other words,

---

[36] Such an analysis would have no doubt played a much more significant role in the *qui tam* suit DiPietro and Mosley were also investigating.

the Lating Affidavit recounted a scheme to defraud the Government which was supported by evidence that medications were being billed for and not reversed. Photos, witness accounts, and claims data all supported these assertions. The specific instances of unreversed prescriptions in the Affidavit were indicative of fraud and would have associated losses by themselves. An in-and-out analysis was not needed to prove an element of fraud. It would only serve to elucidate its scale. Thus, reliance on MEDIC 1495, even if erroneous, was not material.

### 4.   Disregarded Evidence

Plaintiff finally argued that that investigators could have and should have performed additional investigation prior to finalizing the Lating Affidavit. Specifically, Plaintiff avers that investigators should have interviewed delivery drivers and Nevine Abdallah, a part-time Pharmacare employee who also worked as a fraud inspector for the state of Maryland. Plaintiff also averred that investigators should have procured delivery logs to confirm that prescriptions were in fact delivered to patients.

In making this argument, Plaintiff essentially argues that the Government performed an inadequate investigation by failing to fully exhaust every possible source of information prior to seeking a search warrant. But the law is clear that a potential criminal defendant is not entitled to a perfect investigation. *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) ("It will, of course, always be possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer

*might* have taken that *might* have shaken his belief in the existence of probable cause.") (emphasis in original).

The testimony presented at this trial made clear that investigators believed they had probable cause based on a wide variety of sources. Every witness that investigators chose to interview appeared to provide further corroboration of the purported fraud scheme. There is no requirement that law enforcement agents leave no stone unturned in a search for exculpatory information. *Smith v. Reddy*, 101 F.3d 351, 357 (4th Cir. 1996) (holding that a "failure to pursue the other suspect did not make it unreasonable for her to seek warrants" because "an officer's failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause.").

Investigators also explained that further investigative steps, such as choosing additional employees to interview, were narrowly tailored to maintain the covert nature of the investigation. Thus, failure to interview additional pharmacy employees or delivery drivers is not a material omission which would negate probable cause. *Torchinsky*, 101 F.3d at 263–64 ("There are also numerous reasons why a reasonable police officer might choose not to interview a suspect prior to arrest. For example, an officer might legitimately fear that questioning may alert a suspect that he is a target of an investigation, enabling him to destroy evidence or flee the jurisdiction before police have established probable cause for his arrest.").

Moreover, Plaintiff avers that the failure to reference the hours of audio recordings Ridolfi made along with the undercover operation's failure to produce inculpatory results at two Pharmacare locations amounts to a material omission. Here again, the court

63

disagrees. Recordings that encompass hours of seemingly normal communications do nothing to dispel the allegations of fraud. Investigators believed Annappareddy was utilizing a close cohort of Indian employees to bill for prescriptions and then refuse to effectuate proper reversals after they went undelivered. The fact that he chose not to admit such dealings in his conversations with Ridolfi can hardly be said to be exculpatory, let alone constitute a material omission to a probable cause determination.

Plaintiff also discussed the fact that the undercover operation revealed fraudulent activity at one location but produced no results in two other locations. The fact that two locations followed the law on these occasions in no way negates the failure to follow the law on a third occasion. A potential defendant is not allowed to offset criminal conduct with separate lawful actions. Accordingly, failure to outline each and every aspect of the undercover operation within the Lating Affidavit does not amount to a material omission. *See United States v. Lull*, 824 F.3d 109, 115 (4th Cir. 2016) ("An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.") (internal citations omitted).

In summation, the court does not find that Lating or Mosley intentionally or recklessly caused false material information to be included within the Lating Affidavit or presented to the grand jury. Additionally, the court concludes that Lating and Mosley did not intentionally or recklessly omit information that was material to the determination of probable cause. Therefore, probable cause existed to support both the search warrant and criminal indictment against Annappareddy. Because agents and prosecutors had probable cause, Plaintiff's claims for malicious prosecution fail.

E. Malice

Moreover, even if this court were to find that probable cause did not exist, the court finds no evidence of malice.[37] In the malicious prosecution context, malice is a primary purpose in instituting the proceeding other than that of bringing an offender to justice. *Montgomery Ward v. Wilson*, 339 Md. 701, 714, 664 A.2d 916, 922 (1995). Plaintiff averred that Lating and Mosley were motivated, not by a desire to bring a fraudster to justice, but by personal desires to win awards. The court finds absolutely no evidence that Lating and Mosley ever acted out of a personal desire to win some mythical award. Other than Plaintiff asking agents whether they could ever win awards for stopping a criminal prosecution, the was no mention of any award. This theory seems to have been completely manufactured in an effort to create the appearance of malice where none existed.

Additionally, there is no evidence that any investigative agent, including Mosley and Lating, had any knowledge of or experience with Annappareddy or Pharmacare prior to this investigation, let alone any evidence of ill-will. The record is simply devoid of any indication that Lating, an agent with 25 years of experience, and Mosley, an agent with 18 years of experience, ever acted for personal gain or for any reason other than to bring about justice.

For Plaintiff's theory to succeed, the court must believe that Ridolfi and Tokofsky, each motived by greed, racism, and retribution, individually lied to federal and state

---

[37] Although malice may be inferred from lack of probable cause, such a finding is merely permissive. *Wesko v. G. E. M., Inc.*, 272 Md. 192, 197, 321 A.2d 529, 532 (1974). The court would decline to infer malice in this instance even if probable cause were lacking.

investigators about a wide-ranging fraud scheme they concocted from whole cloth. The court must further find that those investigators knew of these lies and yet conspired amongst themselves to coordinate fictitious corroboration from paid claims data, fellow employees, outside pharmacists, and defrauded patients. After weaving such a wide conspiratorial web, those investigators then fabricated evidence, falsified data analyses, ignored exculpatory information, intentionally chose not to interview alleged co-conspirators, and lied to federal prosecutors. Moreover, the court must believe all of this was done for the mere chance of winning an undisclosed award. The evidence presented at trial revealed that this simply was not the case.

Investigators and prosecutors, including Agents Mosley and Lating, initiated a criminal investigation based upon reports of fraudulent activity. Thereafter, they undertook normal investigative steps in the pursuit of bringing an individual they had no prior knowledge of to justice for his role in the reported fraud. The team took painstaking efforts to verify, corroborate, and gather evidence of fraud.  Thereafter, they each contributed to the formulation of an affidavit over the course of several months and numerous drafts. At no point did any agent or prosecutor express any doubt that probable cause existed. Accordingly, this court finds the presence of probable cause and the absence of malice. Thus, Annappareddy's claims for malicious prosecution must fail.

## IV.   CONCLUSION

For all the reasons stated above, Plaintiff has failed to prove his claims for malicious prosecution. Accordingly, the claims against the Government are dismissed with prejudice.

Because there is no just reason for delay, the clerk is ordered to enter final judgment in favor of the Government. Fed. R. Civ. P. 54(b).

IT IS SO ORDERED.

August 3, 2023
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge